UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

CBF INDÚSTRIA DE GUSA S/A/, DA TERRA
SIDERÚRGICA LTDA, FERGUMAR - FERRO GUSA
DO MARANHÃO LTD, FERGUMINAS SIDERÚRGICA
LTDA, GUSA NORDESTE S/A, SIDEPAR -
SIDERÚRGICA DO PARÁ SA, and SIDERÚRGICA
UNIÃO S/A,



                    Plaintiffs,

                                        13 Civ. 2581 (RWS)

     - against -
                                            OPINION


AMCI HOLDINGS, INC., AMERICAN METALS &
COAL INTERNATIONAL, INC., K-M INVESTMENT
CORPORATION, PRIME CARBON GMBH,
PRIMETRADE, INC., HANS MENDE, and FRITZ
KUNDRUN


                    Defendants.

---------------------------------------X

A P P E A R A N C E S:

     Attorneys for the Plaintiffs

     NORTON ROSE FULBRIGHT
     666 Fifth Avenue
     New York, NY 10103
     By:  David L. Barrack, Esq.
          James Nespole, Esq.
          Jami Mills Vibbert, Esq.
          David B. Schwartz, Esq.


     Attorneys for the Defendants

     BUCHANAN INGERSOLL & ROONEY, P.C.
     1290 Avenue of the Americas, 30th Floor
     New York, NY 10104
     By:  Stuart P. Slotnick, Esq.

BUCHANAN INGERSOLL & ROONEY, P.C.
One Oxford Centre, 30th Floor
301 Grant Street
Pittsburg, PA 15219
By:  Kevin P. Lucas, Esq.
     Bruce A. Americus, Esq.
     Alexandra P. West, Esq.

**Sweet, D.J.**

Defendants AMCI Holdings, Inc. ("AMCI Holdings"), American Metals & Coal International, Inc. ("American Metals"), K-M Investment Corporation ("K-M"), Prime Carbon GMBH ("Prime Carbon"), Primetrade, Inc. ("Primetrade") (collectively, the "Corporate Defendants") and Hans Mende ("Mende") and Fritz Kundrun ("Kundrun") (collectively, the "Individual Defendants", and with the Corporate Defendants, the "Defendants") have moved pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure as well as under the doctrines of *forum non conveniens* and international comity abstention to dismiss the Complaint of Plaintiffs CBF Indústria de Gusa S/A ("CBF"), Da Terra Siderúrgica Ltda, Fergumar – Ferro Gusa Do Maranhão Ltda, Ferguminas Siderúrgica Ltda, Gusa Nordeste S/A, Sidepar - Siderúrgica Do Pará S/A ("Gusa") and Siderúrgica União S/A (collectively, "Plaintiffs")

For the reasons set forth below, Defendants' motion is dismissed in part and granted in part.

## I.  Prior Proceedings

This action was commenced on April 18, 2013 with

1

Plaintiffs' filing of the Complaint.   The Complaint seeks enforcement of an arbitral award pursuant to 9 U.S.C. § 207 and alleges fraud and conspiracy to defraud against all Defendants, constructive fraudulent transfer pursuant to N.Y. Debt. Cred. Law §§ 273-275 and 276 against Prime Carbon and AMCI Holdings and aiding and abetting fraudulent transfer against Mende and Primetrade.  (Compl. ¶¶ 100-03.)

The Defendants filed the instant motion to dismiss the Complaint on July 30, 2013.  Oral arguments were held, and the motion was marked fully submitted, on October 30, 2013.

## II.  <u>Allegations of the Complaint</u>

The following facts, assumed to be true, are taken from the Complaint.

The Complaint seeks to enforce a foreign arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") against the alleged alter egos and successor-in-interest to the award debtor, Steel Base Trade, AG ("SBT").  The foreign arbitration was conducted by the International Chamber of Commerce Paris ("ICC Paris") (the "ICC Arbitration") which issued an

2

arbitration award ("Award") in excess of $48 million in favor of Plaintiffs against SBT.  (Compl ¶ 1.)  The Complaint alleges that the Individual Defendants dominated and controlled the Corporate Defendants and fraudulently transferred the business, assets and most, but not all, of the liabilities of SBT to Prime Carbon, thereby rendering SBT insolvent and unable to satisfy the Award.  (*Id.*)  Plaintiffs allege this is not the first time the Individual Defendants had undergone a scheme to defraud creditors.

***Plaintiffs' Contracts With SBT***

Plaintiffs are companies organized under the laws of, and with their offices located in, Brazil, and they produce and supply pig iron, an intermediate metal made by smelting iron ore with a high-carbon fuel.  (Compl. ¶ 25.)  Pig iron can be further refined through melting and blending processes into steel or wrought iron.  (*Id.*)

Plaintiffs began selling pig iron to Primetrade AG, a Swiss company and predecessor to SBT, over fifteen years ago.  (*Id.* ¶ 26.)  Primetrade AG supplied a portion of this pig iron to its U.S. subsidiary, Primetrade.  (*Id.* ¶ 28.)

3

Primetrade AG became SBT in 2004 following an explosion on a bulk carrier carrying cargo for the benefit of Primetrade AG. On or about February 28, 2004, off the coast of Colombia, a bulk carrier, the YTHAN, exploded, causing the death of the master and five crew members of the vessel. (Compl. ¶ 29.) The YTHAN cargo was being supplied for the benefit of Primetrade AG. (*Id.*) Following the loss of life and cargo on the YTHAN, Primetrade AG transferred its business to SBT on or about April 6, 2005 and began operating with the same officers and directors as and at the same offices as Primetrade AG. (*Id.* ¶ 30.) At that time, Primetrade AG's representative in Brazil, Silvio Moreira ("Moreira") informed a representative of CBF and Gusa that Primetrade AG had to change its name due to its inability to obtain financing and otherwise continue its business following litigation arising out of the vessel explosion. (*Id.*) Moreira assured Plaintiffs that the business would be the same, just under a different name, and for some time Plaintiffs and SBT continued to contract for the sale of pig iron in the same manner as before. (*Id.*)

On or about October 5, 2007, AMCI International GmbH ("AMCI International"), a company owned and controlled by Mende and Kundrun, purchased SBT and its U.S. subsidiary, Primetrade USA. (Compl. ¶ 31.) Moreira, then an SBT employee, told a

4

representative of CBF and Gusa of the purchase.  (*Id.*)  Between
January 1, 2008 and September 17, 2008, Plaintiffs and SBT (now
owned by the "AMCI Family") entered into ten separate contracts
for the sale and purchase of 103,500 metric tons of pig iron to
SBT for total consideration to Plaintiffs of over $76 million
(the "Contracts").  (*Id.* ¶ 32.)  Only Plaintiffs and SBT are the
signatories of the Contracts, none of the Defendants are
signatories.  (*Id.* ¶ 34.)  Plaintiffs allege that four of the
ten Contracts provide for delivery of the pig iron in the United
States.  (*Id.* ¶ 35.)  The scheduled time of shipment of the pig
iron was from April 2008 through December 1, 2008.  (*Id.* ¶ 36.)

Each of the contracts contained the following
arbitration provision:

> All disputes arising in connection with the present
> contract shall be finally settled under the rules of
> Conciliation and Arbitration of the International
> Chamber of Commerce, Paris, by one or more arbiter,
> appointed in accordance with said rules.

(*Id.* ¶ 37.)

SBT initially purchased 33,056 metric tons of pig iron
under the Contracts.  However, after purchasing this amount the
market for pig iron fell, and SBT stopped its purchases.  (*Id.*

¶ 39.)   By October 2008, SBT was in default of the Contracts. (*Id.*)

When contacted by Plaintiffs regarding the default, Defendants stated in an e-mail dated November 20, 2008:

> You know our group and it is not our style to walk away from obligations. . . . We will need a long time to work this out together.  My message to your group is:  we are not walking away!!!

(Compl. ¶ 40.)  But after delivery of this e-mail, SBT continued to be in default and did not purchase any further pig iron. (*Id.* ¶ 41.)   Instead, SBT was purchasing pig iron from other suppliers at this time.  (*Id.*)

***Plaintiffs Initiate The ICC Arbitration***

On September 11, 2009, Plaintiffs sent notice to SBT regarding the outstanding amounts due and proposed a negotiation prior to submitting the dispute to the ICC Paris.  (*Id.* ¶ 42.) SBT requested an extension of time to respond to Plaintiffs' notice, purportedly to assess and evaluate the Contracts and related issues.  (*Id.* ¶ 43.)  Plaintiff agreed to extend SBT's time to respond to the notice until October 5, 2009.  (*Id.*

¶ 44.)   Unbeknownst to Plaintiffs, SBT was at the time unloading its assets, including its main asset Primetrade.   Business operations continued to proceed under Prime Carbon, another Mende- and Kundrun- controlled company.   The unloading of SBT assets caused SBT to become unable to pay Plaintiffs for its default of the Contracts.   (*Id.* ¶ 43.)

After the October 5, 2009 deadline passed, Plaintiffs filed a Request for Arbitration with the ICC Paris on November 16, 2009.   (Compl. ¶ 45.)   SBT sought to delay the ICC Arbitration by requesting an extension of time to answer the Request for Arbitration, which caused the ICC Paris to extend SBT's deadline to answer to January 27, 2010.   (*Id.* ¶ 46.)   SBT initially participated in and indicated its intent to defend on the merits the liability and damages claims asserted in the ICC Arbitration, and in January 2010, SBT filed an Answer to Plaintiffs' Request for Arbitration ("Arbitration Answer").   The Arbitration Answer asserted that Plaintiffs had temporarily stopped production of pig iron and accordingly "were not able to deliver [SBT] with pig iron" and that they "ha[d] not contacted [SBT] for one year as they knew that they could not fulfill their contractual obligation to [] deliver the agreed amount of pig iron to [SBT] due to a(n) (at least temporary) stop of or shortage in the production of pig iron."   (Award ¶ 13.)

As the ICC Arbitration continued, Prime Carbon made its first purchase of pig iron in the Brazilian market on January 11, 2010. (Compl. ¶ 47.) Concerned that this purchase represented an attempt by SBT to evade its obligations under the Contracts, Plaintiffs brought the information it had to the attention of the ICC Paris. On January 15, 2010, Plaintiffs sent a letter to the ICC Paris informing it that SBT may be transferring its business operations and assets to Prime Carbon and requested SBT provide a guarantee in the amount being sought in the arbitration. (*Id.* ¶ 48.) In the letter, Plaintiffs advised that: (i) Prime Carbon had the same address as AMCI International (SBT's parent); (ii) Mende (one of the ultimate owners of SBT) was the President of the Board of Directors of Prime Carbon; (iii) former directors of SBT were now directors of Prime Carbon; and (iv) SBT had discontinued its web site. (*Id.*)

On January 25, 2010, SBT responded to Plaintiffs' letter to ICC Paris:

> It is true that the website www.steelbasetrade.com was shut down at the beginning of January 2010[.] The reason is that the Respondent first has to analyze his position regarding pending or imminent claims for damages from purchasers as well as against suppliers

as well as his financial situation[.]  Therefore, the
Respondent has at least temporarily suspended his
business activities.   Please note, however, the
Respondent is still existing and has not resolved to
be dissolved and liquidated.

(Compl. ¶ 49.)

But despite its representation to the ICC Paris and
Plaintiffs in January 2010, SBT had earlier signed an agreement
transferring its business assets to Prime Carbon on December 27,
2009 (the "Transfer Agreement").   (*Id.* ¶ 50.)   SBT also sent
letters to various of its pig iron suppliers on January 18, 2010
(the "January 18, 2010 Letters") informing them that:  (i) as of
November 30, 2009, SBT had transferred "all Goods and the
respective title of the Goods" to Prime Carbon; (ii) Prime
Carbon was "the new and sole owner of the Goods"; (iii) Prime
Carbon "assumes all rights with respect to the transferred
Goods"; and (iv) Prime Carbon "is willing to enter into all
contracts between your company and [SBT] and to perform under
the same conditions."   (*Id.* ¶ 51.)   Additionally, the letters
advised the suppliers "to act from the time being only on
instruction of Prime Carbon" and that representatives of Prime
Carbon would be contacting the suppliers "within the next few
days."   (*Id.* ¶ 52.)   The letters were signed by Stephan Herzig
("Herzig"), the only remaining director of SBT on behalf of SBT;

9

Herzig would later become a director of Prime Carbon. (*Id.* ¶ 53.) Plaintiffs did not receive the January 18, 2010 Letters or any other communication from Prime Carbon. (*Id.* ¶ 55.)

The Transfer Agreement was signed by Herzig, for SBT, and Thomas Buerger ("Buerger"), a former director of SBT, director of Prime Carbon and the Chief Financial Officer of AMCI Capital at the time, who signed on behalf of Prime Carbon. (*Id.* ¶ 56.) SBT and Prime Carbon designated the Transfer Agreement as a "single entity succession." (*Id.*) It transferred $126 million in assets to Prime Carbon for $1, along with $130 million of liabilities. (*Id.* ¶ 57.) SBT's most valuable asset, Primetrade, SBT's U.S. subsidiary, was one of the assets transferred through a transfer of the 1,000 shares of Primetrade's Common Capital Stock to Prime Carbon. (*Id.*) Prime Carbon also assumed SBT's bank lines, presumably in order to continue its business; its insurance policies and physical assets, including cars and computers, were also transferred. (*Id.* ¶¶ 59-60.)

Five directors of SBT became directors of Prime Carbon. (*Id.* ¶ 64.) Prime Carbon also assumed ten of SBT's employment contracts. (*Id.*) Mende was the President of the Board of Directors of Prime Carbon and controlled Prime Carbon

10

during the transfer period; Prime Carbon was at all times
ultimately owned by Mende and Kundrun. (*Id.* ¶ 65.) Defendants
later caused Prime Carbon to transfer the shares of Primetrade
to AMCI Holdings, another U.S. company under the ownership and
control of Mende and Kundrun. (*Id.* ¶¶ 67, 68.) Plaintiffs
allege that this transfer was done to place jurisdictional
hurdles on any creditors from obtaining SBT's former assets.
(*Id.* ¶ 67.)

On or around April 28, 2010, SBT informed the Cantonal
Court of the Canton of Zug, Switzerland, of its insolvency.
(Compl. ¶ 74; Rüd Decl. ¶ 4 & Ex. 1, at A00001-A00011.) The
following day, April 30, 2010, the Cantonal Court of the Canton
of Zug declared SBT bankrupt. One day prior to the filing for
bankruptcy, April 28, 2010, SBT transferred CHF 15,000 to Prime
Carbon. (Compl. ¶ 75.) Neither SBT's minutes nor Prime
Carbon's minutes nor any transfer agreement explained this
transfer of money. (*Id.*) That same day, SBT, through its sole
director Herzig, passed a resolution providing that SBT would
deposit its balance sheet to the bankruptcy judge in
Switzerland. (Jörg Aff. ¶ 8.)

Subsequently, SBT, through the bankruptcy
administrator, sought a stay of the arbitration proceedings

11

pending before the ICC Paris on June 10, 2010. The ICC Paris did not rule on this request at that time. (Compl. ¶ 77.) The bankruptcy administrator renewed its request for a stay on December 15, 2010 to the tribunal in the ICC Arbitration ("ICC Tribunal"). (*Id.* ¶ 78.) SBT's bankruptcy administrator informed the ICC Tribunal that the bankruptcy estate and creditors did not wish to defend the claims in the ICC Arbitration (*id.*), as the bankruptcy administrator had determined that the estate did not have the funds to defend SBT or pay any potential award (Jörg Aff. ¶ 16; Rüd Decl. Ex. 6a at A00027.) Defendants contend that Swiss bankruptcy law precluded SBT from defending or continuing to defend against any claims that had been previously asserted against SBT, including the ICC Arbitration. (Def. Br. at 10.) Ultimately, the ICC Tribunal denied the stay request and moved forward with the arbitration.

With the denial of the stay request, the administrator pursuant to Swiss law asked SBT's creditors if they would like to proceed in the ICC Arbitration on SBT's behalf on February 23, 2011. (*See* Jörg Aff. ¶ 17; Rüd Decl. Ex. 6a at A00029.) None of SBT's creditors sought to defend SBT in the ICC Arbitration as no assets existed to distribute to creditors. (*See* Jörg Aff. ¶ 18.) As a result, the bankruptcy administrator admitted the claims against SBT by Plaintiffs in the ICC

12

Arbitration, as well as the damages sought by Plaintiffs in the amount of CHF 51,756,269.75. (Jörg Aff. ¶ 21; Rüd Decl. Ex. 8.) The Zug Bankruptcy Office also declined to defend against the approximately $4.0-$5.0 million claims of another SBT creditor, Progress Rail, in proceedings before the Cantonal Court of the Canton of Zug. (Def. Br. at 11.)[1]

Plaintiffs made several requests to the ICC Tribunal to take action with regards to SBT and its assets transferred to Prime Carbon throughout the arbitration. Plaintiffs submitted a June 23, 2010 petition for Interim or Conservatory Measures under Article 23 of the International Chamber of Commerce Rules ("ICC Rules") alleging wrongful asset transfers and requested the ICC Tribunal grant them relief allowing them to seize assets held either by SBT or in the name of Prime Carbon. (Award ¶ 22.) In follow-up correspondences and memorandums, Plaintiffs specifically requested that the ICC Tribunal "recognize the existence of fraudulent acts" as a basis upon which Plaintiffs might reach the assets of third parties (*id.* ¶ 25), "recognize as illegal the fraud perpetrated by [SBT], which shall then be

---

[1] Progress Rail commenced in September 2012 in Switzerland civil proceedings against former SBT director Herzig (the "Progress Rail Action"). (Def. Br. at 15.) The Progress Rail Action alleges that Herzig formulated a scheme to transfer the main part of the SBT business to Prime Carbon to avoid paying certain creditors of SBT and that the dividend of liquidation payments distributed to the creditors in the SBT bankruptcy would have been substantial if the asset transfer between SBT and Prime Carbon had not taken place. (*Id.* at 15.)

held liable, permitting Claimants to pursue its credits against [SBT's] shareholders and managers, by application of the disregard doctrine" (*id.* ¶ 26), "recognize these acts taken in the course of the procedure as frauds" (*id.* ¶ 35), and "to decide upon the interim measures which are necessary to make an upcoming award effective" (*id.* ¶ 36).   Plaintiffs also argued that it was "pursuing a reasonable relief by means of having their credit duly recognized, as well as the fraud carried out by [SBT] . . . so that they can pierce the corporate veil and make [SBT's] shareholders, directors and affiliated companies liable for the losses caused to [Plaintiffs]." (*Id.* ¶ 33.)   The ICC Tribunal considered Plaintiffs' allegations (*see id.* ¶ 28), and deferred resolution of these issues until the merits phase of the proceedings.

Following notice that SBT admitted the claims against it, on November 9, 2011 the ICC Tribunal rendered the Award in favor of Plaintiffs for $48,053,462.16 plus interest.   The Award also granted Plaintiffs' arbitration costs and legal fees in the amount of $360,000.   (Compl. ¶ 82.)   However, the Award did not grant Plaintiffs' requested relief vis-à-vis Prime Carbon or any of SBT's other affiliates, shareholders or directors, or relating to the alleged transfer of SBT's assets.   The Award held that Plaintiffs "[did] not introduce[] sufficient evidence

14

in the present proceedings to demonstrate the existence of fraud in the bankruptcy proceedings." (Award ¶ 47). The Award then dismissed those claims made by Plaintiffs. (*Id.* ¶ 49.)

Plaintiffs were unable to collect any money awarded under the Award against SBT due to the transfer of SBT's assets to Prime Carbon. (*Id.* ¶ 83.)

**Defendants' Alleged Pattern And Practice Of**
**Defrauding Contractual Partners**

According to the Complaint, the business model of Mende and Kundrun is to engage in beneficial transactions, breach unfavorable contracts when the market price changes and avoid creditors by moving assets away from indebted companies into new companies. (Compl. ¶ 85.) To do this, Mende and Kundrun form a number of corporate entities and promote them to the mining industry as part of the "AMCI Group" or "AMCI Family." (*Id.* ¶ 86.) The AMCI Family holds itself out as and operates as one family; several of the companies in the U.S. AMCI Family share the same office space. (*Id.*) Mende and Kundrun own and/or control all of the companies in the AMCI Family, either in their individual capacities or through corporate entities they dominate and control. (*Id.* ¶ 89.)

15

Plaintiffs contend the operations of the AMCI Family are carried out by Mende and Kundrun in New York, where they reside. (*Id.* ¶ 90.)   Several of the companies in the U.S. AMCI Family share office space in either Delaware or Connecticut. (*Id.* ¶ 90.)

Defendants Mende and Kundrun have carried out similar schemes against other companies.   In *Adani Exports Limited v. AMCI (Export) Corp., et al.*, No. 05-cv-0304 (W.D. Pa. 2006), the plaintiff, Adani Exports Limited ("Adani") entered into a contract with defendant AMCI Export Corporation ("AMCI Export"), and AMCI Export allegedly did not fulfill its contract obligations. (Compl. ¶ 101.)   Plaintiffs in *Adani* alleged that the defendants engaged in a scheme that transferred the coal-trading business and assets of AMCI Export to a different entity that had been formed by Mende, Kundrun and a third individual. (*Id.*)   The Honorable Terrence F. McVerry of the Western District of Pennsylvania denied all of defendants' motions to dismiss pursuant to Rule 12(b)(6), aside from dismissing one count against one defendant, and all motions for summary judgment to dismiss the complaint. *See Adani Exports Limited v. AMCI (Export) Corp.*, No. 05-cv-0304, 2006 WL 1785707 (W.D. Pa. June 26, 2006); 2006 WL 2924786 (W.D. Pa. Oct. 10, 2006); 2006 WL 2924783 (W.D. Pa. Oct. 10, 2006); 2007 WL 4298525 (W.D. Pa. Dec. 4, 2007).   The case did not reach the resolve the merits of the

allegations: the action was settled on the eve of trial.

**Plaintiffs' Swiss Action**

Defendants have noted that on June 12, 2012, Plaintiffs also commenced an action in Switzerland pursuing their direct claims for the damages Plaintiffs asserted in the ICC Arbitration and the SBT bankruptcy against various parties, including SBT directors, auditors and Defendants Mende and Prime Carbon (the "Swiss Action"). (Def. Br. at 16.) One of the claims in the Petition for Reconciliation was that Defendants Mende and Prime Carbon acted wrongfully by assisting in the transactions transferring certain assets and liabilities from SBT to Prime Carbon. (*Id.*) In the Swiss Action, Plaintiffs pursued their own direct claims and not SBT claims assigned to them by the Zug Bankruptcy Office. The reconciliation hearing for Plaintiffs' Swiss Action took place in Zug. The parties did not reach a settlement, and the magistrate granted leave to Plaintiffs to file the claim with the Cantonal Court of the Canton of Zug within three months. (Rüd Decl. ¶ 25 & Exs. 14 at A00095-A00097 & 15 at A00099-A00101.) Plaintiffs did not file a claim within that deadline, but are, according to Defendants, not precluded from bringing the same claim again. (Def. Br. at 17.)

17

## III. *The Applicable Standards*

Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08, empowers federal courts to enforce arbitral awards, such as this one, governed by the New York Convention. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 404 (2d Cir. 2009). When a party seeks confirmation of an arbitral award under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; *see Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005). "Article V of the Convention specifies seven exclusive grounds upon which courts may refuse to recognize an award." *Encyclopaedia Universalis*, 403 F.3d at 90. "The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." *Telenor*, 584 F.3d at 405 (citation omitted). "The burden is a heavy one, as the showing required to avoid summary confirmance is high." *Id.* (citation omitted).

"Given the strong public policy in favor of international arbitration, review of arbitral awards under the

New York Convention is 'very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Encyclopaedia Universalis,* 403 F.3d at 90 (quoting *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997) (additional internal citations omitted)); *accord Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir. 1997) ("The court's function in confirming or vacating an arbitration award is severely limited." (citation and alteration omitted)). However, "[a] petition to confirm an arbitral award is 'treated as akin to a motion for summary judgment.'" *STX Pan Ocean Shipping Co. Ltd. v. Progress Bulk Carriers Ltd.,* No. 12 Civ. 5388(RJS), 2013 WL 1385017, at *2 (S.D.N.Y. Mar. 14, 2013) (quoting *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 109 (2d Cir. 2006)).

A facially sufficient complaint may be "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). Once subject matter jurisdiction is challenged, the burden of establishing jurisdiction rests with the party asserting that it exists. *See*

19

*Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S. Ct. 673, 86 L. Ed. 951 (1942) (citations omitted).   The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that the court has subject matter jurisdiction. *See Makarova,* 201 F.3d at 113.

In addition, Rule 12(b)(2) requires that a court dismiss a claim if the court does not have personal jurisdiction over the defendant.   *See* Fed. R. Civ. P. 12(b)(2).   "To establish personal jurisdiction, [a plaintiff] must show that [the defendant] has minimum contacts with the forum state and was properly served."   *Salmassi e. Kfr. v. Euro-America Container Line Ltd.,* No. 08-4892, 2010 WL 2194827, at *4 (S.D.N.Y. June 1, 2010) (citations omitted).   Once a defendant has raised a jurisdictional defense on a Rule 12(b) motion to dismiss, the plaintiff bears the burden of establishing that the court has jurisdiction over a defendant.   *DiStefano v. Carozzi N. Am. Inc.,* 286 F.3d 81, 84 (2d Cir. 2001).

"[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."   *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted).   As such, a court may rely on evidence outside of the

20

pleadings, including declarations submitted in support of the motion and the records attached to these declarations. *See Makarova*, 201 F.3d at 113 ("In resolving a motion to dismiss . . . under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

Rule 12(b)(3) provides that a defendant may move to dismiss a complaint on the grounds of improper venue. *See* Fed. R. Civ. P. 12(b)(3). "[T]he burden of showing that venue in the forum district is proper falls on the plaintiff." *E.P.A ex rel. McKeown v. Port Auth. of N.Y. & N.J.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001). However, absent an evidentiary hearing, "'the plaintiff need only make a prima facie showing of [venue].'" *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir. 1986)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This is not intended to be an onerous burden, as

21

plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### Plaintiffs' First Cause Of Action Is Dismissed

Plaintiffs' First Cause of Action seeks enforcement of the Award based on alter ego and successor liability. Plaintiffs contend that this Court has subject matter jurisdiction pursuant to 9 U.S.C. § 203 (the FAA), 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1376 (supplemental jurisdiction). (Compl. ¶ 23.) The FAA does not "independently confer subject matter jurisdiction on the federal courts." *Scandinavian Reins. Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (quoting *Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 63 (2d Cir. 2009)). Unlike most federal laws, it requires "an independent basis of jurisdiction before a district court may entertain petitions." *Id.*

Section 203 of the FAA provides federal jurisdiction over actions to confirm or vacate an arbitral award that is governed by the New York Convention. *See* 9 U.S.C. § 203. A distinction exists between a court's powers under the New York

Convention when the court sits in primary jurisdiction versus secondary jurisdiction. "'[T]he country in which, or under the [arbitration] law of which, [an] award was made' is said to have primary jurisdiction over the arbitration award." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Nebara*, 335 F.3d 357, 364 (5th Cir. 2003)). Proceedings to modify a foreign arbitral award can only be brought in a court of primary jurisdiction, or the court in the state in which, or under the laws of which, the arbitration award was made. *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 ("The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."); *Daebo Int'l Shipping Co. v. Americas Bulk Transport (BVI) Ltd.*, No. 12 Civ. 4750(PAE), 2013 WL 2149591, at *6-7 (S.D.N.Y. May 17, 2013). Courts sitting in secondary jurisdiction, *i.e.*, "in a foreign state," "lack[] the ability to 'set aside or modify [the] award,' except based on the grounds set forth in the [New York] Convention." *Daebo Int'l Shipping Co.*, 2013 WL 2149591, at *6 (quoting *Yusuf*, 126 F.3d at 23). Instead, courts sitting in secondary jurisdiction may only enforce the arbitral award.

23

*Karaha Bodas*, 500 F.3d at 115 n.1 ("All other signatory States are secondary jurisdictions, in which parties can only contest whether that State should enforce the arbitral award."). "[W]hen an action for enforcement is brought in a foreign state [under secondary jurisdiction], the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23; New York Convention, Art. V(1)(e).

The Award was rendered in Paris, France, under French Law (Award ¶ 5); the Court thus sits in secondary jurisdiction. Accordingly, modification of the Award is not permissible. However, Plaintiffs contend that they seek not to modify the Award but to enforce it against the alter egos or successor-in-interests to SBT. *See, e.g.*, *Constellation Energy Commodities Group Inc. v. Transfield ER Cap Ltd.*, 801 F. Supp. 2d 211, 222-23 (S.D.N.Y. 2011) (in a confirmation proceeding, "a claim for piercing the corporate veil may be construed as a separate action and proceed against the relevant parties"); *Overseas Private Inv. Corp. v. Marine Shipping Corp.*, 02 Civ. 0475 (TPG), 2002 WL 31106349, at *3 (S.D.N.Y. Sept. 19, 2002) (allowing claim to pierce corporate veil on motion to confirm arbitration award because claim "will proceed in effect as a separate action" against the principal of the corporation who was also

24

named a defendant); *In re Arbitration Between Dist. 15, Int'l Assoc. of Machinists Aerospace Workers, AFL-CIO & Numberall Stamp & Tool Co.*, No. 85 Civ. 8561 (SWK), 1987 WL 19285, at *1 (S.D.N.Y. Oct. 28, 1987) (engaging in an alter-ego determination in a confirmation proceeding where all production facilities were transferred from one party to the other and the companies shared common officers).

There are few decisions in this circuit defining the scope of a court's discretion on veil-piercing or alter-ego claims seeking to hold a successor-in-interest liable in a New York Convention enforcement proceeding of a foreign arbitral award. Veil piercing is permissible against nonparties to arbitrations: the Second Circuit noted in *In re Arbitration Between Monegasque de Reassurances S.A. M. v. NAK Naftogaz of Ukr.*, 311 F.3d 488 (2d Cir. 2002), five theories for binding nonsignatories to arbitration agreements: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* at 495; *see also ThomsonCSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995). Those theories arise not out of the explicit language of the New York Convention, but "out of common law principles of contract and agency law." *Monegasque de Reassurances*, 311 F.3d at 495.

25

In *Daebo Int'l Shipping Co.*, 2013 WL 2149591, one of
the few cases that involved alter-ego claims against a nonparty
to a foreign arbitral award, plaintiff sought to confirm an
award rendered in London in favor of a defunct entity, Daebo
Shipping Co. ("Daebo Shipping").   *Id.* at *1.   During the
pendency of the arbitration, Daebo Shipping merged with Daebo
International Shipping Co., Ltd. ("Daebo International"), but
the merger was not brought to the arbitrators' attention during
the pendency of the arbitration.   *Id.* at *3 n.3.   Consequently,
the arbitral panel granted the award to the defunct Daebo
Shipping.   Daebo International moved the District Court to
confirm the award for Daebo International, not Daebo Shipping.
*Id.* at *1.   The *Daebo* court found that Daebo International was
seeking to modify the award on several grounds, including that
(1) the sole petitioner was not a party to the award; (2) the
arbitration agreement at issue did not contain a provision that
provided that any arbitration award would be "binding upon and
inure" to the parties and "their successors and assigns"; and
(3) Daebo International had asked the arbitration panel to
determine whether it was the successor to Daebo Shipping, but
the panel declined to make this finding.   *Id.* at *4-5.   Since
primary jurisdiction lays in England, modification was outside
the court's subject matter jurisdiction.   *Id.* at *5.

26

As an initial matter, *Daebo Int'l* involved a non-party plaintiff seeking to become a beneficiary party of an arbitral award. *Id.*, at *4. Such actions undoubtedly require modification, as only parties to an award, not nonparties, have the right to bring an action to confirm and enforce. *See* 9 U.S.C. § 207 ("any *party* to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award . . . .") (emphasis added); *Daebo Int'l*, 2013 WL 2149591, at *4. By contrast, Plaintiffs seek to find *the Defendants* as the successors and alter egos to the liable party in the Award. An alter ego determination is a finding of *legal* equivalence between the nonparty and party to an agreement or award. *See, e.g.*, *Local Union No. 38, Sheet Metal Workers' International Ass'n, AFL-CIO v. Custom*, 357 F.3d 266, 268 (2d Cir. 2004) ("A district court's independent determination of alter ego signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the [agreement]."). Such a legal finding is not an exercise of a court's modification powers, but a determination made as an extension of the court's grant of jurisdiction over enforcement.[2] *See, e.g.*, *Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46-47 (2d Cir. 1994)

---

[2] Thus, the fact that Contracts do not state that they or the arbitration provisions thereof are binding on successors and assigns is irrelevant to determining whether the Court has subject matter jurisdiction.

27

(holding that whether an arbitral award could be enforced against a successor-in-interest was appropriate in an action to confirm and enforce the award); *Constellation Energy*, 801 F. Supp. 2d at 222-23 (in a confirmation proceeding, "a claim for piercing the corporate veil may be construed as a separate action and proceed against the relevant parties"); *Overseas Private Inv. Corp.*, 2002 WL 31106349, at *3 (allowing claim to pierce corporate veil on motion to confirm arbitration award because claim "will proceed in effect as a separate action" against the principal of the corporation who was also named a defendant); *In re Arbitration Between Dist. 15, Int'l Assoc. of Machinists Aerospace Workers, AFL-CIO & Numberall Stamp & Tool Co.*, 1987 WL 19285, at *1 (engaging in an alter-ego determination in a confirmation proceeding where all production facilities were transferred from one party to the other and the companies shared common officers).   Determining alter-ego liability against a nonparty in an action brought by an award party is within the purview of a court sitting in secondary jurisdiction under the New York Convention as it is within the scope of an enforcement action.

However, courts generally must avoid complex factual determinations regarding alter-ego or successor-in-interest theories in confirmation actions. *Orion Shipping & Trading Co.*

28

*v. Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir. 1963); *see also Daebo*, 2013 WL 2149591, at \*4; *In re Arbitration between Promotora de Navegacion, S.A.*, 131 F. Supp. 2d 412, 421 (S.D.N.Y. 2000). Cases that present factually straightforward successor liability are exceptions and may be determined in the course of confirmation proceedings. *See Productos Mercantiles*, 23 F.3d at 46-47 (holding that whether an arbitral award could be enforced against a successor-in-interest was appropriate in an action to confirm and enforce the award); *Monegasque*, 311 F.3d at 495 ("We have recognized certain theories under which a non-signatory party may be bound by an arbitration agreement and thus subject to the jurisdiction of the court in proceedings to compel arbitration or confirm an arbitration award.").

Unsurprisingly, the parties disagree as to whether successor-in-interest or alter-ego determinations in this action are factually straightforward. Defendants contend that neither the alleged existence nor the identity of a successor to SBT can be determined by a factually simple and straightforward analysis, as Prime carbon did not acquire the stock of or merge with SBT. (Def. Br. at 28.) Moreover, the Contracts between Plaintiffs and SBT do not state that they or the arbitration provisions thereof are binding on successors and assigns. (*Id.* at 29.) Accordingly, Defendants contend that whether Prime

29

Carbon is a successor to SBT cannot be determined in a confirmation hearing. *See Orion*, 312 F.2d at 301. In opposition, Plaintiffs contend that finding Prime Carbon is a successor to SBT is factually straightforward given the overwhelming evidence alleged. (Opp. at 30.) Plaintiffs further maintain that *Orion* is not applicable here. (*Id.* at 28-30.)

In *Orion*, the Second Circuit analyzed whether an action for confirmation was the proper time for a District Court to pierce the corporate veil. 312 F.2d at 301. In deciding that it was not, the Circuit Court noted that confirmation actions are ones "where the judge's powers are narrowly circumscribed and best exercised with expedition." *Id.* Thus, "[i]t would unduly complicate and protract the proceeding were the court to be confronted with a potentially voluminous record setting out details of the corporate relationship between a party bound by an arbitration award and its purported 'alter ego.'" *Id.*

*Orion* involved a summary petition to confirm an arbitration award, which is, by its nature, an abbreviated procedure. 312 F.2d at 300-01. The Circuit Court's decision involved a proceeding to confirm an award under 9 U.S.C. § 9 and

not under 9 U.S.C. §207. *Id.* at 301. 9 U.S.C. § 9 is found under Chapter 1 of the FAA and differs from Chapter 2 of the FAA, which implements the New York Convention. *Compare* 9 U.S.C. §§ 1-16 *with* 9 U.S.C. §§ 201-208. This action, which raises considerations on the confirming and enforcing of foreign arbitral awards under the New York Convention, falls outside of the issues contemplated in *Orion* insofar as the Circuit Court's decision relies on the purview of 9 U.S.C. § 9.

However, the difference in the scope between 9 U.S.C. § 9 and 9 U.S.C. §207 is minimal. *Compare* 9 U.S.C. § 9 ("[A]ny party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected . . . .") *with* 9 U.S.C. § 207 ("[A]ny party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."); *see also In re Arbitration between Promotora de Navegacion, S.A.*, 131 F. Supp. 2d at 421-22 (applying *Orion* in an action seeking confirmation under 9 U.S.C. §§ 9 and 207). Plaintiffs' contention that *Orion* stands for the limited

31

proposition that in some circumstances, a court should manage its docket to promote the quick confirmation of an award (Opp. at 28-29), ignores *Orion*'s explicit language that confirmation proceedings are an inappropriate time at which to assert factually intensive theories of liability. *See Orion*, 312 F.2d at 301 ("[W]e hold that an action for confirmation is not the proper time for a District Court to 'pierce the corporate veil.'"). Thus, "[a] motion to confirm an arbitral award is generally an inappropriate occasion for a district court to consider an alter ego theory of liability." *In re Arbitration between Promotora de Navegacion, S.A.*, 131 F. Supp. 2d at 421.

Making an alter ego or successor-in-interest determination will not be a factually straightforward issue in this case. Plaintiffs note that SBT transferred its assets to Prime Carbon and made representations to other pig iron suppliers in the January 18, 2010 Letters that Prime Carbon was the successor to SBT and contend that the facts make this a straightforward inquiry. Moreover, Plaintiffs' allegation is not supported by any contractual provision or legal title. The arbitration agreement in the Contracts does not expressly provide that any award shall bind successors and assigns, and SBT the corporate entity was not bought by or merged with any of the Defendants. *See, e.g., Productos Mercantiles e*

32

*Industriales, S.A. v. Faberge USA, Inc.*, No. 92 CIV. 7916 (SWK), 1993 WL 362391, at *8 (S.D.N.Y. Sept. 14, 1993), *aff'd* 23 F.3d 41 (finding that a complex fact-finding inquiry as to successor-in-interest not necessary where agreement bound party as "successor and assigns").

Furthermore, successor liability in this case is factually complex, and significant evidentiary exploration will be needed in order to determine Plaintiffs' claims. Notably, the Complaint alleges that Prime Carbon's successor status is based not on acquisition of SBT's stock but rather on the transfer of SBT's assets and liabilities. (Compl. ¶¶ 57, 120-125.) More than $125 million in assets allegedly were involved as well as at least $130 million in consideration paid by means of Prime Carbon's alleged assumption of SBT's liabilities. (*Id.* ¶ 57.) The alleged assets transferred to Prime Carbon included shares owned by SBT in two other companies, one of which Prime Carbon did not retain. (*Id.* ¶¶ 57, 67.) The January 18, 2010 Letters names Prime Carbon as "the new and sole owner of the Goods" and "assumes all rights with respect to the transferred Goods," but also states that Prime Carbon "is willing to enter into all contracts between your company and [SBT] and to perform under the same conditions." (*Id.* ¶ 51.) The transaction was also supported by a third party fair value opinion. Both

33

Plaintiffs and Defendants contest many of these and other factual issues in the case. Given the level of complexity involved in both the facts and the legal issues surrounding whether such facts can support alter-ego or successor-in-interest determinations, a simple review of the transaction documents to determine the identity of a successor is not possible. Indeed, to the extent Plaintiffs are arguing for successor liability on a *de facto* merger theory, such an inquiry will be fact specific and complex. *See In re NYSE Specialists Litig.*, 405 F. Supp. 2d 281, 317 (S.D.N.Y. 2005), *aff'd in part, vacated in part on other grounds*, 503 F.3d 89 (2d Cir. 2007).

Plaintiffs attempt to sidestep the *Orion* problem by only seeking enforcement of the Award, claiming that the SBT bankruptcy proceeding confirmed the Award. Plaintiffs' claim against SBT was listed in the SBT bankruptcy administrator's inventory of claims for CHF 52,855,844.86 on March 29, 2011 (Jörg Aff. ¶ 19), whereby it allegedly became immediately enforceable by Plaintiffs (*id.* ¶ 20). Based on the recognition of Plaintiffs' claim, Plaintiffs received a certificate of loss ("Certificate of Loss"). (*Id.* ¶¶ 19-20.) Plaintiffs contend that the admitted claim functions as confirmation of the Award issued by the ICC Paris against the bankrupt company in Switzerland. (*Id.*) But the March 2011 recognition of

34

Plaintiffs' claim in the SBT bankruptcy preceded the November 2011 ICC Award by six full months. (*Compare* Rüd Decl. Ex. 8 *with* Award). In addition, the amounts are not the same, with Plaintiffs' claim recognized in the SBT bankruptcy in the amount of CHF 51,756,269.75 ($48,053,462.16) and the Award, which included interest, arbitration costs and legal fees, entered in the amount of $48,446.768. *Id.* Under Swiss law, according to Plaintiffs' affidavit, the recognition of a claim in bankruptcy merely "means that the bankruptcy administrator has accepted the claim of a creditor in the bankruptcy proceedings and listed the claim in the inventory of claims." (Jörg Decl. ¶ 19). Acceptance of a claim, however, is not the same as recognizing and confirming an arbitral award. Given these factors, the SBT bankruptcy administrator's inventory of Plaintiffs' claims against SBT and subsequent Certificate of Loss recognizes the ICC Arbitration, but does not constitute confirmation or recognition of the Award as contemplated under the New York Convention. *See* New York Convention, Art. I ("This Convention shall apply to the recognition and enforcement of *arbitral awards* . . . .") (emphasis added).

*Orion* does contemplate separate actions for the confirmation of an arbitral award and an enforcement action against an award debtor's alter egos. 312 F.2d at 301. *Orion*'s

35

dicta indicates that a finding of alter-ego theory in an enforcement action is not permissible on an unconfirmed arbitral award. The plaintiffs in the cases that found successor liability against an alter ego sought both confirmation and enforcement. *See, e.g.*, *Productos*, 1993 WL 362391, at *2 (seeking confirmation and enforcement); *Sea Eagle Maritime, Ltd. v. Hanan Int'l Inc.*, No. 84 Civ. 3210, 1985 WL 3828, at *1 (S.D.N.Y. Nov. 14, 1985) (same); *Monegasque*, 311 F.3d at 490 (same); *Overseas Private Inv. Corp.*, 2002 WL 31106349, at *1 (seeking only confirmation of an award). None of the cases sought only enforcement. Plaintiffs here have not sought confirmation of the Award in this proceeding, merely enforcement, presumably because of SBT's unavailability in this forum, and the Award itself has not been confirmed by any other court. (*See* Opp. at 3 ("Plaintiffs could not bring this action to confirm and enforce the award directly against SBT's alter egos in Switzerland.").)

Orion, in examining whether enforcement against alter egos is permissible in a confirmation proceeding, suggested that "an action to confirm the arbitrator's award cannot be employed as a substitute for either" an action against an alter ego as "guarantor" of an arbitral party's obligations or a separate action against the alter ego, under "'alter ego' theory." 312

36

F.2d at 301.  The *Orion* court indicates a contemplated alter-ego claim subsequent to a confirmation action.   If Plaintiffs were allowed to bring an enforcement action based on alter-ego theory without the confirmation of the Award in any court it would effectively act as a bypass on the recognition and enforcement scheme contemplated by the Second Circuit in *Orion*.   Plaintiffs' enforcement action may be permissible if the Award was confirmed in Switzerland or other court of competent jurisdiction.   Here the Award is unconfirmed, and Plaintiffs' enforcement claim and First Cause of Action is dismissed absent confirmation.[3]

***Plaintiffs' Second Through Sixth Causes Of Action Are Dismissed***

Defendants contend that, like the plaintiff in *Daebo*, Plaintiffs have collaterally attacked the Award and their claims must be denied as impermissible modification by this Court sitting in secondary jurisdiction.   According to the Defendants, the Plaintiffs raised issues of alter ego and

---

[3] Defendants have challenged this Court's personal jurisdiction over Prime Carbon.  (Def. Br. at 30.)   Personal jurisdiction over an entity may be predicated on personal jurisdiction over its alter ego.   *See, e.g.*, *Transfield ER Cape Ltd. v. Indus. Carriers Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) ("'alter egos are treated as one entity' for jurisdictional purposes") (citation omitted); *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 142-43 (2d Cir 1991 ("[I]f the plaintiffs in this case can prove the defendants are in fact the alter ego of Developers, defendants' jurisdiction objection evaporates because the previous judgment is then being enforced against entities who were, in essence, parties to the underlying dispute; the alter egos are treated as one entity.").   Thus, notwithstanding Defendants' argument, this Court does have personal jurisdiction over the Defendants if they are alter egos of Prime Carbon.

successor liability in the ICC Arbitration, as well as claims of
fraud. (Def Br. at 21-22.)  The Tribunal considered Plaintiffs'
allegations (see Award ¶ 28), but held that Plaintiffs "[did]
not introduce sufficient evidence . . . to demonstrate the
existence of a fraud in the bankruptcy proceedings" (id. ¶ 47).

Plaintiffs requested findings of *fraud and provisional
remedies* from the Tribunal. (See Award ¶¶ 22, 25, 26, 33, 35,
36.)  The only mention of alter ego liability came in
Plaintiffs' response to the bankruptcy office's second request
to stay the arbitration. (Id. ¶ 33.)  In that response,
Plaintiffs merely reiterated that receiving a timely and final
award against SBT was of the essence because the award would
allow Plaintiffs to seek relief against the nonparties that
rendered SBT assetless.  No actual requests for the Tribunal to
pierce the corporate veil or find alter-ego or successor-in-
interest liability were made.[4]  (Id.)

---

[4] The ICC Paris did not make any merits determinations regarding any interim
relief or provisional remedies sought by Plaintiffs.  Plaintiffs had sought
an order for documents and information regarding SBT's shareholders and
directors, which SBT assets "ha[d] been sold, donated or somehow transferred
to third parties after the date" the arbitration began, and "the list of
debts that caused [SBT] to enter into bankruptcy." (Palhares Decl. Ex. 3 at
10.)  Plaintiffs also requested that the ICC Paris preliminary recognize the
existence of a fraud in SBT's attempt to evade an award because "such
preliminary recognition" would allow Plaintiffs to bring actions in other
jurisdictions to attach SBT's assets. (Id. ¶ 8.)  In response, the ICC Paris
held an oral hearing on September 21, 2010, during which it recognized that
it would be unable to enter relief against any party allegedly holding SBT's
pig iron because such entities were not parties to the arbitration. (Id.
¶ 9.)  The ICC Paris, by order, did grant Plaintiffs the right to obtain the
information it requested from SBT. (Id. ¶ 10 & Ex. 4 at 2.)  SBT never

As noted above, this Court sits in secondary jurisdiction and cannot modify the Award. Plaintiffs' Second, Third, Fourth, Fifth and Sixth Causes of Action allege fraud and seek a remedy previously sought by Plaintiffs in the ICC Arbitration. These claims are therefore barred. *See National Football League Players Ass'n v. National Football League Management Council*, 523 Fed. App'x 756, 760-61 (where arbitrator expressly declined to address whether contractual provision preempts state law claims, district court was not authorized to resolve the preemption issue in proceeding to enforce the arbitration award); *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) ("In the context of an arbitration, the judgment to be enforced encompasses the terms of the confirmed arbitration awards and may not enlarge upon those terms.").

Defendants' insistence of the applicability of *Daebo* to all of Plaintiffs' claims, which based its holdings partially on the fact that the arbitral panel there rejected the plaintiff's request, is incorrect as to the First Cause of Action as it seeks a remedy, enforcement, that Plaintiffs did not request in the ICC Arbitration. Thus, Plaintiffs' enforcement claim is not barred by its previous requests for

complied with this Order, and Plaintiffs were unable to obtain the information. (*Id.* ¶ 11.)

findings of fraud by the Tribunal, although the First Cause of Action is dismissed on other grounds.   However, given the Plaintiffs' attempts at raising fraud as an issue before the ICC Tribunal, Plaintiffs' Second through Sixth Causes of Action are dismissed.

### *Due Process, Forum Non Conveniens And International Comity Considerations*

As concluded above, Plaintiffs' First Cause of Action seeking enforcement against alter ego and Second through Sixth Causes of Action alleging fraud are dismissed.   That dismissal obviates the need to determine the due process, *forum non conveniens* and international comity issues raised in Defendants' motion to dismiss.

40

## IV.  Conclusion

Based on the conclusions set forth above, the Defendants' motion to dismiss the Complaint is granted and the Complaint is dismissed.  Plaintiffs are granted leave to replead within twenty days.

It is so ordered.

New York, NY
April  9  , 2014

_____
ROBERT W. SWEET

41