UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

CBF INDÚSTRIA DE GUSA S/A/, DA TERRA
SIDERÚRGICA LTDA, FERGUMAR – FERRO GUSA
DO MARANHÃO LTD, FERGUMINAS SIDERÚRGICA
LTDA, GUSA NORDESTE S/A, SIDEPAR –
SIDERÚRGICA DO PARÁ SA, and SIDERÚRGICA
UNIÃO S/A,

                    Plaintiffs,

         - against -

AMCI HOLDINGS, INC., AMERICAN METALS
& COAL INTERNATIONAL, INC., K-M
INVESTMENT CORPORATION, PRIME CARBON
GMBH, PRIMETRADE, INC., HANS MENDE, and
FRITZ KUNDRUN,

                    Defendants.

----------------------------------------X



13 Civ. 2581(RWS)

OPINION

A P P E A R A N C E S:

    Attorneys for the Plaintiffs

    NORTON ROSE FULBRIGHT
    666 Fifth Avenue
    New York, NY 10103
    By:  David L. Barrack, Esq.
         James Nespole, Esq.
         Jami Mills Vibbert, Esq.
         David B. Schwartz, Esq.

    Attorneys for the Defendants

    BUCHANAN INGERSOLL & ROONEY, P.C.
    1290 Avenue of the Americas, 30th Floor
    New York, NY 10104
    By:  Stuart P. Slotnick, Esq.

BUCHANAN INGERSOLL & ROONEY, P.C.
One Oxford Centre, 30th Floor
301 Grant Street
Pittsburg, PA 15219
By:  Kevin P. Lucas, Esq.
     Bruce A. Americus, Esq.
     Alexandra P. West, Esq.

**Sweet, D.J.**

Defendants AMCI Holdings, Inc. ("AMCI Holdings"), American Metals & Coal International, Inc. ("American Metals"), K-M Investment Corporation ("K-M"), Prime Carbon GMBH ("Prime Carbon"), Primetrade, Inc. ("Primetrade") (collectively, the "Non-SBT Corporate Defendants"), and Hans Mende ("Mende") and Fritz Kundrun ("Kundrun") (collectively, the "Individual Defendants," and together with the Non-SBT Corporate Defendants, "Defendants") have moved pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil Procedure as well as under the doctrines of forum non conveniens and international comity abstention to dismiss the Amended Complaint ("AC") of Plaintiffs CBF Indústria de Gusa S/A ("CBF"), Da Terra Siderúrgica Ltda, Fergumar - Ferro Gusa Do Maranhão Ltda, Ferguminas Siderúrgica Ltda, Gusa Nordeste S/A, Sidepar - Siderúrgica Do Pará S/A ("Gusa") and Siderúrgica União S/A (collectively, "Plaintiffs"). Plaintiffs have moved to stay this case.

For the reasons set forth below, Defendants' motion is granted and Plaintiffs' motion is denied.

## I.   **Prior Proceedings**

Plaintiffs filed an initial complaint in this action (the "Enforcement Action" or "EA") on April 18, 2013.  Upon Defendants' motion to dismiss, the EA complaint was dismissed with leave to replead on April 9, 2014.  CBF Industria de Gusa S/A/ v. AMCI Holdings, Inc., 14 F.Supp.3d 463 (S.D.N.Y. 2014).

On April 29, 2014, Plaintiffs filed an amended complaint ("AC") in Enforcement Action.  On the same date, Plaintiffs also initiated a separate action under caption CBF Industria De Gusa S/A v. Steel Base Trade AG, 14 Civ. 3034 (the "Confirmation Action").   The Confirmation Action has been recently dismissed.

Plaintiffs made a motion to stay the Enforcement Action on May 9, 2014 and Defendants filed a motion to dismiss the EAAC on July 22, 2014.  Oral argument with respect to both of those motions was heard, and the motion was marked fully submitted, on October 8, 2014.

## II.  **Allegations of the Complaint**

The EAAC's allegations largely track those of the

2

original complaint in the Enforcement Action. Compare Compl. dated April 18, 2013 with AC dated April 29, 2014. The following facts, assumed to be true, are taken from the AC:

Plaintiffs seek to enforce a foreign arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") against the alleged alter egos and successor-in-interest to the award debtor SBT. The foreign arbitration was conducted by the International Chamber of Commerce Paris ("Arbitral Tribunal" or "Tribunal") which issued an arbitration award ("Award") in excess of $48 million in favor of Plaintiffs against SBT. (AC ¶ 1.) The Complaint alleges that the Individual Defendants dominated and controlled the Non-SBT Corporate Defendants and fraudulently transferred the business, assets and most, but not all, of the liabilities of SBT to Prime Carbon, thereby rendering SBT insolvent and unable to satisfy the Award. (Id.) Plaintiffs allege this is not the first time the Individual Defendants had undergone a scheme to defraud creditors.

**Plaintiffs' Contracts With SBT**

Plaintiffs are companies organized under the laws of, and with their offices located in, Brazil, and they produce and

3

supply pig iron, an intermediate metal made by smelting iron ore with a high-carbon fuel. (AC ¶ 10-16, 27.) Pig iron can be further refined through melting and blending processes into steel or wrought iron. (Id. ¶ 27.)

Plaintiffs began selling pig iron to Primetrade AG, a Swiss company and predecessor to SBT, over fifteen years ago. (Id. ¶ 28.) Primetrade AG supplied a portion of this pig iron to its U.S. subsidiary, Primetrade. (Id. ¶ 30.)

Primetrade AG became SBT in 2004 following an explosion on a bulk carrier carrying cargo for the benefit of Primetrade AG. On or about February 28, 2004, off the coast of Colombia, a bulk carrier, the YTHAN, exploded, causing the death of the master and five crew members of the vessel. (Id. ¶ 31.) The YTHAN cargo was being supplied for the benefit of Primetrade AG. (Id.) Following the loss of life and cargo on the YTHAN, Primetrade AG transferred its business to SBT on or about April 6, 2005 and began operating with the same officers and directors as and at the same offices as Primetrade AG. (Id. ¶ 32.) At that time, Primetrade AG's representative in Brazil, Silvio Moreira ("Moreira") informed a representative of CBF and Gusa that Primetrade AG had to change its name due to its inability to obtain financing and otherwise continue its business

4

following litigation arising out of the vessel explosion.  (Id.)
Moreira assured Plaintiffs that the business would be the same,
just under a different name, and for some time Plaintiffs and
SBT continued to contract for the sale of pig iron in the same
manner as before.  (Id.)

On or about October 5, 2007, AMCI International GmbH
("AMCI International"), a company owned and controlled by Mende
and Kundrun, purchased SBT and its U.S. subsidiary, Primetrade
USA.  (Id. ¶ 33.)   Moreira, then an SBT employee, told a
representative of CBF and Gusa of the purchase.  (Id.)  Between
January 1, 2008 and September 17, 2008, Plaintiffs and SBT (now
owned by the "AMCI Family") entered into ten separate contracts
for the sale and purchase of 103,500 metric tons of pig iron to
SBT for total consideration to Plaintiffs of over $76 million
(the "Contracts").  (Id. ¶ 34.)   Only Plaintiffs and SBT are the
signatories of the Contracts, none of the Defendants are
signatories.  (Id. ¶ 36.)   Plaintiffs allege that four of the
ten Contracts provide for delivery of the pig iron in the United
States.  (Id. ¶ 37.)   The scheduled time of shipment of the pig
iron was from April 2008 through December 1, 2008.  (Id. ¶ 38.)

Each of the contracts contained the following
arbitration provision:

> All disputes arising in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, Paris, by one or more arbiter, appointed in accordance with said rules.

(Id. ¶ 39.)

SBT initially purchased 33,056 metric tons of pig iron under the Contracts. (Id. ¶ 41.) However, after purchasing this amount, SBT stopped its purchases. (Id.) By October 2008, SBT was in default of the Contracts. (Id.)

When contacted by Plaintiffs regarding the default, Defendants stated in an e-mail dated November 20, 2008:

> You know our group and it is not our style to walk away from obligations. . . . We will need a long time to work this out together.  My message to your group is:  we are not walking away!!!

(Id. ¶ 42.) But after delivery of this e-mail, SBT continued to be in default and did not purchase any further pig iron. (Id. ¶ 43) Instead, SBT was purchasing pig iron from other suppliers at this time. (Id.)

6

**Plaintiffs Initiate The ICC Arbitration**

On September 11, 2009, Plaintiffs sent notice to SBT regarding the outstanding amounts due and proposed a negotiation prior to submitting the dispute to the ICC Paris.  (Id. ¶ 44.) SBT requested an extension of time to respond to Plaintiffs' notice, purportedly to assess and evaluate the Contracts and related issues.  (Id. ¶ 45.)  Plaintiff agreed to extend SBT's time to respond to the notice until October 5, 2009.  (Id. ¶ 46.)  Unbeknownst to Plaintiffs, SBT was at the time unloading its assets, including its main asset Primetrade.  Business operations continued to proceed under Prime Carbon, another Mende- and Kundrun-controlled company.  The unloading of SBT assets caused SBT to become unable to pay Plaintiffs for its default of the Contracts.  (Id. ¶ 45.)

After the October 5, 2009 deadline passed, Plaintiffs filed a Request for Arbitration with the ICC Paris on November 16, 2009.  (Id. ¶ 47.)  SBT sought to delay the ICC Arbitration by requesting an extension of time to answer the Request for Arbitration, which caused the ICC Paris to extend SBT's deadline to answer to January 27, 2010.  (Id. ¶ 48.)  SBT initially participated in and indicated its intent to defend on the merits the liability and damages claims asserted in the ICC

Arbitration, and in January 2010, SBT filed an Answer to
Plaintiffs' Request for Arbitration ("Arbitration Answer"). The
Arbitration Answer asserted that Plaintiffs had temporarily
stopped production of pig iron and accordingly "were not able to
deliver [SBT] with pig iron" and that they "ha[d] not contacted
[SBT] for one year as they knew that they could not fulfill
their contractual obligation to [] deliver the agreed amount of
pig iron to [SBT] due to a(n) (at least temporary) stop of or
shortage in the production of pig iron." (Award ¶ 13.)

As the ICC Arbitration continued, Prime Carbon made
its first purchase of pig iron in the Brazilian market on
January 11, 2010. (Id. ¶ 49.) Concerned that this purchase
represented an attempt by SBT to evade its obligations under the
Contracts, Plaintiffs brought the information it had to the
attention of the ICC Paris. On January 15, 2010, Plaintiffs
sent a letter to the ICC Paris informing it that SBT may be
transferring its business operations and assets to Prime Carbon
and requested SBT provide a guarantee in the amount being sought
in the arbitration. (Id. ¶ 50.) In the letter, Plaintiffs
advised that: (i) Prime Carbon had the same address as AMCI
International (SBT's parent); (ii) Mende (one of the ultimate
owners of SBT) was the President of the Board of Directors of
Prime Carbon; (iii) former directors of SBT were now directors

8

of Prime Carbon; and (iv) SBT had discontinued its web site.
(Id.)

On January 25, 2010, SBT responded to Plaintiffs'
letter to ICC Paris:

> It is true that the website www.steelbasetrade.com was
> shut down at the beginning of January 2010[.]   The
> reason is that the Respondent first has to analyze his
> position regarding pending or imminent claims for
> damages from purchasers as well as against suppliers
> as well as his financial situation[.]   Therefore, the
> Respondent has at least temporarily suspended his
> business activities.   Please note, however, the
> Respondent is still existing and has not resolved to
> be dissolved and liquidated.

(Id. ¶ 51.)

But despite its representation to the ICC Paris and
Plaintiffs in January 2010, SBT had earlier signed an agreement
transferring its business assets to Prime Carbon on December 27,
2009 (the "Transfer Agreement").   (Id. ¶ 52.)   SBT also sent
letters to various of its pig iron suppliers on January 18, 2010
(the "January 18, 2010 Letters") informing them that:  (i) as of
November 30, 2009, SBT had transferred "all Goods and the
respective title of the Goods" to Prime Carbon; (ii) Prime
Carbon was "the new and sole owner of the Goods"; (iii) Prime
Carbon "assumes all rights with respect to the transferred

Goods"; and (iv) Prime Carbon "is willing to enter into all contracts between your company and [SBT] and to perform under the same conditions." (Id. ¶ 53.) Additionally, the letters advised the suppliers "to act from the time being only on instruction of Prime Carbon" and that representatives of Prime Carbon would be contacting the suppliers "within the next few days." (Id. ¶ 54.) The letters were signed by Stephan Herzig ("Herzig"), the only remaining director of SBT on behalf of SBT; Herzig would later become a director of Prime Carbon. (Id. ¶ 55.) Plaintiffs did not receive the January 18, 2010 Letters or any other communication from Prime Carbon. (Id. ¶ 57.)

The Transfer Agreement was signed by Herzig, for SBT, and Thomas Buerger ("Buerger"), a former director of SBT, director of Prime Carbon and the Chief Financial Officer of AMCI Capital at the time, who signed on behalf of Prime Carbon. (Id. ¶ 58.) SBT and Prime Carbon designated the Transfer Agreement as a "single entity succession." (Id.) It transferred $126 million in assets to Prime Carbon for $1, along with $130 million of liabilities. (Id. ¶ 59.) SBT's most valuable asset, Primetrade, SBT's U.S. subsidiary, was one of the assets transferred through a transfer of the 1,000 shares of Primetrade's Common Capital Stock to Prime Carbon. (Id.) Prime Carbon also assumed SBT's bank lines, presumably in order to

10

continue its business; its insurance policies and physical assets, including cars and computers, were also transferred. (Id. ¶¶ 61-62.)

Five directors of SBT became directors of Prime Carbon. (Id. ¶ 66.) Prime Carbon also assumed ten of SBT's employment contracts. (Id.) Mende was the President of the Board of Directors of Prime Carbon and controlled Prime Carbon during the transfer period; Prime Carbon was at all times ultimately owned by Mende and Kundrun. (Id. ¶ 67.) Defendants later caused Prime Carbon to transfer the shares of Primetrade to AMCI Holdings, another U.S. company under the ownership and control of Mende and Kundrun. (Id. ¶¶ 69-70.)

SBT filed for bankruptcy on April 29, 2010 in the Cantonal Court of the Canton of Zug. One day prior to the filing for bankruptcy, April 28, 2010, SBT transferred CHF 15,000 to Prime Carbon. (Id. ¶ 78.) Neither SBT's minutes nor Prime Carbon's minutes nor any transfer agreement explained this transfer of money. (Id.) That same day, SBT, through its sole director Herzig, passed a resolution providing that SBT would deposit its balance sheet to the bankruptcy judge in Switzerland. (Id. ¶ 77.)

Subsequently, SBT, through the bankruptcy administrator, sought a stay of the arbitration proceedings pending before the ICC Paris on June 10, 2010. (Id. ¶ 80.) The ICC Paris did not rule on this request at that time. (Id.) The bankruptcy administrator renewed its request for a stay on December 15, 2010 to the tribunal in the ICC Arbitration ("ICC Tribunal"). (Id. ¶ 81.) SBT's bankruptcy administrator informed the ICC Tribunal that the bankruptcy estate and creditors did not wish to defend the claims in the ICC Arbitration, as the bankruptcy administrator had determined that the estate did not have the funds to defend SBT or pay any potential award. (Id. ¶ 83.)

The administrator pursuant to Swiss law then asked SBT's creditors if they would like to proceed in the ICC Arbitration on SBT's behalf on February 23, 2011. (Id. ¶ 84.) None of SBT's creditors sought to defend SBT in the ICC Arbitration as no assets existed to distribute to creditors. (Id. ¶ 85.) As a result, the bankruptcy administrator admitted the claims against SBT by Plaintiffs in the ICC Arbitration, as well as the damages sought by Plaintiffs in the amount of CHF 51,756,269.75. (Id. ¶ 87.)

Plaintiffs made several requests to the ICC Tribunal

12

to take action with regards to SBT and its assets transferred to Prime Carbon throughout the arbitration.  Plaintiffs submitted a June 23, 2010 petition for Interim or Conservatory Measures under Article 23 of the International Chamber of Commerce Rules ("ICC Rules") alleging wrongful asset transfers and requested the ICC Tribunal grant them relief allowing them to seize assets held either by SBT or in the name of Prime Carbon.  (Award ¶ 22.)  In follow-up correspondences and memorandums, Plaintiffs specifically requested that the ICC Tribunal "recognize the existence of fraudulent acts" as a basis upon which Plaintiffs might reach the assets of third parties (id. ¶ 25), "recognize as illegal the fraud perpetrated by [SBT], which shall then be held liable, permitting Claimants to pursue its credits against [SBT's] shareholders and managers, by application of the disregard doctrine" (id. ¶ 26), "recognize these acts taken in the course of the procedure as frauds" (id. ¶ 35), and "to decide upon the interim measures which are necessary to make an upcoming award effective" (id. ¶ 36).  Plaintiffs also argued that it was "pursuing a reasonable relief by means of having their credit duly recognized, as well as the fraud carried out by [SBT] . . . so that they can pierce the corporate veil and make [SBT's] shareholders, directors and affiliated companies liable for the losses caused to [Plaintiffs]."  (Id. ¶ 33.)  The ICC Tribunal considered Plaintiffs' allegations (see id. ¶ 28),

13

and deferred resolution of these issues until the merits phase of the proceedings.

Following notice that SBT admitted the claims against it, on November 9, 2011 the ICC Tribunal rendered the Award in favor of Plaintiffs for $48,053,462.16 plus interest. The Award also granted Plaintiffs' arbitration costs and legal fees in the amount of $360,000. (AC ¶ 90.) However, the Award did not grant Plaintiffs' requested relief vis-à-vis Prime Carbon or any of SBT's other affiliates, shareholders or directors, or relating to the alleged transfer of SBT's assets. The Award held that Plaintiffs "[did] not introduce[] sufficient evidence in the present proceedings to demonstrate the existence of fraud in the bankruptcy proceedings." (Award ¶ 47). The Award then dismissed those claims made by Plaintiffs. (Id. ¶ 49.)

Plaintiffs were unable to collect any money awarded under the Award against SBT due to the transfer of SBT's assets to Prime Carbon. (AC ¶ 91.)

**_Defendants' Alleged Pattern And Practice Of Defrauding Contractual Partners_**

According to the Complaint, the business model of

Mende and Kundrun is to engage in beneficial transactions, breach unfavorable contracts when the market price changes and avoid creditors by moving assets away from indebted companies into new companies. (Id. ¶ 93.) To do this, Mende and Kundrun form a number of corporate entities and promote them to the mining industry as part of the "AMCI Group" or "AMCI Family." (Id. ¶ 94.) The AMCI Family holds itself out as and operates as one family; several of the companies in the U.S. AMCI Family share the same office space. (Id.) Mende and Kundrun own and/or control all of the companies in the AMCI Family, either in their individual capacities or through corporate entities they dominate and control. (Id. ¶ 96.) Several of the companies in the U.S. AMCI Family share office space in either Delaware or Connecticut. (Id. ¶ 107.)

Defendants Mende and Kundrun have carried out similar schemes against other companies. In Adani Exports Limited v. AMCI (Export) Corp., No. 05-cv-0304 (W.D. Pa. 2006), the plaintiff, Adani Exports Limited ("Adani") entered into a contract with defendant AMCI Export Corporation ("AMCI Export"), and AMCI Export allegedly did not fulfill its contract obligations. (AC ¶ 121.) Plaintiffs in Adani alleged that the defendants engaged in a scheme that transferred the coal-trading business and assets of AMCI Export to a different entity that

15

had been formed by Mende, Kundrun and a third individual. (Id. ¶ 122.) The Honorable Terrence F. McVerry of the Western District of Pennsylvania denied all of defendants' motions to dismiss pursuant to Rule 12(b)(6), aside from dismissing one count against one defendant, and all motions for summary judgment to dismiss the complaint. See Adani Exports, 2006 WL 1785707; 2006 WL 2924786; 2006 WL 2924783; 2007 WL 4298525. The case did not reach the merits of the allegations: the action was settled on the eve of trial.

### *Plaintiffs' Swiss Action*

Defendants have noted that on June 12, 2012, Plaintiffs also commenced an action in Switzerland pursuing their direct claims for the damages Plaintiffs asserted in the ICC Arbitration and the SBT bankruptcy against various parties, including SBT directors, auditors and Defendants Mende and Prime Carbon (the "Swiss Action"). (Def. MTD Mem. in Supp't at 19.) One of the claims in the Petition for Reconciliation was that Defendants Mende and Prime Carbon acted wrongfully by assisting in the transactions transferring certain assets and liabilities from SBT to Prime Carbon. (Id.) In the Swiss Action, Plaintiffs pursued their own direct claims and not SBT claims assigned to them by the Zug Bankruptcy Office. (Id.) The

reconciliation hearing for Plaintiffs' Swiss Action took place in Zug. (Id.) The parties did not reach a settlement, and the magistrate granted leave to Plaintiffs to file the claim with the Cantonal Court of the Canton of Zug, which Plaintiffs have not yet done.

## III. The Applicable Standards

Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08, empowers federal courts to enforce arbitral awards, such as this one, governed by the New York Convention. See Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 404 (2d Cir. 2009). When a party seeks confirmation of an arbitral award under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; see Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005). "Article V of the Convention specifies seven exclusive grounds upon which courts may refuse to recognize an award." Encyclopaedia Universalis, 403 F.3d at 90.

"Given the strong public policy in favor of international arbitration, review of arbitral awards under the

17

New York Convention is 'very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" Encyclopaedia Universalis, 403 F.3d at 90 (quoting Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. 1997) (additional internal citations omitted)); accord Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997) ("The court's function in confirming or vacating an arbitration award is severely limited.") (citation and alteration omitted). However, a petition to confirm an arbitral award is "treated as akin to a motion for summary judgment." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 109 (2d Cir. 2006).

A facially sufficient complaint may be "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Once subject matter jurisdiction is challenged, the burden of establishing jurisdiction rests with the party asserting that it exists. See Thomson v. Gaskill, 315 U.S. 442, 446 (1942) (citations omitted). The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that

the court has subject matter jurisdiction. See Makarova, 201
F.3d at 113.

In addition, Rule 12(b)(2) requires that a court
dismiss a claim if the court does not have personal jurisdiction
over the defendant. See Fed. R. Civ. P. 12(b)(2). "To
establish personal jurisdiction, [a plaintiff] must show that
[the defendant] has minimum contacts with the forum state and
was properly served." Salmassi e. Kfr. v. Euro-America
Container Line Ltd., No. 08-4892, 2010 WL 2194827, at *4
(S.D.N.Y. June 1, 2010) (citations omitted). Once a defendant
has raised a jurisdictional defense on a Rule 12(b) motion to
dismiss, the plaintiff bears the burden of establishing that the
court has jurisdiction over a defendant. DiStefano v. Carozzi
N. Am. Inc., 286 F.3d 81, 84 (2d Cir. 2001).

"[J]urisdiction must be shown affirmatively, and that
showing is not made by drawing from the pleadings inferences
favorable to the party asserting it." Shipping Fin. Servs.
Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations
omitted). As such, a court may rely on evidence outside of the
pleadings, including declarations submitted in support of the
motion and the records attached to these declarations. See
Makarova, 201 F.3d at 113 ("In resolving a motion to dismiss

19

. . . under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

Rule 12(b)(3) provides that a defendant may move to dismiss a complaint on the grounds of improper venue. See Fed. R. Civ. P. 12(b)(3). "[T]he burden of showing that venue in the forum district is proper falls on the plaintiff." E.P.A ex rel. McKeown v. Port Auth. of N.Y. & N.J., 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001). However, absent an evidentiary hearing, "'the plaintiff need only make a prima facie showing of [venue].'" Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364-65 (2d Cir. 1986)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

**Plaintiffs' Claim Is Dismissed**

As discussed above, Plaintiffs' initial complaint in this Enforcement Action was dismissed, in part, for failure to first confirm the award against SBT prior to attempting to enforce it against its alter egos. CBF Industria, 14 F. Supp. 3d at 479 (dismissing Plaintiffs' earlier complaint because "the Award is unconfirmed, and Plaintiffs' enforcement claim and First Cause of Action is dismissed absent confirmation").

Plaintiffs, in opposition to the instant motion to dismiss the Amended Complaint, urge the Court to create an exception to the principle that confirmation of an arbitral award is a prerequisite to enforcement against the arbitral respondent's alter egos. See Orion Shipping & Trading Co. v. Eastern States Petroleum Corp., 312 F.2d 299, 301 (2d Cir. 1963). Plaintiffs contend that the confirmation prerequisite should not apply where "alter ego defendants, through their own intentional wrongdoing, foreclosed any opportunity to confirm the award." Pls.' MTD Mem. in Opp'n 22.

Plaintiffs have not marshalled persuasive authority justifying an exception to the confirmation requirement for

enforcement.   Several cases cited by Plaintiffs reinforce rather than call into question the confirmation-first requirement. See, e.g., Constellation En'gy Cmdt'ies Grp. v. Transfiled ER Cape Ltd., 801 F. Supp. 2d 211, 221-222 (S.D.N.Y. 2011) (establishing confirmation of award prior to determining enforcement against alter egos); Overseas Priv. Inv. Corp. v. Marine Shp'g Corp., No. 02 Civ. 475, 2002 WL 31106349, at * 1, 3 (S.D.N.Y. Sept. 19, 2002) (same).


Moreover, Plaintiffs' proposed carve-out would undermine "the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."   See Encyclopaedia Universalis, 403 F.3d at 90. Plaintiffs have fully presented their allegations of fraud and "wrongdoing" with respect to Defendants to the Arbitral Tribunal. See generally, CBF Industria, 14 F. Supp. 3d at 479-480 (noting Plaintiffs' allegations and the Arbitral Tribunal's holding that "Plaintiffs did not introduce sufficient evidence to demonstrate the existence of a fraud in the bankruptcy proceedings.") (internal quotations and ellipses omitted).   As was explained in the earlier motion to dismiss Opinion in this action, "this Court sits in secondary jurisdiction and cannot modify the Award," which includes the Arbitration Tribunal's refusal to credit Plaintiffs' allegations of wrongdoing against

22

Defendants.  See  CBF Industria, 14 F. Supp. 3d at 480.


     In keeping with Orion and this Court's earlier Opinion in this case, Plaintiffs cannot seek to enforce the Award against SBT's purported alter egos prior to confirming the Award against SBT.  As was decided in the Confirmation Action, 14 Civ. 3034, SBT lacks capacity to be sued under Rule 17 and the Award cannot, therefore, be confirmed against it in this Court.


     The above warrants dismissal of this action and, consequently, denial of Plaintiffs' motion to stay.  Plaintiffs requested a stay of this Enforcement Action on the theory that the instant motion to dismiss was best addressed following a decision in the Confirmation Action in 14 Civ. 3034 and in parallel proceedings in France and Switzerland.  See Pls.' Mem. in Supp't 3-4.  The Confirmation Action has been dismissed, as is the Enforcement Action.  Moreover, Plaintiffs have doubts as to the efficacy of their confirmation efforts in France and Switzerland altogether.  See Pls.' Mem. in Supp't 2-3.  A stay under these circumstances will not further the goal of judicial economy, since no outstanding claims remain in either the Enforcement or Confirmation Actions before this Court and since the probability of confirmation in other jurisdictions appears unclear.  Plaintiffs' motion to stay is therefore denied.

## Conclusion

Based on the conclusions set forth above, the Defendants' motion to dismiss the Complaint is granted. Plaintiffs have leave to renew this case against the non-SBT Defendants following successful confirmation against SBT.

It is so ordered.

New York, NY
March /2 2015

ROBERT W. SWEET
U.S.D.J.