UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
CBF INDUSTRIA DE GUSA S/A, DA TERRA
SIDERURGICA LTDA, FERMUGAR - FERRO
GUSA DO MARANHAO LTDA, FERGUMINAS
SIDERURGICA LTDA, GUSA NORDESTE S/A,
SIDEPAR - SIDERURGICA DO PARA S/A,
SIDERURGICA UNIAO S/A,

                Plaintiff,

   -against-

AMCI HOLDINGS, INC., AMERICAN METALS
& COAL INTERNATIONAL, INC., K-M
INVESTMENT CORPORATION, PRIME CARBON
GMBH, PRIMETRADE, INC., HANS MENDE,
FRITZ KUNDRUN,

                Defendants.
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED 6-15-18

13 Civ. 2581 (RWS)

OPINION

A P P E A R A N C E S:

    Attorneys for Plaintiff

    DAY PITTNEY LLP
    Seven Times Square
    New York, NY 10036
    By:  Adam K. Grant, Esq.
        Elizabeth J. Sher, Esq.
        Jonathan S. Zelig, Esq.

    Attorneys for Defendants

    BUCHANAN INGERSOLL & ROONEY, PC
    1290 Avenue of the Americas, 30th Floor
    New York, NY 10104
    By:  Stuart P. Slotnick, Esq.

    BUCHANAN INGERSOLL & ROONEY, PC
    One Oxford Centre, 20th Floor
    301 Grant Street
    Pittsburgh, PA 15219
    By:  Kevin P. Lucas, Esq.

1

**Sweet, D.J.**

Defendants AMCI Holdings, Inc. ("AMCI Holdings"),
American Metals & Coal International, Inc. ("AMCI
International"), K-M Investment Corporation ("K-M Investment"),
Prime Carbon GmbH ("Prime Carbon"), Primetrade, Inc.
("Primetrade"), Hans Mende ("Mende"), and Fritz Kundrun
("Kundrun") (collectively, the "Defendants"), bring this motion
to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),
on remand from the United States Court of Appeals for the Second
Circuit, to dismiss the Amended Complaint (the "AC") of
Plaintiffs CBF Indústria de Gusa S/A ("CBF Indústria de Gusa"),
Da Terra Siderúrgica LTDA ("Da Terra Siderúrgica"), Fergumar —
Ferro Gusa do Maranhão LTDA ("Fergumar - Ferro Gusa do
Maranhão"), Ferguminas Siderúrgica LTDA ("Ferguminas
Siderúrgica"), Gusa Nordeste S/A ("Gusa Nordeste"), Sidepar—
Siderúrgica do Pará S/A ("Sidepar—Siderúrgica do Pará"), and
Siderúrgica União S/A ("Siderúrgica União") (collectively, the
"Plaintiffs"). Specifically, Defendants contend that Plaintiffs,
in their AC, fail to state a claim upon which relief may be
granted under the New York Convention, Chapter 2 of the Federal
Arbitration Act ("FAA"), and the applicable law of the Southern
District of New York. Based on the facts and conclusions set
forth below, the Defendants' motion to dismiss is denied.

2

Plaintiffs are permitted to conduct discovery regarding the
fraud claims.

## I.  **Facts & Prior Proceedings**

The facts pertinent to the present motion are set
forth in the AC, the contracts entered into between Plaintiffs
and Steel Base Trade, AG ("SBT") between January 1, 2008 and
September 17, 2008 (the "Contracts"), the International Chamber
of Commerce Award ("ICC Award") incorporated in the AC, and
matters of public record, of which this Court has taken judicial
notice, in the SBT Bankruptcy referred to in the ICC Award.[1] The
facts are assumed true for the purpose of this motion to
dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d
Cir. 2012).

Plaintiffs are a group of foreign companies organized
under the laws of, and with their offices located in, Brazil.
They produce and supply "pig iron," which is a type of
"intermediate metal made by smelting iron ore with high-carbon

---

[1]    Courts may "take judicial notice of a document filed in another court .
. . to establish the fact of such litigation and related filings." *Rates
Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 167 n.3 (2d Cir. 2012) (quoting
*Global Network Commc'n, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir.
2006)); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking
judicial notice of complaint in another action as a public record on a motion
to dismiss).

3

fuel." Am. Compl. ¶ 27, ECF No. 47. Pig iron can then be further refined to become steel or wrought iron.

Defendants are a group of interrelated companies (collectively, the "Corporate Defendants") and two individuals, Hans Mende and Fritz Kundrun (collectively, the Individual Defendants"). According to Plaintiffs, the Individual Defendants financially control, directly or indirectly, the Corporate Defendants.

In 2008, Plaintiffs and SBT entered into a series of contracts wherein SBT agreed to buy 103,500 metric tons of pig iron for more than $476 million (the "Contracts"). *Id.* ¶ 34. Within a short period of signing the Contracts, following the financial crisis in late 2008 and the attendant collapse in commodity prices (including pig iron), SBT ceased purchasing pig iron under the Contracts. *Id.* ¶ 41. Following SBT's breach, Plaintiffs contacted SBT and requested that SBT fulfill its obligations. *Id.* ¶ 42. In response, on November 20, 2008, an SBT representative said:

> You know our group and it is not our style to walk away from obligations . . . . We will need a long time to work this out together. My message to your group is: we are not walking away!!!

4

*Id.* ¶ 42. SBT remained in default and did not purchase any further pig iron as required by the Contracts. *Id.* ¶ 43. Plaintiffs first became aware that this assurance was false when they learned, through publicly available shipping records, that SBT was purchasing pig iron from other suppliers. *Id.*

On November 16, 2009, Plaintiffs submitted their dispute with SBT (the "Arbitration") to the ICC Paris. *Id.* ¶ 47. Thereafter, SBT requested an extension of time to respond to Plaintiffs' arbitration demand, and the ICC Paris granted SBT until January 27, 2010 to respond. *Id.* ¶ 48. During that extension of time, on January 11, 2010, Prime Carbon made its first purchase of pig iron in the Brazilian market. *Id.* ¶ 49. Given the limited size of the pig iron market, Plaintiffs decided to investigate newcomer Prime Carbon and its purchase. *Id.*

On January 15, 2010, Plaintiffs wrote to the ICC Paris to express their concern that they were being defrauded by SBT, which appeared to be "transferring its business operations and assets to Prime Carbon." *Id.* ¶ 50. Ten days later, SBT responded to the ICC Paris (the "January 25th Statement"):

[SBT] does not try to evade from its obligations[.]

5

It is true that the website www.steelbasetrade.com was shut down at the beginning of January 2010[.] The reason is that [SBT] first has to analyze [its] position regarding pending or imminent claims for damages from purchasers as well as against suppliers as well as [its] financial situation[.] Therefore, [SBT] has at least temporarily suspended [its] business activities. Please note, however, [SBT] is still existing and has not resolved to be dissolved and liquidated.

*Id.* ¶ 51. Plaintiffs allege that, although they did not know it at the time, this statement was untrue, and was intended to distract Plaintiffs and the ICC Paris while Defendants effectuated their plan to steal SBT's assets. Defendants contend that the January 25th Statement was accurate when made. *See* Reply Br. in Support of Cert. Petition at 2, n.1.


According to Plaintiffs, notwithstanding SBT's misrepresentations that it had not resolved to be liquidated and dissolved, SBT did not disclose to the ICC Paris or Plaintiffs that, on December 27, 2009, it had already signed an agreement transferring its business to Prime Carbon (the "Transfer Agreement"). Am. Compl. ¶ 52. SBT also did not disclose to the ICC Paris or Plaintiffs that it had sent letters to various of its pig iron suppliers on January 18, 2010, informing them that:

    (i)    as of November 30, 2009, SBT had transferred "all Goods and the respective title of the Goods" to Prime Carbon;

6

(ii) Prime Carbon was "the new and sole owner of the Goods";

(iii) Prime Carbon "assumes all rights with respect to the transferred Goods"; and

(iv) Prime Carbon "is willing to enter in all contracts between your company and [SBT] and to perform under the same conditions."

*Id.* ¶ 53. The letters advised the suppliers "to act from the time being only on instruction of Prime Carbon" and that representatives of Prime Carbon would be contacting the suppliers "within the next few days." *Id.* ¶ 54. Thus, Plaintiffs allege, while telling the Plaintiffs and the ICC Paris on January 25th that SBT "is still existing and ha[d] not resolved to be dissolved and liquidated," Defendants already had started effectuating a plan to make SBT an assetless and judgment proof company via the Transfer Agreement. *Id.* ¶¶ 45, 51.

Under the terms of the Transfer Agreement, Plaintiffs allege, SBT transferred $126 million in assets to Prime Carbon, as well as liabilities of $130 million, in exchange for $1. *Id.* ¶ 59. The assets transferred to Prime Carbon included SBT's main asset, its U.S. subsidiary, Primetrade USA, through a transfer of the 1,000 shares of Primetrade USA's Common Capital Stock on December 27, 2009. *Id.* SBT also transferred, among other things,

shares of an Aruba limited liability company, Steel Base Trade
A.V.V. ("SBT Aruba"), pursuant to the Transfer Agreement and a
blocking certificate dated January 18, 2010. *Id.* ¶ 60.

The Transfer Agreement between SBT and Prime Carbon
was signed on behalf of Prime Carbon by Thomas Buerger, a former
director of SBT, and the then-Chief Financial Officer of AMCI
Capital, and a director of SBT's parent company, Defendant AMCI
International. *Id.* ¶ 58. Plaintiffs allege that following the
effectuation of the Transfer Agreement, Prime Carbon (a) had at
least five of the same directors as SBT; (b) assumed ten of
SBT's employment contracts; (c) appointed Defendant Mende to
serve as the president of the Board of Directors; and (d) at all
times shared an office address with SBT or AMCI International.
*Id.* ¶¶ 66-68.

The Transfer Agreement was formally approved on
January 27, 2010 by SBT's and Prime Carbon's Supervisory Boards,
the same day SBT filed its response in the Arbitration. *Id.* ¶
65. Plaintiffs allege that SBT did not tell the ICC Paris about
this material change in the circumstances, or that its January
25th Statement was untruthful or no longer operative. *Id.*
Moreover, Plaintiffs allege that although SBT was insolvent on
January 27, 2010, it was not put into bankruptcy until April 28,

2010, though not before Defendants arranged to have SBT transfer nearly all of its remaining cash to Prime Carbon. *Id.* ¶ 78.

Following these developments, in June of 2010, Plaintiffs asked the ICC Paris for discovery concerning SBT's actions and sought interim relief to seize up to approximately $42 million of SBT's assets, whether held by SBT or Prime Carbon (the "Interim Relief"). *See* Arbitration Award, ECF Nos. 1-2, Ex. M, ¶ 22. The ICC Paris held hearings concerning the Interim Relief that SBT neither attended nor requested be postponed. Thereafter, the ICC Paris sent SBT a list of questions concerning, *inter alia*, whether and to what extent SBT had "transferred goods and respective titles of goods to Prime Carbon AG . . . after being notified of the Request for Arbitration." *Id.* ¶ 28. SBT did not provide a response to these requests for information. *Id.* ¶¶ 23-30.

On March 29, 2011, SBT's bankruptcy administrator informed the ICC Paris that SBT did not have funds sufficient to participate in the Arbitration, and that "the estate and SBT's creditors did not wish to defend the claims before the ICC Paris." Am. Compl. ¶ 87. The bankruptcy administrator admitted the claims against SBT as well as the damages sought by Plaintiffs in the amount of CHF 51,756,269.75. *Id.* On November

9

9, 2011, following this notice, the ICC Paris issued its final

Award in favor of Plaintiffs for $48,053,462.16 plus interest,

at rates detailed in the Award, incurred on this amount from

November 20, 2009, until the Award amounts are paid in full. *Id.*

¶ 90. The Award also awarded Plaintiffs' arbitration costs and

legal fees in the amount of $360,000. *Id.*

SBT's bankruptcy was declared closed on January 24,

2012, with no assets left to satisfy the Award. *Id.* ¶ 89.

Plaintiffs were unable to collect the Award against SBT because,

as Plaintiffs allege, all of SBT's assets had been fraudulently

transferred to Prime Carbon. *Id.* ¶ 91. Plaintiffs told SBT that

Plaintiffs would seek to recover the amount owed from SBT. *Id.* ¶

92. SBT responded that Plaintiffs should not waste their time

bringing a claim and, relaying a comment made by Mende, stated:

"A naked man has no pockets." *Id.*

On April 18, 2013, Plaintiffs filed an action before

this Court to enforce the Award against Defendants as SBT's

alter egos and successors-in-interest pursuant to the Convention

(the "Enforcement Action.") *See* Compl., ECF No. 1. The

Enforcement Action also alleged common law fraud and violations

of New York's fraudulent conveyance laws related to Defendants'

actions before the ICC Paris and thereafter (the "Fraud

10

Claims"). Defendants moved to dismiss the Enforcement Action on numerous grounds, including that the Award had not been confirmed against SBT, *forum non conveniens*, and that the Fraud Claims were barred by the ICC Paris' ruling. *See* Def's Br. Motion to Dismiss Compl., ECF No. 23. The Enforcement Action's Convention claims were dismissed on the grounds that *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir.), *cert. denied*, 373 U.S. 949 (1963) required Plaintiffs to first confirm the Award against SBT before seeking to enforce the Award against Defendants. *See* Opinion on First Motion to Dismiss, ECF No. 46.

Following this Court's decision, Plaintiffs filed an Amended Complaint on April 29, 2014 containing only the federal enforcement cause of action. *See* Am. Compl. On this same day, Plaintiffs filed an action seeking to confirm the Award against SBT (the "Confirmation Action"). *See* Compl. It was during this proceeding that Defendants disclosed SBT's removal from the Swiss Commercial Registry, arguing that, as a result, SBT was immune from suit under Fed. R. Civ. P. 17 and that the Confirmation Action must be dismissed. *See* Defs.' Motion to Dismiss Confirmation Action, ECF No. 28 at 6. On March 12, 2015, both the Enforcement and Confirmation Actions were dismissed on the basis that *Orion* required a two-step process of confirmation

against SBT followed by enforcement against Defendants, and because SBT's immunity from suit rendered confirmation impossible. *See* Opinion on Motion to Dismiss, ECF No. 91.

Plaintiffs timely appealed the dismissal of both actions, and on January 18, 2017, the Second Circuit issued its initial ruling (the "Vacated Decision"). *See CBF Industria de Gusa v. AMCI Holdings, Inc.*, 846 F.3d 35 (2d Cir. 2017). In Section I.c. of the Vacated Decision, titled "Applicable Law for an Enforcement Action," the Second Circuit cited to the analysis set forth in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995), and instructed this Court as follows:

> Accordingly, on remand, the district court must first consider whether the Contracts . . . provide clear and unmistakable evidence that the parties . . . agreed to have an arbitrator decide whether they decided to arbitrate the question of whether a nonsignatory could be bound to an award under the Contracts. If the district court determines that the parties to the Contracts *did* agree to have an arbitrator decide whether they agreed to arbitrate the question of whether a nonsignatory can be bound, then the district court must refuse to decide the issue.

Vacated Decision at 47. Defendants moved for rehearing, which the Second Circuit granted and heard on March 2, 2017. During the Second Circuit's consideration of Defendants' rehearing request, the New York City Bar Association ("NYCBA") submitted an *amicus* brief in which it argued that a *First Options* arbitrability analysis would be improper in this case because

12

Plaintiffs were not seeking to enforce an arbitration agreement; they were seeking to enforce an arbitration award. *See* NYCBA Amicus Br. at 1, 9 ("An award is like a court judgment and, once made, has its own legal significance even though it arose out of an agreement. . . . [T]he proper instructions to the district court would be to proceed directly to an analysis of whether the award may be enforced against appellees on an alter ego theory of liability, without directing the court to consider the scope of the arbitration agreement under a *First Options* analysis.").

On March 2, 2017, the Second Circuit issued its revised decision (the "Revised Decision"), in which it wrote that it had vacated its earlier ruling "and simultaneously issu[ed] this amended decision to correct our instructions to the district court with regards to the applicable law for an enforcement action at Section I.c., *infra*." *See CBF Industria de Gusa v. AMCI Holdings, Inc.*, 850 F.3d 58 (2d Cir. 2017). Section I.c. of the Revised Decision, titled "Applicable Law for an Enforcement Action," consists of a re-write of the Vacated Decision's analysis, eliminating any reference to *First Options* or the requirements thereunder. *See id.* The Second Circuit held, as relevant here, that:

> On remand, therefore, we instruct the district court to evaluate appellants' Enforcement Action, particularly appellants' effort to reach appellees as

13

alter-egos of SBT, under the standards set out in the
New York Convention, Chapter 2 of the FAA, and
applicable law in the Southern District of New York. .
. .

Thus, the question of whether a third party not named
in an arbitral award may have that award enforced
against it under a theory of alter-ego liability, or
any other legal principle concerning the enforcement
of awards or judgments, is one left to the law of
enforcing jurisdiction, here the Southern District of
New York, under the terms of Article III of the New
York Convention. . . .

The New York Convention additionally provides that
"[r]ecognition and enforcement of [a foreign arbitral]
award may be refused . . . only if [the requesting]
party furnishes to the competent authority where the
recognition and enforcement is sought, proof that" one
of five enumerated conditions has been meet. N.Y.
Convention, art. V(1). Here, the "competent authority"
is the federal district court to which the award-
creditor has applied for enforcement. See 9 U.S.C. §
203.

Thus, it appears that the sole issue at present for
the district court to consider on remand pertains to
the liability of appellees for satisfaction of
appellants' foreign arbitral award as alter-egos of
the award-debtor under the applicable law in the
Southern District of New York. We leave further legal
and factual development of this issue, and any other
barriers to enforcement that appellees may argue on
remand, to the district court. . . .

Revised Decision at 43-46. Further, the Revised Decision also

restored the Fraud Claims:

Given appellants' assertions of fraud on the part of
appellees, assertions we must accept as true at the
motion to dismiss stage . . . we find the district
court's application of the equitable doctrine of issue
preclusion was inappropriate. On remand, appellants
should be allowed to conduct discovery with respect to
the fraud claims.

14

*Id.* at 51.

On September 28, 2017, Defendants filed a
Petition for Certiorari with the United States Supreme
Court, which was denied on December 11, 2017.

Defendants' filed the instant motion to dismiss
on January 4, 2018, and the motion was heard and marked
fully submitted on February 21, 2018.

## II. **The Applicable Standard**

On a Rule 12(b)(6) motion to dismiss, all factual
allegations in the complaint are accepted as true and all
inferences are drawn in favor of the pleader. *Mills v. Polar
Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint
must contain "sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially
plausible when "the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663
(quoting *Twombly*, 550 U.S. at 556). In other words, the factual

allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *Williams v. Calderoni*, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (citation and internal quotation omitted).

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

16

# III. **Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is Denied**

In its Revised Decision, the Second Circuit instructed this Court, on remand, "to evaluate [Plaintiffs'] Enforcement Action, particularly [Plaintiffs'] effort to reach [Defendants] as alter-egos of SBT, under the standards set out in the New York Convention, Chapter 2 of the FAA, and applicable law in the Southern District of New York." Revised Decision at 43. As such, it is appropriate to consider first the threshold question of whether Plaintiffs may pierce the corporate veil of SBT to reach Defendants as alter egos. Next, the Court must consider whether any of the conditions set out in the New York Convention, under which a district court may refuse enforcement of a foreign arbitral award, have been sufficiently invoked as to warrant dismissal.

## 1. Plaintiffs May Pierce the Corporate Veil to Hold Defendants Liable as Alter Egos of SBT

As a general rule, "courts are reluctant to disregard the corporate entity in large part because there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." *Abu-Nassar v.*

17

*Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1991 WL 45062, at
*10 (S.D.N.Y. March 28, 1991) (citing *Am. Protein Corp. v. AB
Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, 488 U.S. 852
(1988)) (internal quotation marks and citations omitted).
Nevertheless, the corporate form may be pierced where "(1) the
owner has exercised such control that the corporation has become
a mere instrumentality of the owner, which is the real actor;
(2) such control has been used to commit a fraud or other wrong;
and (3) the fraud or wrong results in an unjust loss or injury
to plaintiff." *Atateks Foreign Trade, Ltd. v. Private Label
Sourcing, LLC*, 402 Fed. App'x 623, 625 (2d Cir. 2010) (citing
*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir.
1997) ("While complete domination of the corporation is the key
to piercing the corporate veil, . . . such domination, standing
alone, is not enough; some showing of a wrongful or unjust act
toward plaintiff is required."); *see also Oriental Commercial &
Shipping Co., Ltd.*, 702 F. Supp. at 1018 (citing *Am. Protein
Corp.*, 844 F.2d at 60) (internal quotation and citation omitted)
("The parent . . . exercise[d] complete domination in respect to
the transaction attacked so that the subsidiary had at the time
no separate will of its own, and such domination [was] . . .
used to commit fraud or wrong against plaintiff, which
proximately caused plaintiff's injury." *Oriental Commercial &
Shipping Co., Ltd.*, 702 F. Supp. at 1018 (citing *Am. Protein

18

*Corp.*, 844 F.2d at 60) (internal quotation and citation omitted)).

Courts consider a variety of factors in assessing the control element, including "(1) intermingling of personal and corporate funds and siphoning of corporate funds by a principal; (2) failure to observe corporate formalities and keep proper books and records; (3) failure to pay dividends; (4) inadequate capitalization; (5) insolvency; and (6) perpetuation of fraud by shareholders in maintaining the corporate form." *Abu-Nassar*, 1991 WL 45062, at *11 (citations omitted). Other factors considered include (7) "overlap in ownership, officers, directors, and personnel," (8) "common office space, address, and telephone numbers of corporate entities," (9) "the degree of discretion shown by the allegedly dominated corporation," (10) "whether the dealings between the entities are at arms length," (11) "whether the corporations are treated as independent profit centers," and (12) "payment or guarantee of the corporation's debts by the dominating entity." *Freeman*, 119 F.3d at 1053.

There is no set rule regarding how many factors must weigh in favor of piercing the corporate veil for control to be found. *William Wrigley, Jr. Co.*, 890 F.2d at 600-01 (citing *Brunswick Corp. v. Waxman*, 599 F.2d 34, 35 (2d Cir. 1979)); *see*

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d
Cir. 1995) ("Veil piercing determinations are fact specific and
differ with the circumstances of each case.") (internal
quotation and alteration omitted). Instead, "the general
principle followed by the courts has been that liability is
imposed when doing so would achieve an equitable result." *Id.* at
601 (noting that when fraud sufficient to pierce the corporate
veil has been found in this Circuit, "the evidence demonstrated
an abuse of that form either through on-going fraudulent
activities of a principal, or a pronounced and intimate
commingling of identities of the corporation and its principal
or principals, which prompted the reviewing courts, driven by
equity, to disregard the corporate form.").

Further, at this stage of the proceedings, Plaintiffs
need only detail the factual allegations to the degree required
by Federal Rule of Civil Procedure 8(a)'s liberal pleading
standard to show the domination or control necessary to pierce
the corporate veil. *See Network Enter., Inc. v. APBA Offsore
Prods., Inc.*, No. 01 Civ. 11765 (CSH), 2002 WL 31050846, at *4
(S.D.N.Y. Sept. 12, 2002); Fed. R. Civ. P. 8(a) (a claim for
relief "shall contain . . . a short and plain statement of the
claim showing that the pleader is entitled to relief.").

The record is replete with examples of SBT's control over Prime Carbon. First, Plaintiffs have alleged facts supporting the notion that the dealings between the entities were closer than arms length. On December 27, 2009, after SBT entered into the Contracts wherein SBT agreed to buy over 100,000 tons of pig iron worth over $476 million, SBT signed the Transfer Agreement, transferring all of its business to Prime Carbon and claiming SBT's insolvency. Am. Compl. ¶¶ 34, 41, 52. Specifically, SBT transferred $126 million in assets to Prime Carbon and $130 million in liabilities, in exchange for $1, evidencing no consideration involved in the transfer. *See id.* ¶ 59; *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp LLC*, 268 F.3d 58, 64 (2d Cir. 2001) (finding the factor regarding "whether the dealings between the entities are at arms length" weighed in favor of finding fraud where there was no consideration involved in new companies succeeding to manage old companies).

Second, an overlap in ownership and control weigh in favor of finding control. Plaintiffs allege that Individual Defendants Mende and Kundrun ultimately owned and controlled SBT, Prime Carbon, and AMCI Holdings. Am. Compl. ¶ 4. On January 18, 2010, SBT sent letters to its pig iron suppliers putting them on notice of the change in ownership from SBT to Prime

21

Carbon. *Id.* ¶ 53. The letters provided that, as of November 30, 2009, SBT had transferred "all Goods and the respective title of the Goods" to Prime Carbon; that Prime Carbon was "the new and sole owner of the Goods"; that Prime Carbon "assumes all rights with respect to the transferred Goods"; and that Prime Carbon "is willing to enter in all contracts between [its pig iron suppliers and SBT] and to perform under the same conditions." *Id.* The letters advised the suppliers "to act from the time being only on instruction of Prime Carbon." *Id.* ¶ 54. These letters were signed by Stephan Herzig ("Herzig"), a director of SBT who later became a director of Prime Carbon, *id.* ¶¶ 36, 55, and Thomas Buerger ("Buerger"), a director of Prime Carbon and Chief Financial Officer of AMCI Capital at the time, and a former director of SBT, who signed on behalf of Prime Carbon. *Id.* ¶¶ 58.

Moreover, following the Transfer Agreement, Prime Carbon employed at least five of SBT's former directors and took over 10 of SBT's employment contracts. *Id.* ¶¶ 66-68. Mende, whom Plaintiffs allege was "one of the ultimate owners of SBT," became the President of the Board of Directors of Prime Carbon. *Id.* ¶ 50. Moreover, other former directors of SBT became directors of Prime Carbon. *Id.* *See Balmer v. 1716 Realty, LLC*, No. 05 Civ. 839 (NG) (MDG), 2008 WL 2047888, at *5 (E.D.N.Y. May

22

9, 2008) (finding that 'overlap in ownership' factor supported finding control and domination where five of six persons shared an ownership interest in both entities).

Third, Plaintiffs have pleaded facts supporting the reasonable inference that SBT was inadequately capitalized at the time of the transaction. "Evidence of substantial undercapitalization . . . is significant because it can be evidence of a company's lack of independent substance." *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, No. 09 Civ. 6148 (VM) (MHD), 2012 WL 12932049, at *22 (S.D.N.Y. July 17, 2012). While undercapitalization is just "an additional factor to be weighed in the balance," *see Abu-Nassar*, 1991 WL 45062, at *13, "it weighs heavily in favor of a finding that the corporate form of an entity should be disregarded." *Eagle Transp. Ltd., Inc. v. O'Connor*, 470 F. Supp. 731, 733 (S.D.N.Y. 1979). A corporation will be found undercapitalized "when its liabilities exceed its assets." *Cardell Fin. Corp.*, 2012 WL 12932049, at *22; *see also Abu-Nassar*, 1991 WL 45062, at *13 (finding corporation "currently undercapitalized and essentially insolvent, in that its liabilities exceed its assets, it is no longer in business and it can no longer meet its obligations without financial assistance from [the shareholders-principals]"). As to the timing of insolvency, the relevant inquiry for liability

purposes is that of the transaction at issue. *Cardell Fin.
Corp.*, 2012 WL 12932049, at \*22.

The Contracts were entered into between January 1,
2008 and September 17, 2008. Am. Compl. ¶ 34. Plaintiffs assert
that SBT's annual audit reports, issued on December 31, 2007,
and December 31, 2008, indicate that SBT was undercapitalized,
such that its equities were outweighed by its assets. Am. Compl.
¶ 111. Further, Plaintiffs assert that SBT's General Assembly
did not convene within six months after conclusion of either of
those business years to verify the audit reports, in violation
of Swiss corporate law. *Id.*

Fourth, Prime Carbon initially had the same address as
SBT, before changing its address to be the same as SBT's parent.
On January 10, 2010, SBT transferred its lease contract
concerning its commercial, storage, and parking spaces to Prime
Carbon. *Id.* ¶ 68.

Finally, as to maintaining corporate formalities,
courts have held that "when determining whether a foreign
corporation has observed the proper corporate formalities,
courts apply the law of the country of incorporation," which
here is Switzerland. *See Abu-Nassar*, 1991 WL 45062, at \*12 n.17

(citing *Oriental Commercial & Shipping Co.*, 702 F. Supp. at 1019-20); Am. Compl. ¶ 26. The parties have not provided the Court with any authority on Swiss corporate law, but Plaintiffs have submitted two allegations supporting that SBT failed to adhere to corporate formalities. Plaintiffs allege that "SBT's annual audit reports, issued on December 31, 2007, and December 31, 2008, indicated that SBT was undercapitalized," and that "SBT's General Assembly did not convene within six months after conclusion of either of those business years to verify the audit reports, in violation of Swiss corporate law." Am. Compl. ¶ 111. Further, Plaintiffs assert that "SBT did not have regular, required meetings under Swiss law and did not observe corporate formalities." *Id.* ¶ 135. These two assertions, without more, provide some support for the assertion that Defendants and SBT disregarded corporate formalities.

Taken together, the above allegations sufficiently allege that Defendants dominated and controlled SBT to satisfy the first element of a veil-piercing claim at the motion to dismiss stage. *See Accordia Northeast, Inc. v. Thesseus Intern. Asset Fund, N.V.*, 205 F. Supp. 2d 176, 182 (S.D.N.Y. 2002) (holding, on a motion to dismiss, that allegations of sharing an office address, gross undercapitalization, and shared directors, management, and employees, "if proven, could well justify

piercing the veil, making dismissal inappropriate."); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 274 (S.D.N.Y. 2004) (finding control sufficiently alleged at motion to dismiss stage where complaint contained statements concerning domination by owner of parent company, how subsidiary was used to further individual defendant's own interest, and how subsidiary was directed to conceal information about its operating difficulties and delays); *Campo v. 1st Nationwide Bank*, 857 F. Supp. 264 (E.D.N.Y. 1994) (finding control and domination on a motion to dismiss where plaintiff alleged by more than conclusory statements that corporation was in common ownership with and shared same management as other defendants, created subsidiaries to escape federal regulation, held itself to be only viable corporate entity in dealing with plaintiff, and commingled funds with other defendants).

Next, Plaintiffs must have sufficiently alleged Defendants used SBT "to commit a fraud or wrong that caused [Plaintiffs] unjustly to suffer a loss." *Oriental Commercial & Shipping Co., Ltd.*, 702 F. Supp. at 1022. This second prong "can be satisfied either by showing outright fraud, or another type of 'wrong,' such as a 'breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights.'" *Telenor Mobile Commc'n A.S. v. Storm LLC*, 587 F. Supp. 2d 594,

620 (S.D.N.Y. 2008) (citing *Elec. Switching Indus., Inc. v. Faradyne Elec. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)). Fraud is "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and induces them to act upon it, causing injury." *Oriental Commercial & Shipping Co., Ltd.*, 702 F. Supp. at 1022 (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 216 (1969)).

Treating the Amended Complaint as true, SBTs' activities as alleged by Plaintiffs are sufficient to constitute a fraud or wrong for purposes of piercing the corporate veil. The facts, as alleged by Plaintiffs, demonstrate that a jury could find that Defendants, acting on behalf of SBT, sought to make SBT judgment proof as a means of evading its obligations under the Contracts. Defendants entered into the Transfer Agreement on December 27, 2009, after Plaintiffs filed the request for arbitration with the ICC on November 16, 2009. Am. Compl. ¶¶ 47, 52. Plaintiffs allege that SBT misrepresented that it intended to honor the Contracts, and misrepresented to the arbitration panel that it needed to evaluate its position while it was in the process of rendering SBT insolvent. *Id.* ¶ 3. Plaintiffs further allege that SBT then fraudulently transferred

SBT's business to Prime Carbon by way of the Transfer Agreement without informing Plaintiffs or the arbitration panel of this action. *Id.* ¶¶ 3, 53-57. In light of these allegations, and in conjunction with those mentioned above, Plaintiffs have adequately alleged that Defendants acted to commit a wrong or fraud by attempting to make SBT judgment proof to evade SBT's obligations under the Contracts. *See Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Intern., Inc.*, 758 F. Supp. 908, 917 (S.D.N.Y. 1991) (stripping the assets of the subsidiary by the parent to render it "judgment proof" constitutes "fraud or wrong"); *Freeman v. Complex Computing Co., Inc.*, 979 F. Supp. 257, 260 (S.D.N.Y. 1997) (shifting of assets by equitable owner of corporation to make corporation judgment proof constitutes fraud or wrong justifying veil-piercing); *Smoothline Ltd. v. North Am. Foreign Trading Corp.*, No. 2002 WL 31885795, at *11 (S.D.N.Y. Dec. 27, 2002) (intercompany transfers designed to drain money sufficient to constitute fraud or wrong for purposes of piercing the corporate veil).

Accordingly, the AC sufficiently has alleged the piercing of SBT's corporate veil to reach Defendants as alter egos of SBT.

## 2. Defendants Have Failed to Provide Grounds on Which
### Recognition and Enforcement of the ICC Award May be Denied

The New York Convention provides that "[r]ecognition and enforcement of [a foreign arbitral award] may be refused . . . only if [the requesting party] furnishes to the competent authority where the recognition and enforcement is sought, proof that" one of the enumerated conditions has been met in Article V(1) or (2). N.Y. Convention, art. V(1),(2). "The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009); *see also Duferco Intern Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003) ("A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law.") For purposes of this litigation, this Court is the "competent authority" as it is the federal district court to which the award-creditor has applied for enforcement. *See* Revised Decision at 45.

Defendants have moved to dismiss Plaintiffs' Amended Complaint on three grounds. First, on the basis that Article V

of the New York Convention prevents enforcement of an award against a party that was deprived of a full and fair opportunity to be heard at the time of the underlying arbitration. Defs.' Br. 21. Second, Defendants assert that Plaintiffs cannot avoid their contractual agreement to arbitrate veil-piercing issues by arguing that Defendants are not SBT for purposes of seeking an independent judicial veil-piercing determination, while simultaneously alleging that Defendants are SBT for purposes of enforcing the Award against them. *Id.* 29-32. Third, Defendants allege that Plaintiffs lack standing to state a veil-piercing claim to the extent that such a claim is derivative of an injury to SBT under Swiss law, which provides that creditors without an assignment in the bankruptcy lack standing to pursue claims for indirect damages flowing from damage to a bankrupt debtor. *Id.* 35.

Defendants' second and third arguments fail as they do not speak to any of the enumerated Article V conditions that must be present for recognition and enforcement of the Award to be refused. *See* N.Y. Convention, art. V(1) ("[r]ecognition and enforcement of [a foreign arbitral award] may be refused . . . only if [the requesting party] furnishes to the competent authority . . . proof" of one of the Article V enumerated

conditions). Specifically, the five enumerated conditions laid out under the New York Convention are as follows:

> *(a)* The parties to the [arbitration] agreement referred to in article II [of the New York Convention] were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> *(b)* The party against whom the award is invoked was not given proper notice of the appointment of the arbitration or of the arbitration proceedings or was otherwise unable to present his case; or
>
> *(c)* The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> *(d)* The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>
> *(e)* The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

N.Y. Convention, art. V(1) (italics in original). Moreover, dismissal is further permitted if the Court determines that "(*a*) [t]he subject matter of the difference is not capable of

settlement by arbitration under the law of [the United States]; or (*b*) [t]he recognition or enforcement of the award would be contrary to the public policy of [the United States]." *Id.* art. V(2).

None of the above enumerated conditions apply to the Defendants' second and third argued grounds for dismissal. The Second Circuit held that Plaintiffs can in fact seek to hold Defendants liable on an alter ego theory, thereby defeating Defendants' second argument. Revised Decision at 43 ("On remand, therefore, we instruct the district court to evaluate appellants' Enforcement Action, particularly appellants' effort to reach appellees as alter-egos of SBT, under the standards set out in the New York Convention, Chapter 2 of the FAA, and applicable law in the Southern District of New York."). The standing argument must similarly be denied as it is not a ground mentioned in the Convention.

As to Defendants' remaining argument, they contend that the forum's standards of due process have not been met. Defendants claim a foreign arbitration award is not enforceable where the arbitration tribunal denied one party the opportunity to "be heard at a meaningful time and in a meaningful manner." Defs.' Br. 21 (citing *Iran Aircraft Indus. v. Avco Corp.*, 980

F.2d 141, 145-46 (2d Cir. 1992). Defendants claim that, as a result of the SBT Bankruptcy, they were incapacitated to defend and were unable to present SBT's case within the meaning of the New York Convention. *Id.* at 23. Further, Defendants argue that Plaintiffs deliberately did not seek to name alleged successors, alter egos, transferees, Defendants or other allegedly liable third parties as respondents or in connection with the ICC Arbitration, nor in a subsequent proceeding in France seeking to modify or vacate the ICC Award, so as to ensure that no defense on the merits could be mounted. *Id.*

Plaintiffs argue that Defendants may not evade liability on the basis of its incapacity to participate in SBT's bankruptcy pursuant to Swiss law because Defendants fabricated the situation that led to such alleged incapacity. Pls.' Br. 19. Moreover, Plaintiffs assert that their allegations must be taken as true, and as such, Defendants as SBT's alter egos not only had the opportunity to defend themselves in the Arbitration, but voluntarily abandoned that opportunity, choosing instead to steal SBT's assets in order to force SBT into bankruptcy as way of avoiding liability for SBT's breach of the Contracts. *Id.* at 19-20. Plaintiffs further argue that the only reasons Defendants were not involved in the Arbitration was because they chose not to be. *Id.* at 20. Had Defendants desired for SBT to have a

33

viable defense in the Arbitration, they could have: (i) not stolen all its assets or (ii) infused sufficient assets back into SBT to allow it to contest the Arbitration. *Id.*

Here, Defendants assert Articles V(1)(a), (b), and V(2)(b) as grounds for dismissal. Under Article V(1)(a), Defendants must demonstrate that they were under some incapacity "at the time of the agreement rather than at the time of the arbitration." *In the Matter of the Arbitration Between UNITED MEDIA HOLDINGS, NV, et al, Petitioner, v. FORBES MEDIA, LLC, Respondent. Additional Party Names: TriLado Enterprises, Inc.*, No. 16 CIV. 5926 (PKC), 2017 WL 9473164, at *10 (S.D.N.Y. Aug. 9, 2017) (internal citation omitted); *see also China Nat. Bldg. Material Inv. Co. v. BNK Int'l LLC*, No. A-09-CA-488-SS, 2009 WL 4703578, at *5-6 (W.D. Tex. Dec. 4, 2009) (noting that Article V(1)(a) as whole appears to refer to the validity of the underlying arbitration agreement, and that "the incapacity defense requires the challenging party to prove it was under an incapacity at the time the agreement was entered into, not at the time of the arbitration proceeding."). Because Defendants have offered no evidence that they suffered from any incapacity at the time the Contracts were signed, this claim fails.

34

Under Article V(1)(b), "enforcement of a foreign arbitral award may be denied if the defendant can prove that he was not given proper notice . . . or was otherwise unable to present his case." *Parson & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 975 (2d Cir. 1974). As the Second Circuit has provided, this provision "essentially sanctions the application of the forum state's standards of due process." *BSH Hausgerate GmbH v. Kamhi*, 291 F. Supp. 3d 437, 441 (S.D.N.Y. 2018) (citing *Mondis Tech. Ltd. v. Wistron Corp.*, No. 15 Civ. 2340 (RA), 2016 WL 6534255, at *5 (S.D.N.Y. Mar. 4, 2013) (internal citation and quotation marks omitted). In this Circuit, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) (internal citation omitted). The inquiry is "limited to determining whether the procedure used was fundamentally, unfair," *Abu Dhabi Inv. Auth v. Citigroup, Inc.*, No. 12 Civ. 283 (GBD), 2013 WL 789642, at *7 (S.D.N.Y. Mar. 4, 2013) (citing *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)), *aff'd*, 557 Fed. Appx. 66 (2d Cir. 2014), and ensuring that there was "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Iran Aircraft Indus.*, 980 F.2d at 145 (internal citation

omitted). Under these standards, a party is entitled only to

"'notice reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections.'" *Yukos*

*Capital S.A.R.L. v. Samaraneftegaz*, 592 Fed. Appx. 8, 11 (2d

Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950)) (internal citation omitted).

As the alter ego analysis above demonstrates,

Plaintiffs in their Amended Complaint sufficiently alleged

Defendants' control over SBT, such that if SBT is found to have

received proper notice and an opportunity to be heard,

Defendants by implication may be found to have as well.

According to Plaintiffs' allegations, SBT received notice

regarding the Arbitration proceedings before the ICC, *see* Am.

Compl. ¶¶ 47-48. That SBT requested an extension of time to

answer the Request for Arbitration, *id.*, and responded to

Plaintiffs' letter to the ICC Paris, *id.* at ¶ 51, evidence that

SBT was provided proper notice of the Arbitration.

Plaintiffs have also sufficiently alleged that SBT

could have proceeded to defend itself in the Arbitration had its

creditors found it a worthwhile endeavor. *Id.* at ¶ 84-85.

However, because, Plaintiffs allege, SBT transferred all its

assets and liability to Defendants, no assets existed to distribute to creditors, and therefore SBT's creditors had no incentive to pursue the defense. *Id.* at ¶ 85. Treating the Amended Complaint as true, and limiting this analysis to the facts stated in the Amended Complaint, Defendants have failed to meet their "heavy burden" of demonstrating that their due process was violated. *See Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999) (citation omitted) (when deciding a Rule 12(b)(6) motion to dismiss, "a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint."). Accordingly, Defendants' Article V(1)(b) argument fails.

"Article V(2)(b) allows a court to refuse enforcement of an arbitration award where enforcement would violate the forum state's public policy." *Yukos Capital S.A.R.L.*, 592 Fed. Appx. at 11 (citing *Telenor Mobile Commc'ns AS*, 584 F.3d at 405). This forum has "tightly restricted the public policy exception, emphasizing that the exception applies only where enforcement of the arbitration award, as opposed to enforcement of the underlying contract, would violate public policy." *Id.* (citing *Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 46 (2d Cir. 1997)); *see also Telenor*

*Mobile Commc'ns AS*, 584 F.3d at 411 ("Article V(2)(b) must be 'construed very narrowly' to encompass only those circumstances 'where enforcement would violate our most basic notions of morality and justice.'") (internal citation omitted).

Here, Defendants do not state with specificity why enforcement of the ICC Award would violate public policy pursuant to Article V(2)(b). *See* Defs.' Br. at 28 (". . . it would also be 'contrary to the public policy of [the United States . . . .]'"). Absent more, it is concluded that enforcing the award as against Defendants would not be contrary to public policy.

## IV.  **Conclusion**

For the foregoing reasons, the Defendants' motion to dismiss is denied.

It is so ordered.

**New York, NY**
**June /5/ 2018**

ROBERT W. SWEET
U.S.D.J.

38