# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

CBF INDÚSTRIA DE GUSA S/A, DA TERRA
SIDERÚRGICA LTDA, FERDUMAR – FERRO GUSA
DO MARANHÃO LTDA, FERGUMINAS
SIDERÚRGICA LTDA, GUSA NORDESTE S/A,
SIDEPAR – SIDERÚRGICA DO PARÁ S/A, and
SIDERÚRGICA UNIÃO S/A,

                 *Plaintiffs*,

          - vs -

AMCI HOLDINGS, INC., AMERICAN METALS &
COAL INTERNATIONAL, INC., K-M INVESTMENT
CORPORATION, PRIME CARBON GMBH,
PRIMETRADE, INC., HANS MENDE, AND FRITZ
KUNDRUN,

                 *Defendants*.

-------------------------------------------------------------------X

Civil Action No. 13-2581-PKC

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
CONFIRM ORDER OF PREJUDGMENT ATTACHMENT
AND FOR INJUNCTIVE RELIEF**

Adam K. Grant
Elizabeth J. Sher
Jonathan S. Zelig

**DAY PITNEY LLP**
Seven Times Square
New York, New York 10036
Tel: 212-297-5800
Fax: 212-916-2940
agrant@daypitney.com

*Counsel for Plaintiffs*

Dated: June 3, 2019

102876487

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .......................................................................................................................2

I.  SBT BREACHES ITS CONTRACTS WITH PLAINTIFFS ...............................................2

II.  DEFENDANTS HATCH THEIR PLAN TO DEFRAUD PLAINTIFFS ...............................2

III.  PLAINTIFFS' ARBITRATION REQUEST HASTENS DEFENDANTS' EFFORTS...................3

    A.  Defendants Arrange the Support of Their Financing Banks ...........................3

    B.  SBT Retains Valuation Consultants to Cloak The Transactions with a
       Veneer of Legitimacy.......................................................................................4

    C.  SBT Obtains Additional Time From the ICC Paris ..........................................4

IV.  THE FRAUDULENT SCHEME COMES TO FRUITION IN THE SECRET TRANSFER
    AGREEMENT AND SECRET SIDE LETTER ...............................................................5

V.  THE SECRET SPA .................................................................................................6

VI.  SBT AND PRIME CARBON DISCLOSE THE SECRET TRANSFER AGREEMENT, ITS
    PURPOSE AND ITS EFFECTS, TO THEIR ACCOUNTANTS, CUSTOMERS, AND
    SUPPLIERS (BUT NOT TO PLAINTIFFS) .................................................................6

VII.  SBT FINALLY HOLDS A SHAREHOLDER "MEETING" TO DISCUSS THE SECRET
    TRANSFER AGREEMENT .......................................................................................7

VIII.  PLAINTIFFS RAISE CONCERNS ABOUT PRIME CARBON TO DEFENDANTS AND
    THE ICC PARIS ...................................................................................................8

IX.  SBT'S BANKRUPTCY.............................................................................................10

X.  THE ARBITRATION AWARD...................................................................................10

XI.  DEFENDANTS ADMIT THEIR FRAUDULENT INTENT TO SWISS TAX AUTHORITIES ...10

XII.  PROCEDURAL HISTORY.........................................................................................11

ARGUMENT.............................................................................................................................12

I.  THE COURT SHOULD CONFIRM THE ATTACHMENT ORDER ...................................12

    A.  Plaintiffs Will Succeed on Their Claim to Enforce the Arbitration Award
       Against Mende as the Alter Ego of SBT .........................................................14

        1.  The Award Is Enforceable Under the New York Convention ..........15

        2.  Mende Is the Alter Ego of SBT .....................................................16

    B.  Plaintiffs Will Succeed on Their Common Law Fraud Claim Against
       Mende ...........................................................................................................20

    C.  Plaintiffs Will Succeed on Their Fraudulent Transfer Claim Against
       AMCI Holdings...............................................................................................20

D.      Plaintiffs Will Succeed on Their Conspiracy and Aiding and Abetting Fraud Claims Against the Attachment Defendants ............................................22

E.      Grounds for Attachment Exist Under CPLR § 6201 ............................24

      1.      Grounds for Attachment Exist Under CPLR § 6201(3) Against the Attachment Defendants Based on Their Past Fraudulent Conduct ..........................................................................................24

      2.      Grounds for Attachment Exist Against the Attachment Defendants Under CPLR § 6201(1) ........................................25

F.      Defendants Have Not Asserted Counterclaims in This Action.......................25

G.      Attachment Is Necessary to Secure Judgment in this Action Because the Attachment Defendants' Past Acts Present a "Real Threat" to Enforcement of a Judgment in This Action ........................................25

II.      THE SCOPE OF THE ATTACHMENT ORDER AND THE UNDERTAKING SET BY THE COURT ARE APPROPRIATE .........................................................................................27

III.      A PRELIMINARY INJUNCTION IS NECESSARY TO ENSURE THE EFFICACY OF THE ATTACHMENT ORDER BY PREVENTING MENDE FROM DIMINISHING THE VALUE OF THE INTERESTS SUBJECT THERETO................................................................29

A.      Plaintiffs Will Suffer Irreparable Harm Absent Issuance of the Requested Injunction.................................................................................................30

B.      The Balance of Hardships Tips in Favor of Plaintiffs..........................31

CONCLUSION................................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.,*
711 F. Supp. 2d 301 (S.D.N.Y. 2010) ..................................................................28

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC,*
820 F. Supp. 2d 510 (S.D.N.Y. 2011) ..................................................................21

*Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC,*
402 F. App'x 623 (2d Cir. 2010) ..........................................................................19

*Baker v. Latham Sparrowbush Assocs.,*
72 F.3d 246 (2d Cir. 1995) ..........................................................................21, 23

*Bank of Am., N.A. v. Won Sam Yi,*
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ..................................................................31

*Bank of China, N.Y. Branch v. NBM L.L.C.,*
192 F. Supp. 2d 183 (S.D.N.Y. 2002) ..................................................................26

*Bank of Leumi Tr. Co. of N.Y. v. Istim, Inc.,*
892 F. Supp. 478 (S.D.N.Y. 1995) ..................................................12, 13, 14, 25

*In re Bernard L. Madoff Inv. Sec. LLC,*
454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..................................................................21

*Brenntag Int'l Chemicals, Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ..................................................................................29

*BSH Hausgerate, GmbH v. Kamhi,*
282 F. Supp. 3d 668 (S.D.N.Y. 2017) ..................................................13, 15, 16, 25

*Capital Ventures Int'l v. Rep. of Argentina,*
443 F.3d 214 (2d Cir. 2006) ..................................................................................26

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,*
316 F. Supp. 3d 635 (S.D.N.Y. 2018) ..................................... 13, 15, 16, 17, 18

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,*
850 F.3d 58 (2d Cir.), *cert. denied*, 138 S. Ct. 557 (2017) ........................14, 15, 16

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,*
403 F.3d 85 (2d Cir. 2005) ..................................................................................15

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ................................................................................................22

*Faulkner v. City of Yonkers*,
    105 AD.3d 899, 902 (2d Dept. 2013) ..................................................................22

*In re Feit & Drexler, Inc.*,
    760 F.2d 406 (2d Cir. 1985) ................................................................................30

*First Options of Chi. Inc. v. Kaplan*,
    514 U.S. 938 (1995) ......................................................................................16, 31

*Garden City Irrigation, Inc., v. Salamanca*,
    No. 13304-04, 2005 WL 927001 (N.Y. Sup. Ct. Apr. 18, 2005) .......................28

*Graubard Mollen Dannett & Horowitz v. Kostantinidis*,
    709 F. Supp. 428 (S.D.N.Y. 1989) .....................................................................26

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) .............................................................................................31

*Herzi v. Ateliers De La Haute-Garonne*,
    No. 15 Civ. 7702, 2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015) ...........13, 25, 26

*Hotel 71 Mezz Lender LLC v. Falor*,
    14 N.Y.3d 303 (2010) ....................................................................................27, 28

*In re Hypnotic Taxi LLC*,
    543 B.R. 365 (Bankr. E.D.N.Y. 2016) ................................................................27

*III Finance Ltd. v. The Aegis Consumer Funding Group, Inc.*,
    99-Civ-2579, 1999 WL 461808 (S.D.N.Y. July 2, 1999) ....................................32

*ITC Entm't, Ltd. v. Nelson Film Partners*,
    714 F.2d 217 (2d Cir. 1983) ................................................................................27

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) .............................................................23, 24

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
    306 F. Supp. 2d 482 (S.D.N.Y. 2004) ................................................................14

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ................................................................21

*Mishcon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*,
    No. 11 Civ. 4971, 2011 WL 6957595 (S.D.N.Y. Dec. 28, 2011) .......................14

*Morris v. N.Y. State Dep't of Taxation & Fin.,*
  82 N.Y.2d 135 (1993) ........................................................................................................16

*Motorola, Inc. v. Abeckaser,*
  No. 07 Civ. 3963, 2009 WL 1362833 (E.D.N.Y. May 14, 2009) ....................................31

*Mulder v. A.S. Goldman & Co.,*
  703 N.Y.S.2d 678 (Sup. Ct. N.Y. Cty. 1999) .................................................................13

*N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.,*
  No. 07 Civ. 8008, 2008 WL 2115225 (S.D.N.Y. May 16, 2008) ................................25, 27

*Offor v. Mercy Med. Ctr.,*
  No. 17 Civ. 1872, 2018 WL 3364389 (S.D.N.Y. July 10, 2018) .....................................20

*OSRecovery, Inc. v. One Groupe Int'l, Inc.,*
  305 F. Supp. 2d 340 (S.D.N.Y. 2004) .............................................................................28

*Pena v. Morgan,*
  149 F. Supp. 2d 91 (S.D.N.Y. 2001) ...............................................................................27

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.,*
  144 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................................30, 31, 32

*Red Ball Interior Demolition Corp. v. Palmadessa,*
  874 F. Supp. 576 (S.D.N.Y. 1995) ..................................................................................20

*Rehill v. Rehill,*
  202 Misc. 865 (Sup. Ct. N.Y. Cty. 1952) .......................................................................27

*Republic of the Philippines v. Marcos,*
  806 F.2d 344 (2d Cir. 1986) ............................................................................................30

*Richmond Hill Realty Co. v. E. Richmond Hill Land Co.,*
  246 A.D. 301(1st Dep't 1936) ....................................................................................22, 23

*Telenor Mobile Comm'ns AS v. Storm LLC,*
  584 F.3d 396 (2d Cir. 2009) ............................................................................................15

*Victor Lalli Enters., Inc. v. Skippy Candle Corp.,*
  578 F. Supp. 1384 (S.D.N.Y. 1984) ................................................................................20

*Williamson v. Recovery Ltd. P'ship,*
  542 F.3d 43 (2d Cir. 2008) .........................................................................................16, 19

**Statutes**

DCL § 276.......................................................................................................................20

**Rules**

CPLR 2004.................................................................................................................13

CPLR 6201..................................................................................................................24

CPLR 6201(1)..............................................................................................................25

CPLR  6201(1)..............................................................................................................14

CPLR 6201(3)..............................................................................................................24

CPLR  6201(3)..............................................................................................................14

CPLR  6211(a)..............................................................................................................12

CPLR 6211(b)..............................................................................................................12

CPLR 6212................................................................................................................ 13, 25

CPLR 6212(a)..............................................................................................................13

CPLR 6212(b)..............................................................................................................28

CPLR 6212(c)..............................................................................................................13

CPLR 6219..................................................................................................................12

Fed. R. Civ. P. 64........................................................................................................12

Fed. R. Civ. P. 65(a)....................................................................................................29

**Other Authorities**

David D. Siegel, *New York Practice* § 316 (6th ed.).....................................................14

## PRELIMINARY STATEMENT

On May 14, 2019, the Court granted Plaintiffs' *ex parte* application for an order of prejudgment attachment (the "Attachment Order") against Defendant Hans Mende ('Mende") – the billionaire international business tycoon known as the "coal king" and "godfather of coal" – and Defendant AMCI Holdings, Inc. ("AMCI Holdings"), a company co-owned by Mende, in the amount of $48,413,462.16 (Mende and AMCI Holdings are, together, the "Attachment Defendants.")

In granting the Attachment Order, the Court found it is "probable that Plaintiffs will succeed on the merits" of the following claims:

- Mende committed fraud against Plaintiffs;

- Mende conspired to commit, and aided and abetted the commission of, fraud against Plaintiffs;

- Mende  improperly used his control over Steel Base Trade, AG ("SBT")), to fraudulently transfer SBT's assets to Prime Carbon, AG ("Prime Carbon") for the express purpose of helping SBT fraudulently or improperly avoid liability to Plaintiffs;

- AMCI Holdings, an entity owned by Mende and Defendant Fritz Kundrun, knowingly received assets fraudulently transferred from Europe; and

- AMCI Holdings conspired to commit, and aided and abetted the commission of, fraud against Plaintiffs.

As demonstrated herein, and in the supporting papers hereto, the Attachment Order was properly issued and should be confirmed.  Additionally, Plaintiffs now also seek (on notice to Defendants) injunctive relief against Mende to forestall the real and substantial risk that he will again seek to evade his responsibilities to Plaintiffs.

## BACKGROUND

### I.   SBT BREACHES ITS CONTRACTS WITH PLAINTIFFS

In 2008, Plaintiffs, a group of Brazilian pig iron producers, agreed to sell 103,500 metric tons of pig iron to SBT, a commodities trader, for $76 million (the "Contracts"). (Grant Decl., ¶ 65). When market forces changed during the 2008 financial crisis, SBT breached the Contracts by refusing to purchase more pig iron.  Thus, on September 11, 2009, Plaintiffs formally notified SBT of its breach and of their intent to arbitrate at the ICC Paris.  (*Id.* at ¶ 66).

### II.   DEFENDANTS HATCH THEIR PLAN TO DEFRAUD PLAINTIFFS

On September 15, 2009, just four days after Plaintiffs notified SBT of their intent to arbitrate, ███████████ (a trader at SBT) forwarded Plaintiffs' September 11, 2009 notice to ███████████ (a director at Prime Carbon), writing that ████████████████████████ ████ (Grant Decl., ¶¶ 67, 56, 53).  One week later, after conferring with ████ ████ reported the news up the chain to Mende, who was *not* an SBT executive but who was the ultimate 50% owner of the AMCI corporate family: ████████████████████████████ (*Id.* at ¶ 68).  In response, Mende made his intention clear: ██████████████████████ ███████████████ (*Id.*). ████ responded: █████████████ (*Id.* at ¶ 69).

On September 29, 2009, SBT's counsel, ███████████████ (the ████████ ████), requested additional time to respond to Plaintiffs' claims. (*Id.* at ¶ 70).  The Attachment Defendants, in coordination with others, used the extra time that Plaintiffs granted to generate a ████████████████████████ designed to loot SBT and to protect Mende's and Kundrun's interests from Plaintiffs' claims.  (*Id.* at ¶ 71).  For approval of this plan, ████ wrote directly to Mende (who did not hold any position with SBT [Grant Decl., ¶ 51]):





(*Id.* at ¶¶ 71-73) (emphasis supplied).  Mende quickly signed off on this plan.  (*Id.* at ¶ 74).[1]

### III.   PLAINTIFFS' ARBITRATION REQUEST HASTENS DEFENDANTS' EFFORTS

As the fraudulent scheme took shape, Plaintiffs remained in the dark. Frustrated by SBT's continued refusal to comply with its contractual obligations, Plaintiffs filed a formal request for arbitration (the "Arbitration Request") with the ICC Paris on November 16, 2009 (the "Arbitration").  (Grant Decl., ¶ 78).  The Arbitration Request only accelerated the scheme; as ▮▮▮ put it: ▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at ¶ 79).

### A.  Defendants Arrange the Support of Their Financing Banks

On the very same day they received the Arbitration Request, SBT and/or ▮▮▮▮ personnel[2] appear to have met with SBT's banks to ensure funding for Prime Carbon after it assumed control of SBT's business – just as ▮▮▮▮ suggested would be necessary in his communication to Mende in October 2018.  (*See* Grant Decl., ¶ 80; Ex. 16).  A series of power point

---

[1] Prime Carbon, the entity Defendants selected as SBT's counterparty for this asset deal, was a ▮▮▮▮▮▮▮ within the AMCI Family that was owned by the same company that owned SBT (AMCI International, AG ("AMCI International")). (Grant Decl., ¶ 75).  AMCI International was ultimately owned by Mende and Kundrun.  (*Id.* at ¶ 61).  ▮▮▮▮▮▮ (*Id.* at ¶ 76).

[2] As explained in the accompanying Grant Declaration, the referenced PowerPoint presentations contain the logo for AMCI, and indicate on their cover slides that they were presentations concerning SBT.  However, as explained herein, further e-mail communications about the slides indicate that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ all appear to have been involved on some level with the creation of and presentation of the PowerPoint presentations.  (*See* Grant Decl., ¶¶ 80-81; *see also id.* at ¶¶ 52-54, 56-57, 75 (for identification of these individuals and their roles in the AMCI Family)).

presentations prepared by ████████ in mid-November 2009, █████████████████[3] ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (*Id.* at Exs. 23-24).[4]

### B. SBT Retains Valuation Consultants to Cloak The Transactions with a Veneer of Legitimacy

Defendants' plan – as expressed by ████████ to Mende, and to which Mende agreed in e-mail

communications in October 2009 – included ████████████████████████████████

████████████████ (Grant Decl., Ex. 16).  Thus, SBT retained ████████████ to conduct a

"Fairness Opinion" related to the Secret Transfer Agreement.  (*Id.* at ¶ 82.  On its face, the Fairness

Opinion confirms ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ (*Id.*, Ex. 27). ███ also acknowledged it ████████████████████████

█████████████████████████████████████████ (*Id.* at ¶ 83).

### C. SBT Obtains Additional Time From the ICC Paris

To buy more time to complete the scheme, SBT – through the Schweiger Firm – requested

an extension of time to respond to the Arbitration Request until February 15, 2010, but the ICC

Paris allowed only a shorter extension, until January 27, 2010. (Grant Decl., ¶¶ 84-85).

---

[3] While Plaintiffs are not identified by name, Defendants are referring to Plaintiffs' claims. In Exhibit 19 to the Grant Decl., an e-mail chain from October 2009, just one month prior, ████ and Mende discuss a ████████████████████ in response to ████████████  Thus, the logical inference is that the ██████████████ referenced by ████████████ in Exhibits 26 and 27 to the Grant Decl. are the ███████████████████ discussed by ████ and Mende in Exhibit 21 ██████████████████████

[4] Further discussions with SBT's financial institutions continued through December 2009. (Grant Decl., ¶ 81).

## IV. THE FRAUDULENT SCHEME COMES TO FRUITION IN THE SECRET TRANSFER AGREEMENT AND SECRET SIDE LETTER

By December 23, 2009 (*i.e.,* three months after Plaintiffs' initial demands and six weeks after the Arbitration Request), SBT and Prime Carbon entered into the Secret Transfer Agreement pursuant to which SBT agreed to transfer all its assets and business – valued by SBT at $126 million in assets and $130 million in liabilities – to Prime Carbon for $1.00, effective as of November 30, 2009. (Grant Decl., ¶ 86). On the same day they signed the Secret Transfer Agreement, SBT and Prime Carbon also signed a side letter agreement to *immediately* implement the Secret Transfer Agreement *prior to* the approval of the transaction by the boards of either company, and *prior to* seeking the consent of SBT's contractual counterparties to the assignment of their contracts to Prime Carbon (the "Secret Side Letter"). (*Id.* at ¶ 88).[5] At the same time that SBT and Prime Carbon signed the Secret Transfer Agreement and the Secret Side Letter, ███████████████████ ███████████████ █ ████████████████████████████████████████████ ██████████ (*Id.* at ¶ 89).

The Secret Transfer Agreement, the Secret Side Letter, and the Employee Transfer destroyed SBT as a viable, operating entity. They transformed SBT into a shell with: (i) virtually no assets, (ii) more than $50 million in potential liabilities, (iii) no contracts, (iv) no business, and (v) a skeleton crew of one full-time and one part-time employee. In turn, these transactions transformed Prime Carbon, SBT's sister company, from a non-operational shell company with no business (Grant Decl., Ex. 17; Ex. 18; Ex. 2 at pp. 10, 12), into a turn-key operation that was a mere continuation of SBT.

---

[5] SBT and Prime Carbon even agreed ████████████████████████████████ ████████ (Grant Decl., Ex. 32, at ¶ 4).

[6] ████████ ████████████ (Grant Decl., ¶ 90). ███████████████████████████████ (*Id.*). ████████████████████████████████ (*Id.*).

## V.     THE SECRET SPA

On January 1, 2010, Prime Carbon also agreed to a secret Share Purchase Agreement (the "Secret SPA") through which it sold to AMCI Holdings (a U.S.-based company also owned by Mende and Kundrun) the shares of Primetrade it had just obtained from SBT through the Secret Transfer Agreement. (Grant Decl., ¶ 91).  Critically, Mende signed the Secret SPA on behalf of *both* AMCI Holdings (as purchaser) *and* Prime Carbon (as seller).  (*Id.* at ¶ 92).  Thus, Primetrade would be transferred to Prime Carbon for one month, at least on paper according to the Secret Transfer Agreement, and then transferred on to AMCI Holdings pursuant to the Secret SPA.

Prime Carbon's sale of Primetrade to AMCI Holdings was remarkable not only because the Secret SPA was signed by the same person on behalf of both parties (Mende) and because of the bizarre step of first sending Primetrade's shares to Prime Carbon, but also because Prime Carbon never actually received the funds it was due under the terms of the Secret SPA.  Rather, **Mende** directed the sale proceeds from AMCI Holdings to an account strictly controlled by him and two of his trusted minions.  (*Id.* at ¶ 93; Ex. 36 (wherein Mende states ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████)).[7]

## VI.     SBT AND PRIME CARBON DISCLOSE THE SECRET TRANSFER AGREEMENT, ITS PURPOSE AND ITS EFFECTS, TO THEIR ACCOUNTANTS, CUSTOMERS, AND SUPPLIERS (BUT NOT TO PLAINTIFFS)

After executing the Secret Transfer Agreement and Secret Side Letter, SBT and Prime Carbon began disclosing Prime Carbon's assumption of SBT's business to SBT's accountants, customers, and suppliers – **other than Plaintiffs**.  (*See* Grant Decl., ¶ 97; Ex. 44 (the ██████ ████ conveyed to SBT's customer that, as of December 23, 2009, Prime Carbon ████████

---

[7] Indeed, Prime Carbon's own accounting personnel had no access to the account in which the proceeds were placed, leaving Mende's selected employees to send Prime Carbon's accounting department relevant information independently, including the payment receipts for the Secret SPA. (Grant Decl., ¶ 94).

████████████████████████████████ and ███████████████████████████████████

████████████████████████); Ex. 40 (announcing to customer that █████████

█████████████████████████); Ex. 45 (announcing to accountant that as of

December 23, 2009, ██████████████████████████████████████████████);

Ex. 41 (discussing ████████████████████████████); Ex. 42 (announcing ████

████████ to customer); Ex. 43 (confirming to customer that ██████████████

████████████████████████████████); Ex. 46 (announcing to

supplier that ███████████████████████████████████████████████████████████

████████████████████████████████████████████████); Ex. 17).

## VII.   SBT FINALLY HOLDS A SHAREHOLDER "MEETING" TO DISCUSS THE SECRET TRANSFER AGREEMENT

Although the Secret Transfer Agreement had, by December 2009, been fully executed and

effectuated (through the Secret Side Letter), and although SBT and Prime Carbon had already begun

informing third parties of the transfer, SBT nevertheless held an extraordinary shareholder meeting

on ***January 5, 2010*** to ████████████████████████████████. (Grant Decl., ¶ 98).

The minutes do not reflect who was present at this meeting, other than █████████████████████

████████████████████████████████████████████████████. Curiously, ██████

███████████████████████████████████████████████████████████████████████

████████████. (*See* Grant Decl., ¶ 57).

The minutes of that meeting reflect that ████████████████████████████████

████████████████████████████████████████████████ and asks ███████████████

████████████████████████████████████████ (*Id.* at ¶ 99; Ex. 47, at

p. 3). The same minutes then reflect that the ████████████████████████████

██████████████████████████ and ███████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ (*Id.* at Ex. 47, at p. 4).

Puzzlingly, ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ (*Id.*)  The minutes conclude with the statement that ████████████

███████████████████████████████████ (*Id.*).[8]  In other words, t████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

## VIII.   PLAINTIFFS RAISE CONCERNS ABOUT PRIME CARBON TO DEFENDANTS AND THE ICC PARIS

Although they were ***unaware*** of the Secret Transfer Agreement, the Secret Side Letter or the Secret SPA, on January 11, 2010, Plaintiffs became concerned that a company called Prime Carbon, which appeared to be related to SBT, had entered the pig iron market.  (Grant Decl., Ex. 49).  On January 15, 2010, Plaintiffs sent a letter (the "January 15 Letter") to SBT and the ICC Paris, noting the conspicuous overlap between Prime Carbon and SBT and stating:

> There are strong and undisputable indications that **the operations from Steel Base Trade AG are being transferred to another company [Prime Carbon] from the same AMCI Group** . . . .
>
> Therefore, prior to taking any drastic provisional measures aiming to block assets, accounts, and in general means prevent the Respondent from evading their means to pay their debts, the Claimants request the Respondent to demonstrate before this

---

[8] Similarly, even though the Secret Transfer Agreement had been signed and effectuated over two weeks prior, Prime Carbon's board meeting minutes from January 7, 2010 reflect that ████████████████████████████
████████████████████████████████████████████████████████
████████████████  (Grant Decl., ¶ 101).

respectable court and before the Claimants good faith on the course of this dispute and present guarantees of means for payment of the present claim. . . .

> **Prior to taking any measures of such nature to bring security of the debts from the Respondent and the AMCI Group, Claimants brings the facts above to knowledge of the Court and of the Respondent, allowing the Respondents to demonstrate good faith and respect to this Court and their business partners . . . .**

(*Id.*) (emphasis supplied).  The January 15 Letter made it perfectly clear that unless Plaintiffs received assurances that SBT was viable and not simply transferring its business to Prime Carbon, they were prepared to seek remedies akin to prejudgment attachment or injunctive relief.

The Schweiger Firm – which represented SBT *both* before the ICC Paris *and* ██████ ████████████████████████ (Grant Decl., ¶ 87) – responded to the January 15 Letter in the "January 25 Letter." (*Id.* at ¶¶ 103-104; Ex. 50).  The January 25 Letter sought to convince Plaintiffs not to seek, and the ICC Paris not to grant, interim relief not only by omitting any mention of the Secret Transfer Agreement (which the Schweiger Firm helped arrange), the Secret Side Letter, the Secret SPA, the Supplier Letters, and the Employee Transfer (collectively the "Secret Transactions"), but also by fraudulently telling the ICC Paris that nothing amiss was occurring:

> The respondent [SBT] does not try to evade from its obligations. . . . . [T]he Respondent has to build financial accruals in his balance sheet and to set up restructuring measures. . . .

> Respondent [] has to analyze his position regarding pending or imminent claims for damages from purchasers as well as against suppliers as well as his financial situation. Therefore, the Respondent has at least temporarily suspended his business activities. Please note, however, the Respondent is still existing and has not resolved to be dissolved and liquidated. . . .

> It is correct that Prime Carbon AG belongs to the AMCI Group. However, Prime Carbon AG was already established in September 2006 with the main corporate purpose of producing, trading and distribution of petroleum products. Further, it is normal that from time to time new players are coming up in that business. . . .

> Based on these reasons, we kindly ask you in the name and on behalf of the Respondent to refrain from ordering conservatory and/or interim measures if such measures should ever be requested. . . .

(Grant Decl., ¶ 104; Ex. 50).  On January 27, 2010, the Schweiger Firm filed SBT's response in the Arbitration, again failing to disclose the Secret Transactions (the "January 27 Filing").  (Grant Decl., ¶ 106).

## IX.     SBT's BANKRUPTCY

The Attachment Defendants knew that Plaintiffs' claims would result in SBT's bankruptcy as early as October 2009 (Grant Decl., Ex. 16), and that the Secret Transactions left SBT with no assets, massive liabilities, and no way to generate revenue.  But SBT was not placed into bankruptcy for another four months, during which time SBT and the Schweiger Firm failed to inform Plaintiffs or the ICC Paris of the material change in SBT's financial status.  (Grant Decl., ¶ 107).  Instead, they allowed the lies and misrepresentations in the January 25 Letter to linger.  On April 29, 2010, SBT finally filed for bankruptcy (the "Bankruptcy").  (*Id.*).

## X.      THE ARBITRATION AWARD

A week after SBT filed for bankruptcy, it finally notified the Arbitration panel.  (Grant Decl., Ex. 52).  SBT's Bankruptcy administrator determined that SBT's estate did not possess sufficient funds to defend SBT in the Arbitration (nor did any of SBT's creditors desire to do so).  (Grant Decl., ¶ 108).  Thus, on November 9, 2011, the ICC Paris rendered its Award against SBT and in favor of Plaintiffs in the amount of $48,053,462.16, plus legal fees of $360,000.  (*Id.* at ¶ 113).

## XI.     DEFENDANTS ADMIT THEIR FRAUDULENT INTENT TO SWISS TAX AUTHORITIES

In March 2013, ███████████ of ███████████ wrote an e-mail to ███ ███████████ of the ███████████ of Zug, Switzerland, copying ███████[9] in



---

[9] ██████ was one of two individuals selected by Mende to ██████ ███████████ (Grant Decl., ¶¶ 52, 93).

which he stated that:



(Grant Decl., ¶ 114).

In this e-mail, ██████ references that ██████████████████████ ██████████████. In Exhibit 16 to the Grant Declaration, an e-mail chain from October 2009, ██████ and Mende discuss a ████████████████████████████ ████████████████████████████████████████████████ Thus, the logical inference is that the ██████████████████ referenced by ██████ in Exhibit 54 to the Grant Declaration, are the ████████████████████████ ██████ discussed by ██████ and Mende in Exhibit 16 as ████████████████████ ██████████. (Grant Decl., ¶ 115).

## XII.   PROCEDURAL HISTORY

A complete recitation of the procedural history of this matter is set forth more fully in the accompanying Grant Declaration and will not be repeated herein in full.   (*See* Grant Decl., ¶¶ 6-48). Plaintiffs outline herein only those developments occurring after the Court's issuance of the Attachment Order.[10]

This Court issued the Attachment Order on May 14, 2019. (Grant Decl., ¶ 2).   Plaintiffs posted the bond required thereunder on May 20, 2019.   (*Id.* at ¶ 3).   Thereafter, Plaintiffs moved expeditiously to identify the appropriate property and garnishees on which to levy the Attachment

---

[10] As set forth in greater detail in the Grant Declaration, and as described in Plaintiffs' application for issuance of the Attachment Order, Plaintiffs' application for the Attachment Order was timely. Many of the crucial documents necessary to carry Plaintiffs' burden on its application (and on this motion to confirm) were not produced until the last two weeks of February of this year. Once produced, Plaintiffs moved expeditiously to file their application, and now move to confirm this Court's properly issued Attachment Order.

Order. (*Id.*). On May 30th and 31st, 2019, Plaintiffs effected levies of the Attachment Order against the Attachment Defendants' property by service of the Attachment Order on the entities listed in Appendix A. (*Id.*).[11] As directed by the Attachment Order, Plaintiffs now timely move to confirm the Attachment Order within 5 days of the first levy.[12]

## ARGUMENT

### I. THE COURT SHOULD CONFIRM THE ATTACHMENT ORDER[13]

Federal Rule of Civil Procedure 64 empowers a district court to seize "property[ ] to secure satisfaction of [a] potential judgment" in accordance with "the law of the state where the court is located." Article 62 of the New York Civil Practice Law and Rules ("CPLR") governs attachment of assets in New York, and allows "[a]n order of attachment [to] be granted without notice, before or after service of summons and at any time prior to judgment." CPLR 6211(a).

Where, as here, an order of attachment is issued *ex parte*, the party obtaining the attachment must move to confirm the order on notice to the party whose property is subject to the attachment. CPLR 6211(b); *Bank of Leumi Tr. Co. of N.Y. v. Istim, Inc.*, 892 F. Supp. 478, 481–82 (S.D.N.Y. 1995).

---

[11] Plaintiffs acknowledge that 27 entities may appear to be a large number of entities upon which to serve the Attachment Order. However, given the size of the attachment, the fact that Plaintiffs have been unable to identify substantial assets directly in the name of Mende, and that Plaintiffs are uncertain as to the assets held by these entities (all of which, except one, are private companies or trusts), Plaintiffs are simply trying to identify the entities necessary to secure their interests. Once Plaintiffs have the garnishee statements, they will have a better idea of which of the entities hold sufficient assets to secure the attachment, and will ask the Court to release the non-essential entities from the Attachment Order's strictures.

[12] On May 30, 2019, Plaintiff sent a courtesy copy of this memorandum of law and the Grant Declaration to counsel for Defendants, as well as copies of both documents including Plaintiffs' proposed redactions of the types of information Defendants previously indicated constituted confidential information under the applicable protective order. Given that Plaintiffs had to effectuate service of these papers on the Attachment Defendants as well as the 27 entities on whom Plaintiffs served the Attachment Order within five days of the first levy, Plaintiffs gave Defendants twenty-four hours to identify any additional redactions they felt necessary under the circumstances.

[13] Based on their search of publicly available information, Plaintiffs have a good faith belief the entities upon whom Plaintiffs effected the levy of the Attachment Order are garnishees of the Attachment Defendants. However, Plaintiffs have not yet received the garnishee statements that this Court directed the garnishees to serve within five days of Plaintiffs' levy pursuant to CPLR 6219. (Grant Decl., ¶¶ 4-5). Accordingly, to the extent the Court deems it necessary, Plaintiffs request this Court grant Plaintiffs an additional ten days to renew or supplement this motion to confirm after receipt of the garnishee statements, so that Plaintiffs can specifically identify the assets over which Plaintiffs seek attachment. *See* CPLR 6211(b) ("If the plaintiff upon such motion [to confirm] shall show that the [garnishee] statement has not been served and that the plaintiff will be unable to satisfy the requirement of subdivision (b) of section 6223 until the statement has been served, the court may grant one extension of the time to move for confirmation for a period not to exceed ten days.").

On such motion, the movant must demonstrate that: (1) "there is a cause of action"; (2) "it is probable that the plaintiff will succeed on the merits"; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR 6212(a); *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 671–72 (S.D.N.Y. 2017); *Herzi v. Ateliers De La Haute-Garonne*, No. 15 Civ. 7702, 2015 WL 8479676, at *1 (S.D.N.Y. Oct. 13, 2015); *Bank of Leumi Tr. Co. of N.Y.* , 892 F. Supp. at 481–82. In addition, the movant must demonstrate "a need for continuing the levy." *Bank of Leumi Tr. Co. of N.Y.*, 892 F. Supp. at 481–82 (quoting CPLR 6211(b), 6223(b)). To do so, Plaintiffs must demonstrate that "attachment is needed to secure payment or obtain jurisdiction." *BSH Hausgerate*, 282 F. Supp. 3d at 671–72 (quoting *Mishcon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, No. 11 Civ. 4971, 2011 WL 6957595, at *3 (S.D.N.Y. Dec. 28, 2011). The evidence set forth on this motion satisfies each of these elements.[14]

With respect to the first element, Plaintiffs have indisputably stated viable causes of action for money damages against each of the Attachment Defendants, as all six validly asserted claims in Plaintiffs' Second Amended Complaint (the "SAC") survived Defendants' motions to dismiss. *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 647 (S.D.N.Y. 2018). (*See* Grant Decl., ¶¶ 7-22).

---

[14] In addition, CPLR 6212(c) provides that "[w]ithin ten days after granting of an order of attachment, the plaintiff shall file it and the affidavit and other papers upon which it was based . . . . [u]nless the time for filing has been extended. . . ." Thus, the Court has discretion to extend the ten-day time limit either before or after expiration of the period. CPLR 2004; *Mulder v. A.S. Goldman & Co.*, 703 N.Y.S.2d 678, 681-82 (Sup. Ct. N.Y. Cty. 1999) (noting that the filing requirement is not jurisdictional, and thus is curable and not fatal to the attachment order, especially insofar as the "court may grant an extension to comply with the filing requirement before or after the original 10 day time period has expired"). Here, good cause exists to extend the time for filing. The Court issued the Attachment Order on an *ex parte* basis. After the Attachment Order issued, Plaintiffs moved expeditiously to identify and effect a levy on Defendants' assets. Had Defendants filed the Attachment Order and the papers on which it was based prior to completion of these efforts, Defendants would have received notice, thereby obviating the *ex parte* nature of the Attachment Order. Further, the purpose of the filing requirement is "to provide public notice of the attachment." *Mulder*, 703 N.Y.S.2d at 681 (*citing* Legislative Studies and Reports following CPLR 6212. Here, the Court directed the Attachment Order and its supporting papers be filed under seal. As such, there would be no public harm (and no harm to the Attachment Defendants) attendant to an extension of the 10 day period.

The remaining elements are also met: (i) Plaintiffs will "more likely than not" succeed on the merits of their claims against the Attachment Defendants; (ii) grounds for attachment exist under CPLR 6201(1) & (3) based on the Attachment Defendants' prior fraudulent conduct and non-domiciliary status; (iii) none of the Defendants have asserted any counterclaims in this action; and (iv) there is a need for continuing the levy insofar as the Attachment Defendants' past conduct in this case demonstrates their willingness to fraudulently transfer, and aid and abet in the fraudulent transfer of, assets out of Plaintiffs' reach.

### A. Plaintiffs Will Succeed on Their Claim to Enforce the Arbitration Award Against Mende as the Alter Ego of SBT

As the Court already found, Plaintiffs will "more likely than not" succeed in enforcing the Award against Mende as the alter ego of SBT. *Mishcon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, No. 11 Civ. 04971, 2011 WL 6957595, at *4 (S.D.N.Y. Dec. 28, 2011) (holding the "probability of success on the merits" standard for attachment requires a demonstration that "more likely than not. . . [Plaintiffs] will succeed on its claims" (quoting *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F.Supp.2d 308, 319 (E.D.N.Y.2009)) ; David D. Siegel, *New York Practice* § 316 (6th ed.). Significantly, "[i]n determining whether there is a likelihood of success on the merits, **all legitimate inferences should be drawn in favor of the party seeking the attachment**." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (emphasis added); *see also Bank of Leumi Tr. Co. of N.Y.*, 892 F.Supp. at 482 (noting that "the court must give the plaintiff the benefit of all legitimate inferences that can be drawn from the facts") (quoting *Nat'l. Bank & Tr. Co v. J.L.M. Int'l., Inc.*, 421 F.Supp. 1269, 1272 (S.D.N.Y. 1976)).

To succeed on their enforcement claim, Plaintiffs must prove: (i) the Award is enforceable, and (ii) Mende is the alter ego of SBT. *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 75 (2d Cir.), *cert. denied*, 138 S. Ct. 557 (2017). As the Court already held, the evidence submitted herein easily satisfies the "more likely than not" standard with respect to both elements.

102876487

-14-

### 1.   The Award Is Enforceable Under the New York Convention

Foreign arbitral awards (such as the Award) are enforceable in the U.S. pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). *See BSH Hausgerate, GmbH v. Kambi*, 282 F. Supp. 3d 668, 672 (S.D.N.Y. 2017); *CBF*, 850 F.3d at 75. Summary confirmation of such awards is the expected result in Convention proceedings, subject only to the rigidly circumscribed – and rarely successful – defenses set forth in Article V of the Convention. *See, e.g., Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005); *see also Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009) (holding the exceptions "must be construed very narrowly to encompass only those circumstances where enforcement would violate our most basic notions of morality and justice")(quoting *Europcar Italia S. p. A. v. Maiellano Tours, Inc.* , 156 F. 3d 310, 315 (2d Cir. 1998)). .

None of the so-called "Article V defenses" remotely applies here.   Defendants have attempted to trigger Article V by arguing that SBT was "incapacitated" in the Arbitration, and thus neither SBT nor Defendants had a full and fair opportunity to be heard.  *See CBF Industria de Gusa*, 316 F. Supp. 3d at 651 (describing Defendants' arguments).  Of course, as a factual matter and as set forth in the Background above, Defendants themselves caused that incapacity, and thus cannot complain of it now.   But, more importantly, Judge Sweet also disposed of the legal basis for Defendants' arguments by holding (correctly) that: (1) the relevant time for determining incapacity under the Convention is at the time of signing the contracts, not at the Arbitration; (2) if Defendants are SBT's alter egos, then they received adequate notice of the arbitration and an opportunity to be heard; and (3) "enforcing the award as against Defendants would not be contrary to public policy." *Id.* at 651-53.[15]

---

[15] In a recent letter to Judge Cott, Defendants asserted "[t]he ICC Award is unenforceable against Defendants . . . under Article V of the New York Convention due to: . . . the arbitration agreements in the Contracts, which provide that arbitrability issues as to who is bound are for the arbitrators . . . ." (Joint Status Ltr. dated Apr. 29, 2019, Dkt #216, at 9).

As Defendants have yet to raise a single Article V defense that could plausibly apply, there is a high probability, as the Court already found, that Plaintiffs will enforce the Award. *See BSH Hausgerate*, 282 F. Supp. 3d at 672-75.

### 2. Mende Is the Alter Ego of SBT

The Court correctly determined the evidence produced *by the Defendants* demonstrates it is more likely than not that Plaintiffs will be able to establish Mende was SBT's alter ego, such that enforcement of the Award against him is appropriate.  As Judge Sweet held in denying Defendants' motion to dismiss the SAC, alter-ego liability may attach where: "(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *CBF Industria de Gusa S/A*, 316 F. Supp. 3d at 646(quoting *Atateks Foreign Trade, Ltd. v. Private Label Sourcing*, LLC, 402 Fed. App'x 623, 625 (2d Cir. 2010)) . While courts consider a number of factors in making this determination, there is no "firm rule," only a "general principle … that liability is imposed *when doing so would achieve an equitable result*." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) (emphasis added) (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir.1989) ; *see also Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993) ("[C]ourts will disregard the corporate form … whenever necessary to prevent fraud or to achieve equity." (quoting *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (1966)).

As the Court correctly found, the evidence presented on this motion demonstrates Plaintiffs will "more likely than not" succeed in their alter ego case against Mende.

---

However, this argument was rejected by the Second Circuit, and Judge Sweet. In its March 2, 2017, amended decision, the Second Circuit, at the urging of *amici* from the New York City Bar Association, excised its vacated decision's direction that this Court, on remand, must first conduct an arbitrability analysis under *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 941-43 (1995).  Instead, the Second Circuit directed that, on remand, the issue before the issue before the Court only to "evaluate . . . . [Plaintiffs'] effort to reach appellees as alter-egos of SBT, under the standards set out in the New York Convention. . . ."  *CBF*, 850 F.3d at 75-76; *see also id.* at 62; *see also CBF Industria de Gusa*, 316 F. Supp. 3d at 645–53.

### i.      Mende Exercised Control Over SBT[16]

As described throughout this motion, Mende personally abused SBT's corporate form to defraud Plaintiffs.  The evidence leaves no doubt that Mende, who was not an officer, director or employee of SBT (Grant Decl., ¶ 51):

- **Directed SBT to transfer all of its assets to Prime Carbon through the Secret Transfer Agreement.** SBT and Prime Carbon had officers, directors and boards. Yet Mende, who was neither an officer nor a director of SBT, ███████████████████████████ ███████████████████████████ (Grant Decl., ¶¶ 71-74; Ex. 16). ████████████████████████████████████████████████ ████████████████████████████████████████████ (*Id.* at ¶¶ 98-101).  *See CBF Industria de Gusa*, 316 F. Supp. 3d at 646 (noting importance of "the degree of discretion shown by the allegedly dominated corporation");[17]

- **Ensured the Secret Transfer Agreement was not a negotiated, arms' length transaction.** Mende ███████████████████████████████, there was no sale or bidding process, and the inventory and values of the assets to be bought and sold was not the result of an independent appraisal by the buyer and seller. (Grant Decl., ¶¶ 71-74, 82-83). Instead, the appraisal was done – at Mende's instruction – solely for the purpose of making sure the whole transaction was done at ██████████████ (*Id.* at ¶¶ 72-73; Ex. 16).  *See CBF Industria de Gusa*, 316 F. Supp. 3d at 646 (noting "whether the dealings between the entities are at arms' length" is a factor);

- **Successfully drove SBT into bankruptcy to thwart Plaintiffs' collection efforts.** E-mail correspondence between Mende and █████ at the commencement of the Secret Transactions made Mende's purpose and goals crystal clear: ████████████████████████ (Grant Decl., ¶ 69; Ex. 14).  In line with this concept, Mende's minions developed a plan that involved rendering SBT insolvent.  (*Id.*, Ex. 16). Mende knew that SBT's bankruptcy was the inevitable (and indeed intended) outcome of this plan from its inception.  (Ex. 16 (██████████████████████████████ ██████████████████)).  *CBF Industria de Gusa*, 316 F. Supp. 3d at 646 (noting "insolvency" is a factor); and

---

[16] As explained more fully in the accompanying Grant Declaration, Plaintiffs did not acquire definitive proof of the Attachment Defendants' role in Defendants' scheme until late February 2019, and could not have met their burden on this element prior thereto. (Grant Decl., ¶¶ 34-41).

[17] As discussed in Background §VII, *supra*, the minutes of SBT's extraordinary shareholder meeting held on January 5, 2010, ██████████████████████████████████ ██████████████████  In other words, the pre-textual meeting minutes appear to have been contrived in an attempt to cloak, *post hoc*, the Secret Transfer Agreement with the appearance of propriety. Similarly, ████████████████████████████████████████████, in what appears to be a mere contrivance intended to legitimize the Secret Transfer Agreement after it had already been fully effectuated. (Grant Decl., ¶ 101).

102876487

- **Ensured Primetrade's shares ended up at AMCI Holdings following its transfer from SBT to Prime Carbon.** The ultimate goal of getting Primetrade's shares to AMCI Holdings in the U.S. was achieved by Mende's own acts, both ██████████ ████████████████████████████████████████████████████████████████ (Grant Decl., Exs. 14, 16, 33). *See CBF Industria de Gusa*, 316 F. Supp. 3d at 646 (considering "whether the dealings between the entities are at arms' length" and "overlap in ownership, officers, directors, and personnel").

Taken together, the evidence of Mende's personal involvement in every aspect of the Secret Transactions demonstrates it was Mende– not the executives and corporate boards ostensibly in charge – who made the critical decisions concerning SBT's transfer of its assets to Prime Carbon. Mende made that decision to thwart liability to Plaintiffs, not to achieve legitimate business goals.

### ii.    Mende Used His Control to Defraud Plaintiffs

The timing and substance of the Secret Transactions demonstrates the Secret Transactions (*see, e.g.,* Background §§I-V, *supra*), were designed to evade liability to Plaintiffs.   That this was Mende's intent also is expressly spelled out first in his e-mail to ██████████ in September 2009 in which he declares that ████████████████████ (Grant Decl., Ex. 14), and later in the e-mail between him and ██████ in October of 2009 in which ██████ (also not directly affiliated with SBT) suggested:



(Grant Decl., Ex. 16).  Mende, ██████████████████, agreed:

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

(*Id.*)   That the intent of the Secret Transactions was to avoid liability to the Plaintiffs was also confirmed by an attorney ███████████████████████████████████████████ ██████████ in 2013:

█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████

(*Id.*, Ex. 54).

Finally, any doubt concerning the fraudulent intent of the Secret Transactions was dispelled by the deceitful January 25 Letter, which covered-up Mende's scheme, and successfully dissuaded Plaintiffs from seeking the very type of relief now sought on this motion.

### iii.   Mende's Fraud Resulted in an Unjust Loss to Plaintiffs

To satisfy the final element, Plaintiffs must simply demonstrate the fraudulent scheme "exacerbated [SBTs'] insolvency and rendered [it] less able to pay damages." *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623, 626 (2d Cir. 2010). Here, the scheme not only "exacerbated" SBT's insolvency, it literally and intentionally drove SBT into bankruptcy. (Grant Decl., ¶¶ 71-72, 107). As a result, Plaintiffs have not only been deprived of the funds awarded in the Award, but also have incurred, to date, millions of dollars in legal fees, lost interest, and other expenses trying to enforce the Award. (Grant Decl., ¶ 135).

*       *       *

The evidence set forth in Argument §§ I.A.2.(i)-(iii), *supra*, clearly demonstrates, as this Court already held, that Plaintiffs will more likely than not succeed on their alter ego claim against Mende. Holding Mende personally liable for SBT's debt to Plaintiffs is necessary to "achieve an equitable result," the very purpose of alter-ego liability. *Williamson,* 542 F.3d at 53 *(*quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir.1989)).

**B.  Plaintiffs Will Succeed on Their Common Law Fraud Claim Against Mende**

For the same reasons, the Court correctly held the evidence establishes Plaintiffs will "more likely than not" succeed on the merits of their common law fraud claim against Mende. "There are five elements necessary to sustain a claim in fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995). As discussed in Argument § I.A.2.ii, *supra*, each of these elements is satisfied here.  The evidence proves that: (i) SBT, with Mende's knowledge and at his direction, effectuated a fraudulent scheme intended to render SBT judgment proof from Plaintiffs' claims (*see* Argument §I.A.2, *supra*);[18] (ii) Plaintiffs reasonably relied on the misrepresentations in the January 25 Letter and the January 27 Filing;[19] and (iii) Plaintiffs were damaged by such reasonable reliance. (*See, e.g.*, Grant Decl., ¶ 135).  In addition, as discussed in detail in Argument § I.A.2.i, *supra*, Mende personally participated in the fraud.

**C.  Plaintiffs Will Succeed on Their Fraudulent Transfer Claim Against AMCI Holdings**

The Court also correctly held Plaintiffs are likely to succeed on their fraudulent transfer claim against AMCI Holdings under the New York Debtor and Creditor Law ("DCL").  Under DCL § 276, "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."[20]  Here, there can be no dispute the Secret Transfer Agreement and the Secret SPA

---

[18] Even if the evidence produced to date does not prove Mende knew of or directed the misstatements in the January 25 Letter (which likely is the result of the significant spoliation of evidence that Plaintiffs are working to address in the proceedings before Judge Cott, he is responsible for those statements as the alter-ego of SBT.

[19] *Offor v. Mercy Med. Ctr.*, No. 17 Civ. 1872, 2018 WL 3364389, at *5 (S.D.N.Y. July 10, 2018) ("Counsel is entitled to rely upon the factual representations of his adversary, particularly where, as here, the representations were repeated, clear, and unequivocal."); *Victor Lalli Enters., Inc. v. Skippy Candle Corp.*, 578 F. Supp. 1384, 1386 (S.D.N.Y. 1984) (finding party entitled to rely on representations of opposing counsel made in court).

[20] Moreover, for purposes of the DCL, even if SBT and/or the Attachment Defendants believed Plaintiffs' breach of contract claims against SBT were meritless and that SBT had valid defenses, the Secret Transactions still constitute

(which were part of one overall transaction) were made with the "actual intent . . . to hinder, delay, or defraud" Plaintiffs.  While "badges of fraud" abound,[21] the Court need look no further than Mende's explicit admission, and counsel's express confirmation, that the entire purpose of the Secret Transactions was to ███████████████████████████████████████████████████████ ███████████████████████████████████████ (Grant Decl., Ex. 54; Ex. 16).

Moreover, although it is the intent of the transferor (SBT) and not the transferee (AMCI Holdings) that is relevant to this claim, *see, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011), the evidence leaves no doubt that AMCI Holdings knowingly received SBT's fraudulently transferred assets. For example:

- **AMCI Holdings served as Prime Carbon's counterparty for the Secret SPA, which transferred SBT's interest in Primetrade further out of Plaintiffs' reach.** (Grant Decl., Ex. 33). ███████████████████████████████████████████████ (*Id.*).

- **AMCI Holdings' employees, in conjunction with Mende and employees of Prime Carbon and SBT, helped orchestrate the Secret SPA.**  Mr. Wood[22] admitted the ███████ ████████████████████████████████████████████████ (Grant Decl., ¶ 95; Ex. 38). At that time, AMCI Holdings knew the transfer was in direct response to Plaintiffs' claims. (*Id.* at ¶ 77; Ex. 20). In addition, Mr. ██████ and Mr. Wood ████████████████████████████ ██████ (*Id.* at ¶ 96; Ex. 39 (discussing ███████████████).

- **Mende's knowledge of the scheme is imputed to AMCI Holdings as a matter of law.**  *See Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (holding knowledge

---

fraudulent transfers.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 409 (Bankr. S.D.N.Y. 2007) (finding a transfer made with the actual intent to hinder, delay or defraud creditors is fraudulent and avoidable "even where the parties to an intentional fraudulent conveyance hold the 'genuine belief' that there are defenses to the creditors' claims and that one or more creditors has been needlessly overbearing in refusing forbearance").

[21] Badges of fraud include: "(1) a close relationship between the parties to the transaction,... (3) "inadequacy of consideration, (4) "the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011) (quoting *Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998)).  *All* of these "badges of fraud" exist in this action.

[22] While Mr. Wood ████████████████████████████████████████████████████████████████████████████ (Grant Decl., ¶ 58).

of an organizer, president, controlling officer, and sole owner of a corporation is imputed to the corporation); *Richmond Hill Realty Co. v. E. Richmond Hill Land Co.*, 246 A.D. 301, 305(1st Dep't 1936) (finding that the knowledge "of Turton, as president, of Turton and his brother, as owners of all the stock of the plaintiff corporation, and the knowledge of the whole of its board of directors, is imputed to the corporation itself and it is held to have knowledge of the same facts").

### D. Plaintiffs Will Succeed on Their Conspiracy and Aiding and Abetting Fraud Claims Against the Attachment Defendants

The SAC alleges civil conspiracy against, *inter alia*, both Attachment Defendants and alleges aiding and abetting fraud against, *inter alia*, Mende.  The Court correctly held Plaintiffs are likely to succeed on such claims against both Attachment Defendants.[23]

Under New York law, "to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement."  *Faulkner v. City of Yonkers*, 105 AD.3d 899, 902 (2d Dept. 2013).  The tort here is the fraud embodied in the Secret Transactions detailed *passim*.  Mende's agreement to the torts in question is demonstrated by, among other things, his e-mail with ███████████ in October of 2009 and his ████████████ ████████████████████████████████████████████████.  (Grant Decl., Exs. 16 and 33).  AMCI Holdings' agreement to the torts in question is embodied in, among other things, its agreement to serve as Prime Carbon's counterparty in the Secret SPA, and the participation of its employees and its executive, Mende, in signing and effectuating the Secret SPA with full knowledge of the fraud. (Grant Decl., ¶¶ 77, 95-96; Exs. 20, 33, 38-39).

AMCI Holdings' overt acts in furtherance of the agreements are embodied in the completion of the Secret Transactions, the participation of its employees in effectuating those transactions, its

---

[23] While the SAC's Fourth Claim for Relief (aiding and abetting fraud) is not styled as against AMCI Holdings, the allegations in the complaint provide AMCI Holdings with fair notice that the claim also applies to it.  *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

acceptance of the Primetrade's shares from Prime Carbon/SBT, and its payment of funds therefore. (*Id.* at ¶¶ 77, 93-96; Exs. 16, 20, 33-36, 38-39). Mende's overt acts abound.  (*See* Argument §I.A.2(i)-(ii), *supra*).

"To establish liability under New York law for aiding and abetting fraud, [Plaintiffs] must prove: '(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (quoting *Filler v. Havit Bank*, No 01 Civ. 9510, 2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003)).  As explained in Argument §I.C, *supra*, Plaintiffs have established a likelihood of success in establishing the first element – the existence of a fraud. Mende's actual knowledge of the fraud is embodied in the e-mails discussed above.  (*See, e.g.,* Grant Decl., Ex. 16). AMCI Holdings' knowledge of the fraud is (i) demonstrated by the involvement of its employees organizing and effectuating the Secret SPA (Grant Decl., ¶¶ 77, 93-96; Exs. 16, 20, 33-36, 38-39); and (ii) implied by law by reason of Mende's knowledge as a director of AMCI Holdings (Grant Decl., ¶ 50) and ███████████████████████████████████ (*id.* at ¶ 92). *See Baker*, 72 F.3d at 255; *Richmond Hill Realty Co.*, 285 N.Y.S. at 428.

As to the last element, "[a] defendant provides substantial assistance only if [he] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *Winnick*, 406 F. Supp. 2d at 256 (quoting *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)).  "Whether the assistance is substantial or not is measured, in turn, by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated."  *Id.* (quotations omitted). Proof that Mende provided substantial assistance to the Secret Transactions is embodied by, *inter alia*, his approval of the Secret Transfer Agreement, his involvement in effectuating the Secret SPA (*see, e.g.,* Grant Decl., ¶ 92-93 (describing Mende's ███████████████)), and ███████

███████████████████████████████████████████████ (*Id.*, Ex. 33).  Indeed, the

evidence is clear that without Mende's involvement, the fraudulent scheme likely would not have

been possible.  *Winnick*, 406 F. Supp. 2d at 257 ("The critical test is . . . whether [the defendant's

conduct] made a substantial contribution to the perpetration of the fraud.").  Proof that AMCI

Holdings provided substantial support to the Secret Transactions is supplied by, *inter alia*, ██

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Grant

Decl., ¶¶ 77, 93-96; Exs. 16, 20, 33-36, 38-39). *Winnick*, 406 F. Supp. 2d at 257 (noting that

"substantial assistance can take many forms . . . . [E]xecuting transactions, even ordinary course

transactions, can constitute substantial assistance under some circumstances, such as where there is

an extraordinary motivation to aid the fraud.")(quoting *Primavera Familienstifung v. Askin*, 130

F.Supp.2d 450, 511-12 (S.D.N.Y.2001)).

### E.  Grounds for Attachment Exist Under CPLR 6201

The Court correctly held that, in addition to demonstrating Plaintiffs' probability of

succeeding on the merits, Defendants' documents also demonstrate grounds for attachment under

CPLR 6201, the third element of prejudgment attachment in New York.

#### 1.  Grounds for Attachment Exist Under CPLR 6201(3) Against the Attachment Defendants Based on Their Past Fraudulent Conduct

Appropriate grounds for an order of attachment under CPLR 6201 include circumstances

under which "the defendant, with intent to defraud his creditors or frustrate the enforcement of a

judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or

secreted property, or removed it from the state or is about to do any of these acts."  CPLR 6201(3).

To satisfy this standard, Plaintiffs need not offer evidence of the Attachment Defendants' present

intent to dispose, encumber or secret assets.  Instead, "the overwhelming weight of authority in New

York State courts and courts in this District favors the view that [CPLR] 6201(3) may be satisfied

where the plaintiff merely demonstrates *past* fraudulent transfers by the defendant." *N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, No. 07 Civ. 8008, 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (collecting cases). As detailed above, both Mende and AMCI Holdings were active and knowing participants in the scheme to remove SBT's assets from Plaintiffs' reach. (*See* Argument §§I.A-D, *supra*).

### 2. Grounds for Attachment Exist Against the Attachment Defendants Under CPLR 6201(1)

Under CPLR 6201(1), attachment is also warranted where a "defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." AMCI Holdings is a Delaware corporation that is not otherwise authorized to do business in New York. (*See* Grant Decl., Ex. 9 (Defs' Am. Ans.), at ¶ 20). In addition, while he does not "contest[] personal jurisdiction," Mende has denied the allegations that he is a domiciliary of New York residing in the state. (*See id.* at ¶ 25).

### F. Defendants Have Not Asserted Counterclaims in This Action

With respect to the fourth and final element for prejudgment attachment, Defendants have not asserted any counterclaims in this action. (*See generally* Grant Decl., Ex. 9). Accordingly, the amount demanded from Defendants exceeds all counterclaims known to Plaintiffs. CPLR 6212.

### G. Attachment Is Necessary to Secure Judgment in this Action Because the Attachment Defendants' Past Acts Present a "Real Threat" to Enforcement of a Judgment in This Action

The Court correctly held there is a "need for continuing the levy" insofar as the Attachment Defendants' past conduct in this case demonstrates their willingness to fraudulently transfer, and aid and abet in the fraudulent transfer of, assets out of Plaintiffs' reach. *Bank of Leumi Tr. Co. of N.Y.*, 892 F. Supp. at 481–82 (citing CPLR 6211(b) and 6223(b)). Attachment is necessary for security purposes where "there exists a real threat to [Plaintiff's] ability to enforce a judgment against [D]efendant . . . ." *Herzi*, 2015 WL 8479676, at *2; *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d

at 676.  This Court has broad discretion "to the extent that [making this determination] require[s] weighing of evidence and also in balancing competing considerations."  *Capital Ventures Int'l v. Rep. of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006).

As explained throughout the Background section and in Argument § I of this brief, *supra*, the Attachment Defendants' past conduct in this case demonstrates their willingness to fraudulently transfer, and aid and abet in the fraudulent transfer of, assets out of Plaintiffs' reach.  An order of prejudgment attachment is thus necessary to prevent the Attachment Defendants from repeating their scheme, and forcing Plaintiffs (and the Court) to expend additional, unnecessary time and money unwinding any such future transactions.

Moreover, that the Attachment Defendants are not domiciled in New York provides further evidence that attachment is needed for security purposes.  (*See* Grant Decl., Ex. 9 (Defs' Am. Ans.), at ¶¶ 20, 25).  Many courts have found attachment necessary in circumstances just like those presented in this case.  *See Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 188-91 (S.D.N.Y. 2002) (confirming *ex parte* attachment order where defendants had already tried, *inter alia*, to dissipate assets to the Cayman Islands and noting that decision was based on "past and present conduct" of defendants); *Herzi*, 2015 WL 8479676, at *1-3 (granting *ex parte* order of attachment where defendant's assets in New York could be transferred overseas); *Graubard Mollen Dannett & Horowitz v. Kostantinidis,* 709 F. Supp. 428, 432 (S.D.N.Y. 1989) (finding that attachment against foreign defendants not authorized to do business in New York was appropriate to avoid putting plaintiff in the position of having to chase defendants to foreign venues).

At bottom, Plaintiffs here seek to do what SBT and its European counsel prevented them from doing before the ICC Paris – *i.e.*, seek timely prejudgment conservatory relief to ensure the Attachment Defendants can make good on their debts.  This is a case where prior conduct is indicative of future behavior.  Because the Attachment Defendants have proven the lengths to

which they will go to forestall Plaintiffs' efforts to collect on the Award, confirmation of the Attachment Order is necessary.[24]

## II. THE SCOPE OF THE ATTACHMENT ORDER AND THE UNDERTAKING SET BY THE COURT ARE APPROPRIATE

Under New York law, "[i]t is not necessary for the order of attachment to describe the property to be attached." *In re Hypnotic Taxi LLC*, 543 B.R. 365, 384 (Bankr. E.D.N.Y. 2016) (quoting 12 Weinstein, Korn & Miller, New York Civil Practice ¶ 6211.05 (2015)); *see also Rehill v. Rehill*, 202 Misc. 865, 867, (Sup. Ct. N.Y. Cty. 1952). Accordingly, the scope of the Attachment Defendants' assets reached by the Attachment Order (*i.e.*, any funds, monies, personal or real property and/or interest in property belonging to Attachment Defendants) is wholly appropriate and consistent with the CPLR. *N.Y. Dist. Council of Carpenters Pension Fund*, 2008 WL 2115225, at *6 n.3.

Nor must the Attachment Order be limited to the Attachment Defendants' property located within New York State. Where, as here, an attachment "serve[s] only a security function" (rather than a jurisdictional function), a "court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York." *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 312 (2010). Here, the Attachment Defendants have submitted to the jurisdiction of this Court, both explicitly (*see, e.g.,* Grant Decl., Ex. 9 (Defs.' Am. Ans.), at ¶¶ 20, 25; and Dkt. # 108 at 6 n.5) and implicitly by litigating this action without contesting personal jurisdiction. Accordingly, this Court has "authority to order prejudgment attachment of the property [Attachment Defendants] own[] and/or control[]"

---

[24] Further, in this action, Plaintiffs served document demands targeted towards ascertaining Defendants' financial health and ability to satisfy a judgment in this action, which Defendants refused to answer. (*See* Grant Decl., Ex. 1, at Resp. to Demand 7 for Mende, Resp. to Demand 6 for AMCI Holdings). Defendants' failure to provide transparency as to the existence and location of assets sufficient to satisfy the judgment that Plaintiffs will now inevitably obtain demonstrates further necessity for confirmation of the Attachment Order. *ITC Entm't, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir. 1983) (upholding order of attachment where defendant did not have sufficient assets in New York to satisfy a potential $2.7 million judgment against him); *Pena v. Morgan*, 149 F. Supp. 2d 91, 93–95 (S.D.N.Y. 2001).

regardless of whether "the situs of the property is outside New York." *Hotel 71*, 14 N.Y.3d at 312. Thus, the scope of the Attachment Order is appropriate.

Plaintiffs also posted the undertaking ordered by the Court in the Attachment Order. (Grant Decl., ¶ 3). The amount of the undertaking directed by the Court is wholly consistent with the CPLR. CPLR 6212(b) provides that "the plaintiff shall give an undertaking, in a total amount fixed by the court, but not less than five hundred dollars . . . ." Here, the Attachment Order attaches the Attachment Defendants' property in an amount sufficient to secure the full amount of the Award$48,413,462.16 (exclusive of post-award prejudgment interest and statutory interest on Plaintiffs' state law claims). Case law that a bond in the amount of .04% to .35% of the total value of the assets sought to be attached is appropriate.[25] While Plaintiffs offered to post a bond of $200,000, falling at 0.31% of the total value of the assets Plaintiffs sought to attach, the Court ordered Plaintiffs provide an undertaking in the amount of $80,000 (or 0.17% of the total value of the assets attached by the Attachment Order). The amount of this undertaking was well within the discretion of the Court.

As explained more fully in the accompanying Grant Declaration, based on known information about the Attachment Defendants' financial condition, the attachment of $48,413,462.16 likely will not work a hardship on them. (*See* Grant Decl., ¶¶ 118-134). AMCI Holdings is a holding company which, as of December 31, 2012, ███████████████ ██████ (*Id.* at ¶ 118). Although Defendants refused to provide financial information for any of the Defendants, including AMCI Holdings, for the period of time after December 31, 2012, the historical audited consolidated financial statements they did produce for the fiscal years ending

---

[25] *See, e.g., OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (undertaking of $100,000 on assets of 250,000,000 [.04%]); *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (undertaking of $250,000 on assets of $72.4 million [.35% of the assets]); *Garden City Irrigation, Inc., v. Salamanca*, No. 13304-04, 2005 WL 927001, at *3 (N.Y. Sup. Ct. Apr. 18, 2005) (undertaking of $500 where plaintiff sought to recover $150,000 [.33%]).

102876487

-28-

December 31, 2009 through December 31, 2012, ███████████████

████████████████████████████████████████████████████████

██████. (*Id.* at ¶ 119).

Further, with respect to Mende, other than disclosing his 50% ownership of AMCI Holdings and his relative ownership positions in certain of the other Defendants, Defendants have refused to provide any other financial information for Mende for any time period.  However, public reports from 2017 through 2019 reflect that Mende – often referred as the "coal king" – is a billionaire. (Grant Decl., ¶¶ 125-134).

### III. A PRELIMINARY INJUNCTION IS NECESSARY TO ENSURE THE EFFICACY OF THE ATTACHMENT ORDER BY PREVENTING MENDE FROM DIMINISHING THE VALUE OF THE INTERESTS SUBJECT THERETO

In addition to confirmation of the Attachment Order, Plaintiffs now ask the Court to enjoin Mende from taking any action (directly or indirectly) to transfer, encumber, or diminish the value of any assets subject to the Attachment Order to the point where such asset becomes valued at less than the amount to secure the full amount of the Attachment Order.  As set forth herein, such relief is necessary to ensure the efficacy of the Attachment Order by preventing Mende from transferring, diminishing, or destroying the value of the interests subject to the Attachment Order.

"To justify the issuance of preliminary injunctive relief, a party must ordinarily show that it will suffer irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *see also* Fed. R. Civ. P. 65(a). For the reasons set forth above in connection with Plaintiffs' motion to confirm the Attachment Order, Plaintiffs have established a probability of success on the merits. *See* Argument §§ A-D, *supra*.  Plaintiffs' motion also satisfies the remaining elements, as set forth directly below.

### A. Plaintiffs Will Suffer Irreparable Harm Absent Issuance of the Requested Injunction

Absent the requested injunctive relief, Plaintiffs will suffer irreparable harm. "Although the monetary injury claimed here usually does not constitute irreparable harm because such injury can be estimated and compensated, irreparable harm may exist where 'but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 248 (S.D.N.Y. 2001) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999)). Thus, "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible." *Republic of the Philippines v. Marcos,* 806 F.2d 344, 356 (2d Cir. 1986); *In re Feit & Drexler, Inc.,* 760 F.2d 406, 416 (2d Cir. 1985) (finding irreparable harm where it was shown that defendant "intended to frustrate any judgment on the merits by transfer[ring its assets] out of the jurisdiction" (quoting *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980)); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d at 248 ("Preliminary injunctions are therefore appropriate to thwart a defendant from making a judgment uncollectible.").

As explained above, Mende demonstrated his desire and willingness to fraudulently transfer, and to aid in the fraudulent transfer of, assets out of Plaintiffs' reach. Mende's prior conduct, in and of itself, demonstrates the propriety of the requested injunction under Second Circuit precedent. However, the requested injunction in this matter is especially necessary as concomitant relief to the Attachment Order.

Specifically, the requested injunction is necessary to prevent the dissipation or diminution of assets held by the garnishee entities Mende controls and that are subject to Attachment Order. By way of example, Mende is a trustee of both the 2005 Irrevocable Kirmar Trust and the Mende Family Trust, and he is either the sole member or manager (or both) of 253 Long Neck Point Road,

LLC, HJM Investments LLC, and New Kirmar LLC. Although the Attachment Order reaches Mende's interest in these entities, it does not reach the *assets held* by the entities. In his roles as trustee, manager, and/or sole member, Mende thus retains the ability to transfer, devalue, or otherwise dispose of the assets held by those entities. To the extent he effectuates such a transfer, devaluation, or disposal, this Court's Attachment Order would be rendered ineffective, as the assets subject to the Attachment Order (Mende's interest in these entities) could be rendered worthless. Thus, the requested injunction is necessary to protect the integrity and efficacy of the Attachment Order.

Plaintiffs recognize that since the Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), courts have held that "[t]he [c]ourt's equitable power to issue a preliminary injunction to prevent a defendant from transferring assets does not extend to an action for money damages where the plaintiff claims no lien or equitable interest in the assets sought to be enjoined." (*quoting Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.,*No. 06 Civ. 52 (JGK), 2006 WL 2337186, at *7 (S.D.N.Y. Aug. 11, 2006)). However, *Grupo Mexicano* does not control this matter insofar as Plaintiff have "something akin to security interest in [Mende's] assets" as the result of the Attachment Order. *Motorola, Inc. v. Abeckaser*, No. 07 Civ. 3963, 2009 WL 1362833, at *4 (E.D.N.Y. May 14, 2009) (distinguishing *Grupo Mexicano* on the grounds that "plaintiff holds something akin to a security interest in defendants' assets, and specifically defendant Abeckaser's home, by virtue of the Asset Injunction"); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 78–79 (W.D.N.Y. 2018) (collecting authority).

### B.  The Balance of Hardships Tips in Favor of Plaintiffs

Moreover, the balance of hardships tips decidedly in Plaintiffs' favor. *First*, "the evidence establishe[s] a continuing pattern of bad-faith by [Mende] in evading creditor claims and simply winding-up companies at the first hint of []trouble." *Quantum Corp. Funding, Ltd.*, 144 F. Supp. 2d at

248-49. Thus, "[w]ithout an injunction, [Plaintiffs] would suffer a hardship because [they] would not be paid monies that . . . are justly due and owed." *Id. Second,* "the injunction would ensure that [Plaintiffs] would be paid in the future should [they] prevail, but it would *not* shut down [Mende's] corporations." *Id.* . Plaintiffs do not seek to interfere with the normal business operations of the entities over which Mende exercises control; they seek an injunction sufficient only to ensure that Mende does not dissipate or dilute the assets of those entities below the amount of the Attachment Order.[26]

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that this Court confirm the Attachment Order, and grant a preliminary injunction enjoining Mende from taking any action to transfer, encumber, or diminish the value of any assets subject to the Attachment Order below the amount of the Attachment Order.

Respectfully submitted,

Dated: June 3, 2019

Adam K. Grant
Elizabeth J. Sher
Jonathan S. Zelig

**Day Pitney LLP**
Seven Times Square
New York, NY 10036
T: (212) 297-5803
F: (212) 499-4154
agrant@daypitney.com

*Counsel for Plaintiffs*

---

[26] In the alternative, this Court retains the discretion to permit Mende to pay the amount of the Attachment Order into the Court's registry, thereby obviating the need for either the Attachment Order of the requested preliminary injunction. *See, e.g., Quantum Corp. Funding, Ltd.,* 144 F. Supp. 2d at 249 (wherein the court issued a preliminary injunction directing defendants to deposit funds sufficient to cover plaintiffs' claims into the court's registry and prohibiting defendants from transferring assets other than in the ordinary course of business); *III Finance Ltd. v. The Aegis Consumer Funding Group, Inc.,* 99-Civ-2579, 1999 WL 461808 at *4 (S.D.N.Y. July 2, 1999) (Chin, J.) (granting injunction directing defendant to deposit $1.5 million in collateral for plaintiffs loans into the court's registry and prohibiting defendant from interfering with plaintiff's collateral interests).

102876487

**Appendix A**
**List of Entities/Individuals Served with the Attachment Order**[27]

1. Hans J. Mende

2. 2005 Irrevocable Kirmar Trust

3. 253 Long Neck Point Road, LLC

4. AMCI Acquisition Corp.

5. AMCI Eagle LLC

6. AMCI Holdings, Inc.

7. AMCI Minerals Corp.

8. AMCI Resources, Inc.

9. American Metals & Coal International, Inc.

10. Citicorp Nominees Pty Ltd (as holder for UBS Financial Services Inc. as nominee for Hans Mende as trustee of the Mende Family Trust)

11. Consulting & Coal Services, Inc.

12. Day Med Properties, Inc.

13. HJM Investments LLC

14. HPC, Inc.

15. Kirmar Investment Incorporated

16. Kirmar Property Management LLC

17. K-M Investment Corporation

18. Mende Family Trust

19. New Kirmar LLC

20. Primetrade, Inc.

21. Senate Coal Mines, Inc.

---

[27] *See* Declaration of Adam K. Grant dated June 3, 2019, ¶ 3.

22. Senate Resources, Inc.

23. Tanoma Coal Company, Inc.

24. Tanoma Energy II Inc.

25. Tanoma Enterprises, Inc.

26. Tanoma Mining Company

27. Virginia Crews Coal Company

28. Whitehaven Coal Ltd.