**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CBF INDÚSTRIA DE GUSA S/A, DA TERRA
SIDERÚRGICA LTDA, FERGUMAR - FERRO
GUSA DO MARANHÃO LTDA, FERGUMINAS
SIDERÚRGICA LTDA, GUSA NORDESTE S/A,
SIDEPAR - SIDERÚRGICA DO PARÁ S/A, and
SIDERÚRGICA UNIÃO S/A,

        Plaintiffs,

    -against-

AMCI HOLDINGS, INC., AMERICAN METALS &
COAL INTERNATIONAL, INC., K-M
INVESTMENT CORPORATION, PRIME CARBON
GMBH, PRIMETRADE, INC., HANS MENDE, and
FRITZ KUNDRUN,

        Defendants.

Case No: 13 Civ. 2581 (PKC) (JLC)

---

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION TO CONFIRM ORDER OF PREJUDGMENT ATTACHMENT
## AND FOR INJUNCTIVE RELIEF

BUCHANAN INGERSOLL & ROONEY, PC
Kevin P. Lucas
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Tel: (412) 562-8800
Fax: (412) 562-1041

MANDEL BHANDARI LLP
Rishi Bhandari
Robert Glunt
80 Pine Street, 33rd Floor
New York, New York 10005
Tel: (212) 269-5600
Fax: (646) 964-6667

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ..................................................................................................................... 3

ARGUMENT ........................................................................................................... 12

I.      PLAINTIFFS HAVE MADE NO SHOWING THAT AN
ATTACHMENT IS NECESSARY IN THIS ACTION ..................................... 13

II.     PLAINTIFFS HAVE NOT DEMONSTRATED A LIKLIHOOD
OF SUCCESS ON THE MERITS ........................................................ 17

     A.     Plaintiffs' Claims Were Rejected By the ICC Arbitration
Tribunal ........................................................................................ 17

     B.     Swiss Law And Proceedings Do Not Permit Plaintiffs'
Claims ........................................................................................... 20

          1.     Plaintiffs' Claims are Barred by Res Judicata
and Lack of Standing ................................................... 20

          2.     Plaintiffs' Other Claims Do Not Support a
Civil Claim for Relief Under Swiss Law ...................... 24

     C.     The Purchase Contract and SPA Were Fair And Reasonable .................. 26

     D.     Plaintiffs Did Not Rely Upon Any Alleged Misstatements ..................... 29

     E.     The Arbitration Award Is Unenforceable Against
Defendants Under the New York Convention. ........................................ 30

     F.     Hans Mende Was Not an Alter-Ego of SBT ............................................ 33

          1.     Plaintiffs' Evidence Fails to Demonstrate
Mende's Control over the Restructuring Transactions. ............... 36

          2.     Plaintiffs Show No Nexus Between Mende
and the Arbitration Award ............................................ 37

III.    PLAINTIFFS HAVE NOT SATISFIED THE STATUTORY
REQUIREMENTS FOR ATTACHMENT UNDER CPLR § 6201(3) ............... 38

IV.    AN ATTACHMENT WOULD BE UNDULY PREJUDICIAL TO
DEFENDANTS ............................................................................. 41

V.     DEFENDANTS ARE ENTITLED TO COSTS AND DAMAGES ..................... 41

VI.    PLAINTIFFS HAVE DISMISSED THEIR REQUEST FOR
       A PRELIMINARY INJUNCTION........................................................................ 42

CONCLUSION........................................................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Adam v. Itech Oil Co. (In re Gibraltar Resources, Inc.)*,
    210 F.3d 573 (5th Cir. 2000) ........................................................................................... 22

*Alesayi Beverage Corp. v. Canada Dry Corp.*,
    947 F. Supp. 658 (S.D.N.Y. 1996) ................................................................................. 23

*Alfadda v. Fenn*,
    966 F. Supp. 1317 (S.D.N.Y. 1997) ............................................................................... 23

*Allen v. McCurry*,
    449 U.S. 90 (1980)........................................................................................................... 21

*Am. Protein Corp. v. AB Volvo*,
    844 F.2d 56 (2d Cir. 1988) .............................................................................................. 36

*Ames v. Clifford*,
    863 F. Supp. 175 (S.D.N.Y. 1994) ........................................................................... 15, 17

*Bank of China, New York Branch v. NBM L.L.C.*,
    192 F. Supp. 2d 183 (S.D.N.Y. 2002) ...................................................................... 14, 15

*Brezenoff v. Vasquez*,
    433 N.Y.S.2d 553 (Civ. Ct. N.Y. Co. 1980).............................................................. 16, 39

*Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*,
    178 F. Supp. 2d 380 (S.D.N.Y. 2001) ........................................................................... 15

*Carter v. Healthport Techs.*,
    822 F.3d 47 (2d Cir. 2016) .............................................................................................. 24

*CBF Industria de Gusa v. AMCI Holdings*, *Inc.,*
    316 F. Supp. 3d 635 (S.D.N.Y. June 15, 2018) ...................................................... 36

*CBF Industria de Gusa v. AMCI Holdings, Inc.*,
    850 F.3d 58 (2d Cir. 2017) ................................................................................. 12, 18, 19

*Citibank, N.A. v. Keenan Powers & Andrews PC*,
    49 N.Y.S.3d 895 (1st Dep't 2017)................................................................................... 42

*Cohain v. Klimley*,
    Case No. 08 Civ. 5047, 2010 WL 3701362 (S.D.N.Y. 2010) ................................... 24

*Conason v. Megan Holding, LLC*,
    25 N.Y.3d 1 (2015)......................................................................................................... 34

*Cortlandt St. Recovery Corp. v. Hellas Tel.*,
    790 F.3d 411 (2d Cir. 2015) ........................................................ 24

*Cromwell v County of Sac*,
    94 U.S. 351, 352 (1877) ............................................................. 21

*D & K Props. Crystal Lake v. Mut. Life Ins. Co. of New York*,
    112 F.3d 257 (7th Cir. 1997) ...................................................... 22

*De Vos v. Lee*,
    Case No. 07-CV-804, 2009 U.S. Dist. LEXIS 134541
    (E.D.N.Y. 2009).................................................................... 26, 27

*Div. 1181 Transit Union - N.Y. Emps. Pension Fund v. N.Y. Dep't of Educ.*,
    Case No. 13-cv-9112, 2017 U.S. Dist. LEXIS 139882
    (S.D.N.Y. Aug. 30, 2017) ........................................................... 35

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003).................................................................... 33

*Drenis v. Haligiannis*,
    452 F. Supp. 2d 418 (S.D.N.Y. 2006) ........................................ 26

*East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc.*,
    16 N.Y.3d 775 (2011) ...................................................... 34, 35, 36

*Encore Credit Corp. v. LaMattina*,
    Case No. CV-05-5442 (CPS), 2006 WL 148909
    (E.D.N.Y. Jan. 18, 2006) ....................................................... 16, 39

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*,
    403 F.3d 85 (2d Cir. 2005) ......................................................... 30

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    596 B.R. 275 (Bankr. S.D.N.Y. 2018)....................................... 21

*Founders Ins. Co. v. Everest Nat. Ins. Co.*,
    41 A.D.3d 350 (1st Dep't 2007) ................................................. 17

*Friedberg v. Lewittes (In re Friedberg)*,
    Case No. 94 Civ. 1569 (JFK), 1995 WL 733636
    (S.D.N.Y. Dec. 12, 1995) ........................................................... 22

*Frontera Res. Azerbaijan Corp. v. State Oil Co.*,
    582 F.3d 393 (2d Cir. 2009) ...................................................... 24

*Grafstein v. Schwartz*,
    100 A.D.3d 699 (2d Dep't 2012)................................................ 13

*Guptill Holding Corp. v. State of N.Y.*,
   33 A.D.2d 362 (3d Dep't 1970) ........................................................................... 35

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ................................................................................... 28

*Hosking v. TPG Cap. Mgmt.*,
   535 B.R. 543 (Bankr. S.D.N.Y. 2015) ................................................................. 24

*In re Amaranth Nat. Gas Commodities Litig.*,
   711 F. Supp. 2d 301 (S.D.N.Y. 2010) ................................................................. 40

*In re Calise*,
   354 F. App'x 510 (2d. Cir. 2009) ......................................................................... 22

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) ................................................................................. 22

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................................................................. 34

*Independence Park Apts. v. United States*,
   449 F.3d 1235 (Fed. Cir. 2006) ........................................................................... 19

*Iran Aircraft Indus. v. Avco Corp.*,
   980 F.2d 141 (2d Cir. 1992) ........................................................................... 19, 30

*JML Sales, Inc. v. Schils Am. Acquisition Corp.*,
   2007 U.S. Dist. LEXIS 6414 (M.D. Pa. January 30, 2007) ................................ 22

*Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*,
   Case No. 03 Civ. 2355 (VM), 300 B.R. 564
   (S.D.N.Y. Oct. 20, 2003) ..................................................................................... 22

*Katzier's Floor & Home Design, Inc.*,
   394 F.3d 1143 (9th Cir. 2004) ............................................................................. 33

*Kim v. Co-Operative Centrale Raiffeisen-Boerenleenbank B.A.*,
   364 F. Supp. 2d 346 (S.D.N.Y. 2005) ................................................................. 23

*Konigsberg v. State Bar*,
   366 U.S. 36 (1961) ............................................................................................... 19

*Ledy v. Wilson*,
   38 A.D.3d 214, 214 (1st Dep't 2007) ................................................................... 35

*Lehman Bros. Fin. S.A. v. Shenkman*,
  Case No. 01 CIV 7701 (MBM), 2001 WL 1019371
  (S.D.N.Y. Sept. 4, 2001) ............................................................................ 17

*Maitrejean v. Levon Properties Corp.*,
  45 A.D.2d 1020 (2d Dep't 1974) ................................................................ 17

*Marcus v. Kane*,
  18 F.2d 722 (2d Cir. 1927) ........................................................................ 27

*Mascis Inv Partnership v. SG Capital Corp.*,
  Case No. 654981/2016, 2017 WL 1423682
  (N.Y. Sup. N.Y. Co. Apr. 21, 2017) .......................................................... 16

Morris v. State Dep't of Tax. & Fin.,
  82 N.Y.2d 135 (1993) ......................................................................... 34, 35

*Motores de Mexicali, S.A. v. Superior Court*,
  331 P.2d 1 (Cal. 1958) .............................................................................. 32

*Ne. United Corp. v. Lewis*,
  137 A.D.3d 1387 (3d Dep't 2016) ............................................................. 13

*New York State Elec. & Gas Corp. v. FirstEnergy Corp.*,
  766 F.3d 212 (N.D. Ind. Apr. 21, 2016) .................................................... 34

*North Atl. Dist. v. Teamsters Local Union No. 430*,
  497 F. Supp. 2d 315 (D.R.I. 2007) ............................................................ 32

*Oriental Comm. & Shp'g Co. v. Rosseel, N.V.*,
  702 F. Supp. 1005 (S.D.N.Y. 1988) .......................................................... 36

*Paramount Pictures Corp. v Allianz Risk Transfer AG*,
  31 N.Y.3d 64 (2018) ................................................................................. 21

*Penoyar v. Kelsey*,
  150 N.Y. 77 (1896) ................................................................................... 13

*People by Schneiderman v. Credit Suisse Sec. (USA) LLC*,
  31 N.Y.3d 622 (2018) ............................................................................... 29

*Peterson v. Islamic Republic of Iran*,
  Case No. 10-CV-4518 (KBF), 2017 WL 10299580
  (S.D.N.Y. Dec. 6, 2017) ........................................................................... 16

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
  792 F. Supp. 244 (S.D.N.Y. 1992) ....................................................... 23, 33

*Porter v. LSB Indus.*,
   192 A.D.2d 205 (4th Dep't 1993) ........................................................... 35

*Sea Hope Navigation Inc. v. Novel Commodities SA*,
   Case No. 13 Civ. 3225(LAK)(GWG), 2013 WL 5695955
   (S.D.N.Y. Oct. 21, 2013) ........................................................................ 30

*Shahedi v. Trimble*,
   Case No. H040809, 2015 WL 1393315
   (Cal. Ct. App. March 26, 2015) ............................................................. 32

*Shisgal v. Brown*,
   21 A.D.3d 845 (1st Dep't 2005) ............................................................. 35

*Shostack v. Diller*,
   Case No. 15-cv-2255, 2015 U.S. Dist. LEXIS 123777
   (S.D.N.Y. Sept. 16, 2015) ................................................................. 33, 34

*Signal Capital Corp. v. Frank*,
   895 F. Supp. 62 (S.D.N.Y. 1995) .......................................................... 39

*Silverman v. Miranda*,
   116 F. Supp. 3d 289 (S.D.N.Y. 2015) ................................................... 15

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
   948 F.2d 869 (2d Cir. 1991) .................................................................. 22

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*,
   783 N.Y.S.2d 758 (N.Y.Sup. N.Y. Co. 2004) ...................................... 16

*TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*,
   2017 U.S. Dist. LEXIS 93143 (S.D.N.Y. June 16, 2017) ..................... 34

*Thornapple Assocs., Inc. v. Sahagen*,
   Case No. 06 CIV. 6412 (JFK), 2007 WL 747861
   (S.D.N.Y. Mar. 12, 2007) ................................................................ 14, 41

*TNS Holdings v. MKI Sec. Corp.*,
   92 N.Y.2d 335 (1998) ............................................................................ 34

*Tracar v. Silverman (In re American Preferred Prescription, Inc.)*,
   266 B.R. 273 (Bankr. E.D.N.Y. 2000) .................................................. 22

*United Feature Syndicate v. Miller Features Syndicate*,
   216 F. Supp. 2d 198 (S.D.N.Y. 2002) ................................................... 24

*United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*,
   115 F. Supp. 2d 35 (D. Mass. 2000) ..................................................... 34

*United States v. Navajo Nat.*,
  556 U.S. 287 (2009) ......................................................................................... 19

*Victrix S.S. Co. v. Salen Dry Cargo A.B.*,
  825 F.2d 709 (2d Cir. 1987) ........................................................................... 23

*VisionChina Media Inc. v. S'holder Representative Servs., LLC*,
  109 A.D.3d 49 (1st Dep't 2013) ..................................................................... 14

*Wells Fargo Bank v. Konover*,
  Case No. 3:05-cv-1924, 2011 WL 1225986
  (D. Conn. March 28, 2011) ............................................................................. 33

*Westside Mothers v. Olszewski*,
  454 F.3d 532 (6th Cir. 2006) .......................................................................... 19

**Statutes**

N.Y. Debtor & Creditor Law § 270 .......................................................................... 27

New York's Debtor and Creditor Law ("NY DCL") § 276 ........................................ 26

**Rules**

CPLR § 6201 ...................................................................................................... 12, 13

CPLR § 6201(1) ......................................................................................................... 40

CPLR § 6201(3) .............................................................................................. 2, 13, 38

CPLR § 6212(a) ......................................................................................................... 13

CPLR § 6212(e) .................................................................................................... 3, 41

Fed. R. Civ. P. 64(a) ................................................................................................. 12

**Treatises**

Albert Jan van den Berg, The New York Arbitration Convention of 1958 (1981) ...................... 18

David D. Siegel, NEW YORK PRACTICE § 317 (5th ed. 2010) ........................................ 14

RESTATEMENT (SECOND) OF JUDGMENTS § 59 .............................................................. 33

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481 (1987) ............................ 23

RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION
  §1-1(l), (z) (Am. Law Inst., Tentative Draft No. 2, 2012)); ...................................... 18

## TABLE OF ABBREVIATIONS

| Abbreviation | Item |
|---|---|
| AMCI Holdings | Defendant AMCI Holdings, Inc. |
| ECF # | Docket Entries in this Action |
| ███████ | ████████████ |
| Grant Decl. (2/15) | Declaration of Adam K. Grant<br>Dated February 15, 2019 |
| Grant Decl. (4/2) | Declaration of Adam K. Grant<br>Dated April 2, 2019 |
| Grant Decl. (6/3) | Declaration of Adam K. Grant<br>Dated June 3, 2019 |
| Herzig Decl. | Second Supplemental Declaration of Stephan Herzig<br>Dated June 17, 2019 |
| Lucas Decl. (3/15) | Declaration of Kevin P. Lucas<br>Dated March 13, 2019 |
| Lucas Decl. (6/18) | Declaration of Kevin P. Lucas<br>Dated June 18, 2019 |
| Mende | Defendant Hans Mende |
| Pl. Br. | Plaintiffs' Memorandum of Law in Support of their Motion to Confirm |
| Pl. Crime-Fraud Br. | Plaintiffs' Memorandum of of Law in Support of Motion to Compel Production of Documents Subject to the Crime-Fraud Exception |
| Rud Decl. | Seventh Supplemental Declaration of Andreas Rud<br>Dated June 17, 2019 |
| SBT | Steel Base Trade AG |

## PRELIMINARY STATEMENT

This case involves a group of disgruntled trade creditors, who received nothing when a Swiss commodities trading company went bankrupt in the wake of the 2008 financial crisis. After winning a default arbitration award against the now-defunct Steel Base Trade AG ("SBT"), Plaintiffs have tried desperately to hold the bankrupt company's shareholders, affiliates, corporate parents, and more distant corporate ancestors responsible for debts that were properly resolved in a Swiss bankruptcy proceeding.

Plaintiffs' claims were previously dismissed in their entirety by Judge Sweet, who held them to be fatally deficient and precluded by the prior arbitration decision. On appeal, that decision was reversed, and the Second Circuit gave Plaintiffs one exceedingly narrow path to victory. Plaintiffs must first prove that the ICC Arbitration that they seek to enforce was *so unfair* that it deprived them of their due process rights and cannot be given preclusive effect. Plaintiffs must then prove that the same proceeding was *so fundamentally fair* that it can be enforced against Defendants even though they were legally barred from participating. Only then can Plaintiffs *try* to prove their underlying fraudulent conveyance, fraud, and alter-ego claims.

When this case was recently reassigned, Plaintiffs seized the opportunity to seek something that they had never claimed to need in the first six years of this litigation – a prejudgment attachment of assets. Moving *ex parte*, Plaintiffs took the opportunity to repeatedly "educate" the Court as to the merits of their claims without any opportunity for Defendants to challenge their legal assertions or contextualize their alleged "evidence."

Plaintiffs now move for confirmation of that ill-gotten attachment, seeking to restrain more than $48 million for the pendency of this litigation. This motion should be denied for several reasons.

*First*, Plaintiffs have not even attempted to prove that they need a prejudgment attachment. The authorities are overwhelmingly clear that even where the statutory requirements are satisfied, a court should decline to issue a prejudgment attachment unless the plaintiff demonstrates an "identifiable risk" that assets will be removed from the jurisdiction – a risk that demands "drastic action" to prevent any subsequent judgment from being thwarted. Despite this, Plaintiff have not offered a shred of evidence that Defendants have done anything in the six years this case has been pending to prevent a judgment from being enforced. And as Plaintiffs' own papers demonstrate, the notion that these wealthy Defendants could credibly be rendered judgment-proof or insolvent is absurd.

*Second*, Plaintiffs have not demonstrated a likelihood of success on the merits. Plaintiffs' application wholesale ignores elements that Plaintiffs must prove to have any hope of recovery on their claims. In particular, Plaintiffs (i) fail to demonstrate that they were deprived of an opportunity to prove fraud in the ICC Arbitration; (ii) fail to prove that their cause of action is even viable under Swiss law, which unambiguously applies to this case; (iii) fail to prove that the transactions of which Plaintiffs complain harmed Plaintiffs in any way, given the significant evidence that the transactions were beneficial to SBT's creditors and that Plaintiffs had no hope of recovering anything in SBT's bankruptcy; (iv) fail to prove any reliance upon the so-called fraud; (v) fail to prove that the arbitration award they received is enforceable; and (vi) fail to prove that Defendants are actually alter-egos of SBT, or that Defendants directed the alleged fraudulent conveyances.

*Third*, Plaintiffs have not established the necessary statutory elements for attachment under CPLR § 6201(3). Defendants have never moved assets to render themselves judgment-proof or otherwise taken action to prevent a recovery in this case. Plaintiffs' allegations

concerning SBT, even if given every favorable inference, are insufficient as a matter of law.

*Fourth*, an attachment would be unduly prejudicial to Defendants.  Plaintiffs seek to restrain $48 million for the duration of this litigation.  Locking up that amount of assets for months, or years, has enormous financial consequences that Defendants should not have to bear.

For the reasons set forth below, Plaintiffs' motion should be denied and the existing attachment(s) vacated immediately.

In addition, CPLR § 6212(e) mandates that the plaintiff "be liable to the defendant for all costs and damages, including reasonable attorney's fees…if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property. Plaintiff's liability shall not be limited by the amount of the undertaking."  Accordingly, the Court should immediately release Plaintiffs' undertaking to Defendants and set a briefing schedule for Defendants to file a motion for all costs and damages caused by Plaintiffs' *ex parte* attachment.

## FACTS[1]

### A.    The Relevant Parties

Defendant AMCI Holdings, Inc. ("AMCI Holdings") is a part of a broad collection of separate affiliated companies engaged in natural resources investment and marketing (the "AMCI Group").  Defendants Hans Mende and Fritz Kundrun founded the AMCI Group in 1986.  Since that time, the AMCI Group has made over forty investments in a variety of energy and mineral industries.  These include more than eleven commodity sectors and a variety of related business activities, including power generation, copper, iron, and metallurgical coal.  The

---

[1]    Large quantities of evidence relevant to this motion have already been filed with the Court, much of it under seal.  To avoid duplication and duplicative motions for material already received under seal, Defendants refer throughout these papers to prior declarations and exhibits already submitted to the Court.  All such materials will be provided to the Court with the courtesy copies of this opposition.  With respect to the few new documents submitted, Defendants are making a simultaneous motion to seal and filing redacted copies on ECF until such time as the application is approved or denied.  All materials provided to the Court will also be provided, electronically, to opposing counsel.

AMCI Group has corporate offices in, *inter alia*, Greenwich Connecticut, Brisbane Australia, and Zug Switzerland.  The remaining Defendants, who are not implicated in this motion, are AMCI Holdings subsidiaries or affiliates in the United States and Switzerland.

Plaintiffs are pig iron suppliers based in Brazil.  (ECF #125 ¶¶ 13-19, 37).  Pig iron is an intermediate metal made from iron ore that is used by steel makers or other manufacturers to create finished goods such as steel or wrought iron.

**B.      Steel Base Trade**

One investment made by the AMCI Group was the 2007 purchase of Steel Base Trade AG ("SBT"), a commodities trading company based in Switzerland that dealt in, *inter alia*, pig iron. (ECF #125 ¶ 36; Lucas Decl. (6/18) Ex. 1 at 403).  In 2008, SBT entered into contracts with Plaintiffs to purchase approximately 103,500 metric tons of pig iron for a total price of approximately $76 million. (ECF #125 ¶ 37; ECF #48-1-11).

Plaintiffs soon breached the contracts by failing to deliver the required pig iron, shutting down their iron ore processing operations, and ceasing all communications with SBT.  (Lucas Decl. (3/15) Exs. 1-7; Grant Decl. (2/15) Ex. P, at 2-3; ECF #22 ¶ 3; ECF #22-3, at A00015-A00016). While all of the details of the breach are not yet known, it is possible that market conditions with respect to commodity prices and manufacturing availability made performance of their obligations under the terms of the contracts unattractive to Plaintiffs.

But SBT had bigger problems than Plaintiffs' non-performance.  In the wake of the financial crisis, global commodity prices dropped significantly, and SBT became economically distressed.  As of late 2009, SBT had over $130 million in liabilities on its balance sheet, the majority of which were due to secured creditors.  (Lucas Decl. (3/15) Ex. 8, at 22; Ex. 9 ¶¶ 28-45; Lucas Decl. (6/18) Ex. 1 at 403; Herzig Decl. Ex. 1 at 11-12).  This significantly outstripped

SBT's assets and imperiled the company's continued operation.  (Lucas Decl. (6/18) Ex. 1 at 403).  In addition to this secured debt, other unsecured trade creditors asserted significant claims against the company.  (ECF #22-3, at A00019-20).

At the same time, Plaintiffs also resurfaced, now claiming that that SBT had breached the agreements by failing to purchase pig iron at a price that was now disadvantageous to SBT. (Grant Decl. (6/3) Ex. 12).  On November 16, 2009, Plaintiffs filed a formal request for arbitration with ICC Paris (the "ICC Arbitration").  (*Id.* Ex. 21).

## C.    The Purchase Contract and Stock Purchase Agreement

SBT, saddled with enormous secured debts and facing both sizeable unsecured trade creditor claims and the (relatively remote) possibility that Plaintiffs might prevail, began to pursue a reorganization outside of bankruptcy that would allow the sale of parts of the business as a going concern, maximizing the overall return for creditors by avoiding liquidation of assets at market or breakup values.  (Grant Decl. (4/2) Ex. DD at 33977-78;[2]; Lucas Decl. (3/15) Ex. 9 ¶¶ 21-56).  As acknowledged by Plaintiffs in their papers, this reorganization was not done in secret and was executed with the knowledge and consent of SBT's secured creditors, primarily banks.  (Pl. Br. 3-4).

The reorganization was accomplished through two agreements.  The first was a contract (the "Purchase Contract") by which Prime Carbon AG ("Prime Carbon"), another AMCI Group subsidiary, would take title to SBT's assets in exchange for also accepting a significantly larger

---



[2]    As indicated in the SBT Minutes, ███████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████"
(Grant Decl. (4/2) Ex. DD at 33977-78).

amount of liabilities.[3]  (Grant Decl. (6/3) Ex. 31; Lucas Decl. (3/15) ¶ 9 & Ex. 8; Lucas Decl. (3/15) Ex. 9 ¶¶ 28-45; Lucas Decl. (6/18) Ex. 1, at 403; Herzig Decl. Ex. 1 at 11-12).  On paper, Prime Carbon acquired $126 million in assets in exchange for the assumption of $130 million in liabilities.  (Lucas Decl. (3/15) ¶ 9 & Ex. 8).  While even on its face this would appear to be a beneficial transaction for SBT, the dollar amounts actually understate the real value of the transaction to SBT's creditors.  *First*, the $126 million included receivables from SBT's customer ███████ that were in serious jeopardy.  (Grant Decl. (2/15) Ex. R at 392, 396; Lucas Decl. (3/15) Ex. 9 ¶¶ 21, 26-27).  *Second*, the remaining business assets included in the $126 million were valued at book value.  (Lucas Decl. (3/15) ¶ 9 & Ex. 8).  In a bankruptcy or other corporate dissolution, SBT's creditors would likely receive significantly less when those assets were liquidated at actual market or breakup values.  (Lucas Decl. (3/15) Ex. 9 ¶¶ 46-52; Herzig Decl. Ex. 1 at 11-12).

Since SBT was distressed, it was no secret that such a transaction might be later challenged.  To further ensure that this transaction was wholly fair, the Purchase Contract was evaluated by independent accountants ███████, who prepared a December 23, 2009 Fairness Opinion.  (Lucas Decl. (3/15) Ex. 10; *see also* Lucas Decl. (3/15) Ex. 9 ¶¶ 13-18).  The Purchase Contract later closed on January 27, 2010.  (ECF #125 ¶ 69; Lucas Decl. (6/18) Ex. 2).

The second transaction involved in the reorganization was a Stock Purchase Agreement ("SPA") between Prime Carbon and AMCI Holdings.  (Grant Decl. (6/3) Ex. 33).  Pursuant to this agreement, AMCI Holdings would purchase certain assets acquired from SBT – specifically shares in SBT's subsidiary Primetrade – for $5,497,000.  *Id.* at 188.  This acquisition had been

---

[3]     Grant Decl. (6/3) Ex. 31 is not a complete copy of the Purchase Contract between SBT and Prime Carbon. That Agreement includes many appendices that Plaintiffs omit without reference. A copy of the balance sheet that is the first appendix to the Purchase Contract is Exhibit 8 to the 3/15/19 Lucas Declaration.

long planned, (Lucas Decl. (3/15) Ex. 11 at 7224; *Id.* Exs. 12, 13), but, again, to ensure that the transaction was also fair and reasonable, a valuation of the shares was conducted by independent appraisers/accountants, (Lucas Decl. (3/15) Ex. 11 at 7224).

Plaintiffs have characterized these transactions as illegitimate since January of 2010 and have been raising legal objections to them ever since.[4]  (Grant Decl. (6/13) Ex. 49; ECF #125 ¶ 76; Lucas Decl. (3/15) Ex. 15; ECF #48-13 ¶¶ 22, 25, 26, 28, 30, 33, and 47; ECF #22 ¶ 15). They have failed every time.  They have failed in part because the transactions were wholly fair and actually maximized value for SBT's creditors.  But they have also failed because as a factual matter, neither transaction impacted Plaintiffs in any way.  Prior to the execution of the Purchase Contract and the SPA, SBT had enormous secured debts that outstripped the liquidation value of its assets.  (Lucas Decl. (3/15) Ex. 9 ¶¶ 46-52; Herzig Decl. Ex.1 at 11-12).

Accordingly, as unsecured trade creditors Plaintiffs would have received nothing in the SBT Bankruptcy, even had neither deal closed.  (Lucas Decl. (3/15) Ex. 9 ¶¶ 22-25, 28-52).

## D.    The SBT Bankruptcy

On April 29, 2010, SBT informed the Cantonal Court of the Canton of Zug, Switzerland, of its insolvency. (ECF #22 ¶ 4 & Exhibit 1, at A00001-A00011).  The following day, April 30, 2010, the Cantonal Court of the Canton of Zug declared SBT bankrupt (case no. EK 2010 187), and the SBT Bankruptcy commenced. (ECF #22 ¶ 4 & Exhibit 2, at A00012-A00014).

---

[4]    Plaintiffs first raised issues of SBT's and Defendants' alleged fraud in a January 15, 2010 letter sent in connection with the ICC Arbitration.  The letter stated that ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ (Grant Decl. (2/15) Ex. M at JA-571). ██████████████████████████████ ████████████████████████████████████████████████" *Id.*  Two months later, on March 19, 2010, Plaintiffs sought injunctive relief for alleged fraud by bringing a vessel seizure proceeding in Brazil. (ECF #125 ¶ 76). Thereafter, Plaintiffs filed a number of similar proceedings in Brazil, with the last filed on October 5, 2010.

As a result of the commencement of the SBT Bankruptcy, SBT was precluded from defending against any claims that had been previously asserted against SBT.  (ECF #22 ¶ 6). This included the ICC Arbitration previously filed by Plaintiffs.  Under Swiss Law, only the applicable Bankruptcy Office may defend actions against a company in Bankruptcy.  *See id.* And while a creditor may petition the office for permission to defend a claim on the company's behalf, a shareholder or affiliate may not do so.  *See id*.

By its circular letter dated February 23, 2011, the Zug Bankruptcy Office decided not to defend SBT against the claims asserted by Plaintiffs in the ICC Arbitration.  (ECF #125 ¶ 87; ECF #22 ¶ 9 & Exhibits 6a at A00027 and 6b at A00033).  The Zug Bankruptcy Office made that decision based upon the fact that there were insufficient funds in the SBT Bankruptcy estate to defend such claims and because Plaintiffs' filed claim in the SBT Bankruptcy was a lower tier unsecured trade creditor claim for which the SBT Bankruptcy estate was expected not to have funds for distribution.  *See id.*

E.     **Plaintiffs Capitalize on SBT's Bankruptcy by Arbitrating Against an Empty Chair.**

Knowing that neither SBT nor its affiliates could defend themselves in the ICC Arbitration, Plaintiffs took action to expand the scope of their claims.  Plaintiffs specifically introduced issues of piercing the corporate veil and the alleged liability of SBT directors, shareholders and affiliated companies for Plaintiffs' damages, as well as alleged fraudulent conduct.  (ECF #48-13 ¶¶ 22, 25, 26, 28, 30, 33, 47; ECF #22 ¶ 15).  Plaintiffs sought interim relief against assets of Defendant Prime Carbon (even though it was not a respondent party in the ICC Arbitration).  And with respect to final relief, Plaintiffs specifically sought "pierc[ing] the corporate veil and mak[ing] the RESPONDENT's shareholders, directors and affiliated companies liable for the losses caused to CLAIMANTS." (ECF #48-13 ¶¶ 22, 25-26, 33).

In addition to veil piercing, Plaintiffs also advanced claims for fraudulent conveyance.  In a June 23, 2010 Petition for Interim or Conservatory Measures (the "Petition for Interim Relief") Plaintiffs alleged wrongful asset transfers and sought to immediately seize assets held by either SBT or Prime Carbon.  (ECF #48-13 ¶ 22).  On July 2, 2010, Plaintiffs submitted a document in support, specifically requesting the ICC Arbitrators to "recognize the existence of fraudulent acts" as a basis upon which Plaintiffs might reach third party assets.  *Id.* ¶ 25.

At the September 21, 2010 hearing on their Petition, the ICC Arbitrators recognized that they were not authorized to reach the assets of non-SBT entities because they were not parties to the Arbitration and on that basis did not grant the requested interim relief.[5] (ECF #39 ¶ 9). The Arbitrators deferred resolution of the fraud claims until the final merits phase of the Arbitration. (ECF #48-13 ¶ 30).

In their July 16, 2010 Memorial on the Merits of the Case, Plaintiffs "expressly request[ed] th[e] Arbitral Tribunal to recognize as illegal the fraud perpetrated by the RESPONDENT, which shall then be held liable, permitting Claimants to pursue its credits against the RESPONDENT's shareholders and managers, by application of the disregard doctrine."  *Id.* ¶ 26.  On March 16, 2011, after the ICC Arbitrators deferred resolution of Plaintiffs' request for interim relief for the alleged fraud and asset transfers to the ultimate determination on the merits, Plaintiffs reiterated that they sought relief for the alleged fraud perpetrated upon them for purposes of "pierc[ing] the corporate veil and mak[ing] the RESPONDENT's shareholders, directors and affiliated companies liable for the losses caused to

---

[5]    Plaintiffs' own expert belies Plaintiffs' counsel representation at the April 18, 2019 *ex parte* hearing that Plaintiffs "tried to bring in the other defendants, and ICC Paris said they had no jurisdiction over them."  (Grant Decl. (6/4) Ex. 10 at 29).  This is the exact opposite of what actually happened, which was that Plaintiffs tried to reach the assets of certain Defendants in the ICC Arbitration while making ***no effort to join those Defendants*** as parties to the Arbitration (ECF #39 ¶ 9).

CLAIMANTS." *Id.* ¶ 33.  On April 12, 2011, Plaintiffs yet again asked the ICC Arbitrators to "recognize these acts taken in the course of the procedure as frauds" and "to decide upon the interim measures which are necessary to make an upcoming award effective." *Id.* ¶¶ 35-36.

Notably, despite all of their arguments to the ICC Arbitrators about alter-ego and veil piercing, Plaintiffs never chose to name the Defendants as respondents in connection with the ICC Arbitration and did not seek to add them to the case.  (*Id.*, at 3; ECF #22 ¶ 15).

## F.   The ICC Arbitrators Issue a Default Award in Favor of Plaintiffs, But Reject Their Fraud and Alter-Ego Claims

Ultimately, in their final ICC Award, while granting relief on Plaintiffs' undefended breach of contract claims, the Arbitrators did not grant the requested relief on their fraud claims. Rather, the final Award expressly held that the Plaintiffs had not proved fraud, (ECF #48-13 ¶ 47), and that "any and all other claims made by the Parties herein are dismissed," (*Id.* ¶ 49).

## G.   Plaintiffs Take No Action To Preserve Their Rights in the SBT Bankruptcy

The SBT Bankruptcy ultimately concluded on January 27, 2012.  (ECF #22 ¶ 16).  In resolving the SBT bankruptcy, the Zug Bankruptcy Office decided not to file a lawsuit against the founders or alleged responsible bodies (including directors) of SBT and/or to file claims for avoiding any alleged preferential or contestable transactions carried out to the detriment of creditors before the SBT Bankruptcy.  All creditors, including Plaintiffs, approved this decision. (ECF #22 ¶ 13 & Exhibits 6a at A00028-A00029, 6b at A00034-A00035 and 7 at A00038).

In its February 23, 2011 circular letter, the Zug Bankruptcy Office offered all SBT creditors, including Plaintiffs, the opportunity to receive an assignment of SBT's liability claims. This would have enabled Plaintiffs to file suit in Switzerland alleging that fraudulent conveyances had undermined their recovery as a creditor.  (ECF #22 ¶ 17; ECF #22-3 at A00028-A00029, A00034-A00035, A00038; ECF #110 ¶¶ 3-5; Rud Decl. ¶¶ 7-10).

***However, Plaintiffs did not request such an assignment***.  (*Id.* ¶ 11; ECF #22 ¶ 14).

**H.      The Swiss Courts Hold That SBT Creditors – Such As Plaintiffs – Have No Civil Claim Under Swiss Law.**

While Plaintiffs slept on their rights in the SBT bankruptcy, ▇▇▇▇▇▇, another unsecured creditor of SBT, did obtain an assignment.  (ECF #22 ¶¶ 14 & 20; ECF #22-3, at A00045, ECF #22-4, at A00050-A00051).  By virtue of that assignment, ▇▇▇▇▇▇ stepped into the shoes of SBT and was authorized to challenge certain business decisions and conveyances made by SBT's directors and officers prior to the insolvency.

In September 2012, ▇▇▇▇▇▇ commenced Swiss civil proceedings (the "▇▇▇▇▇▇ ▇▇▇▇▇▇ Action") against former SBT director, Stephan Herzig.  (ECF #22 ¶ 21; ECF #22-4, at A00053-A00082; ECF #45 ¶¶ 2-3).  ▇▇▇▇▇▇ claimed that Herzig was involved in a scheme to transfer the main part of the SBT business to Prime Carbon to avoid paying trade creditors of SBT, including ▇▇▇▇▇▇ and the Plaintiffs.  ▇▇▇▇▇▇ argued that the dividend or liquidation payments distributed to the creditors in the SBT Bankruptcy would have been substantial if the asset transfer transaction between SBT and Prime Carbon had not taken place. (ECF #22 ¶ 22; ECF #22-4, at A00053-A00082).

This Swiss Courts firmly rejected these claims.  On August 24, 2018, on appeal to the Swiss Federal Court docketed at 4A_623/2017, the ▇▇▇▇▇▇ Proceedings concluded with a final judgment in favor of the defendant, Stephan Herzig, and a dismissal of ▇▇▇▇▇▇ ▇▇'s claims under Swiss law, including both the SBT claims assigned to ▇▇▇▇▇▇ as well claims purportedly belonging to ▇▇▇▇▇▇ directly.  (Herzig Decl. ¶¶ 3-4 & Ex. 2)

**H.      Plaintiffs Commence This Collateral Attack on the ICC Award and the Swiss Bankruptcy**

Plaintiffs commenced this action in April of 2013.  (ECF #1).  In its April 9, 2014

Opinion, this Court dismissed Plaintiffs' fraud-related claims, holding that their fraud allegations were an improper collateral attack on the ICC Award.  (ECF #46).

On appeal, the Second Circuit narrowly reversed the dismissal of Plaintiffs' fraud claims. While recognizing that Plaintiffs' claims might ultimately be precluded by the ICC Award, it held that Plaintiffs should have been be afforded the opportunity for discovery in support of their claim that they were not afforded an adequate opportunity to prove their fraud claims in the ICC Arbitration.  The Second Circuit directed that after such discovery, Defendants could re-raise their issue preclusion defense.  *CBF Industria de Gusa v. AMCI Holdings, Inc.*, 850 F.3d 58, 77-78 (2d Cir. 2017).

The instant motion concerns Plaintiffs' request for a prejudgment attachment of certain Defendants' assets.  There are no facts relevant to this application, as at no time in the ***six years*** since initiating this lawsuit have Plaintiffs made any suggestion that Defendants have taken any action to frustrate a potential judgment in this case.  Indeed, despite submitting 66 pages of briefing in connection with this motion and arguing at length before the Court, Plaintiffs have yet to identify a single piece of evidence suggesting that an attachment is necessary.

## ARGUMENT

This court is empowered to exercise remedies, like attachment, available under the law of the state where it sits.  Fed. R. Civ. P. 64(a) ("At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.").

Attachment by a New York Court is authorized by CPLR § 6201, which provides for attachment where a plaintiff shows, on the basis of evidence, "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for

attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  CPLR § 6212(a).

Under New York law, "attachment is *a drastic remedy*, and 'CPLR 6201 is strictly construed in favor of those against whom it may be employed.'"  *Ne. United Corp. v. Lewis*, 137 A.D.3d 1387, 1388 (3d Dep't 2016) (emphasis added) (*quoting Grafstein v. Schwartz*, 100 A.D.3d 699 (2d Dep't 2012)); *see also Penoyar v. Kelsey*, 150 N.Y. 77, 80 (1896) ("[Attachment] violates every principle of proprietary right held sacred by the common law . . . . Owing to the statutory origin and harsh nature of this remedy the section in question should be construed, in accordance with the general rule applicable to statutes in derogation of the common law, strictly in favor of those against whom it may be employed.").

As explained in detail below, Plaintiffs' application should be denied, as: (i) they have made no effort to show that attachment is necessary; (ii) they have not proven a likelihood of success on the merits; (iii) they have not fulfilled the statutory requirements of CPLR § 6201(3); and (iv) attachment would work undue prejudice on Defendants.

## I.    PLAINTIFFS HAVE MADE NO SHOWING THAT AN ATTACHMENT IS NECESSARY IN THIS ACTION

As a threshold matter, even if every fact alleged by Plaintiffs were true and every element of CPLR § 6201 satisfied, they would still not be entitled to the attachment that they seek.  As an extraordinary remedy in derogation of the common law, the most fundamental requirement for an order of attachment is *necessity*.  An order of attachment may only issue where a Court determines that it is *necessary* to provide security in the face of evidence that Defendants seek to

undermine enforcement of a judgment.  And Plaintiffs have not even attempted to prove that the

order that they seek is necessary.

It is well-established that "[e]ven if the plaintiff satisfies all of the statutory requirements

for an order of attachment, the issuance of relief remains in the discretion of the Court." *JSC*

*Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482,

485 (S.D.N.Y. 2004); *Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183,

186 (S.D.N.Y. 2002) ("even if a plaintiff satisfies the statutory criteria, the issuance of this relief

is discretionary, and the Court must exercise care in its application");  David D. Siegel, NEW

YORK PRACTICE § 317 (5th ed. 2010) ("Even if the plaintiff makes out a case for attachment

under CPLR 6201, its granting is still discretionary with the court.  The plaintiff cannot demand

it as a matter of right.").[6]

Accordingly, "[i]n addition to establishing that a defendant subject to the court's personal

jurisdiction meets the statutory requirements for an attachment, the party seeking attachment

***must demonstrate an identifiable risk*** that the defendant will not be able to satisfy the

judgment." *VisionChina Media Inc. v. S'holder Representative Servs., LLC*, 109 A.D.3d 49, 60

(1st Dep't 2013) (emphasis added); David D. Siegel, NEW YORK PRACTICE § 317 (5th ed. 2010)

("[I]f the judge should perceive from the papers that the plaintiff ***does not need an attachment***,

either for jurisdiction or security, ***discretion is appropriately exercised against it*** even though a

CPLR 6201 showing has been made.") (emphasis added).  Indeed, where – as here – a court

already has jurisdiction over a defendant, "attachment should issue only upon a showing that

---

[6]    *See also, e.g.*, *Thornapple Assocs., Inc. v. Sahagen*, Case No. 06 CIV. 6412 (JFK), 2007 WL 747861, at *3 (S.D.N.Y. Mar. 12, 2007) ("[T]he Court first must determine whether Thornapple has met the statutory requirements for attachment set forth in CPLR sections 6201(1) and 6212(a). If Thornapple has satisfied those statutory requirements, the Court next must determine whether Thornapple has made a sufficient additional showing that attachment is needed for security purposes.").

*drastic action* is required for security purposes." *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001) (emphasis in original).  In fact, several courts in this district have held that, where a party is subject to jurisdiction, "**attachment is only permitted upon a showing that the defendant is attempting to dispose of his assets** in order to frustrate the ability of the plaintiff to collect any judgment that might ultimately be obtained." *Silverman v. Miranda*, 116 F. Supp. 3d 289, 313 (S.D.N.Y. 2015) (*quoting Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994)), *aff'd sub nom. Silverman v. Teamster Local 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018); *see also Bank of China, New York Branch*, 192 F. Supp. 2d at 188 (same).

Plaintiffs' brief sets forth a long litany of grievances relating to the insolvency of SBT, a former commodities trader.  (Pl. Br. 2-11).  The gravamen of Plaintiffs' claims is that SBT's restructuring was a fraudulent conveyance and that it was done in an effort to frustrate Plaintiffs' potential recovery against SBT in a pending arbitration.  Even if true – **and it most certainly is not** – those facts do not demonstrate an "identifiable risk" that the Defendants in this case will shield assets from recovery in a litigation that has already been pending for six years.  Conspicuously absent from Plaintiffs papers are:  (1) evidence of **any actions** taken by Defendants in the six years since this case was filed to convey, shield, or otherwise secret assets from collection; (2) **any evidence** that Attachment Defendants are or may become insolvent, judgment-proof, or otherwise not subject to collection; or (3) **any facts** supporting any other "identifiable risk" that collection will be impaired, or that any Attachment Defendant is "attempting to dispose of his assets."   Simply put, the fact that one AMCI Group investment went bankrupt ten years ago – immediately after the financial crisis – does not mean that other

15

AMCI Group companies, or their ultimate shareholders, are likely to prove insolvent.  The family of companies has been in business since 1986.  They are not going anywhere.

Indeed, Plaintiffs' sole argument boils down to "Hans Mende did something wrong ten years ago."  Defendants take substantial issue with this contention (*see* § II *infra*), but even if true, this does not rise to the level of an "identifiable risk" that assets from a laundry list of Defendants will be disposed of today.  "[P]roof that a defendant committed the underlying unlawful act is not, by itself, sufficient to establish a ground for attachment."  *Encore Credit Corp. v. LaMattina*, Case No. CV-05-5442 (CPS), 2006 WL 148909, at *4 (E.D.N.Y. Jan. 18, 2006); *see also Brezenoff v. Vasquez*, 433 N.Y.S.2d 553, 554 (Civ. Ct. N.Y. Co. 1980) ("The alleged merits of the underlying action may not be used to mitigate the distinct and strict burden of proving the grounds for the pre-judgment attachment."); *Peterson v. Islamic Republic of Iran*, Case No. 10-CV-4518 (KBF), 2017 WL 10299580, at *18 (S.D.N.Y. Dec. 6, 2017) (requirement of identifiable risk "will not be satisfied without a showing that the non-movants lack sufficient assets, or that they will choose to hide or otherwise dispose of their assets.") (internal marks omitted); *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 783 N.Y.S.2d 758, 773 (N.Y.Sup. N.Y. Co. 2004) ("[P]laintiffs have failed to demonstrate a real identifiable risk that the defendants will be unable to satisfy any judgment obtained by plaintiffs. They fail to present evidence that these defendants would conceal or convert any of their assets were it not for an attachment order, or that they would be unlikely to satisfy the potential judgment."); *Mascis Inv Partnership v. SG Capital Corp.*, Case No. 654981/2016, 2017 WL 1423682, at *3 (N.Y. Sup. N.Y. Co. Apr. 21, 2017) (denying attachment where "plaintiffs do not submit any evidence of a risk that defendant will not be able to satisfy a judgment in their favor").

Indeed, Plaintiffs' own papers explain why attachment is unnecessary.  As Plaintiffs themselves acknowledge, the Defendants in this action – unlike SBT – are wealthy individuals and well-capitalized companies with assets that significantly exceed any plausible damages figure in this case.  (Grant Decl. (6/3) ¶¶ 118-134).  Under these circumstances, attachment has generally been held inappropriate.  *See, e.g., Lehman Bros. Fin. S.A. v. Shenkman*, Case No. 01 CIV 7701 (MBM), 2001 WL 1019371, at *2 (S.D.N.Y. Sept. 4, 2001) (*vacating* attachment of $2.6 million as unnecessary where Defendants had in excess of $12 million in assets");  *Maitrejean v. Levon Properties Corp.*, 45 A.D.2d 1020, 1021 (2d Dep't 1974) (*vacating* attachment as unnecessary where Defendant "is a nationally prominent firm, listed on the New York Stock Exchange, with assets exceeding $200,000,000.");  *Ames*, 863 F. Supp. at 179 ("[Defendant has] substantial tangible assets in New York, [and] presents little risk of secreting her assets and fleeing the jurisdiction in order to evade a judgment against her. Thus, attachment is not necessary for plaintiffs' security.");  *Founders Ins. Co. v. Everest Nat. Ins. Co.*, 41 A.D.3d 350, 351 (1st Dep't 2007) (denying attachment where "[b]y petitioner's own admission, respondents have more than $14 billion in assets; since petitioner is seeking some $42 million in the arbitration, it appears that respondents would be able to pay the award").

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKLIHOOD OF SUCCESS ON THE MERITS

### A. Plaintiffs' Claims Were Rejected By the ICC Arbitration Tribunal

Plaintiffs' claims have already been ruled upon and rejected.  They were rejected in a forum where Plaintiffs were not merely parties, but the only actual participants.  The ICC Arbitrators found that there was no fraud in connection with the precise transactions Plaintiffs now challenge.  (ECF #48-13 ¶¶ 47, 49).  As the Second Circuit has held, this finding precludes Plaintiffs' various fraud-related claims, unless they meet their burden of proving that they were

so unfairly deprived of an opportunity to litigate that this Court must refuse to recognize the ICC Award as binding against them.[7]  Despite this, neither Plaintiffs' *ex parte* motion nor their motion to confirm even addresses this issue.

In its ruling, the Second Circuit discussed the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").  The Convention requires that signatory States to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles."  Convention, art. III (emphasis added); *CBF Industria de Gusa*, 850 F.3d at 75.  The Court of Appeals further explained that "'[r]ecognition' is the determination that an arbitral award is entitled to preclusive effect." *CBF Industria de Gusa*, 850 F.3d at 72 (*citing* RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION §1-1(l), (z) (Am. Law Inst., Tentative Draft No. 2, 2012)); *accord* Albert Jan van den Berg,[8] The New York Arbitration Convention of 1958, at 244 (1981) (Ex. A hereto) ("recognition" applies to the defensive use of an award to invoke *res judicata*, in which case a defendant need not institute enforcement proceedings before a court recognizes the award as binding). "[T]he same conditions as for the enforcement of an award as laid down in Articles IV-VI are applicable [to the recognition of an award]." [9] van den Berg, at 244 (Ex. A hereto).

---

[7]    How Plaintiffs can ask the Court to enforce an Arbitration Award issued in a proceeding that Plaintiffs claim lacked basic due process is a question that defies any logical answer.  In essence, Plaintiffs ask this Court to hold binding and preclusive any parts of the Arbitration that they won and to ignore any parts that they lost.  This would be preposterous for any judicial determination, but is particularly absurd here given that Plaintiffs obtained their Arbitration Award largely by default.  The fraud claims that the Arbitration Panel rejected were so totally unsubstantiated that Plaintiffs could not even win them against an empty chair.

[8]    Plaintiffs have admitted that Albert Jan van den Berg is a leading Convention scholar on whom U.S. courts have been directed to rely. (*See* Lucas Decl. (3/15) Ex. 23 at 4 & n.3).

[9]    On the prior appeal, the Second Circuit "underst[ood]" this Court's dismissal of Plaintiffs' fraud claims as based on the common law doctrine of issue preclusion.  It held that under that doctrine, Plaintiffs should be afforded the opportunity for discovery to collect evidence to support a finding that they were not afforded an adequate opportunity to prove their fraud claims in the ICC Arbitration prior to a ruling on the preclusion defense.  *CBF*

Plaintiffs claim that they were denied an adequate opportunity to litigate their fraud claims in the ICC Arbitration. This contention implicates Article V(1)(b) of the Convention, which allows a court to refuse to recognize and enforce an award upon proof that procedural defects prevented the party against whom the award is invoked from presenting its case. *See* Convention, art. V(1)(b); *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145-46 (2d Cir. 1992). Article V(1)(b) allows the court to apply the forum state's standards of due process and refuse recognition or enforcement where the arbitration tribunal denied the arbitrating party the opportunity to "be heard at a meaningful time and in a meaningful manner." *See Iran Aircraft Indus.*, 980 F.2d at 146.

Plaintiffs admit that a party seeking to assert one of the Article V conditions bears a "heavy burden." (ECF #113, at 20 (citing cases)). Despite this, Plaintiffs have presented ***no evidence*** that they were denied a meaningful opportunity to present their case. They certainly have not adduced evidence that any purported defects in the ICC Arbitration ***rise to the level of a deprivation of due process*** so as to provide grounds for refusing enforcement under Convention Article V(1)(b).

To the contrary, the evidence demonstrates that much of what Plaintiffs rely upon in their current application was known to the Plaintiffs during the arbitration and fully available to

---

*Industria de Gusa*, 850 F.3d at 77-78. The Second Circuit's discussion of that preclusion doctrine does not prevent this Court from considering additional bases for precluding Plaintiffs' fraud claims, including the more stringent standards for refusing recognition of the ICC Award's no fraud finding under Article V of the Convention. Indeed, elsewhere in its Opinion, the Second Circuit expressly and emphatically emphasized that Article V provides that "'recognition and enforcement of [a foreign arbitral] award may be refused . . . only if [the requesting] party furnishes to the competent authority where the recognition and enforcement is sought, proof that one of the five enumerated condition has been met." *Id.* at 75-76. And regardless, statements by an appellate court do not foreclose considering those same issues on remand in relation to legal theories and sources of law not considered on appeal. *See United States v. Navajo Nat.*, 556 U.S. 287, 295-96 (2009); *Konigsberg v. State Bar*, 366 U.S. 36, 40-43 (1961); *Westside Mothers v. Olszewski*, 454 F.3d 532, 538-39 (6th Cir. 2006). Moreover, Defendants were appellees defending a favorable judgment and not required to raise alternative grounds for affirmance. *Independence Park Apts. v. United States*, 449 F.3d 1235, 1240 (Fed. Cir. 2006).

present to the Arbitration Tribunal.  For example, Wild's January 25, 2010 letter – not truly evidence of fraud, but the lynchpin of Plaintiffs' current fraud argument – was indisputably available to Plaintiffs prior to the ICC's rejection of their fraud claims.  Similarly, Plaintiffs had knowledge of the Purchase Contract through the SBT Bankruptcy as early as the filing of the April 29, 2010 Notice of Insolvency.  (ECF #22 ¶¶ 4- 5; ECF #22-3, at A00004, A00006). Indeed, the Purchase Contract itself with all exhibits was available to SBT creditors, who were also given the opportunity to review other SBT documents at the offices of Prime Carbon. (ECF #205 ¶¶ 3-6; ECF #205-1; ECF 205-2; ECF #22-4, at A00050, A00081-A00082; Lucas Decl. (3/15) Ex. 16 at 21727; Lucas Decl. (3/15) Exs. 17-22).

Plaintiffs have adduced no evidence to demonstrate that they were so prevented from developing evidence to support their fraud claims in the ICC Arbitration that they could not have presented their case.  Nor have they demonstrated any other conceivable deprivation of due process. Without such a showing, Plaintiffs cannot avoid Award recognition, and their fraud claims must fail.

**B.      Swiss Law And Proceedings Do Not Permit Plaintiffs' Claims**

*1.      Plaintiffs' Claims are Barred by Res Judicata and Lack of Standing*

Under both Swiss law and U.S. law, *res judicata*, claim preclusion, and/or lack of standing bars any claim based on allegations that SBT improperly transferred assets in a way that harmed Plaintiffs (the "Bankruptcy Third Party Claims").

Just like they would in America, the Bankruptcy Third Party Claims belonged to the bankruptcy administrator in SBT's Swiss bankruptcy proceeding.  Plaintiffs actively participated in that bankruptcy case by representing the largest creditor constituency therein.  The SBT bankruptcy administrator chose not to bring the Bankruptcy Third Party Claim, instead offering to assign those claims to multiple creditors, including Plaintiffs.

20

Plaintiffs, however, did not take the necessary steps to acquire those claims.  To the contrary, *another* creditor took the steps necessary to acquire certain of the Bankruptcy Third Party Claims by assignment.  Ultimately, the bankruptcy administrator issued a final report, and the SBT Swiss bankruptcy matter was finally concluded.  (Rud Decl. ¶¶ 4-5, 10-13).

Plaintiffs' Bankruptcy Third Party Claims are barred under both Swiss and U.S. law. Pursuant to Swiss law, having failed to become an assignee of the Bankruptcy Third Party Claims from the SBT bankruptcy estate, Plaintiffs lack standing to bring any such claims.  (*Id.* ¶¶ 6-13).

In addition, because the Bankruptcy Third Party claims could have been brought in the SBT bankruptcy, these claims are barred by *res judicata* and/or claim preclusion.  *Res judicata* bars all claims that were ***brought, or could have been brought*** in or through a prior proceeding. *See e.g.*, *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (res judicata "precludes the parties… from relitigating issues that were or could have been raised in that action.") (emphasis added); *see also*, *Paramount Pictures Corp. v Allianz Risk Transfer AG*, 31 N.Y.3d 64, 72-73 (2018) (claim preclusion may "foreclos[e] litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit") *citing Cromwell v County of Sac*, 94 U.S. 351, 352 (1877).  "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 291 (Bankr. S.D.N.Y., December 6, 2018) *citing NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983).  Here, the facts giving rise to the Bankruptcy

Third Party Claims are identical to the basis of those same claims that belonged to the Swiss bankruptcy administrator and could have been assigned to Plaintiffs.

In particular U.S. courts apply the doctrine of *res judicata* to final resolutions of bankruptcy matters.  For instance, when a bankruptcy trustee settles claims held by a bankruptcy estate against defendants, that settlement is given full *res judicata* effect.  *See e.g.*, *Adam v. Itech Oil Co. (In re Gibraltar Resources, Inc.)*, 210 F.3d 573, 576 (5th Cir. 2000)); *see also In re Calise*, 354 F. App'x 510, 512 (2d. Cir. 2009).  *Res judicata* principals also apply when a chapter 11 bankruptcy case is concluded.  *See, e.g.*, *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 872-73 (2d Cir. 1991) (order confirming plan of reorganization has preclusive effect under res judicata); *accord Tracar v. Silverman (In re American Preferred Prescription, Inc.)*, 266 B.R. 273, 277 (Bankr. E.D.N.Y. 2000); *Friedberg v. Lewittes (In re Friedberg)*, Case No. 94 Civ. 1569 (JFK), 1995 WL 733636, at *2 (S.D.N.Y. Dec. 12, 1995).

Accordingly, *res judicata* bars any attempt by parties to a reorganization hearing to relitigate matters raised ***or that could have been raised***.  *See e.g.*, *Sure-Snap Corp.*, 948 F.2d at 873 (emphasis added).  As such, a debtor is precluded from asserting any claims post-confirmation that are not clearly preserved in its plan.  *Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*, Case No. 03 Civ. 2355 (VM), 300 B.R. 564, 566 (S.D.N.Y. Oct. 20, 2003) (*citing D & K Props. Crystal Lake v. Mut. Life Ins. Co. of New York*, 112 F.3d 257, 259 (7th Cir. 1997)).  "Claim preclusion commonly occurs when a party fails to raise issues in the plan confirmation process that could have been addressed in that forum, or fails to appeal the confirmation order."  *See JML Sales, Inc. v. Schils Am. Acquisition Corp.*, 2007 U.S. Dist. LEXIS 6414, *6-*10 (M.D. Pa. January 30, 2007) *citing In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000)

This specific scenario – failure to preserve a claim in a confirmed bankruptcy plan -- is most comparable to the instant case, where the SBT bankruptcy administrator had an opportunity to bring the Bankruptcy Third Party Claims, but instead chose to offer the claims for assignment. One creditor took that assignment, but Plaintiffs did not preserve their rights by also taking such an assignment.[10]  (Rud Decl. ¶¶ 10-11).

Plaintiffs' claims are also barred by claim preclusion.  U.S. courts apply claim preclusion principles to foreign proceedings.  *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (federal courts generally recognize foreign country judgments "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy"); *see also*, *e.g.*, *Alfadda v. Fenn*, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 41 (2d Cir. 1998) (*citing* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 481 (1987)); *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 664 (S.D.N.Y. 1996); *Kim v. Co-Operative Centrale Raiffeisen-Boerenleenbank B.A.*, 364 F. Supp. 2d 346, 349 (S.D.N.Y. 2005).

Having had a full and fair opportunity to bring the Bankruptcy Third Party Claims that arose from the same facts asserted herein, yet passing on such claims, Plaintiffs are now precluded from doing so in later litigation, regardless of the forum of such litigation and regardless of the application of Swiss or New York bankruptcy law.[11]

---

[10]    Swiss bankruptcy law allows multiple creditors to take such an assignment.

[11]    Contrary to Plaintiffs' assertion, this argument is not precluded by Judge Sweet's June 15, 2018 ruling on Defendants' Amended Motion to Dismiss the Amended Complaint.  ***First***, the law of the case doctrine does not preclude reconsideration of rulings made on a motion to dismiss at a later stage of the proceedings.  *See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244, 263-64 (S.D.N.Y. 1992) ("'the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge.").  ***Second***, the Amended Motion to Dismiss only addressed Plaintiffs' federal claim to enforce the ICC Award under the New York Convention (the sole claim asserted in the Amended Complaint at issue on that Motion), and Judge Sweet's ruling on the standing issue was based entirely on his then legal interpretation that standing is not one of the grounds under

     2.     *Plaintiffs' Other Claims Do Not Support a Civil Claim for Relief Under Swiss Law.*

Switzerland, where, *inter alia*, both allegedly fraudulent transfers originated and where the transferor SBT's bankruptcy was filed, clearly has most compelling interest in having its law applied. *See Hosking v. TPG Cap. Mgmt.*, 535 B.R. 543, 573-74 (Bankr. S.D.N.Y. 2015); *Cohain v. Klimley*, Case No. 08 Civ. 5047, 2010 WL 3701362, at * 10 (S.D.N.Y. 2010); *United Feature Syndicate v. Miller Features Syndicate*, 216 F. Supp. 2d 198, 214-16 (S.D.N.Y. 2002).

Switzerland, however, does not recognize a civil cause of action for damages arising from fraudulent conveyances, fraudulent bankruptcy, or preferential treatment of creditors. (Rud Decl. ¶ 7-8). The only remedy available to a creditor allegedly damaged by a pre-bankruptcy reduction of a Swiss debtor's assets and/or by the preferential treatment of creditors is the claw-back action provided by art. 285 of the Federal Debt Collection and Bankruptcy Act. (*Id.* ¶ 6). Under Swiss Law, this remedy belongs to the bankrupt debtor and can only be pursued by a creditor pursuant to an assignment of the debtor's claim. (*Id.* ¶¶ 6-8; ECF #110 ¶ 4). As noted above, Plaintiffs were offered the opportunity to obtain such an assignment as creditors in the Swiss SBT Bankruptcy. (ECF #22 ¶ 17; ECF #22-3 at A00028-A00029, A00034-A00035, A00038; ECF #110 ¶¶ 3-5; Rud Decl. ¶ 10). ***They declined to do so***. (ECF #22 ¶ 14; Rud Decl. ¶ 11).

Nor would Plaintiffs' claims be meritorious under Swiss Law even if they had obtained

---

Article V of the Convention upon which a court may refuse to enforce a foreign arbitral award. (ECF #116, at 32). Plainly, this reasoning has no application to Plaintiffs' state-law fraud-type claims asserted in the Second Amended Complaint. ***Third***, even with respect to Plaintiffs' federal claims to enforce the ICC Award against alleged alter egos and/or successor, standing is a jurisdictional requirement, *see, e.g., Carter v. Healthport Techs.*, 822 F.3d 47, 56-57 (2d Cir. 2016); *Cortlandt St. Recovery Corp. v. Hellas Tel.*, 790 F.3d 411, 416-419 (2d Cir. 2015) (absence of valid assignment precludes court's assertion of subject-matter jurisdiction), and a determination that the court has jurisdiction must precede a merits determination in an enforcement action under the Convention and is not limited by the exclusivity provisions of Article V, *Frontera Res. Azerbaijan Corp. v. State Oil Co.*, 582 F.3d 393, 396 (2d Cir. 2009).

the right to sue.  As noted above, ███████, SBT's other significant unsecured creditor, did attempt to challenge the Purchase Contract as a preference payment.  (Herzig Decl. Exs. 1-2) This challenge was rejected.

As explained by the Supreme Court of Appeal of the Canton of Zug, the Purchase Agreement neither harmed SBT nor worsened its indebtedness.  The court noted that – even at book values – equivalent assets and liabilities were exchanged.  But it did not stop there.  The court conducted a detailed analysis of the appropriate liquidation values to conclude that the assets transferred by SBT in connection with the Purchase Agreement were only worth approximately ███████.  This was a bargain when balanced by Prime Carbon's assumption of liabilities with a true value of ███████ (███████ *v. Stephan Herzig*, Z1 2016 8, at 11-12 (Canton Zug Sup. Ct. of App. Oct. 24, 2017) (Herzig Decl. Ex. 1), *aff'd* 4A_623/2017 (Swiss Fed. Ct. Aug. 24, 2018) (Herzig Decl. Ex. 2).

With respect to ███████'s claims attempting to assert its own damages suffered as a result of an alleged reduction in assets available to the remaining creditors, the court held such claims were not actionable in a civil action,[12] based upon the Federal Supreme Court judgment at BGE 141 III 527 (discussed further in the Seventh Supplemental Declaration of Andreas Rud), and found it unnecessary to consider relief under the claw-back provisions of art. 285 where ███████ had not pursued a claw-back claim pursuant to assignment.  *See id.* at 13, 15.

To the extent that Plaintiffs recast their claims as common law fraud claims rather than a challenge to a preference payment, they fare no better under Swiss law.  Under Swiss Law,

---

[12]  Even the trial court decision later reversed on appeal concluded that the total amount of damage to the *entire pool* of SBT creditors, including ███████, Plaintiffs and others, was less than ███████, a far cry from the $48 million that Plaintiffs seek to attach here.  (Herzig Decl. Ex. 1 at 7-8).  Because the appellate courts held that these damages would not support a civil claim, it was unnecessary for them to consider the compelling arguments asserted by the defendant Herzig that even this amount was too high.

except in extraordinary circumstances not present or alleged here, a false statement in litigation between represented parties, even if intentional, does not qualify as a fraudulent misrepresentation.  (Rud Decl. ¶¶ 16-18).  Moreover, Plaintiffs do not even allege that they relied upon any allegedly fraudulent misrepresentations, as would be required to support a fraud claim under Swiss law.  (*Id.*).

In sum, (i) to the extent the claims arise from alleged wrongful reduction of SBT's assets, Plaintiffs lack standing under Swiss law to advance their claims; and (ii) any other claims would not support a civil claim for relief under applicable Swiss law.

### C.    The Purchase Contract and SPA Were Fair And Reasonable

Even under New York Law, [13] Plaintiffs are required to prove damages to recover on any of their fraud or fraudulent conveyance claims.  *See* New York's Debtor and Creditor Law ("NY DCL") § 276; *see also e.g., De Vos v. Lee*, Case No. 07-CV-804, 2009 U.S. Dist. LEXIS 134541, at *32-36 & n.29 (E.D.N.Y. 2009) ("[L]iability for a fraudulent conveyance will not attach absent some prejudice to the creditor challenging the transfer".) [14]  As such, Plaintiffs must prove that the Purchase Contract and SPA spirited away assets that Plaintiffs would otherwise have

---

[13]    Plaintiffs assert that New York law applies, but this is simply wrong.  Plaintiffs are not New York residents and assert claims arising from: (1) Swiss SBT's sale of assets to Swiss Prime Carbon, which Plaintiffs allege resulted in the Swiss SBT Bankruptcy proceeding; (2) a subsequent sale by Swiss Prime Carbon to AMCI Holdings, which is not incorporated, located or licensed to do business in New York, of the shares of Primetrade, which likewise is not incorporated, located or licensed to do business in New York; and (3) representations made by a Swiss attorney in Switzerland to the ICC in France.  Of the nine "key individuals" listed by Plaintiffs as involved (Grant Decl. (6/3) ¶¶ 49-59), Plaintiffs have made no effort to adduce evidence that they took any action in New York, and, indeed, only two of the nine, Reggie Wood and Walt Stenger are even citizens of the United States (but not of New York).  For his part, Attachment Defendant Hans Mende is a German citizen, who is not a resident of New York.

[14]    Notably, Plaintiffs do not even contend that they can demonstrate a likelihood of success on their constructive fraudulent conveyance claims under NY DCL §§ 273-275.  Nor can they.  Such claims require them to prove the absence of fair consideration for the transactions at issue.  *See* NY DCL §§ 273-275.  Significantly, in the vast majority of U.S. jurisdictions that, unlike New York, have adopted the Uniform Fraudulent Transfers Act, the exchange of fair consideration is also a defense to claims of intentional fraudulent transfer as well.  *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2006).

received or otherwise caused them financial harm.  This is a major problem for Plaintiffs, since every financial professional, regulator, or court to evaluate the transactions in question has concluded that the transactions were fair and reasonable.  And Plaintiffs have presented no evidence to the contrary.

To the contrary, the record evidence supports the opposite conclusion.  As described above, SBT and its creditors suffered no damage as a result of the sale of assets by SBT to Prime Carbon.  Even using book values, SBT liabilities in an amount in excess of the assets sold were assumed by Prime Carbon.[15]  (Plf Br. 3; Lucas Decl. (3/15) Ex. 8 at 20- 22; *accord* Lucas Decl. (3/15) Ex. 9 ¶¶ 19-20).  And conducting a market value analysis in the manner the Swiss court did in the ████████ case shows that the amount of the assumed liabilities dramatically exceeded the value of the purchased assets.  (Herzig Decl. Ex. 1).  Indeed, the assets purchased by Prime Carbon (the vast majority of which were also offset by secured liabilities) included doubtful receivables against SBT's customer ████.  (Grant Decl. (2/15) Ex. R at 392-396; Lucas Decl. (3/15) Ex. 9 ¶¶ 21-56).  Far from harming SBT and its creditors as a whole, the Purchase Contract inured to their substantial benefit.

Moreover, both transactions were supported by the analysis and reports of independent accountants in the Fairness Opinion and of independent appraisers/accountants in the Independent Valuation. (Lucas Decl. (3/15) Exs. 10 & 11).

Plaintiffs do not provide their own valuation of the SBT assets or liabilities.  Nor do they present any evidence or accepted methodology by which the Court could determine whether the

---

[15]    The evidence also undermines Plaintiffs' assertion that SBT breached the underlying contracts in the first place.  Obviously if SBT did not breach, Plaintiffs were not creditors and have no damages.  *See, e.g.,* N.Y. Debtor & Creditor Law § 270, 278-279; *Marcus v. Kane*, 18 F.2d 722, 723 (2d Cir. 1927); *De Vos v. Lee*, 2009 U.S. Dist. LEXIS 134541, at *32-36 & n.29 (E.D.N.Y. 2009).  In particular, it was Plaintiffs who first breached the Contracts by failing to deliver the required pig iron when the market turned against them and ultimately ceasing even to communicate with Defendants. (*See, supra*, p. 2).

transaction was made for fair value.  Instead, Plaintiffs argue that the restructuring transactions must be unreasonable because: (i) the transactions were motivated by SBT's dire financial condition; (ii) SBT did not inform Plaintiffs before executing the transactions; and (iii) SBT obtained fairness opinions and appraisals to defend the transactions from later challenge.  In essence, Plaintiffs argue that any debt payments or restructuring done by a financially distressed company are necessarily a fraudulent transfer, unless that transaction allows all debts to be paid.

That is not the law, even in New York. "[T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, **whether or not it prejudices other creditors**, because '**the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them**.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (emphasis added).  The restructuring transactions entered into by SBT enabled it to pay more of its debts than it could otherwise accomplish.  Even if that had prejudiced some creditors compared to others, it would not have constituted a fraudulent conveyance.  But as set forth above, the transactions did not even prejudice Plaintiffs, who never had any feasible path to recovery against a company whose secured debts outstripped its ability to pay.[16]

Absent proof that Plaintiffs would have recovered money from SBT absent the complained-about transfers, Plaintiffs' claims must fail.

---

[16]   Plaintiffs attempt to create some inference of impropriety with respect to the SPA by claiming that Prime Carbon "never actually received the funds" since they were transferred to a Prime Carbon account to which only "trusted minions" had access. (Pl. Br. 6).  This is absurd.  Plaintiffs admit that the account to which the $5.5 million was transferred was in the name of Prime Carbon.  (Pl. Crime-Fraud Br. 6; Grant Decl. (2/15) Exs. K, L at 9086).  Moreover, the "trusted minions" that had access to the account, ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮, were Prime Carbon directors, as was Hans Mende. (Grant Decl. (6/3) Ex. 2 at 7-8; *accord* Lucas Decl. (3/15) Ex. 14).  Plaintiffs' suggestion that funds held in a Prime Carbon account under the control of Prime Carbon directors did not belong to Prime Carbon does not merit further response.

### D. Plaintiffs Did Not Rely Upon Any Alleged Misstatements

A plaintiff alleging fraud must prove determinantal reliance upon the allegedly false statements. *People by Schneiderman v. Credit Suisse Sec. (USA) LLC*, 31 N.Y.3d 622, 638 (2018) ("The prima facie elements of an actual fraud claim are (1) a material misrepresentation of fact, (2) knowledge by the defendant of its falsity, (3) an intent to induce reliance, (4) justifiable reliance and (5) damages").  The only alleged false statement identified by Plaintiffs is a January 25, 2010 letter from SBT (not any Defendant) to the Arbitration Tribunal.

As a threshold matter, nothing in this letter is false and the author was not an agent of any Defendant.  But even apart from these failings, Plaintiffs also fail to show any reliance upon the letter.  Accordingly, they cannot show a likelihood of success on the merits with respect to their fraudulent misrepresentation claims.

The only "evidence" of detrimental reliance adduced by Plaintiffs is the Declaration of opposing counsel, who did not represent Plaintiffs during the relevant time period.  Counsel claims that "[b]ecause of the representations in the January 25 Letter, Plaintiffs did not pursue interim conservational measures in January of 2010." (6/3/19 Grant Decl. ¶ 105).  This is simply, provably, false.  Undeterred by any alleged misrepresentations, on March 19, 2010 Plaintiffs did in fact seek injunctive relief with respect to their alleged fraud claims by bringing the first of several vessel seizure proceedings in Brazil. (ECF #125 ¶ 76).[17]

Nor could Plaintiffs credibly contend that the January 25, 2010 letter deprived them of the opportunity to seek interim and conservatory measures in the ICC Arbitration in January.  At that time the file had not yet even been transmitted to the arbitral tribunal.  Under the ICC Rules,

---

[17]    Additionally, the January 25, 2010 letter is not stamped received until January 28, 2010, at which point Plaintiffs admit that the restructuring transactions had already closed. (ECF #125 ¶ 8; Pl Crime-Fraud Br. 8; Grant Decl. (2/15) Ex. I at 182).

this precluded Plaintiffs from pursuing interim and conservatory measures. (Grant Decl. (2/15) Ex. O at 3; ECF #43-2, at 14).  And even if they had, such relief would have been denied. Indeed, when Plaintiffs did ultimately seek interim and conservatory measures several months later that application was denied on the merits.  (ECF #39 ¶¶ 4-9).

Absent some evidence of detrimental reliance upon an identifiable false statement by Defendants, Plaintiffs' fraud claims fail.

### E. The Arbitration Award Is Unenforceable Against Defendants Under the New York Convention.

Article V of the New York Convention states seven grounds upon which a court may refuse to recognize and enforce a foreign arbitral award.  *See* Convention, Art. V; *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).  Defendants have asserted multiple grounds for non-enforcement under Article V, but one unambiguously applies: the provisions of Article V, and particularly, subsection (1)(b), which allows a court to refuse to enforce an award for procedural defects that prevented the party against whom the award is invoked from presenting its case.  *See Iran Aircraft Industries*, 980 F.2d at 145-46; *Sea Hope Navigation Inc. v. Novel Commodities SA*, Case No. 13 Civ. 3225(LAK)(GWG), 2013 WL 5695955, at *5 (S.D.N.Y. Oct. 21, 2013).

Under Article V(1)(b), a foreign arbitration award is not enforceable where the arbitration tribunal denied the defendant the opportunity to "be heard at a meaningful time and in a meaningful manner."  *See Iran Aircraft Industries*, 980 F.2d at 146; *accord Sea Hope Navigation Inc.*, 2013 WL 5695955, at *5.  This is precisely what happened here.  Although SBT received notice of the ICC Arbitration instituted against it and initially participated, its capacity to do so – as a matter of Swiss Law – ended when the SBT Bankruptcy commenced on April 30, 2010.

(ECF #125 ¶ 80; ECF #22 ¶¶ 4 & 6; Grant Decl. (2/15) Ex. P). Thereafter, SBT could not participate in the SBT Arbitration.  (ECF #48-13 ¶ 23; ECF #22 ¶ 6).

On December 15, 2010, Mr. Hess, the Swiss Bankruptcy Administrator, wrote to the ICC Arbitrators reiterating the Zug Bankruptcy Office's request for a stay in light of the SBT Bankruptcy and asking the ICC Arbitrators to issue a written decision upon it.  (ECF #48-13 ¶ 31).  He informed the ICC Arbitrators that the SBT Bankruptcy estate assets were only sufficient to cover administrative expenses, that SBT unsecured trade creditors like Plaintiffs were expected to recover nothing, and that unless one or all SBT creditors were willing either to pay the expense of the Zug Bankruptcy Office to present SBT's defenses on the merits or to themselves defend the ICC Arbitration, the ICC Arbitration proceedings were moot.  *See id.*

With SBT incapacitated, Plaintiffs proceeded to arbitrate against an empty chair.  The ICC Arbitration proceeded without any defense or input by or on behalf of the bankrupt SBT, and Defendants, as a matter of Swiss bankruptcy law, were prohibited from doing so on its behalf.  (ECF #22 ¶ 6; ECF #68 ¶¶ 13, 15). Without any meaningful opportunity for SBT, much less the Defendants, to be heard in defense, Plaintiffs obtained the issuance of an enormous $48 million default Award against SBT.  The basis for these damages and SBT's underlying liability have never been properly scrutinized.  Indeed, a fair proceeding would reveal that Plaintiffs themselves breached the contracts with SBT long before they sought to enforce them. [18]

---

[18]   The flimsy basis for Plaintiffs' contract damages (which, by default, became the Award amount) is evident from their Arbitration damages submittal.  (Lucas Decl. (6/18) Ex. 3). ██████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████.  *Id.* at 292, 317.  Such an unrealistic margin for this industry could survive only in an unscrutinized default proceeding.

This is not seriously disputed.  Plaintiffs *admit* that SBT was entirely controlled in the ICC Arbitration by the Bankruptcy Administrator, who, subject to Plaintiffs' approval as creditors, had sole authority to decide not to defend.  (ECF #125 ¶¶ 86-91; ECF #38, at 14-16; ECF #40 ¶¶ 10-14).  They *further admit* that Bankruptcy Administrator and the SBT creditors had no incentive to defend against Plaintiffs' claims. (ECF #125 ¶¶ 87, 89; ECF #38; ECF #40 ¶¶ 16-18).  Plaintiffs *additionally admit* that they never sought to name Defendants as respondents in or in connection with the ICC Arbitration, (ECF #39 ¶ 16), despite their clearly expressed intent to use the default judgment obtained against Defendants in subsequent litigation.  (ECF #44-2, Supp. Ex. 3, at 3 & Supp. Ex. 4, at 4).[19]

Multiple courts have held that constitutional due process precludes enforcement of a default judgment against alter egos, even where, unlike here, the alter ego remained in control of the affiliate against whom the default was entered and was not, as here, legally barred from defending it.  *See North Atl. Dist. v. Teamsters Local Union No. 430*, 497 F. Supp. 2d 315, 326-27 (D.R.I. 2007) ("[T]he requirements of due process make it impossible for this Court to extend a default judgment to a non-party, regardless of the non-party's [alleged alter ego] relationship to the original party."); *Motores de Mexicali, S.A. v. Superior Court*, 331 P.2d 1, 3 (Cal. 1958) ("To summarily add [alter egos] to the [default] judgment heretofore running only against [the debtor], without allowing them to litigate any questions beyond their relation to the allegedly alter ego corporation would patently violate th[e] constitutional safeguard [of due process]."); *Shahedi v. Trimble*, Case No. H040809, 2015 WL 1393315, at *1-3 (Cal. Ct. App. March 26, 2015) (same);

---

[19]    Plaintiffs' Swiss advocate litigator "expert" has asserted that "under Rule 7 of the Arbitration and ADR Rules of the ICC Paris, Plaintiffs were not allowed to add any parties to the arbitration procedure." (ECF #40 ¶ 16). He is simply wrong. The version of ICC Article 7 to which he refers was not in force until January 1, 2012, after the ICC Arbitration was over. (*See* ECF#61-2, at 3-4). The ICC Rules in effect during the ICC Arbitration did *not* include an equivalent provision. (*See* ECF #61-3). Plaintiffs did not join Defendants, nor commence a separate arbitration proceeding against Defendants and seek to have it consolidated with the ICC Arbitration, choosing instead to obtain a default Award against SBT without having to prove their case on the merits.

*Katzier's Floor & Home Design, Inc.*, 394 F.3d 1143, 1150 (9th Cir. 2004) (same); *accord Wells Fargo Bank v. Konover*, Case No. 3:05-cv-1924, 2011 WL 1225986, at *29 (D. Conn. March 28, 2011) ("Due process concerns are understandably higher when the judgment being enforced against an alter ego is the product of a default judgment."); RESTATEMENT (SECOND) OF JUDGMENTS § 59 ("A judgment against a corporation that is found to be the alter ego of a stockholder or member of the corporation establishes personal liability of the latter only if he is given notice that such liability is sought to be imposed and fair opportunity to defend the action resulting in the judgment.").

Defendants (and SBT) were denied any meaningful opportunity to defend themselves in the ICC Arbitration. Accordingly, Article V bars enforcement of the Arbitration Award.[20]

### F.     Hans Mende Was Not an Alter-Ego of SBT

Plaintiffs' veil-piercing claims fare no better. "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003). It is axiomatic that while a corporation acts through its officers, directors and owners, these individuals are normally not liable for the debts incurred by the corporation.

To pierce that veil and hold Hans Mende responsible for the actions of AMCI Holdings or SBT, Plaintiffs cannot merely show that he had a beneficial interest in the businesses or had the right to control their operations. *See Shostack v. Diller*, Case No. 15-cv-2255, 2015 U.S. Dist. LEXIS 123777, at *18 (S.D.N.Y. Sept. 16, 2015) ("It is clear that simply owning, even wholly owning, a subsidiary is insufficient to pierce the corporate veil.") (*quoting In re Digital*

---

[20]     Plaintiffs claim that this defense was decided by Judge Sweet's denial on remand of Defendants' Amended Motion to Dismiss the Second Amended Complaint. This is silly. Judge Sweet's decision was based on the standard applicable to a motion to dismiss (*i.e.*, accepting Plaintiffs' allegations as true) and has no application at this later stage of the proceedings. (ECF #116, at 3, 15, 33, 37). Regardless, the law of the case doctrine does not preclude reconsideration of rulings made on a motion to dismiss at a later stage of the proceedings. *See, e.g., Polycast Tech. Corp.*, 792 F. Supp. at 263-64.

*Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011)); *see also United States ex rel. Kneepkins v. Gambro Healthcare, Inc*., 115 F. Supp. 2d 35, 39 (D. Mass. 2000) ("Ownership – even total ownership – of a corporation does not by itself impart the corporation's liabilities to the owner….").

As Judge Sweet held, (ECF #116, at 17-20, 25-26), and as Plaintiffs now concede, (Pl. Br. 16), Plaintiffs must also prove that Mende used the corporate form to perpetrate a "fraud or other wrong." *Shostack*, 2015 U.S. Dist. LEXIS 123777, at *7 (quoting *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (N.D. Ind. Apr. 21, 2016)) (plaintiff must show "the alleged alter ego exploits its control to 'commit fraud or other wrong'"); *Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 18 (2015); *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998) (same).

As noted above, Plaintiffs' failure to demonstrate that the restructuring transactions constituted fraud is fatal to their claim to pierce the veil against Mende.

Nor have Plaintiffs even established that Mende is an "alter-ego" of SBT.  For that, it is not enough for the plaintiff to demonstrate that the officer, director or shareholder dominated and controlled the corporate entity.  *See Morris v. State Dep't of Tax. & Fin.*, 82 N.Y.2d 135, 141-142 (1993); *TNS Holdings*, 92 N.Y.2d at 339.  The plaintiff must show that the officer, director or member used the corporation for his/her personal benefit and the corporation was nothing more than an instrumentality of the officer or member.  *See TNS Holdings*, 92 N.Y.2d at 339. Conclusory allegations of domination and control are insufficient.  *See TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, 2017 U.S. Dist. LEXIS 93143, at 8 (S.D.N.Y. June 16, 2017) (Castel, J.); *East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc.*, 16 N.Y.3d 775, 776 (2011).  "[A] plaintiff must do more than merely allege that [the defendant] engaged in

improper acts or acted in 'bad faith' while representing the corporation". *East Hampton Union Free School Dist.* 16 N.Y.3d at 776. Rather, the plaintiff must demonstrate that there was a unity of interest and control between the defendant and the entity such that they are indistinguishable. *See Porter v. LSB Indus.*, 192 A.D.2d 205, 213 (4th Dep't 1993) (under New York law, "the parent's control over the subsidiaries activities 'must be so complete that the subsidiary is, in fact, merely a department of the parent'" and is "so pervasive that the corporate separation is more formal than real.")

The application of the alter ego doctrine depends on the facts and circumstances of each case. *See Ledy v. Wilson*, 38 A.D.3d 214, 214 (1st Dep't 2007). But several factors have emerged in determining whether the plaintiff has made the requisite showing. These factors include, among others: (1) the failure to adhere to corporate formalities; (2) inadequate capitalization (that is, the corporation does not have sufficient funds to operate); (3) a commingling of assets; (4) one person or a small group of closely related people were in complete control of the corporation or LLC; and (5) use of corporate funds for personal benefit. *Shisgal v. Brown*, 21 A.D.3d 845, 848 (1st Dep't 2005) (internal citation omitted). In reviewing the factors used to decide alter-ego status, the Court ultimately weighs the totality of the facts, applying a flexible test that considers the unique context of the case. *Div. 1181 Transit Union - N.Y. Emps. Pension Fund v. N.Y. Dep't of Educ.*, Case No. 13-cv-9112, 2017 U.S. Dist. LEXIS 139882, at *12-13 (S.D.N.Y. Aug. 30, 2017) (Castel, J.)

In addition to these factors, a plaintiff must establish a causal connection between the domination and control of the corporate entity and the injury complained of. *Morris*, 82 N.Y.2d at 141; *Guptill Holding Corp. v. State of N.Y.*, 33 A.D.2d 362, 365 (3d Dep't 1970) (noting that an element of veil piercing is "an injury proximately caused by said wrong") (citation omitted);

*East Hampton Union Free School Dist.,* 66 A.D.3d at 132; *see also CBF Industria de Gusa v. AMCI Holdings*, *Inc.*, 316 F. Supp. 3d 635, 646 (S.D.N.Y. June 15, 2018) (Sweet, J.) (explaining in the instant action that Plaintiffs must show that "[t]he parent . . . exercised complete domination **in respect to the transaction attacked** so that the subsidiary had **at the time** no separate will of its own" and *citing Oriental Comm. & Shp'g Co. v. Rosseel, N.V.*, 702 F. Supp. 1005, 1018 (S.D.N.Y. 1988) (*citing Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988)).

Plaintiffs identify no evidence of SBT's failure to observe corporate formalities, commingling of assets between SBT and Mende, or Mende's use of SBT's corporate funds for his personal benefit. Plaintiffs' claim to enforce the ICC Award against Mr. Mende as an alter ego is instead predicated entirely on "evidence" of Mende's purported control over the Purchase Agreement. This argument fails for two reasons.

1.   *Plaintiffs' Evidence Fails to Demonstrate Mende's Control over the Restructuring Transactions.*

The three pieces of evidence upon which Plaintiffs rely are insufficient to demonstrate that Mende controlled the restructuring transactions. (Pl. Br. 17-18 (*citing* Grant Decl. (6/3) Exs. 14, 16 & 33)). From the filing of their initial Complaint, Plaintiffs have exhibited a fixation on Mende's statement in Exhibit 14 that "a naked man has no pockets," (Grant Decl. (6/3) Ex. 14; *accord* ECF #1 ¶ 7). But viewed in proper context, this statement was not a direction to divest SBT of anything, but merely a recognition of the fact that SBT was already financially distressed and did not have sufficient assets to pay potential unsecured trade creditor claims. Mende never instructed anyone to "make" SBT naked; the market conditions had already stripped it from head to toe. Indeed, the email in question makes clear that ████████████████████████████ ████████████████████████████████. (Grant Decl. (6/13) Ex. 14 at 29463 (████████████████

 (emphasis added).

Similarly, Exhibit 16 shows that Hans Mende was informed of ████████████

████████████████████████████████████████████████

██████. While Mende (along with the other directors of Prime Carbon[21]) agreed to the plan,

this hardly demonstrates that it was hatched at his direction.  To the contrary, the email

demonstrates that █████████████████████████████████████

█████████████████████ (Grant Decl. (6/3) Ex. 16 at 31134, 31137).

Finally, Exhibit 33 shows that Mende executed the SPA (though notably not the Purchase

Contract) in his capacity as President of both Prime Carbon and AMCI Holdings.  This is

irrelevant.  The transaction was either fair and reasonable, or it was not.  It either prejudiced

Plaintiffs, or it did not.  The specific person who signed the document is irrelevant, and nothing

in Exhibit 33 suggests that it was drawn up at his behest.

The sum and substance of Plaintiffs' evidence is that Mende was aware of the relevant

transactions and executed one of them.  If that were sufficient to show alter-ego liability, there

would be no corporate veil.  And absent proof that Mende actually directed the transactions in

question, Plaintiffs' claims must fail.

2.      *Plaintiffs Show No Nexus Between Mende and the Arbitration Award*

Even if Plaintiffs could show that Mende controlled the restructuring transactions, this

would still be insufficient to establish a causal link between the alleged alter ego control and the

damages awarded by ICC Arbitration Award.  Accordingly, Mende could not be held liable for

the damages awarded in that action.

---

[21]      ████████ and ████████ being the others.

The ICC Award is not based on the restructuring transactions, or any injury purportedly suffered by Plaintiffs as a result thereof.  To the contrary, the ICC Award specifically found insufficient evidence of fraud.  (ECF #48-13 ¶¶ 47, 49).  The injury for which the ICC Award granted relief (albeit on a default basis without any contested defense on the merits) was SBT's alleged breach of its pig iron purchase contracts with Plaintiffs.  And Plaintiffs have not adduced a scintilla of evidence that Mr. Mende exercised control over SBT's underlying pig iron purchase contracts.

To the contrary, all of Plaintiffs' proffered evidence "control" relates to Mende's alleged control over the restructuring transactions in late 2009, long after any breach.  Even if credited, this is beside the point.  And as a matter of law, any alleged control ended when SBT went into bankruptcy on April 29, 2010.  (ECF #22 ¶ 6; ECF #68 ¶ 13).  As a result of the bankruptcy filing, complete control over SBT vested in the Zug Bankruptcy Office, and, as a matter of Swiss bankruptcy law, the Defendants had *no* continuing ability to control SBT and were precluded even from defending SBT in the ICC Arbitration.  (ECF #22 ¶ 6; ECF #68 ¶ 13).  Contrary to Plaintiffs' prior argument, without any ability to control the defense of the arbitration, Defendants cannot be considered to have been either alter egos, or, as Plaintiffs assert, "in essence, parties", therein. (ECF #79, at 33).

## III.   PLAINTIFFS HAVE NOT SATISFIED THE STATUTORY REQUIREMENTS FOR ATTACHMENT UNDER CPLR § 6201(3)

CPLR § 6201(3) permits attachment where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."  Plaintiffs contend that they have satisfied this element by

detailing how assets of SBT were transferred to Prime Carbon in late 2009 and early 2010 and the alleged impropriety and prejudice of this transaction. Plaintiffs are mistaken.

**First**, as set forth in § II above, Plaintiffs' attack on the SBT transaction is meritless and Plaintiffs will not prevail in their claim.

**Second**, proof of the underlying claim, even a claim for fraudulent conveyance or a preference payment, is insufficient to prove entitlement to an attachment. *Encore Credit Corp.*, at *4 ("proof that a defendant committed the underlying unlawful act is not, by itself, sufficient to establish a ground for attachment."); *Brezenoff*, 433 N.Y.S.2d at 554 ("The alleged merits of the underlying action may not be used to mitigate the distinct and strict burden of proving the grounds for the pre-judgment attachment.").

**Third**, even if Plaintiffs' "facts" were credited, they allege only **that SBT** has improperly disposed of assets that could be used to satisfy a judgment, not that Attachment Defendants have ever sought to secret **their own assets** or otherwise render themselves judgment-proof. And the law is clear that the actions of a corporation to convey or otherwise encumber assets cannot be automatically imparted to its owners, managers, or directors.

*Signal Capital Corp. v. Frank*, 895 F. Supp. 62 (S.D.N.Y. 1995), is instructive in this matter. In *Signal Capital*, a judgment creditor sued the directors of an indebted business, claiming that they improperly diverted corporate assets to which it would be otherwise entitled. The creditor sought an attachment of the directors' personal assets pursuant to CPLR § 6201(3).

Judge Parker, in reviewing the record, noted that while there had been prior judicial decisions showing that the business itself had engaged in preference payments and fraudulent conveyances, there was no evidence that **the directors** had diverted **their personal assets** to

39

render themselves judgment-proof.  Absent such evidence, the Court found that attachment

pursuant to CPLR § 6201(3) was inappropriate:

> With regard to both Clemence D. Frank and Susan J. Albert, Signal relies upon
> *HBE Leasing Corporation v. Frank,* 851 F. Supp. 571 (S.D.N.Y.1994), in which
> the court found that, during the time Clemence D. Frank and Susan J. Albert were
> allegedly directors of Enterprises, Enterprises was used as a conduit for the
> disbursement of assets for family and noncorporate purposes, despite its facing
> judgment in the above-mentioned RICO action. The decision, however, does not
> provide evidence of intent to frustrate a judgment on the part of either Clemence D.
> Frank or Susan J. Albert. Susan J. Albert was not named as a defendant in the action
> and the court granted summary judgment in Clemence J. Frank's favor…
>
> *            *            *
>
> Because the record is devoid of evidence that the Clemence D. Frank and Susan J.
> Albert have transferred, or are about to transfer or have threatened to transfer, any
> assets with the intention of frustrating a judgment that might be rendered in Signal's
> favor, the Court finds that Signal has failed to demonstrate irreparable harm, and
> failed to satisfy the statutory prerequisites for an order of attachment under CPLR
> 6201(3).

*Signal Capital Corp.*, 895 F. Supp. at 65.

Here the record is even less favorable to Plaintiffs.  Unlike the creditor in *Signal Capital*,

Plaintiffs do not have a final judicial determination that SBT engaged in fraudulent conveyances

or preference payments,[22] only their one-sided version of the facts.  But Plaintiffs' application

fails for the same reason as that of the Signal Capital creditor.  Absent evidence that the

Attachment Defendants themselves have "assigned, disposed of, encumbered or secreted

property, or removed it from the state," Plaintiffs cannot satisfy the requirements of CPLR

§ 6201(3).[23]

---

[22]   To the contrary, both the ICC Arbitrators and the Swiss courts have considered and dismissed trade creditor civil claims based on the transactions at issue.

[23]   Nor is attachment appropriate under CPLR § 6201(1).  Authorities have held that 6201(1) primarily serves to obtain in-rem jurisdiction and does not – under ordinary circumstances – justify a security attachment where the court already has jurisdiction over the parties.  *See In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 306 (S.D.N.Y. 2010) ("Where a nondomiciliary defendant has consented to jurisdiction, an attachment brought under section 6201(1) should issue only upon a showing that drastic action is required") (internal marks omitted).

## IV.    AN ATTACHMENT WOULD BE UNDULY PREJUDICIAL TO DEFENDANTS

In exercising its discretion to issue an attachment, the Court must consider the impact of the attachment on Defendants.  *Thornapple Assocs., Inc. v. Sahagen*, Case No. 06 Civ. 6412 (JFK), 2007 WL 747861, at *8 (S.D.N.Y. Mar. 12, 2007) ("in determining whether to grant security-based attachment of the assets of a non-domiciliary, a court should consider not only the plaintiff's need for attachment, but also the effect of the attachment upon the defendant").  While the Defendants in this case are wealthy and well-capitalized, the enormous size of the attachment sought makes undue prejudice to Defendants a virtual certainty.  Simply put, $48 million is a lot of money, and restraining such a large sum carries unavoidable economic costs.

Even if the attachment only restrains transfers of the $48 million, such a restriction would make it impossible to effectively manage the assets in a manner designed to maximize investment returns and minimize any tax liabilities.  Indeed, the levied assets would essentially be frozen in amber and unable to be sold, traded, borrowed against, lent, or pledged.  Even if this only reduced the investment returns on the $48 million by 2% annually, this would result in a loss to Defendants of $960,000 per year, which would only compound as litigation continued. This is a wholly unreasonable burden to impose on Defendants, regardless of their wealth, and weighs heavily against any theoretical "security interest" that Plaintiffs might desire.

## V.    DEFENDANTS ARE ENTITLED TO COSTS AND DAMAGES

CPLR § 6212(e) mandates that the plaintiff "be liable to the defendant for all costs and damages, including reasonable attorney's fees…if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property***. Plaintiff's liability shall not be limited by the amount of the undertaking***." (emphasis added).  "***A finding of fault is not required*** to recover damages under this provision, as plaintiffs are 'strictly liable' for the damages they

caused." *Citibank, N.A. v. Keenan Powers & Andrews PC*, 49 N.Y.S.3d 895 (1st Dep't 2017) (emphasis added) (internal cite omitted).

In this case, Plaintiffs attempted to serve 27 garnishees, causing Defendants to spend considerable resources to ensure that over $1 billion in assets were not improperly restrained. Defendants respectfully request that the undertaking be released to Defendants and that the Court set a briefing schedule for the parties to brief Defendants' entitlement to costs and legal fees.

## VI.   PLAINTIFFS HAVE DISMISSED THEIR REQUEST FOR A PRELIMINARY INJUNCTION

In the parties' so-ordered stipulation (ECF # 259 ¶ 7), Plaintiffs agreed to "voluntarily dismiss, without prejudice, the request for injunctive relief in their confirmation motion."  But in any event, for all the reasons discussed above and various additional reasons requiring the vacating of the attachment itself, Plaintiffs would not have been entitled to the drastic and extraordinary remedy of a preliminary injunction.

## CONCLUSION

Plaintiffs' motion should be denied and the existing attachment(s) vacated immediately. In addition, Plaintiffs' undertaking should be conveyed to Defendants and the Court should set a briefing schedule for awarding fees and costs pursuant to CPLR § 6212(e).

**Dated:**       New York, NY
                June 18, 2019

                                    Respectfully submitted,

                                    MANDEL BHANDARI LLP
                                    Rishi Bhandari
                                    Robert Glunt
                                    80 Pine Street, 33rd Floor
                                    New York, New York 10005
                                    (212) 269-5600

                                    BUCHANAN INGERSOLL & ROONEY, PC
                                    Kevin P. Lucas
                                    One Oxford Centre, 20th Floor
                                    301 Grant Street
                                    Pittsburgh, PA 15219
                                    (412) 562-8800

                                    By:
                                    Rishi Bhandari

                                    *Attorneys for Defendants*