USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/25/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CBF INDUSTRIA DE GUSA S/A, et al.,                          :
                                                            :
                                                            :
                        Plaintiffs,                         :
                                                            :        13-CV-2581 (PKC) (JLC)
            -v-                                             :
                                                            :
AMCI HOLDINGS, INC., et al.,                                :
                                                            :
                        Defendants.                         :
-------------------------------------------------------------X

**<u>OPINION AND ORDER</u>**

# TABLE OF CONTENTS

I.   BACKGROUND ............................................................................................... 1

   A.  Facts ......................................................................................................... 1

   B.  Procedural History .................................................................................. 4

   C.  Pending Discovery Motions .................................................................... 7

II.  DISCUSSION .................................................................................................. 10

   A.  Legal Standards ...................................................................................... 10

   B.  Analysis ................................................................................................... 12

      1.  Defendants' Motions to Compel ....................................................... 13

         a.  Underlying Transactions ........................................................... 13

            i.   Collateral attack on the ICC Award .................................... 14

            ii.  State law fraud claims and affirmative defenses ............... 15

            iii. Internal communications related to the underlying transactions ...... 17

            iv.  Plaintiffs' alleged damages as a result of SBT's breach ..................... 18

         b.  Swiss Bankruptcy ..................................................................... 19

         c.  Swiss Action .............................................................................. 22

      2.  Plaintiffs' Motions to Compel Interrogatory Responses and Document
          Production ........................................................................................ 22

         a.  General Objections .................................................................... 23

         b.  Financial Information ............................................................... 27

            i.   Documents sufficient to show loans, transfers of value, and payments
                 made between defendants and SBT ..................................... 28

            ii.  Documents from individual defendants ............................... 31

         c.  Third-party Service Providers ................................................. 33

i.    GYF ................................................................................... 36

ii.   Loyalhanna ......................................................................... 37

iii.  Holsinger ............................................................................ 39

iv.  THV ..................................................................................... 39

v.    The Schweiger Firm ........................................................... 40

d.    Transparent Search for ESI ........................................................ 42

e.    Transfer Agreement Documents ............................................... 45

3.    Plaintiffs' Motion to Compel Production of Documents Subject to the
Crime-Fraud Exception of the Attorney-Client Privilege and the Work-
Product Doctrine ............................................................................. 47

a.    Probable cause that a fraud has been committed ................................... 49

i.    Misrepresentation of a material fact, falsity of the misrepresentation,
and intent to defraud ........................................................... 49

ii.   Reasonable reliance on the representation and damage caused by such
reliance ................................................................................ 53

b.    Communications in furtherance of the fraud ........................................ 54

III.    CONCLUSION ............................................................................. 56

**JAMES L. COTT, United States Magistrate Judge.**

By Order dated April 18, 2019, this case involving the enforcement of a foreign arbitration award was referred to me for general pretrial supervision. Seven discovery disputes are pending before the Court.  Plaintiffs have moved to strike defendants' interrogatory objections, compel both United States and European document production in two separate motions, and compel production of certain documents subject to the crime-fraud exception to the attorney-client privilege and the work product doctrine.  Defendants have moved to compel document production related to the events and transactions that led to the arbitration award, and separately production of documents relating to certain Swiss bankruptcy proceedings.  Finally, defendants have sought to defer any applications related to the European defendants or documents in Switzerland.  By Order entered July 15, 2019, the Court granted in part and denied in part both plaintiffs' and defendants' motions for reasons to be explained in an opinion to follow.  This is that opinion.

## I.      BACKGROUND

### A.      Facts

This case concerns allegations of fraud and the enforcement of a foreign arbitration award against the alleged alter egos and successors in interest to the award debtor.  The Court assumes familiarity with the underlying facts in this

action and will not recount them in any detail here.[1]  In brief, plaintiffs are a group

of Brazilian pig iron producers.  Amended Complaint ("Complaint"), dated June 26,

2018, Dkt. No. 125, ¶ 2.  Defendants are a group of companies that are alleged alter

egos and/or successors to the award debtor, Steel Base Trade AG ("SBT"), and two

individuals who allegedly own and control those companies.  *Id.* ¶ 1.[2]

        According to the Complaint, in 2008, plaintiffs entered into a series of

contracts ("Contracts") to sell 103,500 metric tons of pig iron to SBT for more than

$76 million.  *Id.* ¶ 2.  Later that year, SBT discontinued its purchases, thus

allegedly breaching the Contracts.  *Id.* ¶ 44.  After several failed attempts at

negotiation, on November 16, 2009, plaintiffs filed a Request for Arbitration with

the International Chamber of Commerce ("ICC").  *Id.* ¶¶ 45, 47, 50.  SBT requested

an extension of time and the ICC allowed an extension until January 27, 2010.  *Id.*

¶ 51.

        On November 30, 2009, SBT entered into a transfer agreement with a

company called Prime Carbon ("Transfer Agreement").  *Id.* ¶ 55.  As a result of the

Transfer Agreement, Prime Carbon received $126 million in assets and $130 million

in liabilities (except plaintiffs') from SBT.  *Id.* ¶ 63.  On January 11, 2010, Prime

---

[1] For a fuller recitation of the underlying facts, the reader is directed to the Second
Circuit's opinion remanding the case, dated March 2, 2017 (*CBF Industria de Gusa
S/A v. AMCI Holdings, Inc.,* 850 F.3d 58 (2d Cir. 2017)) (Dkt. No. 97), and Judge
Sweet's decision, dated June 15, 2018, denying defendants' renewed motion to
dismiss (*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,* 316 F. Supp. 3d 635
(S.D.N.Y. 2018)) (Dkt. No. 116).

[2] The U.S. Defendants are AMCI, AMCI Holdings, K-M Investments, Primetrade,
and Fritz Kundrun.  The European Defendants are Prime Carbon and Hans Mende.

Carbon began making purchases of pig iron. *Id*. ¶ 52. On January 18, 2010, SBT sent letters to its suppliers (except plaintiffs) stating that SBT had transferred "all Goods and the respective title of the Goods" to Prime Carbon and suppliers were "to act from [sic] the time being only on instruction of Prime Carbon." *Id*. ¶ 59.

On January 15, 2010, after learning about Prime Carbon's entry into the pig iron market and investigating the company, plaintiffs sent a letter to the ICC stating: "There are strong and undisputable indications that the operations from Steel Base Trade AG are being transferred to another company [Prime Carbon] from the same AMCI Group . . ." *Id*. ¶ 53. Plaintiffs further requested that SBT demonstrate "good faith on the course of this dispute." *Id*. On January 25, 2010, SBT responded that it was not "try[ing] to evade from its obligations . . . [SBT] is still existing and has not resolved to be dissolved and liquidated." *Id*. ¶ 54. However, on January 27, 2010, SBT formally approved the Transfer Agreement and thus had "virtually no assets remaining." *Id*. ¶¶ 69, 80. Following the Transfer Agreement, Prime Carbon had at least five of the same directors as SBT, assumed ten of SBT's employment contracts, and at all times shared the same address as SBT or SBT's parent company, AMCI International. *Id*. ¶¶ 70, 72. Prime Carbon later transferred the shares of Primetrade USA (which had been previously owned by SBT) to AMCI Holdings in the United States. *Id*. ¶ 74.

On April 29, 2010, SBT filed for bankruptcy in Switzerland. *Id*. ¶ 80. On May 5, 2010, SBT notified the ICC of the bankruptcy. *Id*. ¶ 83. On June 23, 2010, plaintiffs requested that the ICC grant interim measures allowing them to seize

3

assets from SBT or Prime Carbon. Dkt. No. 1-2, at 86–87, ¶ 22.[3] On July 1, 2010, the ICC requested that plaintiffs "further specify the nature and grounds for its request." *Id.* at 87, ¶ 24. On July 2, 2010, plaintiffs submitted further documents, including a request to "[r]ecognize the existence of fraudulent acts. . ." *Id.* at 87–88, ¶ 25. On December 14, 2010, the ICC reserved judgment on the subject of fraud until it issued its ultimate decision on the merits. *Id.* at 89–90, ¶ 30.

On March 29, 2011, SBT's bankruptcy administrator determined that SBT did not have the funds to defend itself and did not have an interest in the arbitration. Complaint ¶ 87. The administrator thus admitted the claims against SBT, as well as the damages. *Id.* ¶ 91. On November 9, 2011, the ICC rendered an award of more than $48 million in favor of plaintiffs and attorneys' fees and costs of $360,000 ("Award"). *Id.* ¶ 95. As part of its decision, the ICC dismissed "any and all other claims made by the Parties," including plaintiffs' fraud allegations. Dkt. No. 1-2 at 96, ¶ 49. Following the ICC decision, plaintiffs were unable to collect the Award as all of SBT's assets had allegedly been transferred to Prime Carbon. Complaint ¶ 96.

## B.    Procedural History

On April 18, 2013, plaintiffs commenced this action to (1) enforce the Award against the alter egos and successors of SBT, and (2) recover on state law fraud claims. Dkt. No. 1. On July 30, 2013, defendants moved to dismiss, contending that

---

[3] Plaintiffs attached the ICC's Award determination as an exhibit to its original complaint. Dkt. No. 1. Pinpoint citations refer to the pagination generated by this District's Electronic Case Filing system.

(1) a suit in a United States forum was improper; (2) the action was an improper effort to modify the Award; and (3) plaintiffs were precluded from asserting fraud claims because they had been dismissed by the ICC.  Dkt. No. 17.  On April 9, 2014, the Court dismissed plaintiffs' claims with leave to amend, holding that plaintiffs (1) could only enforce the Award after it was confirmed in Switzerland, and (2) were precluded from bringing state law fraud claims.  Dkt. No. 46.  On April 29, 2014, plaintiffs initiated a separate action to confirm the Award in this Court.  *See* 14-CV-3034 (RWS), Dkt. No. 1.[4]  On March 16, 2015, the Court granted defendants' renewed motion to dismiss because SBT lacked the capacity to be sued as it was no longer a corporate entity under Swiss law.  Dkt. No. 91.

On April 11, 2015, plaintiffs appealed the Court's decisions to the Second Circuit.  Dkt. No. 95.  On March 2, 2017, the Second Circuit vacated the Court's April 2014 and March 2015 judgments and remanded the case for further proceedings.  *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 62 (2d Cir. 2017) ("Second Circuit Opinion").[5]  In doing so, the Second Circuit found that (1) the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") provides that enforcement of a foreign arbitral award may be refused only if defendants can prove one of five

---

[4] Plaintiffs filed this action under docket number 14-CV-3034 and filed a statement of relatedness on April 29, 2014, requesting that this action be filed as related to docket number 13-CV-2581.

[5] The Second Circuit issued an opinion on January 18, 2017, and a revised opinion on March 2, 2017.

5

enumerated conditions under Article V of the Convention, which defendants had not yet invoked but could do so on remand (*id.* at 75–76)[6]; (2) "the sole issue at present for the district court to consider on remand pertains to the liability of [defendants] for satisfaction of [plaintiffs'] foreign arbitral award as alter egos of the award-debtor (*id.* at 76); and (3) plaintiffs "should be allowed to conduct discovery with respect to the fraud claims.  [Defendants] may be given the opportunity to re-raise the issue preclusion issue after discovery . . ." (*id.* at 78).

On January 19, 2018, defendants again moved to dismiss, claiming Article V defenses to plaintiffs' action.  Dkt. No. 108.  On June 15, 2018, the Court denied the motion.  *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, (S.D.N.Y. 2018) ("June 15 Opinion").  In doing so, the Court noted that "the corporate form may be pierced where '(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff.'"  *Id.* at 646 (quoting *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 Fed. App'x 623, 625

---

[6] The United States acceded to the New York Convention in 1970.  *See* Second Circuit Opinion at 70.  The New York Convention "specifically contemplates that the state in which, or under the law of which, [an] award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."  *Id.* at 71 (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)).  In this case, the parties agree the primary jurisdiction is France.  *Id.*  The United States thus has secondary jurisdiction, and "'may refuse enforcement only on the limited grounds specified in Article V' of the New York Convention."  *Id.* (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115, n.1 (2d Cir. 2007)).

(2d Cir. 2010)).  The Court thus concluded that plaintiffs had "sufficiently [ ] alleged the piercing of SBT's corporate veil to reach [d]efendants as alter egos of SBT."  *Id.* at 650.

## C.   Pending Discovery Motions

On November 16, 2018, the Court set a scheduling order and provided briefing schedules for various discovery motions.  Dkt. No. 142.  On April 18, 2019, this case was referred to me for general pretrial supervision.  Dkt. No. 214.[7]  The Court held a conference on May 6, 2019 to discuss the pending motions, and to determine, in light of further production, whether any aspects of the motions were moot.  Dkt. No. 217.  The motions are summarized below in chronological order.

### 1.   Defendants' motion to defer Swiss discovery motions

On December 19, 2018, defendants moved to defer any discovery motions related to the European defendants or documents on Swiss territory.  Dkt. No. 145. Defendants contend that such production would risk violating Article 271(1) of Swiss Penal Law, which they assert criminalizes the taking of evidence from Switzerland for use in a foreign proceeding.  Plaintiffs filed their opposition papers (Dkt. No. 152) on December 19, 2018 and defendants replied on the same date (Dkt. No. 155).

---

[7] The case was originally before the Hon. Robert W. Sweet, but upon his passing in March, 2019, the case was reassigned to the Hon. P. Kevin Castel.

2.    <u>Plaintiffs' motion to strike defendants' interrogatory objections</u>

On December 19, 2018, plaintiffs moved to strike defendants' objections to their interrogatories.  Dkt. No. 148 ("Pl. Strike Mem.").  Plaintiffs contend that defendants raised overbroad general objections, unfounded specific objections, and unsubstantiated foreign law objections.  Defendants filed their opposition papers (Dkt. No. 150 ("Def. Strike Opp.")) on December 19, 2018 and plaintiffs replied on the same date (Dkt. No. 158 ("Pl. Strike Reply")).

3.    <u>Plaintiffs' motion to compel U.S. document production</u>

On January 30, 2019, plaintiffs moved to compel U.S. document production. Dkt. No. 167 ("Pl. U.S. Mem.").  Plaintiffs contend that defendants raised improper general objections, provided inadequate responses to financial requests, refused to collect documents from their third-party service providers, and failed to conduct a transparent search for electronically stored information ("ESI").  Defendants filed their opposition papers (Dkt. No. 172 ("Def. U.S. Opp.")) on January 30, 2019 and plaintiffs replied on the same date (Dkt. No. 175 ("Pl. U.S. Reply")).

4.    <u>Defendants' motion to compel production of documents relating to the underlying transactions</u>

On January 30, 2019, defendants moved to compel production of documents related to the Contracts and the underlying transactions that led to the alleged breach of the Contracts.  Dkt. No. 170 ("Def. Underlying Mem.").  Defendants contend that such production is necessary for plaintiffs' alter ego, successor liability, and state law fraud claims, as well as for defendants' own affirmative defenses. Plaintiffs filed their opposition papers (Dkt. No. 174 ("Pl. Underlying Opp.")) on

January 30, 2019 and defendants replied on the same date (Dkt. No. 178 ("Def. Underlying Reply")).

    5.    <u>Plaintiffs' motion to compel European document production</u>

On March 29, 2019, plaintiffs moved to compel European document production.  Dkt. No. 185 ("Pl. Europe Mem.").  Plaintiffs contend that defendants improperly refused to collect documents from their third-party service providers, did not produce documents related to the Transfer Agreement, failed to provide adequate discovery related to Mende, provided inadequate responses to financial requests, raised improper general objections, and failed to conduct a transparent search for ESI.  Defendants filed their opposition papers (Dkt. No. 190 ("Def. Europe Opp.")) on March 29, 2019 and plaintiffs replied on the same date (Dkt. No. 193 ("Pl. Europe Reply")).

    6.    <u>Defendants' motion to compel foreign document production</u>

On March 29, 2019, defendants moved to compel production of documents related to the SBT bankruptcy proceedings, a civil action that plaintiffs began in Switzerland in 2012 and subsequently abandoned, and damages sustained by plaintiffs for defendants' alleged breach of the Contracts.  Dkt. No. 188 ("Def. Foreign Mem.").  Defendants contend that such production is necessary for their affirmative defenses.  Plaintiffs filed their opposition papers (Dkt. No. 192 ("Pl. Foreign Opp.")) on March 29, 2019 and defendants replied on the same date (Dkt. No. 195 ("Def. Foreign Reply")).

7.    Plaintiffs' motion to compel production of documents subject to the
      crime-fraud exception to the attorney-client privilege and the work
      product doctrine

On April 9, 2019, plaintiffs moved to compel production of documents that

defendants had withheld on various privilege grounds (Dkt. No. 201), with an

accompanying memorandum of law.  Dkt. No. 202 ("Pl. Crime-Fraud Mem.").

Plaintiffs contend that there is probable cause to believe that communications

between defendants and SBT and their attorneys were made in furtherance of a

crime or fraud, and thus defendants should produce the communications.  Pursuant

to a stipulation approved by the Court (Dkt. No. 200), defendants filed their

opposition papers (Dkt. No. 204 ("Def. Crime-Fraud Opp.")), plaintiffs filed their

reply (Dkt. No. 208 ("Pl. Crime-Fraud Reply")), and defendants filed a sur-reply

(Dkt. No. 210 ("Def. Crime-Fraud Sur-Reply")) all on the same date.

## II.    DISCUSSION

## A.    Legal Standards

"A district court has wide latitude to determine the scope of discovery."  *In re*

*Agent Orange Prod. Liability Litig.,* 517 F.3d 76, 103 (2d Cir. 2008); *see also SEC v.*

*Rajaratnam,* 622 F.3d 159, 180–81 (2d Cir. 2010) (discussing discretion of district

court to manage discovery).  Rule 26 of the Federal Rules of Civil Procedure, as

amended in 2015, provides that a party is entitled to discovery on "any

nonprivileged matter that is relevant to any party's claim or defense and

proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The Rule also sets

forth factors to consider in analyzing proportionality: "the importance of the issues

at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

"The party seeking discovery bears the initial burden of proving the discovery is relevant." *Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017). "Since the 2015 amendments to the federal rules, the scope of discovery permitted has narrowed. Nonetheless, relevance is still a broad concept under Rule 26(b)(1)." *Michael Kors, L.L.C. v. Su Yan Ye*, No. 18-CV-2684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019) (internal citations omitted). Under the amended rules, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." *Henry v. Morgan's Hotel Grp., Inc.*, No. 15-CV-1789 (ER) (JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Fayda,* No. 14-CV-9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)).[8]

---

[8] Defendants mistakenly cite a pre-Amendment standard when they argue that relevance encompasses "any matter that bears on, or that reasonably could to lead to other matter that could bear on, any issue that is or may be in the case." Def. Foreign Mem. at 1 n.1 (citations omitted).

**B.     Analysis**

In this decision, the Court will address all of the listed motions except defendants' motion to defer Swiss discovery issues.  As to that motion, the parties have agreed to the following protocol:

> (1) The Court [will] rule on the [p]laintiffs' motions to compel documents and information (including the crime fraud motion), limiting any order compelling the production of documents and information to documents and information located outside of Switzerland; and also would
>
> (2) Rule on the motions that seek to compel the production of documents and information located in Switzerland (including the crime fraud motion), but limit such ruling to a declaration that [p]laintiffs have a right to whatever documents or information the Court determines to be discoverable, if any, without ordering the [d]efendants to produce or provide that information.

Dkt. No. 229 at 1–2.

The Court will address the parties' motions in three sections.  The first section will examine defendants' motions to compel production of documents relating to the underlying transactions (Dkt. No. 169) and to compel foreign document discovery (Dkt. No. 187).  The second section will evaluate plaintiffs' motions to strike defendants' interrogatory objections (Dkt. No. 147), to compel U.S. document production (Dkt. No. 166), and to compel European document production subject to the limitations described above (Dkt. No 184).  The third section will consider plaintiffs' motion to compel documents subject to the crime-fraud exception (Dkt. No. 201).

1.     Defendants' Motions to Compel

Defendants seek to compel production in three general categories: 1) the underlying transactions related to the Contracts; 2) the Swiss bankruptcy proceedings of SBT; and 3) the civil case brought by plaintiffs against Prime Carbon and Mende in 2012 that they eventually abandoned.[9]

a.     Underlying Transactions

Defendants request documents related to the execution and performance of the Contracts.  They argue that such documents are important to demonstrate that "it was [p]laintiffs, not SBT, who materially breached the underlying scheme . . . and that it was SBT, not [p]laintiffs, who suffered injury and an inequitable result." Def. Underlying Mem. at 1.  Defendants therefore contend that the underlying transactions are necessary: 1) to rebut plaintiffs' veil-piercing theories, which require a demonstration of "fraud or wrong [that results] in an unjust loss or injury to plaintiff" (*id.* at 15); 2) to respond to plaintiffs' state law fraud claims, which require a showing that plaintiffs were "creditors" and that defendants acted with "fraudulent intent" to hinder them (*id.* at 18–19); and 3) to prove defendants' affirmative defenses, including offset, unclean hands, and mitigation (*id.* at 19–20).

---

[9] Defendants also contend that plaintiffs failed to produce documents from all plaintiff custodians and failed to produce internal communications related to legal proceedings.  Def. Foreign Mem. at 3, 6.  But in their reply papers, they state that the issue of plaintiff custodians "will be a proper subject of future inquiry and verification in future discovery," and the issue of privileged documents is "reserved for another time after appropriate meet and confer efforts have occurred."  Def. Foreign Reply at 2 n.1 & 2.  The Court thus does not consider either of those document requests in this decision.

13

Plaintiffs oppose the motion for two main reasons.  First, they contend that the Award "conclusively resolved issues concerning the underlying breach of contract and resulting damages," and defendants are therefore precluded from "collaterally attacking the determinations set forth in the Award."  Pl. Underlying Opp. at 6.  Second, plaintiffs maintain that both their alter ego and successor in interest claims and their state law fraud claims can be demonstrated only with defendants' post-breach conduct, their "efforts to avoid SBT's liability, and not the manner in which that liability was initially incurred."  *Id.* at 11.

### i.   Collateral attack on the ICC Award

Plaintiffs' contention that defendants' motion should be denied because any litigation as to the underlying transactions would be a collateral attack on Award is without merit.  While their first cause of action is an enforcement of the Award against SBT's alleged alter egos and successors in interest, plaintiffs also bring state law fraud claims against defendants (and not SBT).  *See* Complaint at ¶¶ 168, 172, 177, 186, 192.  As defendants observe, if the factfinder were to ultimately determine that defendants are not alter egos or successors in interest to SBT, then the Award (and the Award amount) would not be enforceable against them.  Def. Underlying Reply at 4.  To adjudicate plaintiffs' state law fraud claims, the factfinder would decide the issue of liability and damages for those claims in the first instance.  Plaintiffs have provided themselves an alternate form of recovery if their enforcement claim fails; defendants should therefore be allowed to conduct discovery as to these separate claims.

14

ii.   State law fraud claims and affirmative defenses

Plaintiffs brought five state law fraud claims including fraudulent transfer. Under New York Debtor and Creditor Law ("NYDCL") § 276, to succeed on a claim of fraudulent transfer, a plaintiff must demonstrate that "[e]very conveyance made [by a defendant] and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent . . . ." *Atateks Foreign Trade Ltd.*, 2009 WL 1803458, at *20 (citing NYDCL § 276). Plaintiffs maintain that they do not allege any wrongdoing or liability in the performance of the Contracts or contend that they were present creditors at the time of the alleged fraudulent conveyance. Pl. Underlying Opp. at 11. Rather, they argue that defendants made the alleged fraudulent transfer to avoid any future award set by the ICC in favor of plaintiffs, and plaintiffs bring their fraudulent transfer claim as "*future* judgment creditors." *Id.* at 13. Thus, they contend that the issue of fraudulent transfer can be decided without reference to the Contracts and the underlying transactions. Defendants counter that any award amount set by the ICC would have been based on the Contracts, the underlying transactions, and the resulting liability. Specifically, they contend that "[i]f . . . the facts regarding the Underlying Transactions were such that SBT had no liability to [p]laintiffs, that is relevant as to whether [d]efendants acted with fraudulent intent to avoid such nonexistent liability." Def. Underlying Reply at 7.[10]

---

[10] Plaintiffs' fifth claim for relief, fraud, alleges that "SBT never intended to cure its breach of the Contracts," and their sixth claim for relief, conspiracy to defraud, alleges that "[e]ach [d]efendant conspired to induce [p]laintiffs to delay filing a

15

Because direct proof of actual intent is rare, fraudulent transfer claims often rely on "badges of fraud." *Long Oil Heat, Inc. v. Spencer*, No. 16-CV-00899 (BKS) (DJS), 2019 WL 1332355, at *13 (N.D.N.Y. Mar. 25, 2019). Courts have recognized several badges of fraud, including "the transferor's knowledge of the creditor's claim and the transferor's inability to pay it . . . [and] a pattern or course of conduct by the transferor after it incurred its obligation to the creditor." *Id.* (citing *A & M Glob. Mgmt. Corp. v. Northtown Urology Assocs., P.C.*, 983 N.Y.S.2d 368 (4th Dep't 2014)). Such badges of fraud suggest that the underlying liability and the transferor's (in this case, SBT's) awareness of the liability are important in determining actual intent. Furthermore, in its June 15 Opinion denying defendants' motion to dismiss, the Court concluded that "[t]he facts, as alleged by [p]laintiffs, demonstrate that a jury could find that [d]efendants, acting on behalf of SBT, sought to make SBT judgment proof as a means of evading its obligations under the Contracts." June 15 Opinion at 649. Defendants argue that the requested document discovery would allow them to demonstrate that they had no obligations under the Contracts to avoid. The Court concludes that defendants should be allowed to conduct discovery related to the underlying transactions based on their contention that they had no

---

request for arbitration and to delay in taking steps to otherwise secure assets to pay for SBT's breach of the Contracts . . ." Complaint ¶¶ 179, 188. Such statements assume that there was a breach of the Contracts, which defendants dispute.

liability under the Contracts to avoid and that plaintiffs were neither present nor future creditors of SBT.[11]

Furthermore, regardless of whether the underlying transactions would be necessary to establish plaintiffs' claims, defendants should be able to seek such discovery to support their own affirmative defenses. Though plaintiffs again contend that "each of the cited affirmative defenses are part of [d]efendants' impermissible effort to re-litigate the Arbitration (Pl. Underlying Opp. at 14)," should defendants be found not to be alter egos or successors in interest to SBT, they should be able to defend themselves against the state law fraud claims. Defendants allege plaintiffs also breached the Contracts and caused damages to SBT; thus, their affirmative defenses include setoff, offset, deduction, and recoupment. In order to prove such defenses, defendants would necessarily need to conduct discovery concerning the underlying transactions.

### iii.  Internal communications related to the underlying transactions

In a subsequent motion, defendants appear to acknowledge that plaintiffs have made some production related to the underlying transactions (which would

---

[11] Plaintiffs cite to one case for the proposition that, as potential future judgment creditors of SBT, they need not rely on the underlying transactions. Pl. Underlying Opp. at 13 (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995)). However, in that case, the petitioners were prevailing plaintiffs in a civil RICO fraud action that had been affirmed on appeal. Having received a judgment that they were creditors, plaintiffs "commenced [a] supplementary proceeding in aid of judgment." *Id.* The Court has not identified (and plaintiffs have not cited to) a case where a plaintiff succeeded on a fraudulent conveyance claim as a future creditor without adequately demonstrating the underlying liability or obligation.

perhaps render the above analysis moot), but have demanded further discovery related to plaintiffs' internal communications in 2008.  Def. Foreign Mem. at 5. However, defendants allege that plaintiffs breached the Contracts by not delivering pig iron on schedule.  Def. Underlying Mem. at 2.  The Court fails to see (and defendants have not attempted to explain) why defendants would specifically need plaintiffs' internal communications to demonstrate that breach (as opposed to evidence such as shipping records and communications between plaintiffs and SBT). Accordingly, the Court denies defendants' motion to compel internal communications related to the Contracts.

iv.   <u>Plaintiffs' alleged damages as a result of SBT's breach</u>

Defendants also seek "documents supporting [plaintiffs'] claimed damages as a result of SBT's alleged breach of the underlying contracts."  Def. Foreign Mem. at 6.  Plaintiffs objected to this request because their "damages . . . have already been established as a matter of law, and cannot be challenged by [d]efendants irrespective of how many different ways they try."  Pl. Foreign Opp. at 6.  As discussed above, if the Court ultimately determines that defendants are not bound by the Award, then plaintiffs' damages have not been established as a matter of law as against these defendants.  If defendants can demonstrate that they are not liable for the Award amount as alter egos or successors in interest, should plaintiffs still seek recovery on their state law fraud claims, the issue of damages will need to be further litigated.  Simply because plaintiffs have styled their state law fraud claim relief to seek the "Award Amount" does not mean the factfinder would be

18

necessarily limited to that amount as damages.  (Indeed, the factfinder could find plaintiffs are entitled to more than that amount).  The Court thus concludes that defendants are entitled to discovery on plaintiffs' damages related to the Contracts.

      b.   <u>Swiss Bankruptcy</u>

      Defendants further move to compel the production of documents related to the Swiss Bankruptcy, namely plaintiffs' "own submissions to the Swiss Bankruptcy Court, any communications with the Bankruptcy Administrator, or any internal or external communications related to the [p]laintiffs' conduct in connection with the SBT Bankruptcy."  Def. Foreign Mem. at 4.  They contend such discovery is important for their affirmative defenses: 1) that plaintiffs had a full and fair opportunity to raise and prove their alter ego and fraud claims in the ICC Arbitration (Second Affirmative Defense); 2) that the appointment of a Bankruptcy Administrator ended any alleged control between SBT and defendants, and discharged plaintiffs' claims (Ninth and Twelfth Affirmative Defenses); and 3) that plaintiffs lack standing because they failed to take an assignment of SBT's claims in the SBT Bankruptcy and also lack clean hands (Thirteenth and Twenty-Fourth Affirmative Defenses).  *Id.*  Defendants' motion, however, simply lists their defenses, describes the documents that plaintiffs have refused to produce, and dedicates one conclusory sentence to the relevance of their request.  *Id.* at 3–4 ("In short, the proceedings in the SBT Bankruptcy and Swiss Action and the [p]laintiffs' communications, submissions and conduct related to these proceedings are relevant to numerous of [d]efendants' Affirmative Defenses."); *see also* Pl. Foreign Opp. at 3.

The Court cannot identify any plausible explanation for the importance of the documents sought for the ninth, twelfth, thirteenth, and twenty-fourth affirmative defenses, which raise questions of law that rely only on the fact that plaintiffs did not participate in the bankruptcy proceeding (a fact that plaintiffs have not denied). Defendants did not further attempt to explain the relevance of their document requests to those defenses in their reply memorandum of law.

Defendants have also not fully explained why plaintiffs' own submissions to the Bankruptcy Court and their internal communications are important to demonstrate their second affirmative defense that plaintiffs had a full and fair opportunity to raise and prove their claims in the ICC Arbitration. "Among the factors relevant to the court's assessment of whether a party had a full and fair opportunity to be heard are: 'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.'" *Yeiser v. GMAC Mortg. Corp.*, 535 F. Supp. 2d 413, 425 (S.D.N.Y. 2008) (citing *Schwartz v. Pub. Adm'r of Bronx Cty.*, 246 N.E.2d 725, 729 (1969)). Defendants appear to allege that plaintiffs had access to all the relevant evidence from the Swiss Bankruptcy during the ICC proceeding. Thus, they contend that plaintiffs do not possess any "new evidence" and are precluded from re-litigating their alter ego and fraud claims in this case. However, the Court cannot determine why defendants would require plaintiffs' own submissions to the Bankruptcy Court or their internal

20

communications to make this contention.  Defendants only need to demonstrate

that the relevant evidence was available during the ICC Arbitration.  *See, e.g.,*

*Constantine v. Teachers Coll.,* 448 F. App'x 92, 94 (2d Cir. 2011) ("Moreover, even if

the state court did not consider this evidence, discovery was available to her in that

proceeding . . . and her failure to avail herself of that procedure does not render the

proceeding unfair.") (finding plaintiff had full and fair opportunity to litigate issue

in previous proceeding and thus precluded from re-litigating).  Defendants do not

need to demonstrate that plaintiffs knew of the evidence and chose not to present it,

just that the evidence was available.

As plaintiffs rightly contend, "there is no issue in this matter regarding

[p]laintiffs' awareness of SBT's bankruptcy."  Pl. Foreign Opp. at 4, n.4.[12]  Because

the SBT Bankruptcy proceedings were public, defendants can obtain any documents

filed therein themselves.  *Id.*  As such, the Court denies defendants' motion to

compel plaintiffs' "own submissions to the Swiss Bankruptcy Court, any

communications with the Bankruptcy Administrator, or any internal or external

communications related to the [p]laintiffs' conduct in connection with the SBT

Bankruptcy" as it seeks documents that are irrelevant to the asserted defenses in

this case.

---

[12] In their reply, defendants improperly expand the scope of their second affirmative
defense.  Defendants' answer and motion papers both refer only to plaintiffs' alleged
"access . . . to information relating to the transactions of which they now complain."
Answer at 30; Def. Foreign Mem. at 3.  Only in their reply did defendants assert
that they required documents relating to "[p]laintiff's awareness of and decisions to
pursue or abandon those avenues."  Def. Foreign Reply at 5.

c.    Swiss Action

Defendants also seek to compel the production of documents related to what they have termed the "Swiss Action," "which [p]laintiffs began and abandoned." Def. Foreign Mem. at 3.  Only in their reply do defendants explain that plaintiffs commenced this action on June 12, 2012, half a year after the Award was rendered. Defendants' reasoning is even more sparse for this document request than for their SBT Bankruptcy documents request.  It appears defendants seek documents related to the Swiss Action to demonstrate their second affirmative defense that plaintiffs had a full and fair opportunity to raise and prove their alter ego and fraud claims in the ICC Arbitration.  *Id.*  Such an argument is untenable as the Swiss Action occurred after the ICC proceeding had concluded.  In their opposition to plaintiffs' motion to compel documents subject to the crime-fraud exception, defendants attempt to argue that plaintiffs should have brought the Swiss Action earlier and pursued it in order to develop evidence that they could have used in the ICC arbitration.  Def. Crime-Fraud Opp. at 14.  Defendants have not cited to any authority for the proposition that a plaintiff is required to commence another lawsuit to obtain evidence for a separate proceeding.  Accordingly, the Court denies defendants' motion to compel production of documents related to the Swiss Action.

2.    Plaintiffs' Motions to Compel Interrogatory Responses and Document Production

The Court will address plaintiffs' motions to strike interrogatory objections and to compel U.S. and European document production collectively as plaintiffs raise similar issues in all three motions.  Plaintiffs contend that defendants have

22

1) improperly relied on general objections; 2) failed to provide financial information; 3) failed to collect documents from third-party service providers; 4) failed to provide transparency into their ESI collection; and 5) failed to provide documents related to the Transfer Agreement.[13]

### a.   General Objections

Plaintiffs raise concerns with defendants' general objections to their document requests in their motion to strike interrogatory objections (Pl. Strike Mem. at 9), motion to compel U.S. discovery (Pl. U.S. Mem. at 15), and motion to compel European discovery (Pl. Europe Mem. at 16).  Plaintiffs argue that defendants' responses begin with "General Objections . . . which [d]efendants purport[] to incorporate into each of their [specific] responses to the Requests," thus violating Rules 33 and 34 of the Federal Rules of Civil Procedure.  Pl. U.S. Mem. at 7; *see, e.g.,* Dkt. No. 168-3 at 1–8 ("Def. General Objections").[14]  Plaintiffs thus

---

[13] In their motion to compel European document discovery, plaintiffs also contend that individual defendants Mende and Kundrun have failed to collect and produce all responsive e-mails.  Pl. Europe Mem. at 12–13.  Defendants respond that they had complied with their responsibilities.  Def. Europe Opp. at 9–10.  Plaintiffs counter that defendants' reply is "suspicious" and object to learning about this collection of ESI "in an opposition to a motion, rather than in correspondence or as part of a meet and confer."  Pl. Europe Reply at 5–6.  As it appears plaintiffs' initial concerns were addressed by defendants, and plaintiffs have since announced their intention to raise spoliation issues with regard to Mende and Kundrun's production in recent correspondence, the Court will not address the individual defendants' ESI production in this decision.  *See* Dkt. Nos. 218, 230, 242 (parties' submissions related to spoliation).

[14] Dkt. No. 168-3 is "Defendant Primetrade Inc.'s Objections and Responses to Plaintiffs' First Demand for the Production of Documents."  As defendants essentially repeat these objections in all their document responses and responses to

request that the Court "strike all of [d]efendants' General Objections, find that [d]efendants have waived these objections, and require [d]efendants to produce within 30 days all documents withheld on the basis of any General Objection." *Id.* at 16. Defendants argue that general objections are allowed when "they apply to each request." Def. U.S. Opp. at 3.[15] However, should the Court find their responses to be inadequate, defendants "request the opportunity to provide a further revision to address any issues." *Id.* at 5.

Rule 33(b)(4) provides that "[t]he grounds for objecting to an interrogatory must be stated with specificity." As amended in December 2015, Rule 34(b)(2)(B) provides that a response to a discovery request "must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." "[R]esponses to discovery requests must: [1] State grounds for objections with specificity; [2] An objection must state whether any responsive materials are being withheld on the basis of that objection; and [3] Specify the time for production and, if a rolling production, when production will begin and when it will be concluded." *Fischer v.*

---

interrogatory requests, the Court will conduct its analysis using Dkt. No. 168-3 as a template and the Court's findings will apply to all three of plaintiffs' motions.

[15] Defendants further object to plaintiffs' motion by arguing that plaintiffs themselves provided general objections to defendants' discovery requests. Def. U.S. Mem. at 3; Def. Strike Opp. at 6–9. If defendants have an issue with plaintiffs' responses, they can bring a motion to that effect. An inadequate response by one party does not justify an inadequate response by the other.

*Forrest*, No. 14-CV-1304 (PAE) (AJP), 2017 WL 773694, at *1 (S.D.N.Y. Feb. 28, 2017).

As plaintiffs rightly assert, general objections are "inappropriate and unpersuasive." Pl. Strike Mem. at 10 (citing *Leibovitz v. City of New York*, No. 15-CV-546 (LGS) (HBP), 2017 WL 462515, at *2 (S.D.N.Y. Feb. 3, 2017)) (internal citations omitted). However, plaintiffs' contention that they are "always" so is belied by cases in this District. *Id.* For example, in *Fischer*, the court found that "[g]eneral objections should rarely be used after December 1, 2015 <u>unless each such objection applies to each document request</u> (e.g., objecting to produce privileged material)." 2017 WL 773694, at *3 (emphasis added).

Relying on *Fischer*, defendants thus argue that their general objections "are incorporated into each discovery request, and nothing would be gained from repeating them in each response." Def. U.S. Opp. at 3. However, the Court does not agree that <u>each</u> of the general objections applies to <u>each</u> discovery request, and defendants have made no effort to further explain their conclusory claim. For example, the Court cannot determine why plaintiffs' request for "[d]ocuments sufficient to show Primetrade's board membership, directors and/or officers (Def. General Objections at 9)" would be subject to many of defendants' general objections, including, *inter alia*: "not in Primetrade's actual possession, custody, and control (*id.* at 3)," "vague, burdensome, oppressive, overbroad (*id.* at 4),"or "protected . . . by the attorney/client communication privilege (*id.* at 5)." Clearly, not every general objection applies to every response and thus should not be

permitted.  *See also Futreal v. Ringle*, No. 7:18-CV-00029-FL, 2019 WL 137587, at

\*4 (E.D.N.C. Jan. 8, 2019) ("The relevant language in *Fischer* does not approve of

the use of general objections in every instance, or even in every instance when a

party believes privileged materials are at issue.  Instead, the court in *Fischer*

contended that general objections are appropriate if the objection applies to every

response to every document request.") (citing *Fischer*, 2017 WL 773694, at \*3).

        Thus, the Court directs defendants to revise their responses to plaintiffs'

discovery requests consistent with this Opinion.[16]  First, defendants shall withdraw

their general objections and may not include general objections in their revised

responses unless they truly apply to each request.  Second, for each of their

responses to specific discovery requests, defendants should "indicate whether

documents are being withheld" based on any objections.  *Jose Luis Pelaez, Inc. v.

Scholastic Inc.*, No. 16-CV-2791 (VM) (RLE), 2017 WL 4776993, at \*5 (S.D.N.Y. Oct.

19, 2017); *see also* Pl. U.S. Mem. at 16 (producing party "does need to alert other

parties to the fact that documents have been withheld and thereby facilitate an

informed discussion of the objection") (citing Fed. R. Civ. P. 34, Advisory Comm.

Notes to 2015 Amendment).  Third, Defendants should also "[s]pecify the time for

---

[16] In their motion to strike interrogatory objections, plaintiffs also argue that
several of defendants' general objections are "incomprehensible or legally baseless,"
including "accountant/client communication privilege," and a "commencement of . . .
litigation" exception.  Pl. Strike Mem. at 5.  Defendants responded in part by
contending that questions of privilege are "best addressed at a later time after the
parties have identified in a privilege log the specific privileges applicable to any
documents withheld on the grounds of privilege."  Def. Strike Mem. at 11.  Should
defendants reassert such objections in their revised responses, plaintiffs may raise
these concerns to the Court again.

26

production and, if a rolling production, when production will begin and when it will be concluded." *Fischer*, 2017 WL 773694, at *1.  Though defendants have continually contended that they will "amend and/or supplement its response," they did not provide a timeline for such rolling production.  Def. General Objections at 9.[17]  In accordance with the parties' agreement regarding Swiss law concerns, this ruling is limited to a declaration that plaintiffs are entitled to revised responses from the European defendants.

      b.   <u>Financial Information</u>

Plaintiffs raise concerns with defendants' purported failure to provide sufficient financial information in their motion to strike interrogatory objections (Pl. Strike Mem. at 12), motion to compel U.S. discovery (Pl. U.S. Mem. at 16), and motion to compel European discovery (Pl. Europe Mem. at 13).  After the May 6 status conference, the Court directed defendants to submit a letter describing what they had produced since early 2019 to determine whether any disputes were now moot.  With regard to the financial requests, defendants responded that in total they had provided: (1) unredacted audited financial reports for the corporate defendants and SBT; (2) bank account information for the corporate defendants and

---

[17] As these discovery responses were first provided in early 2018, several of defendants' general objections are now also moot.  *See, e.g.,* Def. General Objections at 1 ("Primetrade objects to the Requests in their entirety on the basis that a Motion to Dismiss is pending before the Court. . . . Primetrade objects to the Requests as premature on the basis that the parties agreed to endeavor to enter into an agreement concerning discovery in this case.").  Given the length of time that has passed, defendants should be able to state with greater specificity what it will produce and what it will withhold, and provide an estimated timeline.

SBT "that identified, by financial institution, the accounts maintained by each during a more than five-year period, so as to enable [p]laintiffs to determine if there were any shared bank accounts (there were not);" (3) monthly balance sheets from early 2008 through April 2013 for the corporate defendants reflecting assets, liabilities, and equity; and (4) materials reflecting transfers between Prime Carbon and SBT and Primetrade, and Prime Carbon and AMCI Holdings.  Dkt. No. 222 ("Def. Supp. Letter") at 1–2.  In their reply letter, plaintiffs raise issues in particular with the materials reflecting transfers and contend that defendants' production is not sufficient to show all "intercompany transfers."  Dkt. No. 227 ("Pl. Supp. Letter") at 3.  Plaintiffs also argue that defendants' supplemental production did not include responsive materials from the individual defendants.  *Id.* at 2; *see also* Pl. Europe Mem. at 14–15 (objecting to lack of documents reflecting transfers or payments made between defendants and from individual defendants).

> i.   <u>Documents sufficient to show loans, transfers of value, and payments made between defendants and SBT</u>

In their document requests to each defendant, plaintiffs sought, *inter alia,* "documents sufficient to show 'any transfer of anything of value between [Defendant] and SBT' . . . documents sufficient to show 'any transfer of anything of value between [Defendant] and Prime Carbon' and . . . documents sufficient to show 'payments made by [Defendant] to SBT or Prime Carbon.'"  Pl. U.S. Mem. at 17 (quoting Dkt. No. 168-4 at 10–12).[18]  Each defendant objected to these requests by

---

[18] Dkt. No. 168-4 is "Defendant K-M Investment Corporation's Objections and Responses to Plaintiffs' First Demand for the Production of Documents."  As

contending that they were "overly broad and unduly burdensome, and [sought] information that is neither relevant to this lawsuit nor likely to lead to the discovery of relevant or admissible evidence." Dkt. No. 168-4 at 10.[19]  Nevertheless, "[u]tilizing available accounting software," defendants subsequently produced documents reflecting "transfers regarding Primetrade's purchase of pig iron from the former SBT and then Prime Carbon [and] a transfer of less than 300 Swiss Francs from Prime Carbon to AMCI Holdings. . . ." Def. Europe Opp. at 15.  They contend that these transfers were "the only transfers that the entity Defendants have identified [between U.S. defendants and SBT or Prime Carbon] . . . . [T]he accounting software . . . reflects payables/receivables for the entire subject time period of January 1, 2008 through April 17, 2013." *Id.* at 15–16.[20]  Plaintiffs respond that they seek "all transfers (not merely those categorized in Defendants' systems as payment for accounts receivable)." Pl. Europe Reply at 7.  Plaintiffs

---

defendants essentially repeat the same objections in all their document responses, the Court will conduct its analysis using Dkt. No. 168-4 as at template.

[19] Defendants' objections are vague and improper.  They have not even attempted to explain why plaintiffs' requests are overly broad or unduly burdensome or not relevant.  *See e.g., Fischer*, 2017 WL 773694, at *3 ("the responses . . . stating that the requests are 'overly broad and unduly burdensome' is meaningless boilerplate. Why is it burdensome?  How is it overly broad?  This language tells the Court nothing.").  Moreover, the 2015 Amendments to the Federal Rules deleted the language "likely to lead to the discovery of relevant or admissible evidence," and, as the Court in *Fischer* admonished, "lawyers need to remove it from their jargon." *Id.*

[20] Defendants provided these documents after a phone call with plaintiffs where plaintiffs inquired "as to the potential production of general ledger materials reflecting receivables/payables." Dkt. No. 191-11 at 2.  Plaintiffs did not limit their document request to only receivables/payables.  *See* Dkt No. 168-4 at 10–12.

contend that bank account information and "corresponding account statements and activity logs" would demonstrate all transfers between defendants. *Id.* at 7 n.12; *see also* Pl. Supp. Letter at 3.

Defendants' production regarding transfers between defendants and SBT is not sufficient. Plaintiffs argue that they seek such information to "uncover[ ] critical [alter ego] proofs," as well as to support their constructive fraudulent transfer claims. Pl. U.S. Mem. at 17. Documents concerning payables and receivables would not demonstrate certain elements of alter ego liability, for example, the "intermingling of funds" or "payment or guarantee of the corporation's debts by the dominating entity." *See Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC*, No. 17-CV-5526 (AJN), 2018 WL 4284279, at *4 (S.D.N.Y. Sept. 7, 2018) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)). Conversely, "[b]ank records will frequently be relevant, particularly when the entities have made payments to each other and on each other's behalf." *Trustees of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 341 (E.D.N.Y. 2017) (citing *Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 348 (N.D.N.Y. 2000)); *see also First Horizon Bank v. Moriarty-Gentile,* No. 10-CV-00289 (KAM) (RER), 2015 WL 8490982, at *5 (E.D.N.Y. Dec. 10, 2015) (relying on bank records to determine alter ego liability); *New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.*, 657

F. Supp. 2d 410, 421 (S.D.N.Y. 2009) (finding company to be alter ego of defendant because "approximately 69% of the money ever deposited into [alter ego's] account came directly from [defendant's] concealed account").

The Court thus directs defendants to provide bank records for all identified bank accounts of the U.S. corporate defendants.  In accordance with the parties' agreement regarding Swiss law concerns, this decision is limited to a declaration that plaintiffs are entitled to bank records for all identified bank accounts of the European corporate defendants.

ii.   Documents from individual defendants

Plaintiffs also contend that defendants have not provided "any documents responsive to the Financial Requests directed to the individual defendants (Mende and Kundrun)."  Pl. Supp. Letter at 2.  Defendants argue that the requests are "overly broad and unduly burdensome" (Def. Europe Mem. at 11) and contend that several of the discovery requests "seek highly confidential and personal information that is entirely irrelevant to the matters at issue."  *Id.* at 13 n.12.

Defendants have not explained why the requests are overly broad, unduly burdensome, or entirely irrelevant, nor have they identified any meaningful difference between the individual and corporate defendants that would protect the individual defendants from providing the same financial information as the corporate defendants.  Mende and Kundrun are also alleged to be alter egos in this action and can be held personally liable.  *See, e.g., McLeod v. Gen. Vision Servs., Inc.,* No. 13-CV-6824 (VSB), 2018 WL 3745662, at *11 (S.D.N.Y. Aug. 6, 2018) ("To

31

establish alter ego liability it is necessary to show that the individual defendant exercised such complete dominion and control that the corporation lacked independent will and that this control was used to commit fraud or wrong against the plaintiffs.") (quoting *Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 430 (S.D.N.Y. 2007)); *see also* Complaint ¶¶ 133–34.  The individual defendants' financial records would be relevant to demonstrate dominion and control.  *See, e.g., HRA Grp. Holdings Ltd. v. Mark's Majestic Diamonds, Inc.,* No. 13-CV-8791 (LAK), 2015 WL 5316404, at *8 (S.D.N.Y. Sept. 11, 2015) (considering "whether funds are put in and taken out of the corporation for personal rather than corporate purposes" to determine control of individual defendant over corporation) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 139 (2d Cir. 1991)); *see also Okapi Partners, LLC v. Holtmeier,* No. 18-CV-6381 (PKC), 2019 WL 1517553, at *4 (S.D.N.Y. Apr. 8, 2019) (denying defendants' motion to dismiss in part because plaintiffs alleged individual defendant paid for corporate defendant's debt with personal check from personal bank account).  Furthermore, though defendants have asserted that bank account information from the individual defendants is "highly confidential," the Court entered a protective order to address such concerns on July 20, 2018.  Dkt. No. 120.  Thus, the Court directs Fritz Kundrun to provide the same financial information as the corporate defendants, including responding to plaintiffs' interrogatory requests by identifying their

personal bank accounts.[21]  In accordance with the parties' agreement regarding
Swiss law concerns, this decision is limited to a declaration that plaintiffs are
entitled to additional financial information from Hans Mende.

    c. <u>Third-party Service Providers</u>

   Plaintiffs also object to defendants' failure to collect documents from third-
party service providers in their motion to compel U.S. discovery (Pl. U.S. Mem. at
18) and motion to compel European discovery (Pl. Europe Mem. at 7).  Plaintiffs
seek documents from three U.S. entities, Loyalhanna Management Services
("Loyalhanna"), Grossman Yanak & Ford LLP ("GYF"), and RC Holsinger
Associates ("Holsinger"), and two European entities, THV and Schweiger
Advokatur/Notariat ("Schweiger Firm").  Pl. U.S. Mem. at 19–20; Pl. Europe Mem.
at 8, 10.  Plaintiffs contend that defendants have the practical ability to obtain

---

[21] Plaintiffs in their motion to strike defendants' interrogatory objections further
contend that the individual defendants must identify not only their personal bank
accounts, but also information for "all bank accounts under their control for which
they have 'the legal right, authority, or practical ability' to respond."  Pl. Strike
Mem. at 13.  In the sole case that plaintiffs cite for this proposition, the question
before the court was whether a parent corporation needed to produce documents
held by its subsidiary.  *Dietrich v. Bauer*, No. 95-CV-7051 (RWS), 2000 WL 1171132,
at *3 (S.D.N.Y. Aug. 16, 2000).  The Court has not found any other support for
plaintiffs' request; indeed, in another case cited by plaintiffs, the court found only
that the individual defendants' "personal bank accounts" were "relevant on the
claim for alter ego liability."  Pl. Strike Mem. at 12–13 (quoting *Behzadi & Brenjian
Carpet v. David & Son Oriental Antique Rugs Corp.*, No. 07-CV-7073 (BSJ) (DFE),
2009 WL 3963890, at *2 (S.D.N.Y. Nov. 16, 2009)).  Furthermore, plaintiffs seek
such information because they hope to demonstrate "the financial ties and
relationships of control between Defendants."  *Id.* at 12.  As the corporate
defendants have identified their bank account information, the Court directs that
plaintiffs ask the individual defendants whether they have control over the
corporate accounts during depositions rather than force defendants to interpret
plaintiffs' expansive definition of "control" in their interrogatory requests.

documents held by these entities, and should thus collect and produce them. Defendants argue that they do not have "control" over the entities and plaintiffs should issue third-party subpoenas to obtain the documents they seek.

Rule 34 of the Federal Rules of Civil Procedure requires a party to produce documents and other tangible objects that are within the party's "possession, custody or control." *Coventry Capital US LLC v. EEA Life Settlements, Inc.*, 329 F.R.D. 508, 514 (S.D.N.Y. 2019) (collecting cases).  Courts have interpreted "control" to encompass situations "where a party has the practical ability to acquire or access documents by (1) legal entitlement or (2) any other means." *Id.* at 515 (quoting *In re Application of Potanina*, No. 14-MISC-31 (LAP), 2015 WL 4476612, at *1 (S.D.N.Y. June 30, 2015)).  Thus, under Rule 34, even if a party does not have actual or physical control over documents, "if [it] has access and the practical ability to possess documents not available to the party seeking them, production may be required." *In re Lozano*, 392 B.R. 48, 54 (Bankr. S.D.N.Y. 2008) (citing *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007)).  "[T]he application of the concept is often highly fact-specific." *Id.* at 53 (citing 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2210 (2d ed. 1994)).  However, "[t]he burden of demonstrating that the party from whom discovery is sought has the practical ability to obtain the documents at issue lies with the party seeking discovery." *Coventry Capital US LLC*, 329 F.R.D. at 514 (quoting *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 148 (S.D.N.Y. 2011)).

34

Defendants contend that the Court can deny plaintiffs' requests "whether or not 'control' exists for purposes of Rule 34," because plaintiffs "can obtain appropriate documents through compulsory subpoena process." Def. U.S. Mem. at 13. They cite to the Second Circuit's decision in *Shcherbakovskiy* for this proposition. 490 F.3d at 138 ("We also think it fairly obvious that a party also need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents."). However, the "documents" in dispute in *Shcherbakovskiy* were "documents that [the objecting party] does not possess or cannot obtain." *Id; see also* Pl. U.S. Reply at 7, n.3.[22] The Second Circuit did not find that in all situations, "a party has no obligation to seek documents from a third part[y] if compulsory process is available." Def. U.S. Opp. at 13; *see also* Def. Europe Opp. at 3. Rather, if both parties cannot obtain the documents, plaintiffs can rightly be required to bear the expense of seeking the documents through third-party subpoenas.

Thus, the Court will not deny plaintiffs' document requests simply because they could issue Rule 45 subpoenas to the third parties themselves. Instead, the Court will embark on a "fact-specific" analysis of plaintiffs' document requests to

---

[22] In other cases cited by defendants, the documents sought by a party were also not within the opposing party's possession, custody, or control. *See, e.g., Nosal v. Granite Park LLC*, 269 F.R.D. 284, 290 (S.D.N.Y. 2010) ("to the extent that the [documents] were not within [defendant's] possession, custody or control, [defendant] had no obligation to produce them"); *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-CV-6608 (PKC) (JCF), 2014 WL 61472, at *4 (S.D.N.Y. Jan. 6, 2014) (party "under no duty to produce documents solely in [third-party's] possession").

determine whether defendants have the "practical ability" to acquire or access the documents.

             i.    <u>GYF</u>

       GYF is "an accounting firm that provided valuations of Primetrade on which [d]efendants appear to have relied in connection with the key transactions in this case." Pl. U.S. Mem. at 19.  Defendants argue that GYF conducted one independent valuation report more than ten years ago and that they have produced the valuation report itself and all "relevant, non-privileged U.S. documents . . . located in their possession related to [it]." Def. U.S. Opp. at 15.  Plaintiffs reply that defendants did not provide the underlying financial documents and/or communications with GYF in connection with the valuation.  Pl. U.S. Reply at 5.  The Court concludes that plaintiffs are not entitled to this production.  Plaintiffs have not met their burden to demonstrate that defendants have the practical ability to obtain these financial documents.  *See* Def. U.S. Opp. at 15.[23]  Plaintiffs rely on two dated cases, one of which is outside the Circuit, for the contention that "financial records of the defendant in the possession of defendant's accountant are documents which defendant has the legal right to obtain."  Pl. U.S. Mem. at 20 (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 154 (S.D.N.Y. 1997); *Winston v. Alhadeff*, No. 83 C 3801, 1986 WL 4437, at *2 (N.D. Ill. Apr. 7, 1986)).

---

[23] Plaintiffs contend that they have shown "that Defendants could obtain documents from each of their Service Providers."  Pl. U.S. Reply at 5.  However, defendants maintain that they have produced only documents that were in their own possession, not from GYF.  Def. U.S. Opp. at 15.

Even assuming these cases are still good law, the "legal right" concept "also has its limits," as there exists the "possibility that a party could have a legal entitlement but nonetheless lack the practical ability to exercise that right." *Coventry Capital US LLC*, 329 F.R.D. at 515 (citing *In re Application of Potanina,* 2015 WL 4476612, at *1). Defendants have claimed that they lack "control" over the documents because of their "limited and dated relationship [with] GYF," and plaintiffs have not otherwise argued that defendants have the practical ability to obtain them. Def. U.S. Opp. at 15. Furthermore, plaintiffs have not demonstrated the relevance of the underlying financial documents provided to GYF more than ten years ago. Defendants have already produced financial records and the Court is ordering further production. Defendants have provided the valuation itself and further inquiry into the independent accounting firm is unnecessary and likely duplicative. Thus, the Court denies plaintiffs' motion with regard to GYF.

ii.    Loyalhanna

Loyalhanna is "a management services and accounting firm that provided routine services to the AMCI family of companies throughout the relevant time period." Pl. U.S. Mem. at 19. Defendants acknowledge that their relationship with Loyalhanna is "significantly different and more extensive than the relationship between [d]efendants and GYF." Def. U.S. Opp. at 16. They maintain that they have taken efforts to voluntarily produce information and documents from Loyalhanna's records, including both emails from Loyalhanna employees and hard copy files. *Id*. The Court thus concludes that defendants have the practical ability

37

to obtain documents from Loyalhanna, which defendants do not appear to contest, and should produce responsive documents.

However, defendants also contend that any further discovery of Loyalhanna's records would be "mostly irrelevant, unnecessary and/or duplicative," as well as burdensome and expensive. *Id.* They thus ask that, if plaintiffs' Loyalhanna discovery request is granted, the Court consider "shifting some or all of the costs of production" to plaintiffs. *Id.* at 18 (quoting *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002)). Although they restate the *Rowe* factors, defendants have not explained why "[t]he balance of factors weigh in favor of shifting the cost," including the total cost associated with such production. *Id.* at 19.[24] Defendants have not provided enough information at this point for the Court to determine that cost-shifting is appropriate in these circumstances.

Nonetheless, the Court will limit its decision to the production of communications and documents from Mike Keenan, "a Loyalhanna employee who also appears in communications with [d]efendants." Pl. U.S. Reply at 6. If, from this production, plaintiffs believe there is additional information they require from Loyalhanna, they should meet and confer with defendants to conduct a more targeted and specific discovery of this provider. Should plaintiffs renew their request, they should more fully explain the relevance of searching through all of

---

[24] Defendants also admit in a footnote that the court in *Zubulake v. UBS Warburg LLC* found that cost-shifting should only apply to "relatively inaccessible" data. 217 F.R.D. 309 (S.D.N.Y. 2003); Def. U.S. Opp. at 19, n.16. They contend, however, that the analysis set forth in *Rowe* is "more appropriate for the present case." Def. U.S. Opp. at 19 n.16.

Loyalhanna's hard drive and hard copy files, which appears to be an onerous task.
*See* Def. U.S. Opp. at 17.

### iii.   Holsinger

Holsinger is "an accounting firm that provided *specific* advice to [d]efendants concerning the timing and structure of the subject transactions, and which also participated in communications containing legal advice concerning this dispute." Pl. U.S. Mem. at 20.  Defendants acknowledge that they have a "current relationship with Holsinger," and "are communicating with Holsinger regarding the possibility of the U.S. [d]efendants obtaining and producing documents maintained by Holsinger responsive to [p]laintiffs' Document Requests."  Def. U.S. Opp. at 20, n.18.  If they have not yet done so, the Court directs defendants to obtain responsive documents from Holsinger.[25]

### iv.   THV

THV is "an auditing and consulting firm that [d]efendants engaged to provide the 'Fairness Opinion' regarding the transfer agreement."  Pl. Europe Mem. at 5. Plaintiffs contend that defendants must collect and produce "documents on which [THV] predicated its Fairness Opinion (and any other related information provided to, reviewed by, or created by [THV] in connection with the Fairness Opinion)," as well as "communications with [THV]."  *Id.* at 8–9.  However, plaintiffs have not demonstrated that defendants have the practical ability to obtain the requested

---

[25] From a review of Exhibit 19 of plaintiffs' motion to compel U.S. discovery, the Court finds that Holsinger, unlike GYF, has potentially relevant information for this case.  Dkt. No. 168-19.

documents from THV.  Defendants have produced certain documents which they have located within their own files, and have not professed to have any access to THV's files.  Def. Supp. Letter at 4 n.5.  As previously discussed, the Court does not find the cases cited by plaintiffs for the contention that defendants must retrieve all financial records provided to their accountants to be persuasive.  With respect to THV, who are not defendants' accountants, plaintiffs have asked for more than just financial records.  Plaintiffs have not demonstrated that defendants have either the legal right or practical ability to obtain documents provided to an independent firm that was requested to do a fairness opinion ten years ago.  Plaintiffs have certainly not demonstrated that THV is an "agent" of SBT, let alone an agent of defendants.  *See* Pl. Europe Mem. at 9 (citing *Chevron Corp. v. Donziger,* 296 F.R.D. 168, 197 (S.D.N.Y. 2013)).  Defendants have provided the fairness opinion itself, which "identifies the documents that SBT provided to THV . . . (copies of which have already been produced to plaintiffs)" and provided additional documents from their own files.  Thus, the Court denies plaintiffs' request to require defendants to acquire additional discovery from THV.[26]

###### v.   The Schweiger Firm

The Schweiger Firm are defendants' European attorneys who, plaintiffs contend, "knowingly aided [d]efendants' fraudulent scheme to bankrupt SBT and

---

[26] In their supplemental letter to the Court, plaintiffs contend that "[d]efendants still have not produced a copy of any written agreement between [THV] and SBT." Pl. Supp. Letter at 4.  Plaintiffs have not explained the relevance of the written agreement and if they still wish to acquire it, they should seek it from THV itself.

forestall [p]laintiffs' ability to enforce their rights."  Pl. Europe Mem. at 10.

Plaintiffs argue that defendants have the ability to obtain documents or information

from the Schweiger Firm because they are defendants' attorneys.  *Id.* at 11.  Rather

than meet plaintiffs' argument head-on, defendants instead claim that plaintiffs

have failed to pursue compulsory processes to obtain documents from third parties

(*i.e.,* the Hague Convention).  As discussed above, this argument is unavailing.

Parties are required to produce documents in their "possession, custody or control."

Fed. R. Civ. P. 34.  "[C]ourts in this district have held that documents held by

outside counsel are in the possession, custody, and control of their clients."  *Gruss v.*

*Zwirn*, 296 F.R.D. 224, 230 (S.D.N.Y. 2013) (citing *Am. Broad. Companies, Inc. v.*

*Aereo, Inc.*, No. 12-CV-1540 (AJN), 2013 WL 139560, at *1 (S.D.N.Y. Jan. 11, 2013);

*see also In re Bank of Cyprus Pub. Co. Ltd.,* No. 10-MISC-23, 2011 WL 223168, at

*3, n.1 (S.D.N.Y. Jan. 21, 2011) (there is "general recognition that documents in the

possession of a party's attorney are deemed to be within the party's possession,

custody, or control because the party has the legal right to obtain the documents on

demand.").  Thus, defendants are obligated to obtain relevant documents from the

Schweiger Firm.

   Though the parties have agreed on a procedure for documents held in the

European defendants' possession in Switzerland (Dkt. No. 229 at 1–2), the parties

have not agreed on how the Court should proceed with regard to documents in the

possession of third parties in Switzerland.  *Id.* at 2; *see also* Def. Europe Opp. at 22

n.25 (contending Article 271 violation would extend to third parties).  Plaintiffs

contend that the Court "should simply rule on whether [d]efendants have met their burden of demonstrating Swiss law precludes the production of such information." Dkt. No. 229 at 2.  Defendants argue that "the question of whether [d]efendants can voluntarily produce in compliance with Article 271 any third-party documents to which the Court may determine [p]laintiffs have a right is best determined after the Court provides guidance. . ."  Dkt. No. 228 at 3.

As the Court has already found plaintiffs are entitled to documents on Swiss territory and defendants already will need to assess their Article 271 risk, the Court will limit its ruling at this juncture to a declaration that plaintiffs have a right to documents held by the Schweiger Firm.  The Court further directs defendants to contact the Schweiger Firm to determine whether it still has relevant documents and whether it will agree to provide such documents voluntarily.  *See* Dkt. No. 229 at 2 n.1.  If Loyalhanna, Holsinger, or the Schweiger Firm has responsive documents, but refuses to provide them to defendants, defendants should inform plaintiffs that materials have been withheld so that plaintiffs can take appropriate measures to obtain those materials.

d.   Transparent Search for ESI

Plaintiffs contend that "[d]efendants have refused to engage in a transparent discovery process by failing to reveal either the data sources they have searched or the results of the search terms they ran against those data sources."  Pl. U.S. Mem. at 21.  Plaintiffs further argue that defendants' "lack of transparency in Europe has prevented [p]laintiffs from ascertaining the basis for [d]efendants' failure to produce

42

responsive documents." Pl. Europe Mem. at 16.  Defendants respond that plaintiffs

have not established that their production is deficient and therefore plaintiffs are

not entitled to "discovery on discovery." Def. U.S. Mem. at 22.

"When the discovery sought is collateral to the relevant issues (*i.e.*, discovery

on discovery), the party seeking the discovery must provide an 'adequate factual

basis' to justify the discovery, and the Court must closely scrutinize the request 'in

light of the danger of extending the already costly and time-consuming discovery

process *ad infinitum.*'" *Winfield v. City of New York*, No. 15-CV-05236 (LTS) (KHP),

2018 WL 840085, at *3 (S.D.N.Y. Feb. 12, 2018) (quoting *Mortgage Resolution

Servicing, LLC v. JPMorgan Chase Bank, N.A.,* No. 15-CV-0293 (LTS) (JCF), 2016

WL 3906712, at *7 (S.D.N.Y. July 14, 2016)).

In this case, plaintiffs have provided specific examples of defendants'

deficient production.  For example, plaintiffs identified two documents that were

"sent to or from Primetrade that once existed, but apparently no longer exist, at

U.S. Defendants AMCI Holdings, AMCI, and K-M," and identified several other

documents demonstrating that "there are documents that once existed, but

apparently no longer exist, at any of the U.S.-based Defendants."  Pl. U.S. Mem. at

14.[27]  Plaintiffs also argue that subsequent production from defendants in May 2019

"contained several emails relevant to this case, including one in which

---

[27] Defendants contend that it is unclear if two of the documents in question were
ever circulated or sent.  Def. U.S. Opp. at 24; *see* Dkt. No. 168-13, Dkt. No. 168-14.
However, both documents appear to have been created by AMCI employees, and
plaintiffs contend that they were provided as part of Primetrade's production and
not provided in AMCI's production.

representatives of SBT discuss the Fairness Opinion in very colorful terms, that were not produced by [d]efendants as part of their production of ESI from SBT/Prime Carbon." Pl. Supp. Letter at 3–4. In addition, other issues with defendants' production, which have been discussed previously, add to the need for transparency. For example, plaintiffs argue that they are unable to determine whether defendants have failed to produce documents because: (1) they relied on an improper objection; (2) they have not sought all documents in their control (for example from third parties); or (3) they failed to preserve relevant ESI. Pl. Europe Mem. at 17. A transparent accounting of defendants' ESI searches and results would allow plaintiffs to determine how many documents have been identified and thus whether documents have been withheld.

Furthermore, plaintiffs' requested relief is modest (compared to the requests in cases cited by defendants) and furthers the goal of "transparency in electronic discovery." *In re Penthouse Exec. Club Comp. Litig.*, No. 10-CV-1145 (KMW), 2012 WL 1511772, at *2 (S.D.N.Y. Apr. 30, 2012). The Court thus directs defendants to disclose: (1) the sources and custodians of information collected in the U.S. and Europe; (2) the number of documents collected in the U.S. and Europe from the relevant time period; (3) the search terms used by defendants; and (4) the number of documents from each source and custodian in the U.S. and Europe identified using those search terms. As this directive is limited to discovery on defendants' collection methods, it applies to both defendants' U.S. and European discovery efforts.

e.    Transfer Agreement Documents

Plaintiffs allege that on November 30, 2009, SBT entered into a Transfer Agreement with Prime Carbon.  Complaint ¶ 55.  As a result of the Transfer Agreement, Prime Carbon received $126 million in assets and $130 million in liabilities (except plaintiffs') from SBT.  Id. ¶ 63.  Plaintiffs argue that the Transfer Agreement was executed to "re-arrang[e] assets on Mende and Kundrun's balance sheet in order to place them beyond [p]laintiffs' reach."  Pl. Europe Mem. at 12.  In their motion to compel European document production, plaintiffs contend that defendants "have not produced documents one would expect to see in a true arm's-length transaction," and thus request that the Court preclude defendants "from offering any arguments or evidence concerning any purported arm's-length negotiations over those transactions."  *Id.* (citing *UBS Int'l Inc. v. Itete Brasil Instalacoes Telefonicas Ltd.*, No. 09-CV-10004 (LAK) (JCF), 2011 WL 1453797, at *4 (S.D.N.Y. Apr. 11, 2011); *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 8 (E.D.N.Y. 2013)).  Defendants maintain that they have "produced a vast quantity of documents and information related to the negotiation, execution and implementation of the [Transfer Agreement]," and oppose plaintiffs' request to preclude them from arguing one of their affirmative defenses.  Def. Europe Opp. at 9.

The Court will not preclude defendants from making arguments that the Transfer Agreement was the result of arm's-length negotiations.  As defendants observe, in the two cases cited by plaintiffs, the court precluded arguments only after a party failed to comply with court orders and had been warned that their

45

noncompliance would result in appropriate sanctions.  *See, e.g., Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 8 (E.D.N.Y. 2013) (defendants "continuously flouted this Court's discovery orders, resulting in multiple monetary sanctions against them and numerous warnings that harsh sanctions would be imposed in response to further violations").  The same is not true in this case.

Furthermore, plaintiffs are contending that defendants have failed to produce documents that support defendants' own affirmative defenses.  Evidence demonstrating that the Transfer Agreement was a fair value transaction and made after arm's-length negotiations would benefit defendants, not plaintiffs.  It is therefore in plaintiffs' best interest if such documents did not exist (indeed they argue that such documents do not exist).  To the extent that defendants have such documents and have not disclosed them to plaintiffs, defendants would be precluded from using them at trial by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *see also Feltenstein v. City of New Rochelle*, No. 14-CV-5434 (NSR), 2018 WL 3752874, at *6 (S.D.N.Y. Aug. 8, 2018) ("The fundamental purpose of Rule 37(c) is to prevent the practice of "sandbagging" an adversary with new evidence") (quoting *Haas v. Delaware and Hudson Ry. Co.*, 282 F. App'x. 84, 86 (2d Cir. 2008)).  The Court therefore denies plaintiffs' request for a preclusion order.

46

3.     Plaintiffs' Motion to Compel Production of Documents Subject to the
       Crime-Fraud Exception of the Attorney-Client Privilege and the Work-
       Product Doctrine

Plaintiffs request that the Court "order the disclosure of all communications

with SBT's and [d]efendants' counsel related to this fraudulent scheme [to transfer

SBT's assets and make it judgment-proof from plaintiffs' claims] and its cover-up."

Pl. Crime-Fraud Mem. at 2.  In response, defendants argue that: (1) as the ICC

dismissed their fraud allegations, plaintiffs are precluded from asserting fraud,

including for purposes of asserting the crime-fraud exception, "until they meet their

burden of proving grounds that would permit this Court to refuse to recognize the

ICC Award as binding" (Def. Crime-Fraud Opp. at 11), and (2) plaintiffs have not

adduced evidence to establish probable cause that a fraud occurred and that

privileged communications were made in furtherance of the fraud.  *Id.* at 15–24.

Federal courts have recognized an exception to the attorney-client privilege

for those communications that "are 'relate[d] to client communications in

furtherance of contemplated or ongoing criminal or fraudulent conduct.'"  *In re*

*Omnicom Grp., Inc. Sec. Litig.,* 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (quoting *United*

*States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997)).  In this Circuit, to invoke the

crime-fraud exception, the moving party "bears the burden to demonstrate that

there is [1] 'probable cause to believe that a fraud or crime has been committed and

[2] that the communications in question were in furtherance of the crime or fraud.'"

*Id.* (quoting *Jacobs*, 117 F.3d at 87).  "[P]robable cause 'requires that a 'prudent

person' have a 'reasonable basis' for believing that the objective of the client's

47

communication with the attorney was to further a fraudulent scheme.'" *Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2019 WL 2085412, at *11 (S.D.N.Y. May 13, 2019) (quoting *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013)).

"Once there is a showing of a factual basis, the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court." *United States v. Tucker*, 254 F. Supp. 3d 620, 625 (S.D.N.Y. 2017) (quoting *Jacobs*, 117 F.3d at 87); *see also Meyer v. Kalanick*, No. 15-CV-9796, 2016 WL 3189961, at *4 (S.D.N.Y. June 7, 2016) (plaintiff provided "evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability") (citing *United States v. Zolin*, 491 U.S. 554, 574 (1989)). However, *in camera* review is "favored when there has been only a 'minimum showing' about whether the communications were in furtherance of a crime or fraud," but is not always required when a party "has comfortably made a showing of probable cause." *Tucker*, 254 F. Supp. 3d at 625 (citing *Jacobs*, 117 F.3d at 88; *United States v. Levin*, No. 15-CR-101 (KBF), 2015 WL 5838579, at *5 (S.D.N.Y. Oct. 5, 2015)).

As a preliminary matter, the Court finds defendants' first argument that plaintiffs are precluded from asserting fraud to be unavailing.  The Second Circuit in its decision remanding the case explicitly stated that plaintiffs "should be allowed to conduct discovery with respect to the fraud claims.  [Defendants] may be given the opportunity to re-raise the issue preclusion issue after discovery . . . ."  Second

Circuit Opinion at 78 (emphasis added).  This language is clear and unequivocal, and defendants cannot now invoke issue preclusion to prevent discovery with respect to the fraud claims.[28]  As such, the Court will devote its analysis to the merits of plaintiffs' motion.

### a.   Probable cause that a fraud has been committed

Plaintiffs contend that the "Transfer Agreement, the transactions related to it, and SBT's lies and omissions to both the ICC Paris and [p]laintiffs were all part of a fraudulent scheme orchestrated by [d]efendants."  Pl. Crime-Fraud Mem. at 2.  Under New York law, five elements are necessary to establish fraud: "'(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance.'"  *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, No. 13-CV-0657 (PGG), 2019 WL 2024808, at *20 (S.D.N.Y. May 8, 2019) (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009)).

### i.   Misrepresentation of a material fact, falsity of the misrepresentation, and intent to defraud

Plaintiffs argue that on January 10, 2010, after becoming aware of Prime Carbon's emergence in the pig iron market, they sent a letter to the ICC and SBT requesting that SBT provide assurances that it was not transferring its business to

---

[28] Furthermore, as plaintiffs observe, the Second Circuit found that "the equitable powers of this court can never be exerted [o]n behalf of one who has acted fraudulently."  Second Circuit Opinion at 78 (quoting *PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 492 (2d Cir. 2004)).  Thus, plaintiffs must be allowed to conduct discovery on alleged fraudulent activity in order for the Court to decide if defendants may even raise issue preclusion as a defense.

Prime Carbon. Pl. Crime-Fraud Mem. at 1.[29]  In response, SBT's attorney Hans-Rudolph Wild of the Schweiger Firm sent a letter on January 25, 2010 to the ICC contending that: (1) "[t]he respondent does not try to evade from its obligations"; (2) "the [r]espondent has to build financial accruals in his balance sheet and to set up restructuring measures"; (3) "the [r]espondent is still existing and has not resolved to be dissolved and liquidated"; and (4) "Prime Carbon AG was already established in September 2006 with the main corporate purpose of producing, trading and distribution of petroleum products." Declaration of Adam K. Grant dated February 15, 2019 ("Grant Decl."), Exhibit O ("Schweiger Letter") at 1–2, Dkt. No. 203-15. Plaintiffs contend that this letter misrepresented material facts concerning SBT's actual efforts to move their assets to Prime Carbon and leave their liabilities with SBT. Plaintiffs argue that when the Schweiger Letter was sent to the ICC: (1) SBT and Prime Carbon had already signed the Transfer Agreement to move business operations to Prime Carbon (*see* Grant Decl., Exhibit F, Dkt. No. 203-6); (2) employees had already been transferred from SBT to Prime Carbon (*see* Grant Decl., Exhibit G at 9–11, Dkt. No. 203-7); (3) SBT had sent letters to their suppliers concerning the transfer (*see* Grant Decl., Exhibit N, Dkt. No. 203-14); and (4) Prime Carbon and AMCI Holdings had entered into a purchase agreement to move shares

---

[29] Though all the papers related to this motion were filed on April 9, 2019, plaintiffs' motion is dated February 15, 2019. Defendants' opposition is dated March 15, 2019. Subsequently, after "[d]efendants produced a treasure trove of *additional* damning documents," plaintiffs submitted their reply memorandum, dated April 2, 2019.

of Primetrade, recently obtained from SBT, to AMCI Holdings in the United States

(*see* Grant Decl., Exhibit I, Dkt. No. 203-9).

Plaintiffs thus contend that the representations made in the Schweiger

Letter on January 25, 2010 were false and provide several documents

demonstrating their falsity.  These documents include, *inter alia*:

- o An email sent on October 14, 2009 by an AMCI employee to Hans
  Mende which stated in relevant part: "Now, if the threatening claims
  from . . . the Brazilian suppliers materialize, SBT's bankruptcy could
  not be avoided any more . . . The only way out of this situation is the
  envisaged transfer of the business (i.e. most assets and liabilities) from
  SBT to Prime Carbon at close-to-zero cost."  Supplemental Declaration
  of Adam K. Grant dated April 2, 2019 ("Grant Supp. Decl."), Exhibit C
  at 4, Dkt. No. 209-3.  Hans Mende then responded to this email
  stating: "Primecarbon could be used for any new business.  Important
  is that we don't transfer legal SBT liabilities to AG [AMCI Group]."  *Id.*
  at 1.

- o An email sent on November 20, 2009 by ███████ to employees at AMCI
  which stated: "The fairness opinion presents a picture that is not
  entirely conclusive . . . Since the fairness opinion primarily aims at
  preventing future actions for annulment from the creditors of Steel
  Base Trade AG, this disclosure even seems helpful to us."  Grant Supp.
  Decl., Exhibit M at 1, Dkt. No. 209-13.

- o A slide presented at a Steel Base Trade meeting on November 16, 2009
  in Geneva that stated: "Now, in the light of the threatening claims, it
  has been decided to sell all operating assets and liabilities of SBT to a
  new entity (Prime Carbon AG, "PC") at arms' length.  Through this
  transaction, the subordinated shareholder loans, the threatening
  claims and other minor liabilities remain with SBT."  Grant Supp.
  Decl., Exhibit P at 8, Dkt. No. 209-16.

- o An email sent on March 15, 2013 by an attorney at ████████████
  ███████ to the Swiss Tax Administration Office stating that: "Due to
  impending legal disputes, certain assets, including the shares in Prime
  Trade Inc., were sold by SBT to Prime Carbon AG in 2009.  The
  objective of this transaction was to prevent the shares of Prime Trade
  Inc. from falling under the recoverable assets of SBT in the unlikely

event of a negative outcome to the legal disputes."  Grant Supp. Decl., Exhibit Y at 1, Dkt. No. 209-25.

o   An email sent on April 23, 2010 from a ████████employee to employees at Prime Carbon stating: "[W]e should be worried that Prime Carbon is not 'in the clear'. . . . [W]e should be worried that the Brazilians could attack Prime Carbon in the USA!  That would have devastating consequences. . . . This is why we need: . . . A "legal opinion" which analyzes the circumstances and gives us security that we don't have anything to fear when it comes to our financing for the benefit of Prime Carbon."  The Prime Carbon employee then responded: "Hans, that's exactly what I want to avoid. ████ is going to send me a legal opinion by Tuesday."  Grant Supp. Decl., Exhibit Z at 1, Dkt. No. 209-26.

Plaintiffs thus argue that the statements in the Schweiger Letter that SBT was not trying to evade its obligations, that it was building up financial accruals, and that it had not resolved to be dissolved and liquidated were false and meant to mislead plaintiffs and the ICC into declining to take further actions.[30]  Pl. Crime-Fraud Mem. at 17.  Plaintiffs further contend that the documents clearly demonstrate that defendants were involved in the fraud (id. at 18), including Hans Mende who was in several of the communications, and that they "have provided an avalanche of evidence—including [d]efendants' own written admissions—that the intent of the Secret Transactions was to defraud [p]laintiffs and deprive them of relief from SBT."  Pl. Crime-Fraud Reply at 13.  Based on the documents provided

---

[30] Plaintiffs also maintain that the Schweiger Letter's representation that Prime Carbon was an established business was misleading.  Using defendants' own words, plaintiffs note that prior to receiving assets and business from SBT, "Prime Carbon was a 'dormant' 'shelf company.'"  Pl. Crime-Fraud Reply at 4 (citing Grant Supp. Decl., Exhibits F and G, Dkt. Nos. 209-6 and 209-7).  Defendants opened Prime Carbon's first bank account in October 2009 after negotiations with plaintiffs broke down.  Id. (citing Grant Supp. Decl., Exhibits I and J, Dkt. No. 209-9 and 209-10.

by plaintiffs, the Court finds that there is probable cause to believe that defendants made false misrepresentations of material facts and that they intended to defraud plaintiffs by making such misrepresentations.

        ii.   <u>Reasonable reliance on the representation and damage caused by such reliance</u>

Plaintiffs further argue that they reasonably relied on the Schweiger Letter and thus did not seek further conservatory measures until "it was too late [and defendants] had effectuated their plan, moving all of the assets out of [p]laintiffs' reach and putting SBT into bankruptcy." Pl. Crime-Fraud Reply at 15. Plaintiffs also claim that they were damaged by their reliance, as they were not able to recover the approximately $48 million awarded by the ICC. *Id.* at 16. Defendants respond that plaintiffs have not demonstrated that as "unsecured trade creditors of SBT, [plaintiffs] would have recovered anything on their $48 million claims against SBT in the SBT Bankruptcy had the Fair Value Purchase Agreement not taken place, much less a recovery of sufficient substance to provide the motivation for the fraudulent scheme they allege." Def. Crime-Fraud Opp. at 18. Such a contention is difficult to support, given the emails provided that demonstrate defendants were motivated by "threatening claims . . . by the Brazilian suppliers." Grant Supp. Decl., Exhibit C at 4, Dkt. No. 209-3. The Court finds that plaintiffs' inability to seek recovery of the Award from SBT constitutes damages sufficient to support their crime-fraud exception motion.

More broadly, the Court finds that plaintiffs have established probable cause to believe that SBT and defendants committed fraudulent actions and intended to

defraud plaintiffs.  Plaintiffs have provided written documentation to demonstrate that defendants intended to move assets out of plaintiffs' reach, that they did in fact move assets prior to the Schweiger Letter sent on January 25, and that representations in the Schweiger Letter were thus false.  Defendants' main rebuttal is that, if read from a particular angle, the Schweiger Letter could be considered accurate, and that the transfer from SBT to Prime Carbon was actually made for tax purposes.  *See* Def. Crime-Fraud Opp. at 20–22; Def. Crime-Fraud Sur-Reply at 6–8.  The Court finds these arguments to be unpersuasive, especially given the multitude of documents demonstrating that defendants made the transfer to "prevent the shares of Prime Trade Inc. from falling under the recoverable assets of SBT in the unlikely event of a negative outcome to the legal disputes."  Grant Supp. Decl., Exhibit Y at 1, Dkt. No. 209-25.  A "prudent person" would have more than a "reasonable basis to suspect" that defendants orchestrated the transfer to prevent plaintiffs from seeking recovery.  *Tucker*, 254 F. Supp. 3d at 625.

> b.   Communications in furtherance of the fraud

In addition, plaintiffs have adduced sufficient evidence to demonstrate that "the objective of [defendants'] communication with [their] attorney was to further a fraudulent scheme."  *Kleeberg*, 2019 WL 2085412, at \*11 (citing *Amusement Indus., Inc.*, 293 F.R.D. at 426–27).[31]  Plaintiffs have adequately established, and

---

[31] Defendants contend that plaintiffs applied an improper standard in their analysis.  Def. Crime-Fraud Sur-Reply at 9–10.  Plaintiffs argue that the attorney-client communication need only be "reasonably related to the crime or fraud."  Pl. Crime-Fraud Reply at 17.  Defendants maintain that the proper standard is that the communication was intended in some way to facilitate or to conceal the criminal

defendants have not denied, that the Schweiger Firm arranged the Transfer Agreement, wrote letters to suppliers concerning the transfer of business operations, and then sent the letter to the ICC stating that SBT had not resolved to dissolve or liquidate.  Pl. Crime-Fraud Reply at 18.  Moreover, an attorney at ███ █████████████ later admitted to the Swiss Tax Administration Office that the objective of moving Prime Trade shares to Prime Carbon was to prevent them "from falling under the recoverable assets of SBT."  Grant. Supp. Decl., Exhibit Y at 1. Furthermore, an email sent on April 23, 2010 from a █████████ employee to employees at Prime Carbon stated: "[W]e should be worried that the Brazilians could attack Prime Carbon in the USA!  That would have devastating consequences. . . . This is why we need: . . . A 'legal opinion' which analyzes the circumstances and gives us security that we don't have anything to fear when it comes to our financing for the benefit of Prime Carbon."  Grant Supp. Decl., Exhibit Z at 1, Dkt. No. 209- 26.  The Prime Carbon employee then responded: "[T]hat's exactly what I want to avoid.  ████ is going to send me a <u>legal opinion</u> by Tuesday."  *Id.* (emphasis added).[32]  The Court thus finds that plaintiffs have established probable cause to believe that communications with defendants' attorneys were made in furtherance of fraudulent activity and that *in camera* review is not necessary as plaintiffs have "comfortably made a showing of probable cause."  *Tucker*, 254 F. Supp. 3d at 625.

---

activity.  Def. Crime-Fraud Sur-Reply at 10.  However, under either standard, the Court concludes that the communications were made in furtherance of the fraud.

[32] ████████████████████████████████████████████████████████ ████████████████████████████████████

Defendants are therefore directed to produce the 34 entries in defendants' U.S. Privilege Log identified by plaintiffs in their May 9, 2019 submission to the Court. Dkt. No. 220-1.  The Court also declares that plaintiffs are entitled to entries in the European Privilege Log "that appear to relate to legal advice given or sought in connection with, or in furtherance of, [d]efendants' fraudulent conduct."  Dkt. No. 220 at 1.

## III.   CONCLUSION

For the foregoing reasons, the Court:

- grants defendants' motions to compel to the extent they seek the production of materials related to SBT's liability and plaintiffs' damages from the underlying transactions;

- denies defendants' motions to compel to the extent they seek the production of plaintiffs' internal communications related to the underlying transactions;

- denies defendants' motion to compel production related to the Swiss Bankruptcy and the Swiss Action;

- grants plaintiffs' motions to the extent they seek to strike defendants' general objections to interrogatories and document requests and directs the U.S. defendants to amend their responses to the discovery requests;

- grants plaintiffs' motion to compel U.S. document production to the extent they seek the bank account records of the U.S. corporate defendants and the personal bank account records of the U.S. individual defendant;

56

- grants plaintiffs' motion to compel U.S. document production to the extent they seek records from third parties Loyalhanna (currently limited to the email account of Mike Keenan) and Holsinger, but not from GYF;

- grants plaintiffs' motions to compel U.S. and European document production to the extent they seek transparency of defendants' ESI collection and directs a further response from defendants (as outlined in the Opinion to follow);

- denies plaintiffs' motion to compel European document production to the extent they seek to preclude defendants from making arguments that the Transfer Agreement was the result of arm's-length negotiations;

- declares, consistent with the parties' agreement set forth in the letter to the Court dated May 20, 2019 (Dkt. No. 229), that plaintiffs are entitled to the following related to their motions directed at the European defendants:

  - to strike defendants' general objections to interrogatories and document requests with leave to amend their responses to the discovery requests;

  - to obtain the European corporate defendants' bank account records and the European individual defendant's personal bank account records; and

  - to collect documents from the third-party Schweiger Firm, but not from THV;

- grants plaintiffs' motion to compel documents subject to the crime-fraud exception and directs the U.S. defendants to produce the withheld documents; and

- declares that plaintiffs are entitled to documents from the European defendants that have been withheld on privilege grounds because the crime-fraud exception applies.

This Opinion and Order refers to information that has been redacted in the parties' motion papers and in the accompanying exhibits, and accordingly will be temporarily filed under seal (and provided to the parties in unredacted form by email). The Court directs the parties to advise the Court by email to CottNYSDChambers@nysd.uscourts.gov within five business days of the date of this Opinion and Order with any proposed redactions for the Court's review. The parties should be mindful of the presumption of public access to judicial documents in proposing any redactions. *See, e.g., Brown v. Maxwell*, __ F.3d __, 2019 WL 2814839, at *3 (2d Cir. July 3, 2019); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). The Court will then determine how this Opinion and Order may be filed on the public docket.

Until further order of the Court, the Clerk is respectfully directed to file this Opinion and Order under seal.

**SO ORDERED.**

Dated: July 15, 2019
   New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

58