UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CBF INDÚSTRIA DE GUSA S/A, DA TERRA
SIDERÚRGICA LTDA, FERGUMAR - FERRO
GUSA DO MARANHÃO LTDA,
FERGUMINAS SIDERÚRGICA LTDA, GUSA
NORDESTE S/A, SIDEPAR - SIDERÚRGICA
DO PARÁ S/A and SIDERÚRGICA UNIÃO
S/A,

|  |  |
|---|---|
| Plaintiffs, | 13-cv-2581 (PKC) (JLC) |
| -against- | OPINION <br> <u>AND ORDER</u> |

AMCI HOLDINGS, INC., AMERICAN
METALS & COAL INTERNATIONAL, INC.,
PRIME CARBON GMBH, PRIMETRADE, INC.
and HANS MENDE,

                         Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

This saga has its origins in ten contracts for the sale of more than 100 metric tons

of pig iron by five Brazilian entities (collectively referred to as "CBF")[1] to Steel Base Trade AG

("SBT").  When market prices collapsed, CBF was left with an unpaid balance of more than $42

million owed by SBT.  The matter proceeded to arbitration before a panel of the International

Chamber of Commerce in Paris (the "ICC"), which awarded CBF principally $48,053,462.16

(the "Award").  SBT was liquidated after Swiss bankruptcy proceedings and is not named in this

action.

---

[1] The five plaintiffs named in the Third Amended Complaint are CBF Indústria de Gusa S/A., Da Terra
Siderúrgica Ltda, Fergumar - Ferro Gusa Do Maranhão Ltda, Ferguminas Siderúrgica Ltda, Gusa Nordeste S/A,
Sidepar - Siderúrgica Do Pará S/A and Siderúrgica União S/A.  Each is alleged to be an entity organized under the
laws of Brazil with offices in various cities in Brazil.  The lead plaintiff is CBF Indústria de Gusa S/A.

The Court assumes familiarity with the several opinions issued in this case. Briefly, CBF alleges that after it advised SBT that it was about to commence an arbitration against it, defendant Hans Mende and others formulated a plan to strip SBT of substantially all assets and transfer them to an affiliated entity under his control. On December 23, 2009, SBT transferred its assets to Prime Carbon Ltd. ("Prime Carbon") for $1 and retained SBT's liabilities to CBF and one other creditor. Prime Carbon carried on the business of SBT, using largely the same employees and operating out of the same office as SBT. SBT then filed for bankruptcy in the Canton of Zug, Switzerland. The Bankruptcy Office later advised the arbitration panel that neither it nor anyone acting on behalf of SBT would be defending the claim, and that CBF's claim against SBT had been "recognized" in the bankruptcy. The arbitration panel issued an Award in CBF's favor, in the amount of the claim recognized in the bankruptcy proceeding. The panel denied CBF's request for interim relief relating to the transfer of SBT's business to Prime Carbon.

As part of the asset transfer, Prime Carbon gained control of SBT's valuable subsidiary, Primetrade, Inc. ("Primetrade"). CBF alleges that Prime Carbon transferred its ownership of Primetrade, Inc. to other Mende-affiliated entities in order to further insulate Mende and affiliated entities in the event CBF was able to reach the assets of Prime Carbon.

CBF's Third Amended Complaint (the "Complaint") presents two claims for relief against defendants Mende, AMCI Holdings, Inc. ("AMCI Holdings"), American Metals & Coal International, Inc. ("American Metals"), Prime Carbon and Primetrade. Prime Carbon is alleged to be the successor of SBT and Mende. Prime Carbon and Primetrade are also alleged to be alter egos of SBT. American Metals and AMCI Holdings are alleged to be liable because defendant Mende was their alter ego. The First Claim seeks to enforce the Award against all

defendants pursuant to the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"). (Compl. ¶¶ 154-63.)[2]  The Second Claim asserts that all defendants fraudulently transferred assets in violation of sections 276 and 276-a of the New York Debtor and Creditor Law. (Compl. ¶¶ 164-71.)

The late Judge Sweet, to whom the case had been assigned, dismissed a prior version of the Complaint that asserted six fraud claims and sought to confirm the Award against defendants as alter egos or successors.  On appeal, the Second Circuit held as follows: "the district court erred (1) in determining that the [New York Convention] . . . require[s] appellants to seek confirmation of a foreign arbitral award before the award may be enforced by a United States District Court and (2) in holding that appellants' fraud claims should be dismissed prior to discovery on the ground of issue preclusion as issue preclusion is an equitable doctrine and appellants plausibly allege that appellees engaged in fraud.  Accordingly . . . we vacate the district court's judgment dismissing the action to enforce and remand for further proceedings consistent with this opinion. . . ."  CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 850 F.3d 58, 62 (2d Cir. 2017).[3]

Defendants now seek summary judgment dismissing the action on multiple grounds.  (Doc 563.)  CBF separately seeks partial summary judgment dismissing all of defendants' 31 affirmative defenses.  (Doc 539.)[4]

---

[2] K-M Investment Corporation and Fritz Kundrun were dismissed by a voluntary Stipulation and Order.  (Doc 537.)

[3] Following remand, CBF withdrew all of its fraud claims and asserted a single fraudulent conveyance claim invoking N.Y. Debtor & Creditor Law §§ 276 and 276-a against all defendants.  CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 13 cv 2581 (PKC) (JLC), 2020 WL 1673701, at *1 (S.D.N.Y. Apr. 6, 2020).

[4] Defendants seek to withdraw Affirmative Defenses 18-20, 22 and 24-26 (Doc 645) and without objection, they will be deemed withdrawn.  Defendants concede that Affirmative Defenses 1, 4 and 8 have been ruled upon and are "asserted only for appeal."  (Pl. Mem. at 50.)  They are deemed asserted and dismissed.

The evidence submitted on the motions is massive.  By the Court's calculation, 520 exhibits have been submitted, several so large that they needed to be uploaded to ECF in multiple parts.  The parties' Local Rule 56.1 statements and counterstatements total 826 paragraphs.[5]  Their responses, which repeat the text of the original statements, total 365 pages of single-spaced text.

After summarizing the well-established standards for deciding a Rule 56 motion, the Court will address the arguments advanced by the parties.  Given the number of arguments raised, it is useful at the outset to summarize the Court's holdings, which are as follows:

- Defendants expressly waived their defense of forum non conveniens during the briefing of their motion to dismiss.

- CBF's claims are not barred by issue preclusion or claim preclusion.

- Defendants have not pointed to evidence that could satisfy the high burden required of the defenses enumerated in Article V of the New York Convention.

- Federal choice-of-law principles determine which jurisdiction's laws govern CBF's claim to enforce the Award, and require the application of Swiss substantive law.  Under Swiss law, CBF may seek enforcement against defendants under an alter-ego or veil-piercing theory, but may not enforce the award against defendants as purported successors to SBT.

- New York's choice-of-law principles determine which jurisdiction's laws govern the fraudulent transfer claim, which is before the Court based on its supplemental jurisdiction.  Swiss law governs, and in order to proceed with the fraudulent transfer claim, Swiss substantive law requires CBF to receive an assignment from the Swiss bankruptcy estate.  Because CBF has not received an assignment, the fraudulent transfer claim will be dismissed, but is subject to reinstatement if CBF obtains an assignment from the proper Swiss bankruptcy authorities within 180 days.

- Of the affirmative defenses that have not been withdrawn, deferred, or preserved for appellate reasons only, CBF's summary judgment motion will be denied as to Affirmative Defenses 9, 12, 13, 14, 17 and 28, and granted as to Affirmative Defenses 2, 3, 5, 6, 7, 16 and 29.

---

[5] Citations to the parties' Local Rule 56.1 Statements are intended as a convenient reference to the evidence cited in those statements.  Citation to exhibits in the summary judgment record does not convey that the Court has relied exclusively on that portion of the record.

DISCUSSION

> I. <u>Summary Judgment Standard.</u>

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>Anderson</u>, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." <u>Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.</u>, 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when no reasonable trier of fact could find in favor

of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon, 575 F.3d at 204 (internal citations omitted).

II.   Defendants Have Waived Their Forum Non Conveniens Defense.

Defendants move for summary judgment based on forum non conveniens. In a proper case, forum non conveniens may warrant dismissal of an action seeking to enforce a foreign arbitral award under a treaty. See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384, 388 (2d Cir. 2011) (Panama Convention); In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488 (2d Cir. 2002) (New York Convention). Defendants asserted a forum non conveniens defense early in this proceeding. Indeed, the Second Circuit expressly stated that the district court on remand should consider the defense if raised again. CBF, 850 F.3d at 79.

But following remand, defendants expressly withdrew their forum non conveniens defense in the briefing on their motion to dismiss. (Doc 114 at 4 n.11 ("Defendants no longer seek forum non conveniens dismissal given the impact on Plaintiffs' ability to pursue claims in Switzerland of intervening changes in applicable Swiss law and the passage of time.").) Defendants, having raised and expressly withdrawn the defense while continuing to litigate the action, have forfeited or waived their right to reassert the defense. See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) (waiver occurs through "a litigant's intentional relinquishment of a known right.").

III.     The First Claim: Enforcement of the Award Against the
         <u>Defendants Under the New York Convention.</u>

The First Claim seeks to enforce the Award against all defendants.  Defendants

move for summary judgment in their favor on several grounds, including claim preclusion, issue

preclusion, certain of the defenses enumerated in the text of Article V of the New York

Convention, and the legal basis for enforcing the Award against SBT's purported alter egos or

successors.  The Court begins by reviewing evidence in the summary judgment record related to

the arbitration proceeding and defendants' intertwined ownership before addressing each of

defendants' arguments in turn.  As will be explained, defendants' motion for summary judgment

on the First Claim will be denied because a reasonable jury could conclude that under Swiss law,

defendants are alter egos of SBT, and that the Award is therefore enforceable against defendants.

The Second Circuit has held that an alter ego or successor liability claim may be

raised in a proceeding to confirm an award under the New York Convention.  <u>CBF</u>, 850 F.3d at

75.  In remanding, the Second Circuit stated that it was not ruling on any defenses to

enforcement under the New York Convention.  <u>Id.</u> at 76 ("We leave further legal and factual

development of this issue, and any other barriers to enforcement that appellees may argue on

remand, to the district court.").

The soon-to-be-sixty-five-years-old New York Convention is "one of the most

important United Nations treaties in the area of international trade law and the cornerstone of the

international arbitration system."[6]  It enables a party to an arbitration to enforce the arbitral

award in the Courts of the 170 countries that are signatories to the treaty without first needing to

confirm the award or convert it into a judgment in the place where the award was issued.  "The

goal of the Convention, and the principal purpose underlying American adoption and

---

[6] https://uncitral.un.org/en/texts/arbitration.

implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which . . . arbitral awards are enforced in the signatory countries." Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974). Because the Award was issued in Paris, the United States has secondary jurisdiction over the enforcement of this foreign award, and enforcement may be denied only on a ground set forth in Article V of the Convention. CBF, 850 F.3d at 71.

CBF's enforcement claim arises under a treaty of the United States. The implementing statute confers original jurisdiction on district courts. 9 U.S.C. § 203. In construing a treaty, courts "begin with the text of the treaty and the context in which the written words are used. . . ." Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 95 (2d Cir. 1998) (quoting Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534-35 (1991)). If the text does not provide the answer, rules of construction and the history of negotiations may be considered. Eastern Airlines, 499 U.S. at 534-35.

      A.      Factual Background: SBT, the Defendants and the Arbitration.

           1.     Events in the Months Preceding the Commencement of Arbitration.

SBT was organized in 2007, and from then until April 29, 2010, it was a corporation organized under the laws of Switzerland. (Pl. 56.1 ¶ 18.)[7] It was the only party formally joined in the arbitration proceeding. As the Court will discuss in detail below, a chain of indirect relationships runs from SBT and the defendant corporations to defendant Hans Mande and former defendant Fritz Kundrun.

---

[7] Citations to the parties' Local Rule 56.1 Statements are intended as a convenient reference to the evidence cited in those statements. Citation to exhibits in the summary judgment record is not intended to convey that the Court has relied exclusively on that portion of the record.

A little more than two months before the commencement of the ICC arbitration, CBF informed SBT that it planned to institute proceedings.  Dominic Sigrist, a trader at SBT, forwarded the email to his boss, Thomas Bürger, with the comment that "[t]he past is catching up with us . . . after all . . . ."  (PX 80.)  Sigrist also stated in an email addressed to Mende, "This was long awaited and has now unfortunately arrived."  (PX 82.)  Mende responded to Sigrist, with a copy to Bürger, on September 29, 2009, stating, "Dominic, a naked man has no pockets. SBT has no equity or funds to pay for any significant claims and AMCI would not support SBT. Just want to make this clear."  (Id.)

In an exchange of emails in September 2009, Sigrist, Bürger and Hans-Rudolph Wild, the lawyer who would eventually represent SBT in the arbitration proceedings, began discussing strategies to insulate AMCI from SBT's liabilities.  (PX 314, 315.)  Ornella Bolz informed Sigrist, with copy to Bürger, that "AMCI International AG has an 'empty' 100% subsidiary that we currently do not need and also has no activity.  The name is Prime Carbon AG.  We could use this company without establishing a new one and pay new capital."  (PX 315.)  In response to an inquiry by Sigrist, Wild responded, "That's OK.  We can process the new business through this company, and the old business can be sold to this company in the course of a transaction as yet to be determined."  (Id.)

### 2. The Commencement of Arbitration and CBF's Suspicions about the Transfer of SBT's Business.

The arbitration was commenced when CBF presented the Secretariat of the ICC with a Request for Arbitration on November 20, 2009.  (Award ¶ 3; ICC Rule 4.)[8]  In the Request, CBF quoted the relevant arbitration provisions in the contracts, described its claims, the relief sought (lost profits and direct damages) and named SBT as the sole respondent.  (Doc 573-

---

[8] See ICC Rules of Arbitration in force as of January 1, 1998 (PX 689).

140.)  The Secretariat notified SBT of CBF's request.  (Award ¶ 8.)  The appointment of the three-member ICC arbitration panel was complete on April 1, 2010.  (Award ¶¶ 15-16.)  CBF and SBT each nominated one arbitrator and the third was selected by the two nominated arbitrators.  (Pl. 56.1 ¶¶ 68, 74.)  SBT agreed that the arbitration would be conducted in Paris using the English language and that the Uniform Law on the International Sale of Goods was applicable to the matter.  (Id. ¶¶ 73, 75.)

On January 15, 2010, CBF wrote to the arbitral panel asserting that "Respondents [sic] are already attempting to evade their obligations to pay their debts towards the Claimants. There are strong and undisputable [sic] indications that the operations from [SBT] are being transferred to another company from the same AMCI Group, even their website was put down the previous week."  (PX 53; Pl. 56.1 ¶¶ 76-77.)  The letter laid out the basis for its suspicions that Prime Carbon AG was related to AMCI Group.  (PX 53.)  It noted that Hans Mende of AMCI Group was president of the Prime Group AG board, that SBT director Thomas Bürger was also a director of Prime Carbon AG, and that Prime Carbon AG had the same address as AMCI International AG.  (Id.)  The letter closed by indicating that it intended to seek interim and conservatory measures if no adequate guarantees were forthcoming from SBT.  (Id.)

SBT's lawyer, Hans-Rudolf Wild, forwarded the letter to Dominic Sigrist, a trader at SBT (who also served as a trader at Prime Carbon AG) stating that he would be submitting a "somewhat nebulous" response to the panel the next day.  (Pl. 56.1 ¶¶ 35, 78.)  Sigrist reported to Bürger while he was working at SBT and Prime Carbon.  (Id. ¶ 36.)  Sigrist responded to Wild on January 25, 2010 as follows: "I think we should get together sometime next week and discuss the next steps (liquidation of SBT, etc.)."  (Id. ¶ 79.)

On January 25, 2010, SBT responded to the ICC panel, stating in relevant part:

> Respondent does not try to evade from its obligations.
>
> $*$  $*$  $*$  $*$
>
> It is true that the website www.steelbasetrade.com was shut down at
> the beginning of January 2010.  The reason is that the Respondent
> first has to analyze [its] position regarding pending or imminent
> claims for damages from purchasers as well as against suppliers as
> well as [its] financial situation[.]  Therefore, the Respondent has at
> least temporarily suspended [its] business activities.  Please note,
> however, the Respondent is still existing and has not resolved to be
> dissolved and liquidated.

(DX 41 ¶ 2.)  Wild further requested that the panel refrain from entering any interim and/or

conservatory measures against SBT.  (Id. ¶ 4.)

SBT did not disclose to CBF or the panel that on December 23, 2009, SBT

entered into an agreement to transfer all of SBT's assets and all of its liabilities, excluding its

liability to CBF and certain other limited carveouts,[9] for the price of $1.00; the transaction was

effective retroactively to November 30, 2009.  (PX 50, 352.)  The agreement was executed by

Stephan Herzig on behalf of SBT, and by Thomas Bürger on behalf of Prime Carbon.  (Pl. 56.1 ¶

171; PX 50.)  Around the time of the agreement, all but two employees of SBT ceased working

for it and all others began working for Prime Carbon AG.  (Pl. 56.1 ¶ 174.)  As of December 29,

2009, one customer was informed as follows: "We are pleased to announce that Steel Base Trade

AG has changed its name to Prime Carbon AG which is a subsidiary of AMCI" and that "we

kindly as you to effect all payment as of 4th January 2010 to the following new bank accounts in

favour of Prime Carbon AG . . . ."  (PX 555; see also PX 528 (stating that "the change is

basically an internal decision"), 556-57, 687; DX 39, 83.)

When asked at deposition about the omission of the foregoing from his January

25 letter to the panel, Wild testified as follows:

---

[9] The liabilities retained by SBT, in addition to its liability to CBF, included a liability to Progress Rail and a loan
from AMCI International.  (Id.)  SBT also retained 50,000 CHF as its only asset.

> Q       Now, in this letter did you acknowledge that the Prime Carbon transaction was taking place?
>
> A       Neither did we acknowledge it nor did we dispute it.
>
> Q       Why didn't you say in your letter that this Prime Carbon transaction was taking place?
>
> A       There was no cause nor was there any legal obligation to do so.

(DX 228 at 307.)

SBT, after receiving an extension, responded to CBF's claims in a three-page submission. (DX 50.) Its denial acknowledged entering into several contracts with CBF, noted a collapse in the price of pig iron and asserted that based on CBF's silence, SBT concluded that CBF could not fulfill the contracts. (Id.) It disputed that CBF had substantiated its claim or proved its damages. (Id.)

On May 5, 2010, SBT informed the panel that it had filed bankruptcy proceedings in the Cantonal Court of Zug, Switzerland. (Award ¶ 17 (PX 176).) On May 20, 2010, a representative of the Bankruptcy Office of the Canton of Zug asked that all correspondence in the case be sent to him, and a few weeks later asked that the arbitration be stayed because of the bankruptcy filing. (DX 250; Award ¶¶ 20-21.) The arbitration panel took no formal action on the stay application.

On June 23, 2010, CBF applied to the arbitration panel for "interim or conservatory measures" to allow it to "seize assets" in the approximate amount of $42 million in the name of SBT or Prime Carbon, the transferee of SBT's assets. (Award ¶ 22.) There is no claim by CBF that the application was served on Prime Carbon.

Under ICC Rules, the "Terms of Reference" is a document prepared by the panel that, among other things, summarizes the claims and relief sought by each party. (ICC Rules

Art. 18 (PX 689).)  CBF submitted the required summary that related to the contracts for the sale of pig iron to SBT.  (Award ¶ 19.) A hearing took place before the arbitration panel on June 25, 2010.  (Award ¶ 23.)  A representative of the Bankruptcy Office stated that he was not empowered to sign the "Terms of Reference."  (Id.)  No appearance was made on behalf of SBT at the hearing.  (Id.)  On July 25, the panel issued the Terms of Reference summarizing the claims and defenses and made no express reference to fraud, fraudulent transfer, alter ego or successors; it did note the receipt of CBF's request for interim and conservatory measures.  (PX 685.)  CBF and the arbitrators signed the Terms of Reference but SBT did not.  (Id.)  The ICC Rules provide that "[i]f any of the parties refuses to take part in the drawing up of the Terms of References or to sign the same, they shall be submitted to the Court for approval."  (ICC Rules Art. 18(3).)  The ICC Court is defined as a body within the ICC.  A letter to the parties from the Secretariat of the ICC Court recites that the Court had approved the Terms of Reference.  (PX 685.)

CBF later asked the panel to order SBT to provide certain information about its assets, debts, transfers, shareholders and directors.  (Award ¶ 25.)  After an oral hearing, the panel issued a limited request of information to SBT regarding transfers or asset sales made subsequent to the Request for Arbitration.  (Id. ¶¶ 28-31.)  The representative of the Bankruptcy Office of the Canton of Zug later advised the arbitration panel that "[t]he receiver in bankruptcy has not and will not actively participate in the proceedings, since there are insufficient funds to finance such efforts," and also reminded the panel that it had never acted on the Office's stay request.  (Id. ¶ 31.)

In response, CBF advised the panel that it was seeking "reasonable relief by means of having their credit duly recognized, as well as the fraud carried out by [SBT] in the

course of the procedure, so that they can pierce the corporate veil and make [SBT's] shareholder, directors and affiliated companies liable for the losses caused to [CBF].'"  (Id. ¶ 33.)  At no time did CBF seek to join any person or entity as a party to the arbitration on any theory of liability, including alter ego or successor-in-interest.  At no time did the arbitration panel invite, request or direct any shareholder, director or entity to be heard on any issue.

Thereafter, the Chairman of the Bankruptcy Office advised the panel that neither the bankruptcy estate nor any of the creditors had asked to take over the defense of the claim against SBT, and that CBF's claim would therefore be "recognized" in the bankruptcy proceeding in the amount of CHF 51,756,269.75 ($48,053,462.16).  (Id. ¶¶ 34, 43.)  CBF pressed the panel to find SBT liable in the amount claimed and also to rule on its request for interim relief.  (Id. ¶ 36.)

On or about November 9, 2011, the panel issued an Award against SBT in the amount recognized by the Bankruptcy Office, plus interest, arbitration fees of $285,000, and legal fees and expenses of $75,000 and Brazilian Real 33,306.08.  (Id. ¶¶ 43-46.)  The Award denied CBF's request for interim relief because CBF had "not introduced sufficient evidence in the present proceedings to demonstrate the existence of a fraud in the bankruptcy proceedings" and dismissed "[a]ny and all other claims made by the Parties. . . ."  (Id. ¶¶ 47, 49.)

      B.    **Defendants' Summary Judgment Motion Based on**
              **Issue Preclusion and Claim Preclusion Will Be Denied.**

Defendants assert that issue preclusion and claim preclusion foreclose CBF's enforcement of the Award and the fraudulent conveyance claim against any defendant.  For the reasons that will be explained, defendants' motion for summary judgment premised on issue preclusion and claim preclusion will be denied.

CBF's enforcement claim invokes federal question jurisdiction, and federal law therefore governs the preclusive effect of the Award.  See Wyly v. Weiss, 697 F.3d 131, 140 (2d Cir. 2012); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation., 402 U.S. 313, 324 n.12 (1971).  The fraudulent conveyance claim invokes the Court's supplemental jurisdiction, and therefore New York choice-of-law principles apply to it.  See Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).  While the parties contest the choice-of-law principles applicable to other issues in this case, both sides rely exclusively on federal precedent, and the Court will proceed on the basis of implied consent to apply federal law to the preclusive effect of the arbitration and Award as to both of CBF's claims.  Arch Insurance Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009); Tehran-Berkeley Civil & Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989).[10]

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion . . . ."  Taylor v. Sturgell, 553 U.S. 880, 892 (2008).  Claim preclusion at its core means that a final adjudication on the merits of an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981); see also Curtis v. Citibank, N.A., 226 F.3d 133, 139 (2d Cir. 2000) ("Whether there is claim preclusion depends upon whether the same or connected transactions are at issue and the same proof is needed to support the claims in both suits or, in other words, whether facts essential to the second suit were present in the first suit.").

Issue preclusion differs from claim preclusion, and "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to

---

[10] To the extent that any of the federal cases relied on state law principles, the parties do not identify how they would have differed from federal preclusion principles.  See, e.g., M.J. Woods, Inc. v. Conopco, Inc., 271 F. Supp. 2d 576, 580 (S.D.N.Y. 2003) ("The doctrine of collateral estoppel – also known as issue preclusion – operates almost identically under federal and New York State law. . . .").

the prior judgment, even if the issue recurs in the context of a different claim." Taylor, 553 U.S.
at 892 (quotation marks omitted).  The party invoking issue preclusion must establish that:

> (1) the issues of both proceedings [are] identical, (2) the relevant
> issues [were] actually litigated and decided in the prior proceeding,
> (3) there must have been "full and fair opportunity" for the litigation
> of the issues in the prior proceeding, and (4) the issues [must have
> been] necessary to support a valid and final judgment on the merits.

Leather v. Eyck, 180 F.3d 420, 425-26 (2d Cir. 1999) (quotation marks omitted).

Defendants principally rely on CBF's alerting the arbitral panel of SBT's asset
transfer to Prime Carbon and its application seeking interim and conservatory measures.  On
June 23, 2010, CBF requested that the panel grant "interim or conservatory" measures to seize
assets of approximately $42.3 million "that they might be able to locate in the name of [SBT] or
Prime Carbon AG (alleged to be a sister company of [SBT] to which [SBT] allegedly transferred
assets, including contracts)."  (Award ¶ 22.)  CBF later asked the panel to order SBT to provide
information about its shareholders and directors and any asset transfers made after they were
notified of the commencement of the arbitration.  (Id. ¶ 25.)  The panel posed questions to SBT
about the transfers and requested that it submit written responses, but none were forthcoming.
(Id. ¶¶ 28-29.)  The panel later ordered SBT to provide information concerning transfers; the
panel declined to grant any other interim or conservatory measure because, among other reasons,
"there is no clear or sufficient evidence, at least at this stage, of illegal wrongdoings or of an
illegal behavior by [SBT]."  (Id. ¶ 30.)

A representative of the Bankruptcy Office kept the panel apprised of the progress
of bankruptcy proceedings, the lack of significant assets held by SBT, the right of creditors to
undertake a defense of the arbitration proceeding under certain circumstances, and renewed the
request for a stay of arbitration.  (Id. ¶ 31.)

On March 16, 2011, CBF asked the panel to have its underlying claim for breach of contract "duly recognized, as well as the fraud carried out by [SBT] in the course of the procedure, so that they can pierce the corporate veil and make [SBT's] shareholders, directors and affiliated companies liable for the losses caused to [CBF]." (Id. ¶ 33.) Thereafter, a representative of the Bankruptcy Office advised that no creditor had elected to take over the defense of the claim and that CBF's contract claim against SBT "has to be considered as recognized and is therefore being listed in the inventory of claims" in the bankruptcy. (Id. ¶ 34.) In view of the acknowledgement by the Bankruptcy Office of its claim and the lack of a defense by SBT, CBF urged that the arbitration be brought to a speedy conclusion and asked the panel "to recognize" the actions of SBT "as frauds." (Id. ¶ 35.) It renewed its request that the panel "decide upon the interim measures which are necessary to make an upcoming award effective." (Id. ¶ 26.)

The panel issued its Final Award on November 9, 2011. (DX 57.) The Award recited that "[t]he Arbitral Tribunal . . . . decides that [CBF has] not introduced sufficient evidence in the present proceedings to demonstrate the existence of a fraud in the bankruptcy proceedings." (Id. ¶ 47.)

Defendants have not demonstrated that issue preclusion bars CBF from pursuing the First Claim. CBF applied to the arbitration panel for "interim or conservatory" measures and never sought an arbitral award against any person or entity other than SBT. It did ask the arbitral panel to declare that SBT had committed a fraud. CBF never amended the Request for Arbitration, the document in which the claimant, among other things, sets forth the nature and circumstances of the dispute giving rise to the claim and a statement of the relief sought. CBF also did not seek to have the panel include in the Terms of Reference, initially or by way of an

amendment, the summary of a fraud or alter-ego claim against any other person, or a list of issues to be determined that related to the transfer of assets.  (ICC Rules Arts. 4(3) & 18(1).)  No party is permitted to raise new claims after the approval of the Terms of Reference without permission of the panel, which was never sought.  (ICC Rules Art. 19.)  The fact that CBF's application for interim and conservatory measures was properly before the panel and alluded to the transfers to Prime Carbon AG did not convert the interim and conservatory measures into an affirmative claim for relief.  (ICC Rules Art. 23.)  Claims of alter ego or successor liability were never actually litigated in the arbitration and were not decided on the merits in the Award.

CBF had limited opportunity in the arbitration proceeding to learn of the relationship between SBT, its affiliates and shareholders.  The information available in SBT's bankruptcy file was hardly sufficient to fully and fairly litigate the issue in the arbitration.  The arbitration proceeding does not provide any basis to preclude CBF on any issue.

Defendants fare no better on claim preclusion.  The Second Circuit has held that a claim-preclusion analysis does not consider events that arose after the commencement of the underlying proceeding:

> While claim preclusion bars relitigation of the events underlying a previous judgment, it does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit.  The crucial date is the date the complaint was filed.  The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events; plaintiff may simply bring a later suit on those later-arising claims.

Curtis, 226 F.3d at 139 (citations omitted).  Here, the crucial date—the time of commencement of the proceeding—was November 6, 2009, before the challenged transfer of assets to Prime Carbon and the filing of SBT's bankruptcy.  CBF was under no continuing obligation to amend

its pleading, and is not precluded from bringing a subsequent action directed to the asset transfers.

Defendants' assertions of issue and claim preclusion fail.

C.    Defendants Have Not Demonstrated that CBF's Claims Are Barred by the Defenses Set Forth in Article V of the New York Convention.

Article V of the New York Convention enumerates grounds that may be asserted by the party against whom the award is invoked, as well as two discretionary grounds that may also be raised by the Court.  In practice, this means the party opposing enforcement bears the burden of proof, which is "very high" in view of the strong policy in favor of arbitration.  KT Corp. v. ABS Holdings, Ltd., 784 Fed. App'x 21, 25 (2d Cir. 2019) (summary order) (citing STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011) and Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 407-10  (2d Cir. 2009)); Pagaduan v. Carnival Corp., 830 Fed. App'x 61, 61-62 (2d Cir. 2020) ("The party opposing enforcement of an arbitral award bears the burden of proving that one of the specified grounds applies, and '[t]he burden is a heavy one, as the showing required to avoid summary confirmance is high.'") (summary order) (quoting Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005)).

1.    Defendants Have Not Come Forward with Evidence of SBT's "Incapacity."

Defendants assert that because CBF seeks to hold each of them liable as a successor or alter ego of SBT, they may invoke any defense that could have been invoked by SBT if CBF had sought to enforce the Award against SBT.  CBF does not dispute this proposition.

According to defendants, as of the time that SBT filed under Swiss bankruptcy law, it was under an "incapacity" to defend itself in the arbitration proceeding, and thus was also "unable to present [its] case." "[I]ncapacity" and inability to present a case are enumerated defenses to enforcement under Article V of the New York Convention.  (Art. V(1)(a) & (b).)

Under Swiss law, control of SBT was vested in The Bankruptcy Office of the Canton of Zug.  Neither the prior management of SBT nor its chosen counsel had the legal authority to speak for or defend SBT in the arbitration.  Defendants assert that the Bankruptcy Office acted on behalf of SBT and its creditors, a point that CBF does not dispute.  (Pl. Response to Def. 56.1 ¶ 96; Def. Resp to Pl. 56.1 ¶ 110 (SBT "was under the control of the Zug Bankruptcy administrator . . . .").)

Defendants draw the erroneous conclusion that because the right to speak for SBT was vested by operation of law in a bankruptcy administrator, SBT was under an incapacity or otherwise could not present a case.  Swiss law changed the identity of the persons authorized to speak for SBT but it did not eliminate SBT's right to speak.  Eventually, the bankruptcy administrator advised the arbitration panel that neither the administrator nor any creditor wished to take over the defense of the claim in arbitration and that the full extent of CBF's claim had been recognized in the bankruptcy.  (Award ¶ 34.)  The panel acknowledged the administrator's statement as "[SBT's] admission of the claims submitted by [CBF]" (id. ¶ 36) and proceeded to render its Award.

In the underlying contractual documents, SBT agreed to arbitration before the ICC, whose rules provide that "[i]f any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure."  (ICC Rules Art. 6(3).)

On the record presented, defendants have failed to establish that SBT was under an incapacity or otherwise unable to present a case.  Article V(1)(a) & (b).

> 2.  Defendants Have Not Come Forward with Evidence that They
> Were Deprived of "Proper Notice" under Article V(1)(b).

Article V(1)(b) of the New York Convention establishes a defense against enforcement of an award if "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case."  Defendants invoke Article V(1)(b), arguing that they were deprived of proper notice and "unable to present [their] case" to the ICC Panel.

In denying defendants' motion to dismiss, Judge Sweet concluded that CBF "sufficiently alleged Defendants' control over SBT, such that if SBT is found to have received proper notice and an opportunity to be heard, Defendants by implication may be found to have as well."  CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 316 F. Supp. 3d 635, 653 (S.D.N.Y. 2018).  Concluding that CBF had alleged that SBT had notice and an opportunity to be heard, he denied defendants' motion to the extent that it invoked Article V(1)(b).  Id.

A Court ordinarily follows its prior rulings under the law-of-the-case doctrine but may alter a previous ruling based on "the need to correct a clear error or prevent manifest injustice."  United States v. Thorn, 446 F.3d 378, 383 (2d Cir. 2006) (quotation marks omitted). At oral argument, the Court inquired of counsel whether they were aware of "Supreme Court, Second Circuit, or, for that matter, other circuit precedent of New York Convention awards being enforced against an alter ego over an Article V(1)(b) objection[.]"  (Nov. 9, 2022 Tr. at 23.)  Counsel confirmed that they were aware of none.  (Id.)  In the absence of precedent, the Court does not conclude that Judge Sweet's holding was "clear error" or presented a manifest injustice.  The Court therefore adheres to Judge Sweet's conclusion as the law of the case.

The Second Circuit has not directly addressed the meaning of the term "proper notice" as used in the New York Convention.  The Ninth Circuit has defined "proper notice" within the meaning of Article V(1)(b) as "notice that is reasonably calculated to apprise a litigant of arbitration proceedings."  Linley Investments v. Jamgotchian, 670 Fed. App'x 627, 628 (9th Cir. 2016) (summary order).  The Tenth Circuit similarly has defined "proper notice" within the meaning of Article V(1)(b) as equivalent to notice required by the due process clause: "Notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  CEEG (Shanghai) Solar Sci. & Tech. Co., Ltd v. LUMOS LLC, 829 F.3d 1201, 1206 (10th Cir. 2016) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)).  This implies that, at a minimum, some form of notice that the person named in the notice may be subject to or bound by the arbitration and has a right to be heard at the arbitration.[11]

In addition to the "proper notice" defense, Article V(1)(b) allows a party against whom enforcement of the award is sought to defend on the basis that it was "unable to present his case."  The Second Circuit has looked to due process jurisprudence and held that "if [the party] was denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b)."  Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 146 (2d Cir. 1992).[12]

The Court concludes that there is evidence sufficient for a reasonable fact finder to conclude that defendants were on notice of and able to present their case to the ICC.  Evidence

---

[11] Cf. Taylor, 553 U.S. at 884 ("It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.").

[12] There, a party to the arbitration successfully invoked the defense on the ground that it was misled by the arbitration tribunal as to the need to introduce voluminous documents rather than summaries.  Id.

developed during the discovery period and submitted in the summary judgment record shows that Hans Mende, who had a 50% ownership in all defendants, served as Chairman of Prime Carbon's Board of Directors from January 1, 2008 through June 14, 2011, and as Chairman of the Management Board from June 15, 2011 through April 17, 2013.  (PX 525.)  Mende also was president of defendant AMCI Holdings and was president of defendant American Metals.

      Before the arbitration was commenced, CBF faxed a letter dated September 11, 2009 directly to Mende, personally informing him of SBT's default and its intention to proceed to arbitration if action was not taken.  (PX 79 ("In case there is no response to this NOTIFICATION, SELLERS will be forced to take the legal actions to receive the proper compensation, including the submission of the case to Arbitration. . . .").)  The interrogatory responses of Prime Carbon identify Mende as a person with knowledge of SBT's formal response to CBF's Request for Arbitration.  (PX 525 at Resp. 14.)  While the arbitration was pending, and two weeks after the SBT-Prime Carbon transfer agreement was executed, Mende demonstrated his control over SBT in a January 6, 2010 email to Bürger:  "Furthermore, I dont want Prime Carbon or SBT to handle any cash unless you or Ornella [Bolz][13] or I authorize it.  In other words we need to control any incoming and outgoing cash . . . no ifs no buts, no exception."  (PX 159 (ellipsis in original); see also PX 368-69.)  Further on March 1, 2010, while the arbitration was still pending, CBF wrote to defendant AMCI Holdings, of which Mende was president, threatening litigation against AMCI Holdings and "all other companies somehow affiliated or part of the AMCI Group" in connection with "Fraud and Disregard of Corporate Entity."  (PX 55.)  Mende was named in the body of the letter, and each entity defendant in the present action was either an addressee or copied on the letter.  (Id.)

---

[13] Bolz served as a director of American Metals and Prime Carbon.  (Def. Resp. to Pl. 56.1 ¶¶ 42-43.)

A reasonable fact finder could conclude that although Mende did not sit on SBT's board or hold an officer position, neither the transfer nor the bankruptcy filing could have happened without his assent, and that these events were undertaken with the intent to undermine the efficacy of the Award.  A reasonable fact finder could also conclude Mende yielded sufficient power over SBT and the defendant entities such that if Mende had wanted SBT to take or refrain from taking any action in the arbitration, his decision would control.  To the extent that the bankruptcy eventually ended their immediate control over SBT, Mende and the defendant companies could have refrained from undertaking the "sales" and transfers that were the immediate cause of the bankruptcy or could have funded SBT's defense of the arbitration.

Accordingly, the Court concludes that defendants have not met their heavy burden of establishing as a matter of law a ground for refusing enforcement of the Award under Article V(1)(b) of the New York Convention.

> D.   **Applying Swiss Law, Defendants May Be Liable as Alter Egos, but Not as Successors in Interest.**
>
> 1.   **A Federal Choice-of-Law Analysis Requires the Application of Swiss Substantive Law.**

Article III of the New York Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles."  CBF urges that the Second Circuit's opinion ruled on the choice-of-law issue when it stated that "the question of whether a third party not named in an arbitral award may have that award enforced against it under a theory of alter-ego liability, or any other legal principle concerning the enforcement of awards or judgments, is one left to the law of the

enforcing jurisdiction, here the Southern District of New York, under the terms of Article III of the New York Convention." CBF, 850 F.3d at 75.

The Court does not read the Circuit's opinion as ruling on the choice-of-law issues presented on the enforcement claim, nor does it determine whether alter ego or successor liability principles are procedural or substantive within the meaning of Article III. Assuming arguendo that federal law applies, the Circuit understandably did not rule whether the Court should apply federal common law or employ a federal choice-of-law analysis.

CBF urges that New York substantive law should be applied to the alter ego and successor issues. But the connection of this enforcement claim to the forum state is tenuous. True, CBF elected to enforce the Award here, and Mende is a former domiciliary of New York who maintains a residence in New York. But none of the defendants are domiciled, incorporated or headquartered in New York. The transfer of assets was not effectuated in New York. The enforcement claim arises under a treaty of the United States and jurisdiction is invoked pursuant to the treaty and the implementing statute. 9 U.S.C. § 203. There is no basis to apply New York law or New York choice-of-law principles to this claim. See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir. 1999) ("[A]s this is a federal question case under 9 U.S.C. § 203 and not a diversity case, we see no persuasive reason to apply the law of New York simply because it is the forum of this litigation.").[14]

The principal question is whether federal common law ought to apply to the alter-ego and successor-liability claims or whether federal choice-of-law principles should govern. The issue is potentially dispositive as to part of CBF's enforcement claim. Federal choice-of-law

---

[14] Without the benefit of a full factual record, Judge Sweet cited federal authorities applying New York substantive law to the alter-ego claims without extended discussion of the choice-of-law issue. CBF, 316 F. Supp. 3d at 646. He indicated that Swiss law would govern corporate formalities but noted that the parties had not submitted sufficient information to determine Swiss law. Id. at 648-49.

principles broadly follow the Restatement (Second) of Conflicts of Laws, which generally concludes that shareholder liability to creditors is determined under the law of the jurisdiction of incorporation.  SBT was incorporated in Switzerland.  On the successor-liability question, CBF concedes that Swiss law would not permit recovery against the defendants.

Thus, there is a true conflict requiring a resolution of the choice-of-law issue, at least as to the successor-liability claim.  For reasons that the Court will explain, the Court concludes that federal choice-of law-principles apply, and that those principles point to the application of Swiss substantive law.

In one of the few extended discussions of the issue, then-District Judge Lynch noted that "[t]he application of federal common law choice-of-law rules . . . does not automatically proceed from the invocation of the Court's federal question jurisdiction." Eli Lilly Do Brasil, Ltda. v. Federal Express Corp., 2005 WL 2312547, at *3 (S.D.N.Y. 2005).[15]  But in the context of a Warsaw Convention case, Judge Lynch found no reason to inject the forum's choice-of-law rules and concluded that federal choice-of-law principles governed whether the law of a foreign nation ought to apply.  Id.  Because of the parties' concession on appeal in that case, the Court of Appeals proceeded from the starting point that federal choice-of-law principles applied.  Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 80-81 (2d Cir. 2007).

The Second Circuit has spoken to the question of the law governing an agreement to arbitrate under the New York Convention and has found "compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is

---

[15] Federal courts have adopted a uniform federal rule on veil piercing in areas touching upon unique federal interests.  See 1 Fletcher Cyc. Corp. § 41.90 (noting Medicare, Interstate Commerce Act, Clayton Act, CERCLA and Admiralty as areas where courts have applied a uniform federal rule apart from a choice of law analysis).

enforceable." Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir. 1999).[16]

But there are important differences between the application of estoppel doctrines to decide whether an agreement to arbitrate is enforceable against a non-signatory, or issues relating to the use or misuse of the corporate form, and the circumstances where a successor may be liable for the debts of its predecessor. While the decision to compel arbitration is of great importance, it does not touch upon the merits of the underlying claim. The liability of officers, directors and shareholders to creditors and others relates entirely to matters of substantive law that varies across jurisdictions: the nature and scope of the corporation's limited liability, the formalities required, and the circumstances under which a party may be considered an alter ego or successor. Applying another jurisdiction's law to these questions may unsettle the expectations of parties who relied on the incorporating jurisdiction's laws. The place of incorporation has a strong interest in protecting the corporate separateness where such protection is warranted and allowing it to be pierced or disregarded where the corporate form has been abused.

For this reason, federal choice-of-law principles, as well as the analogous principles of many states, follow the internal affairs doctrine in order to avoid subjecting corporations to "conflicting demands" in multiple jurisdictions. See Edgar v. MITE Corp., 457

---

[16] In context of the New York Convention, the Supreme Court had occasion to consider whether the Convention, by its silence, implicitly prohibited a Court from compelling a non-signatory to arbitrate a claim. GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637, 1645 (2020). The Court examined the text of the Convention and found that no provision of the Convention foreclosed the application of domestic equitable estoppel doctrines. Id. The Court relied on the provision of the statute implementing the treaty that makes the Federal Arbitration Act applicable to the extent not in conflict with the New York Convention, 9 U.S.C. § 208. 140 S. Ct. at 1645. But the Court stopped short of determining which body of domestic law applied to the question. Id. On remand, the Eleventh Circuit concluded that it did not need to resolve any conflict among the laws of Alabama, Germany and federal common law because the plain language of the agreement contemplated extension of the arbitration provision to claims between the seller and subcontractors. Outokumpu Stainless USA, LLC v. Coverteam SAS, 2022 WL 2643936, at *3 (11th Cir. July 8, 2022).

U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."); VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1113 (Del. 2005) ("By providing certainty and predictability, the internal affairs doctrine protects the justified expectations of the parties with interests in the corporation."); In re MF Glob. Holdings Ltd. Inv. Litig., 998 F. Supp. 2d 157, 179 (S.D.N.Y. 2014) (noting that both New York and Illinois recognize the internal affairs doctrine).

The Second Circuit has indicated that "when conducting a federal common law choice-of-law analysis, absent guidance from Congress, we may consult the Restatement (Second) of Conflict of Laws."  Eli Lilly Do Brasil, Ltda., 502 F.3d at 81.  The Restatement (Second) of Conflict of Laws section 302, comment b, points out that the "certainty, predictability and uniformity of result, protection of the justified expectations of the parties and ease" favor applying the law of the place of incorporation, unless some other jurisdiction has a stronger interest.  Even more directly to point, section 307 of the Restatement (Second) provides that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability . . . to its creditors for corporate debts."[17]  Similarly, section 302(2) provides that the law of the state of incorporation will govern the standard for officer and director liability to creditors unless another jurisdiction has a more significant relationship.  None of the potentially relevant jurisdictions – Brazil, France (where the arbitration took place), New

---

[17] See also Broker Genius, Inc. v. Seat Scouts LLC, 2018 WL 2214708, at *5 (S.D.N.Y. May 14, 2018) (applying Restatement section 307 on a choice-of-law analysis) (Stein, J.).

York or the United States – has interests that outweigh Switzerland's in deciding the liabilities of officers, directors and shareholders of corporations organized under its laws.

Defendants' Swiss law expert acknowledges that the corporate veil may be pierced under Swiss law where at least the following elements are satisfied: (i) economic identity between the legal person and its member, and (ii) abuse of the legal principle of separate personality.  (Rüd Report ¶ 100 (PX 566).)  Economic identity is presumed under Swiss law if "(i) the possibility of control exists, and (ii) as a result, a relationship of dependence of any kind – permissible or impermissible, long-term or short-term, accidental or planned is established – and (iii) is based on share ownership or on other grounds such as contractual ties or family and friendship relations.  Moreover, there must be (iv) an identity of economic interests between the controlled corporation and the person or entity controlling it. . . ."  (Id. ¶ 101.)  The "abuse" element is satisfied "if there are (i) various of different and extraordinary conducts in the sense of fraudulent practices and (ii) a qualified damage to third parties."  (Id. ¶ 102.)[18]

Federal common law is similar but permits the piercing of a corporate veil in either of two circumstances: (1) if the putative alter ego utilized the entity's corporate form "to perpetrate a fraud" or (2) the alter ego "so dominated and disregarded [the] corporate form." Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980); see also Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012) (Sullivan, J.).  If there are overlapping considerations between Swiss law and federal common law, the

---

[18] CBF's Swiss law experts do not dispute the basic description of the two elements of the veil piercing or alter ego claim – economic identity and "abuse of rights" – but add their own take on how it is applied in specific cases. (Bär & Karrer Report ¶¶ 183-84 (PX 567).)  CBF's experts persuasively demonstrate that Swiss law would not require an assignment of rights in order for CBF to assert an alter ego or veil piercing claim.  (Id. ¶ 222, et seq.)

Court may use jury instructions framed in federal common law, to the extent it does not conflict with an element of Swiss law.

But Swiss law is quite different than federal common law on successor liability. CBF has conceded that on its enforcement claim, Swiss law, if applicable, would not allow it to pursue a successor-in-interest claim:

> THE COURT: You are no longer asserting any theory of successor in interest on your enforcement claim; is that correct?
>
> [COUNSEL FOR CBF]: No.  If the Court thinks that Swiss law governs our claims, then we acknowledge Swiss law does not recognize the successor in interest theory.  If the Court agrees with our reading of the Second Circuit's opinion as just saying, apply New York law to these claims, then our successor in interest theory is fine.  So we acknowledge, to the extent Swiss law applies, our successor in interest theory doesn't work. We recognize our own expert said that, their expert said that.

(Nov. 9, 2022 Tr. at 13-14.)[19]

Applying federal choice-of-law principles, including consulting the Restatement (Second) of Conflict of Laws, and giving due consideration to the interests of competing jurisdictions and the differences between federal common law and Swiss law, the Court concludes that Swiss law governs on issues of alter-ego status, veil piercing and successor liability on the First Claim.

2.      CBF Has Pointed to Evidence that Would Permit a Reasonable Jury to Enforce the Award under An Alter Ego or Veil-Piercing Theory.

Four of the five defendants – all but Prime Carbon – move for summary judgment, arguing that they are not alter egos of SBT, or are otherwise improperly named in the

---

[19] According to CBF's expert: "The Rüd-Report is correct in its finding that there exists no doctrine in Swiss law which is substantially similar to the New York law doctrine of 'successor liability." (Bär & Karrer Report ¶ 222 (PX 567).)

action.  This argument consumes three of the fifty pages of defendants' opening brief.  (Def. Mem. at 43-45.)

As discussed, CBF has conceded that Swiss law does not recognize plaintiffs' claim of successor liability.  To the extent that the First Claim seeks to enforce the Award based on defendants' status as successors, the claim does not survive and will be dismissed.  There is, however, sufficient evidence in the summary judgment record for a reasonable trier of fact to conclude that the Award may be enforced against defendants on an alter-ego theory.  The Court will address the alter ego claim, also referred to as the veil-piercing claim.

As noted, Swiss law requires that two elements be satisfied: (1) economic identity between the legal person and its member, and (2) abuse of the legal principle of separate personality.[20]

> Economic identity is presumed if:
>
> (i) the possibility of control exists and (ii) as a result, a relationship of dependence of any kind – permissible or impermissible, long-term or shortterm, accidental or planned is established – and (iii) is based on share ownership or on other grounds such as contractual ties or family and friendship relations.  Moreover, there must be (iv) an identity of economic interests between the controlled corporation and the person or entity controlling it.

(Rüd Dec. ¶ 101 (PX 566).)  Consistent with the foregoing, CBF's expert's explains:

> This does not require that the shareholder and the company constitute one economic unity.  Rather, it is required – but sufficient – that there is a relationship of dependence, i.e. control ("economic domination of one legal entity over the other").  It is irrelevant whether this relationship of dependence is permissible or impermissible, long-term or short-term, accidental or planned.  It is equally irrelevant on what such relationship is based, be it the

---

[20] The Court concludes that defendants' argument that an alter-ego claim belongs exclusively to the bankrupt estate and may not be asserted by a creditor without an assignment of the claim is without merit.  (Bär & Karrer Report ¶ 202 (PX 567).)  The requirement of assignment, however, does apply to the Second Claim.

holding of shares in that company, contractual relations, family, or friendship connections.

(Bär & Karrer Report ¶ 183 (PX 567).)

The second element, abuse of the legal separateness of the entity, is described as follows:

> Abuse of the legal principle of separate personality is to be assumed if there are (i) various of different and extraordinary conducts in the sense of fraudulent practices and (ii) a qualified damage to third parties. Typical cases are the mixing of spheres and assets, i.e., insufficient respect for the independence of the legal person vis-à-vis the controlling person, external control, e.g., through the pursuit of special interests of the controlling person at the expense of the legal person, or the undercapitalization of the legal person in such a way that its survival is endangered.

(Rüd Decl. ¶ 102 (PX 566); see also Bär & Karrer Report ¶¶ 185-87 (PX 567).)

The summary judgment record includes evidence sufficient for a reasonable trier of fact to conclude that the Award is enforceable as to defendants on an alter-ego or veil-piercing theory. SBT was organized in 2007, and from then until April 29, 2010, it was a corporation organized under the laws of Switzerland. (Pl. 56.1 ¶ 18.) It was the only party formally joined in the arbitration proceeding. A chain of indirect relationships runs from SBT and the defendant corporations to defendant Hans Mande and former defendant Fritz Kundrun. The relevant entities include corporations organized under the laws of Delaware, the Cayman Islands, Luxembourg, Netherlands and Switzerland, as well as a trust.[21]

Defendant AMCI Holdings is organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. (Def. 56.1 ¶ 9.) As a holding company, it conducts no business operations. (Id. ¶ 10.) The shares of defendant AMCI Holdings are

---

[21] Unless otherwise noted, the facts relating to ownership, control, officer and director positions are for the period from 2008 through the commencement of this action in April 2013.

owned 50% by each Mende and Kundrun; each was a director and Mende served as president. (PX 64 Resp. 2.)

Defendant American Metals was 100% owned by former defendant K-M Investment Corporation. Mende and Kundrun were directors of American Metals and K-M Investment; respectively, Mende served as president and Kundrun served as Chairman of the Board and CEO of both American Metals and K-M Investment. (PX 66 Resp. 1; PX 67 Resp. 1.) AMCI Holdings owned 100% of K-M Investment. (PX 67 Resp. 2.)

Defendant Prime Carbon Gmbh is a private corporation organized under the laws of Switzerland. (Pl. 56.1 ¶ 14.) Until May of 2011, it was known as Prime Carbon AG, a public corporation. (Id. ¶¶ 15-16.) Prime Carbon has been owned by a series of AMCI-denominated entities. Prime Carbon was 100% owned by non-party AMCI International AG, a corporation organized under Swiss law, until November 2010. (Id. ¶ 17.) In June 2010, AMCI International AG was converted to AMCI International Gmbh, a private company organized under Swiss law. (Id. ¶ 7.) From 2008 to 2013, AMCI International AG and its Gmbh successor were wholly owned by AMCI Euro-Holdings BV, which was wholly owned by AMCI Worldwide Holdings (Lux) Sarl., which was wholly owned by AMCI Worldwide (Lux) Sarl., which was wholly owned by AMCI Worldwide Ltd. (Id. ¶¶ 8-11.) From 2008 to 2013, Kundrun and the 2005 Kirmar Trust each owned 50% of AMCI Worldwide Ltd. (Id. ¶ 12.) Mende was the sole trustee of the 2005 Kirmar Trust and had the right to vote its share interest in AMCI Worldwide Ltd. (Id. ¶ 13.) Mende also served as chairman of Prime Carbon's board of directors during the period January 1, 2008 through June 14, 2011, and as chairman of the Management Board during the period June 15, 2011 through April 17, 2013. (PX 525, Resp. 1.)

Defendant Primetrade is a corporation organized under the laws of Delaware with its principal place of business in North Carolina.  (Pl. 56.1 ¶ 22.)  From 2008 to November 30, 2009, Primetrade was a wholly-owned subsidiary of SBT.  (Id. ¶ 23.)  Primetrade became a wholly-owned subsidiary of Prime Carbon when a substantial portion of SBT's assets were transferred to Prime Carbon, effective November 30, 2009.  (Id. ¶¶ 23, 87.)  Defendant Prime Carbon sold defendant Primetrade to defendant AMCI Holdings on or about January 27, 2010, in a Share Purchase Agreement executed on behalf of Prime Carbon by Hans Mende and AMCI Holdings, also by Hans Mende.  (PX 48 at 7.)  The purchase price of $5,497,000 was paid through a promissory note from AMCI Holdings to Prime Carbon.  (Id.)

Dominic Sigrist, a trader at SBT, wrote to defendant Mende on September 30, 2009, regarding the "Potential Arbitration."  A reasonable jury could conclude that it was a report on progress of efforts to insulate Mende and his companies from liabilities to CBF, which he refers to as "ring fencing."  The tone and explicit nature of Sigrist's communication warrant this substantial excerpt:

> We will start ring fencing our biz by using one of the dormant AMCI companies (Prime Carbon) for any new biz.  We are looking to protect the ongoing biz by routing payment made to SBT through either AMCI accounts held with UBS and Garanti and as a next step we will obviously have to transfer the entire business over to a Newco (or Prime Carbon).
>
> We believe the Brazilian lawyer [i.e., CBF's lawyer]  is trying to make it look as if the producers could go after AMCI (which according to our lawyer they cannot). This may make the producers look at arresting SBT cargoes during the arbitration and have payments blocked in the USA (when USD payment are being cleared).
>
> Will have a next meeting with Wild [SBT's lawyer in the arbitration] this coming Friday and by Monday next week we will have to give a preliminary reply to the other side. We are still trying to buy time.

(PX 147.)

Thomas Bürger emailed an update to Mende on October 14, 2009.[22]  He advised that if the threatened claim from CBF and another creditor materialized, "SBT's bankruptcy could not be avoided any more.  One of the threats of this worst case scenario would be that SBT's financing banks would call the guarantees that have been given by AMCI.  The only way out of this situation is the envisaged transfer of the business (i.e. most assets and liabilities) from SBT to Prime Carbon at close-to-zero cost."  (PX 149.)  Bürger stated that the "[k]ey is to implement the right structure to minimize the risk that old creditors of SBT can jeopardize the whole restructuring."  (Id.)

When Mende responded to Bürger a day later, he forwarded it to Sigrist with the comment, "Here his [sic] answer!"  (Id.)  Mende's answer was that he "agree[d] with the strategy and make sure we isolate AMCI from any SBT liabilities" and that "Primecarbon could be used for any new business.  Important is that we don't transfer legal SBT liabilities to AG."  (Id.)  Mende emailed Bürger on October 28, and inquired: "how far you with the re organization of SBT?  What is the latest . . . ."  (PX 532.)  Bürger responded the next day, "SBT'S lawyer (Wild) provided a draft agreement for the transfer of assets which SBT, Wild and Christian will discuss next Tuesday.  The neutral assessor Elmiger is still working on his evaluation that the proposed transfer is at arm's length."  (Id.)

As noted above, on December 23, 2009, SBT entered into an agreement to transfer all of SBT's assets and all of its liabilities, excluding its liability to CBF and certain other limited carveouts, for the price of $1.00; the transaction was effective retroactively to

---

[22] Thomas Bürger reported to Mende and served as CFO for most of the European subsidiaries of companies under the control of Mende.  (Mende Dep. at 62, 66, 132 (PX 606); Bürger Dep. at 16 (PX 625).)

November 3, 2009.  (PX 50, PX 352.)  On January 6, 2010, Mende wrote to Bürger,

"Furthermore I don't want Prime Carbon or SBT to handle any cash unless you or Ornella or I

authorize it.  In other words we need to control any incoming and outgoing cash . . . no ifs no

buts, no exception."  (PX 159; ellipsis in original.)

      In the second step discussed above, the now-former subsidiary of SBT, defendant

Primetrade, was transferred to defendant AMCI Holdings for what a reasonable jury could find

was less than full value.  On January 28, 2010, Mende executed the transaction on behalf of both

defendants Prime Carbon and AMCI Holdings.  (PX 48.)  A reasonable jury could draw the

inference that the second step – the transfer of Primetrade – was insurance against the possibility

that CBF or SBT's other creditor could reach the assets of Prime Carbon.

      Based on the foregoing evidence, a reasonable jury could conclude that Mende

and the corporate defendants abused the separate personalities of the corporations within

Mende's group of companies.  More specifically, a reasonable jury could conclude that Mende,

though not an officer or director of SBT, controlled the actions of SBT for his personal benefit

and to the detriment of SBT, by guiding and assenting to a set of actions that led to SBT's

bankruptcy.  The transfer of assets from SBT to Prime Carbon, without the transfer of liabilities

owed to CBF and another creditor, caused SBT to be undercapitalized.  A reasonable jury could

conclude that through his domination and control of SBT and other corporate affiliates, Mende

set in motion the two steps thought necessary to insulate himself and the other intermediate

corporate affiliates from SBT's liabilities.  First, substantially all of the assets of SBT were

transferred to Prime Carbon, but none of the liabilities owed to CBF or to a second creditor.  In

context with other evidence submitted on this motion, a reasonable jury could conclude that

Mende himself authorized the stripping of SBT's assets, leaving it insolvent, and that he had the

power to force the transaction on SBT.  Prime Carbon, of which Mende was Chairman, then

proceeded to carry on SBT's business, from the same offices with many of the same employees

and the same accountant.  (PX 525 Resp. 3.)  As noted, one important customer was informed,

"We are pleased to announce that Steel Base Trade AG has changed its name to Prime Carbon

AG which is a subsidiary of AMCI," and that "we kindly as you to effect all payment as of 4th

January 2010 to the following new bank accounts in favour of Prime Carbon AG."  (PX 555; see

also PX 528, 556-57, 687; DX 39, 83.)

   A reasonable jury could conclude that SBT, under the direction and control of

Mende and intermediate affiliates, approved or ratified SBT's lawyers highly misleading

statement to the arbitral panel intended to induce it to delay defer or deny any interim or

conservatory measures to the detriment of CBF.  A reasonable jury also could conclude that

Mende exercised economic dominance over SBT, as well as defendants Prime Carbon, AMCI

Holding, American Metals and Primetrade, and treated them as one.  The jury could also

conclude that Mende's dominance and the (dominance of intermediaries over other affiliates)

was based on share ownership, which resulted in an identity of economic interests.  A reasonable

jury could conclude that the transfer of CBF's assets but its liabilities to Prime Carbon, and the

transfer of the Primetrade subsidiary from Prime Carbon, was an abuse of corporate

separateness, and that such conduct damaged CBF, a creditor to SBT.

   Summary judgment will therefore be denied to defendants on the First Claim for

Relief.

   IV. Based on a Substantive Requirement of Swiss Law, the Second Claim
     Will Be Dismissed without Prejudice to Reinstatement.

   Defendants move for summary judgment in their favor on CBF's second claim,

which asserts fraudulent conveyance under New York law.  As will be explained, the Court

concludes that as a creditor of SBT, the substantive law of Switzerland requires CBF to obtain an assignment from SBT's bankruptcy estate as a precondition for seeking the clawback of SBT's assets.  CBF's fraudulent conveyance claim will therefore be dismissed without prejudice to reinstatement in the event that CBF receives such an assignment.

In the Second Claim, CBF alleges that two separate transfers were made "with the actual intent to hinder, delay, or defraud Plaintiffs in their efforts to collect on whatever award would be issued by the ICC Paris."  (Compl. ¶¶ 165-66.)  The first transfer occurred when SBT's assets, including its stock in Primetrade, were transferred to Prime Carbon in December 2009.  The second transfer occurred when Prime Carbon transferred the stock of Primetrade to AMCI Holdings in or about January 2010.

CBF brings claims of fraudulent conveyance under sections 276 and 276-a of New York Debtor & Creditor Law.[23]  Prior to a legislative amendment that postdated CBF's filing of the Third Amended Complaint, section 276 provided that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  The successor provision, numbered as section 273(a)(1), now provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor."  Section 276-a permits an award of attorneys' fees and costs.

CBF argues that New York law applies and defendants argue that Swiss law applies.  Because subject matter jurisdiction over the fraudulent conveyance claim is premised on

_____

[23] New York amended the Debtor and Creditor Law, effective April 4, 2020, with certain provisions of section 276 now codified in sections 273 and 274.  See 2019 Sess. Law News of N.Y. Ch. 580 (A. 5622) (McKinney's).

the Court's supplemental jurisdiction, 28 U.S.C. § 1367, the Court applies the forum state's

choice-of-law rules.  Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989) (a "federal court

sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply

the choice of law rules of the forum state."); see also Access 4 All Inc. v. Trump Int'l Hotel &

Tower Condo., 2007 WL 633951, at *3 (S.D.N.Y. Feb. 26, 2007) (Karas, J.) (collecting cases).

Fraudulent-conveyance claims under the New York statute are considered tort

claims.  Wimbledon Fund, SPC v. Weston Cap. Partners Master Fund II, Ltd., 184 A.D.3d 448,

450 (1st Dep't 2020); Drenis v. Haligiannis, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) (Holwell,

J.).  New York employs the following choice-of-law framework to tort claims:

> In the context of tort law, New York utilizes interest analysis to
> determine which of two competing jurisdictions has the greater
> interest in having its law applied in the litigation.  The greater
> interest is determined by an evaluation of the facts or contacts which
> relate to the purpose of the particular law in conflict.  Two separate
> inquiries are thereby required to determine the greater interest: (1)
> what are the significant contacts and in which jurisdiction are they
> located; and, (2) whether the purpose of the law is to regulate
> conduct or allocate loss.

Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 521 (1994) (internal citation and quotation

marks omitted).

As noted, CBF asserts that two conveyances were fraudulent.  Both transactions

shared a common purpose: moving SBT's assets out of reach from CBF.  As to the SBT-to-

Prime Carbon transfers, SBT was a corporation organized under the laws of Switzerland with its

headquarters in Switzerland.  Prime Carbon is also organized under Swiss law with its

headquarters in Switzerland.  The allegedly injured parties in the transfer are Brazilian

corporations headquartered in Brazil.  The nexus to New York is minimal.  Hans Mende is a

former domiciliary of New York who resides from time to time in New York, and the action was filed in New York.  No defendant is organized under New York law or has its headquarters here.

As to the Prime Carbon-to-AMCI Holdings transfer, Prime Carbon is, as noted, organized and headquartered in Switzerland.  AMCI Holdings is a Delaware corporation headquartered in Greenwich, Connecticut.  The subject of the transfer was Primetrade, which is a corporation organized under the laws of Delaware with its principal place of business in North Carolina.  The contacts to Brazil and New York are as outlined above.[24]

Before drawing a conclusion, the Court turns to the second prong of the New York's choice of law analysis for tort claims: whether the purpose of the law to be applied is to regulate conduct or to allocate loss.  The concept was explained in Padula:

> Conduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring.  If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.

84 N.Y.2d at 522 (citations and quotation marks omitted).[25]

CBF's experts describe relevant Swiss laws in terms that support the conclusion that they are conduct-regulating rules, because they provide a remedy for unlawful acts:

> The purpose of the claw-back actions in art. 285 et seqq. DEBA is to reinstate the assets of the debtor into the state they would have been, had the legal acts falling under . . . art. 288 DEBA (claw back based on intent) not taken place.  Assets, which were – as matter of debt enforcement law – illegitimately alienated, are returned into the bankruptcy estate.

(Bär & Karrer Report ¶ 80 (PX 567) (emphasis in original).)

---

[24] No party argues for the application of Brazil, Delaware or Connecticut law.

[25] "Loss allocating rules, on the other hand, are those which prohibit, assign, or limit liability after the tort occurs, such as charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules.  Where the conflicting rules at issue are loss allocating and the parties to the lawsuit share a common domicile, the loss allocation rule of the common domicile will apply."  Id. (citations omitted).

Because rules prohibiting conveyances for the purpose of hindering creditors are conduct-regulating rules designed to provide a remedy for their violation, the place where the tort occurred is significant.  Sigrist, Wild and [Bürger] were based in Switzerland.  Mende met with Sigrist in Switzerland to discuss the restructuring.  (PX 316; DX 224 at 273-74.)  The two asset transfers were from Swiss corporations: SBT and Prime Carbon.  A wrongful asset transfer from a corporation headquartered in Switzerland and organized under Swiss law is a wrong with its situs in Switzerland.

Based on the foregoing, the Court concludes that Switzerland is the jurisdiction with the great interest in applying its laws.  This conclusion is bolstered by a provision of New York law that became effective on April 4, 2020: "A claim for relief in the nature of relief under this article [i.e., New York's Debtor & Creditor Law] is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."  N.Y. Debtor & Creditor L. § 279(b).

 Lastly, before making the final determination of whether Swiss law applies to the entirety of CBF's fraudulent conveyance claim, the Court need also consider whether there is an actual conflict between New York and Swiss law.  Kinsey v. New York Times Co., 991 F.3d 171, 176 (2d Cir. 2021).  "An actual conflict exists when the applicable law from each jurisdiction provides different substantive rules and those rules have the potential to affect the outcome of the case significantly."  Dish Network Corp. v. Ace Am. Ins. Co., 431 F. Supp. 3d 415, 422 (S.D.N.Y. 2019) (Carter, J.) (citing Finance One Public Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005)).  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012).

The Court concludes that while there is no significant difference between New York and Swiss law on the standard to be applied to defining a fraudulent conveyance,[26] there is a significant difference between New York and Swiss law as to who may bring the claim.  As will be seen, under Swiss law the fraudulent conveyance claim belongs to the bankrupt estate and may not be asserted by a creditor – such as CBF – absent an assignment.

Defendants persuasively argue that Swiss clawback principles, as applied to an entity in Swiss bankruptcy such as SBT, diverge significantly from those of New York.  Defendants urge that Swiss law would not recognize CBF's standing to pursue a fraudulent conveyance claim, and that under Swiss law, any fraudulent transfer against SBT would belong to the bankruptcy estate.  (Def. Mem. at 26; Rüd Report ¶¶ 76, 120 (PX 566).)  In order to pursue a clawback claim, a creditor such as CBF would be required to apply to the Swiss bankruptcy court for an assignment from the bankruptcy estate.  (Def. Mem. at 26; Rüd Report ¶ 121 (PX 566).)  CBF did not make such an application to the bankruptcy court.  (Id. ¶¶ 37, 75.)

CBF counters that Switzerland's requirement for an assignment is a procedural rule that does not go toward a creditor's substantive rights, and that SBT's creditors lacked the facts necessary to seek the assignment of a clawback claim at the time Swiss bankruptcy proceedings were underway.  (Pl. Mem. at 28-30.)

CBF analogizes Switzerland's requirement of an assignment to a Cayman Islands requirement that a plaintiff receive initial judicial approval before asserting a derivative claim,

---

[26] Defendants conceded at argument that "there may be some small differences, but I agree, your Honor, they are very similar."  (Nov. 9, 2022 Tr. at 40.)  Insofar as is relevant here, under Swiss law, "all legal acts which the debtor has undertaken within the last five years before the . . . the declaration of bankruptcy can be rescinded if the debtor acted with the recognizable intent of disadvantaging his creditors or favoring individual creditors to the detriment of others." Article 288, paragraph 1 of the Swiss Debt Enforcement and Bankruptcy Act ("DEBA") (quoted in Bär & Karrer Report ¶ 82 (PX 567)).  The New York statute is quoted in full at the beginning of this section refers to a transfer made  "with an actual intent to hinder, delay or defraud any creditor of the debtor."  N.Y. Debtor & Creditor L. § 273(a)(1).

which the New York Court of Appeals held to be procedural and inapplicable to an action

brought in state court.  Davis v. Scotland Re Grp. Ltd., 30 N.Y.3d 247 (2017).  Davis described

the Cayman Islands requirement as serving a "gatekeeping function, but only as to derivative

actions brought in the Cayman Islands . . . ."  Id. at 254.  The Davis court noted that New York

had its own gatekeeping rules that would apply to the action in New York court, including

motions to dismiss or for summary judgment.  Id. at 257.  A well-reasoned opinion by a justice

of New York County's Commercial Division distinguished the circumstance in Davis from a

requirement under English law that a derivative action be brought by a "member of a company,"

describing the latter as a substantive rule that deprived the holder of American Depositary Shares

of standing.  City of Aventura Police Officers' Ret. Fund v. Arison, 70 Misc.3d 234, 245 (N.Y.

Sup. Ct. N.Y Cnty. 2020) ("In sum, the court finds that the internal affairs doctrine requires

consideration and application of substantive English law to decide Plaintiff's standing to sue

derivatively.") (Cohen, J.).

　　　　　　CBF does not dispute that Swiss law requires an assignment, but argues that the

requirement is procedural.  CBF's own experts concedes: "If claw-back claims pursuant to art.

285 et seq. DEBA are discovered only after formal closing of the bankruptcy proceedings,

standing to sue must be obtained by any bankruptcy creditor."  (Bär & Karrer Report ¶ 122 (PX

567) (emphasis added).)  But Swiss law does not merely require that a would-be creditor who

wishes to bring a clawback claim obtain a piece of paper called an assignment.  Rather, the

clawback claim is the property of the bankruptcy estate.  This is a substantive principle that

limits standing in the same manner as the rule in City of Aventura.  It allows a single creditor,

such as CBF, to seek an assignment of the bankrupt's claim, which, if granted, may be subject to

conditions.  According to CBF, applying the Swiss requirement that a creditor obtain an

assignment does not doom its claim. "Swiss law permits creditors to reopen closed bankruptcy proceeding and obtain an assignment to assert 'new' or 'doubtful' claims." (Pl. Mem. at 28.)

The Court will dismiss the Second Claim without prejudice to reinstatement in the event that (1) CBF applies within 45 days of this Opinion and Order to reopen the SBT bankruptcy and seeks an assignment of clawback claims; and (2) an assignment of any clawback claims is obtained from the proper Swiss bankruptcy officials in 180 days. The Court will deny without prejudice all other defenses raised by defendants to the Second Claim without prejudice to renewal in the event that the proper assignment is obtained.

> V.     CBF's Summary Judgment Motion Directed to the 31 Affirmative
>        <u>Defenses Is Granted in Part and Denied in Part.</u>

CBF seeks summary judgment dismissing 31 affirmative defenses asserted by defendants. As is typical of affirmative defenses, they are short, concise and lacking in detail and, thus, difficult to adjudicate on a summary judgment motion. With the encouragement of the Court, a stipulation of the parties has since narrowed the scope of CBF's motion. (Doc 645.) Accepting the stipulation, the Court rules as follows:

Affirmative defenses 18-20, 22, 24-26 are withdrawn.

Affirmative defenses 1, 4, 8 are preserved for appeal and require no ruling from this Court.

Affirmative defenses 10-11, 21, 23 and 27 are withdrawn as affirmative defenses and asserted only as specific denials.

The Court accepts the parties' joint request that a ruling on affirmative defenses 15 and 30-31 be deferred.

Affirmative defense 13 relates to the Second Claim, which has been dismissed subject to possible reinstatement.  The Court will allow defense 13 to stand, subject to a further ruling if appropriate.

Summary judgment is granted striking affirmative defense 16, asserting the Court lacks subject matter jurisdiction, for reasons stated herein, without prejudice to the right of any party to raise lack of subject matter jurisdiction at any point in the proceeding if there is a valid basis to do so.

Summary judgment is granted striking affirmative defenses 2 and 3, asserting issue and claim preclusion, for reasons previously stated in the discussion of issue and claim preclusion.

Summary judgment is granted striking affirmative defense 5 for reasons previously stated in the discussion of Article V defenses.

Summary judgment is granted striking affirmative defenses 6, 7 and 29, asserting that claims against defendants are foreclosed either because they were neither party to the arbitration agreement nor party to the arbitration, or because they are foreclosed by the Second Circuit's ruling in this case and/or this Court's ruling on the Article V defenses.

Summary judgment is granted striking affirmative defense 28, which asserts untimeliness, as to the First Claim.  Because the Second Claim will be dismissed, and is subject to reinstatement in the event of assignment from the Swiss bankruptcy authorities, the timeliness defense will stand for now as to the Second Claim.

Summary judgment will be denied with regard to affirmative defenses 9, 12, 14 and 17.  They assert that by reason of the SBT bankruptcy proceedings, any potential alter ego or successor status of defendants ended (9), CBF's claims against other defendants are released

(12), an assignment of rights to another creditor in the SBT bankruptcy proceedings forecloses any claim against defendants (14), and that the bankruptcy proceedings in Switzerland should be respected as final and dispositive under principles of international comity (17).  Because this Opinion and Order contemplates CBF moving to reopen the SBT bankruptcy proceedings, it will allow these affirmative defenses to stand for now.

CONCLUSION

Defendants' summary judgment motion as to the First Claim is GRANTED to the extent plaintiffs seek to proceed on a theory of successor liability but DENIED to the extent plaintiffs seek to proceed on an alter-ego or veil-piercing theory.  The Second Claim is dismissed but subject to reinstatement in the event that (1) CBF applies within 45 days of this Order to reopen the SBT bankruptcy and seeks an assignment of clawback claims; and (2) an assignment of any clawback claims is obtained from the proper Swiss bankruptcy officials within 180 days of this Order.

Plaintiffs' summary judgment motion is GRANTED as to affirmative defenses 2, 3, 5, 6, 7, 16 and 29 and DENIED as to affirmative defenses 9, 12, 13, 14, 17 and 28.  All other affirmative defenses are withdrawn, deferred, or preserved for appeal, as set forth above.

The Clerk is respectfully directed to terminate the motions.  (Doc 539, 563.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        January 13, 2023